# 22-2634

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

BANDY LEE,

*Plaintiff-Appellant,*

v.

YALE UNIVERSITY,

*Defendant-Appellee.*

On Appeal from the United States District Court
For the District of Connecticut
Case No. 3:21-cv-00389
The Honorable Sarah A.L. Merriam, U.S.C.J.

PLAINTIFF-APPELLANT'S OPENING BRIEF

Todd Steigman
Madsen, Prestley & Parenteau, LLC
402 Asylum Street
Hartford CT 06103
Tel.: (860) 246-2466
tsteigman@mppjustice.com
*Counsel for Plaintiff-Appellant*

Dated: December 23, 2022

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................................ 1

STATEMENT OF THE ISSUES............................................................................2

STATEMENT OF THE CASE................................................................................4

    A. Plaintiff's Employment and Faculty Appointment at Yale ...............................6

    B. Yale's Contractual Commitments to Protecting Academic Freedom and
       Free Expression ...........................................................................9

    C. Plaintiff Exercised Free Expression and Academic Freedom on Matters of
       Public Concern ...........................................................................15

    D. Yale Discontinued Plaintiff's Employment and Appointment Because of Her
       Public Statements, Free Expression, and Exercise of Academic Freedom, and
       Offered Pretextual and Arbitrary Explanations ........................................18

SUMMARY OF THE ARGUMENT ....................................................................26

ARGUMENT ......................................................................................................28

  I.  Court Erred by Dismissing Breach of Contract Claim ...................…..……..28

    A. Plaintiff Successfully Alleged a Breach of Contract Claim ……………28

    B. The Court Misconstrued Plaintiff's Breach of Contract Claim …………38

    C. Factual Issues Relating to Breach of Contract Claim Should be
       Resolved by Jury on Full Record, Not by the Court on a Rule 12(b)(6)
       motion …………………………………………………………………..41

    D. The District Court Erred by Considering Hearsay for the Truth ……….44

  II. Court Erred by Dismissing Claim for Breach of Contract of Good Faith
     and Fair Dealing ……………………..………………………………… 47

  III. Court Erred by Dismissing Section 31-51q Claim ……………………… 49

    A. Meaning of "Employee" in Section 31-51q Should be Consistent
       With Section 31-51m…..………………………………………………..49

B. Alternatively, the District Court Erred by Dismissing Plaintiff's
Section 31-51q Claim Based on the Remuneration Test .................56

D. Dismissal on Rule 12(b)(6) Motion was Improper .......................58

CONCLUSION ...................................................................................59

CERTIFICATE OF COMPLIANCE.......................................................60

CERTIFICATE OF SERVICE ............................................................. 60

# TABLE OF AUTHORITIES

*Berkowitz v. President & Fellows of Harvard Coll.*, 58 Mass. App. Ct. 262 (2003) …………………………………………………………… 31

*Byrne v. Yale University*, 450 F.Supp. 3d 105 (D.Conn. 2020) …………. *passim*

*Cloud v. Trustees of Boston Univ.*, 720 F.2d 721 (1st Cir. 1983) ………… 31

*Coelho v. Posi-Seal International, Inc.*, 208 Conn. 106 (1988) ………… 31,41,42

*Comm'n on Human Rights & Opportunities v. Echo Hose Ambulance*, 322 Conn. 154 (2016) …………………………………………………… 54,56

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 104 L.Ed. 2d 811, 109 S.Ct. 2166 (1989) …………………………………………….. 56

*Cotto v. United Techs. Corp.*, 251 Conn. 1 (1999) ……………………… 53,54

*Craine v. Trinity College*, 259 Conn. 625 (2002) ……….……………. *passim*

*Daley v. Wesleyan Univ.*, 63 Conn. App. 119 (2001) ………..………….. 44

*Doe v. Columbia Univ.,* 831 F.3d 46 (2d Cir. 2016)……………..……….. 6,28,41

*Doe v. New York Univ.*, No. 1:20-cv-01343, 2021 U.S. Dist. LEXIS 62985 (S.D.N.Y. Mar. 31, 2021) …………..……………………………….. 45

*Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54 (2d Cir. 1987) ……..…………………………………………………….. 24,38

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263 (S.D.N.Y. 2016) …………….……………………………. 12,13

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ………………………………. 54

*Gaudio v. Griffin Health Servs. Corp.*, 249 Conn. 523 (1999) ………….. 28,41,42

*Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385 (2016)………. 48

*Hartwig v. Albertus Magnus College*, 93 F.Supp. 2d 200 (D.Conn. 2000). *passim*

*Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.,* 311 F.3d 534 (2d Cir. 2002) ……………..……… 12,13

*Jauhari v. Sacred Heart University*, No. 3:16-cv-680(DJS), 2019 U.S. Dist. LEXIS 230470 (D.Conn. Aug. 13, 2019) ………………………… 29,30,44

*Lynch v. City of N.Y.*, 952 F.3d 67 (2d Cir. 2020) ……………………… 41

*Lyons v. Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977)………. 31

*McAdams v. Marquette Univ.*, 914 N.W.2d 708 (Wisc. 2018) ………….. 33

*Magnan v. Anaconda Indus.*, 193 Conn. 558 (1984) …………………… 31

*Meade v. Yale Univ.*, CV054016155, 2006 Conn. Super. LEXIS 2720 (Conn. Super. Sept. 7, 2006) …………………..…………………………. 31

*Neiman v. Yale Univ.*, 270 Conn. 244 (2004) …………..……………… 33

*Nielsen v. Rabin*, 746 F.3d 58 (2d Cir. 2014) …………………………… 45

*Oblin Homes v. Vill. of Dobbs Ferry*, No. 96-9188, 1997 U.S. App. LEXIS 29859 (2d Cir. Oct. 30, 1997) ………………..……………….. 24

*Pollalis v. President & Fellows of Harvard Coll.*, 95 Mass. App. Ct. 1103 (2019) …………………………………………………………… 30

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ……………..………… 28,45,46

*State v. Wright*, 320 Conn. 781, 801 (2016) ……………………….. 51

iv

*Torosyan v. Boehringer Ingelheim Pharmaceuticals*, 234 Conn. 1
  (1995) ………………………………………………………….. 41

*Trusz v. UBS Realty Investors LLC*, 319 Conn. 175 (2015) …………….. 54

*United States v. City of N.Y.*, 359 F.3d 83 (2d Cir. 2004) ……..………… 56,57

*Weinstein v. Univ. of Conn.*, HHD-CV-11-6027112-S,
2022 Conn. Super. LEXIS 1421 (Super. Ct. June 30, 2022) …………… 40,52

*Young v. City of Bridgeport*, 135 Conn. App. 699 (2012) ………………. 53

Rules

Fed. R. Evid. Rule 801 ……………………………………………. 45,46

Fed. R. Evid. Rule 802 ……………………………………………. 45,46

Statutes

Connecticut General Statutes §31-51q ………………………………… *passim*

Connecticut General Statutes §1-2z ………………………………… 50,52

Connecticut General Statutes §1-1(a) ……………………………….... 50

Connecticut General Statutes §31-51m ………………………………… 50,52,55

Connecticut General Statutes §46a-51 *et. seq.* ………………………… 52,54

Connecticut General Statutes §46a-60 ………………………..………… 54,55

Other Authority

Black's Law Dictionary, 11th Ed. 2019 ………………………………… 50,51

# JURISDICTIONAL STATEMENT

Plaintiff-Appellant Bandy Lee appeals from the decision by the District Court (Merriam, J.) dismissing the case. (SA 1-46.) The District Court had subject matter jurisdiction over Plaintiff's federal court complaint pursuant to 28 U.S.C. § 1332 because the parties are diverse and the matter in controversy exceeds $75,000.00. (SA 1, fn.1.). This Court has jurisdiction over Plaintiff's appeal because Plaintiff appeals from a final decision pursuant to 28 U.S.C. § 1291. The District Court dismissed all claims and entered judgment against Plaintiff (SA 1-46, 50).

The District Court granted Defendant's motion to dismiss and entered judgment against Plaintiff on August 30, 2022 (SA 1-46, 50.) On September 21, 2022, less than thirty days after the entry of the judgment, the District Court extended Plaintiff's deadline to file her notice of appeal until October 17, 2022. (Dist. Ct. CM/ECF No. 55, JA 5.) Plaintiff filed her notice of appeal on October 6, 2022, (JA 271-72), the same date on which the District Court denied Plaintiff's motion for permission to seek reconsideration. (Dist. Ct. CM/ECF No. 58, JA 5-6.)

## STATEMENT OF THE ISSUES

(1) Whether the District Court erred by not accepting Plaintiff's allegations in the Amended Complaint as true, by accepting or finding facts in favor of Defendant and against Plaintiff, by not drawing inferences from those allegations in the light most favorable to Plaintiff, and by not construing the complaint liberally.

(2) In deciding Plaintiff's claim for breach of implied contract, whether the District Court erred in concluding that Plaintiff failed to state a claim.

(3) In deciding Plaintiff's claim for breach of implied contract, whether the District Court erred by incorrectly construing Plaintiff's claim in a manner that deviated from the claim that Plaintiff alleged in her Amended Complaint, including by framing Plaintiff's claim as requiring a disregard for whether Defendant found that she was no longer qualified for her position.

(4) In deciding Plaintiff's claim for breach of implied contract, whether the District Court erred by concluding that the absence of a contractual guarantee of continued reappointment constituted a basis for dismissing Plaintiff's claim.

(5) In deciding Plaintiff's claim for breach of contract, whether the District Court erred by considering the content of documents outside of the pleadings for the truth of what was stated in the documents, and not merely to verify what was stated in the documents.

2

(6) Whether the District Court erred in dismissing Plaintiff's claim for breach of the covenant of good faith and fair dealing.

(7) Whether the District Court erred in dismissing Plaintiff's claim under Conn. Gen. Stat. § 31-51q on the grounds that Plaintiff failed to sufficiently allege that she was an employee for purposes of the statute.

(8) Whether the District Court erred by applying an incorrect definition of "employee" for purposes of Plaintiff's claim under Conn. Gen. Stat. § 31-51q.

## STATEMENT OF THE CASE

This is an employment case brought by Plaintiff, Dr. Bandy Lee ("Plaintiff"), against her former employer, Yale University ("Defendant" or "Yale"). For seventeen years, from 2003 until 2020, Plaintiff held a faculty appointment with Defendant. She served as a faculty member of the Law and Psychiatry Division at Yale School of Medicine, and also taught courses at Yale Law School. After Defendant discontinued Plaintiff's faculty appointment, Plaintiff filed state law claims against Defendant in U.S. District Court in Connecticut on March 22, 2021. (JA-7-27.)

On August 21, 2021, Plaintiff filed an Amended Complaint. (JA-28-50.) Through her Amended Complaint, Plaintiff alleged that Defendant terminated her employment and her faculty appointment in 2020 in violation of an express and implied contract pursuant to which Defendant guaranteed protections for academic freedom and free expression as a right and privilege at Yale, and that Defendant also retaliated against Plaintiff in violation of Section 31-51q of the Connecticut General Statutes because she engaged in constitutionally protected speech on matters of public concern. Plaintiff also asserted common law claims against Defendant for breach of the covenant of good faith and fair dealing and negligent misrepresentation. (JA-28-50.)

On August 30, 2022, the District Court (Merriam, J.) granted Defendant's motion to dismiss under Rule 12(b)(6) and entered judgment in favor of Defendant. (SA 1-46, 50.)  The District Court held that Plaintiff failed to state a claim for a breach of implied contract, and that in the absence of a contract, Plaintiff's claim for breach of the covenant of good faith and fair dealing must also be dismissed. The District Court also held that Plaintiff failed to state a claim under Conn. Gen. Stat. § 31-51q because Plaintiff failed to sufficiently allege that she was an employee under the "remuneration test" which the Court used to control the meaning of "employee" under the statute.  The District Court also dismissed Plaintiff's claim for negligent misrepresentation.  (SA 1-46). *Lee v. Yale Univ.*, No. 3:21CV00389(SALM), 2022 U.S. Dist. LEXIS 155782 (D. Conn. Aug. 30, 2022).

In accordance with its Ruling granting Defendant's motion to dismiss, the Court entered judgment in favor of Defendant.  (SA 50.)  On October 6, 2022, the District Court denied Plaintiff's motion seeking leave to file a motion for reconsideration.  (JA 5-6, Doc. No. 58.)  On that same date, well in advance of the October 17, 2022, deadline established by the District Court (Dist. Ct. CM/ECF No. 55, JA-5), Plaintiff filed her notice of appeal.  (JA-271.)

Since the District Court dismissed Plaintiff's claims in response to a motion to dismiss filed under Rule 12(b)(6), this Court must accept the truth of the facts alleged in the Amended Complaint, draw all reasonable inferences in Plaintiff's

5

favor, and construe ambiguities in the light most favorable to Plaintiff. *Doe v. Columbia Univ.*, 831 F.3d 46, 48-49 (2d Cir. 2016).

A.     Plaintiff's Employment and Faculty Appointment at Yale

After graduating from Yale School of Medicine in 1994 and earning a Masters of Divinity from Yale Divinity School in 1995, Plaintiff returned to Yale in 2003 as a member of the faculty.  (Am. Compl. ¶ 2, JA-29.)  In 2003, Yale appointed Plaintiff as an Assistant Clinical Professor, Law and Psychiatry Division, in the Yale School of Medicine.  (Am. Compl. ¶ 2, JA-29.)  Plaintiff continued working at Yale in that faculty appointment for the next 17 years, during which time she also taught courses at Yale Law School for 15 years.  (Am. Compl. ¶ 9, JA-30.)  Plaintiff's appointment required that she participate in four hours of student-related, teaching, or supervisory activities per week, such as teaching, lecturing, advising students, supervising residents, participating in seminars and rounds, engaging in scholarly activity, and participating in department administration.  Plaintiff more than satisfied this weekly requirement on an annual basis.  (Am. Compl. ¶ 12, JA-30-31.)  Plaintiff also served as the Director of the Violence and Health Study Group of the MacMillan Center for International and Area Studies at Yale University, and as the Director of Research for the Center for the Study of Violence at Yale.  (Am. Compl. ¶ 16, JA-32.)  Plaintiff also provided expert review and consultation services to Yale Law School and its Legal Clinics

6

in support of asylum, criminal justice, and veteran, claims that were being pursued by Yale Law School clinics and students. (Am. Compl. ¶ 16, JA-32.) Plaintiff also contributed to the launch of Yale's Global Health Initiative and created a popular Global Health Studies course at Yale College: "Violence: Causes and Cures." The popularity of Plaintiff's Global Health Studies course led the Education Studies program at Yale College to also recruit Plaintiff to teach a course. (Am. Compl. ¶ 17, JA-33.)

In exchange for the work and services that Plaintiff provided to Yale and its students, Yale provided Plaintiff with benefits, privileges, and opportunities, including office space, facilities, libraries, subscription-based access to research databases and journal articles, statisticians, laboratories, statistical programs and software, IT and technology services, computer programs and software, media studios, and campus transportation. (Am. Compl. ¶¶ 13-14, JA-31.) During her tenure as a Yale faculty member, Plaintiff also received research grants that she could only have obtained based upon her academic affiliation. (Am. Compl. ¶ 20, JA-33.) Yale also provided Plaintiff with malpractice insurance coverage for her forensic consultations. These benefits, privileges, and opportunities and related compensation or other indirect but significant remuneration would cost Plaintiff thousands, if not tens of thousands, of dollars if Plaintiff were to obtain them on her own. (Am. Compl. ¶ 14, JA-31.)

7

Through her affiliation with Yale, as well as partnerships that Yale had with other entities, Plaintiff was able to provide clinical work at maximum security prisons and in state hospitals, in addition to working as an expert witness. Plaintiff received monetary remuneration for her services in these matters, which were referred to her solely due to her faculty appointment and affiliation with Yale. (Am. Compl. ¶ 15, JA-32.) In addition, as a direct result of Plaintiff's academic affiliation and faculty appointment at Yale, Plaintiff received appointments and opportunities to work with the World Health Organization, the United Nations, state and international governments, and other prestigious universities. (Am. Compl. ¶ 16, JA-5-6.)

Through the resources and benefits that she received due to her faculty appointment at Yale, as well as the courses that she taught for Yale and to its students, Plaintiff became a well-known and reputable scholar on violence prevention with a prodigious record of scholarly publication. (Am. Compl. ¶¶ 17-19, JA-6.) A majority of Plaintiff's income was derived from her faculty appointment, affiliation, and relationship with Yale. (Am. Compl. ¶ 21, JA-34.)

In Plaintiff's experience, and based on a continuing course of dealing between Plaintiff and Yale, Dr. Lee was not required to apply for the renewal of her appointment. Oftentimes, Plaintiff would not receive any written notification about the renewal of her appointment. It was understood by both Plaintiff and

Defendant that Plaintiff's appointment was ongoing, and that she would continue in her role without any specific end date.  (Am. Compl. ¶ 10, JA-30.)

    B.    <u>Yale's Contractual Commitments to Protecting Academic Freedom and Free Expression</u>

 Plaintiff had a contractual relationship with Yale through her faculty appointment.  (Am. Compl. ¶ 59, JA-46.)  Plaintiff's employment and faculty appointment was covered by Yale's Faculty Handbook ("Handbook"), in addition to other policy statements, guidance, regulations, and rules.  (Am. Compl., ¶¶ 42, 61 JA-40, 46.)  The Handbook makes clear that "[t]he policies *included <u>and referred to</u>* in this Handbook form *part of the essential employment understandings* between members of the faculty and the University."  (Am. Compl. ¶ 43, JA-40; Handbook Introduction, JA-75)(emphasis added.)

Rights of academic freedom and freedom of expression are expressly preserved in the Handbook, and elsewhere on Yale's website.  (Am. Compl. ¶ 44, JA-40.)  The very first "policy" that Yale included and referred to in the Handbook affirmed Yale's commitment to protecting academic freedom and freedom of expression.  In Section II of the Handbook, entitled "Academic Freedom and Faculty Standards of Conduct," Yale set forth the "University Policy on Freedom of Expression."  (Handbook, Section II.A., JA-79.)  The foundation of Yale's policy on freedom of expression is the 1975 Report of the Committee on Freedom of Expression at Yale ("Woodward Report") that is expressly "referred to" in the

9

Handbook and in Yale's policy on freedom of expression. (*Id.*) Yale not only referred to the Woodward Report in its policy on freedom of expression; it included – and emphasized with italics - the following quote from the Woodward Report:

> *The primary function of a university is to discover and disseminate knowledge by means of research and teaching. To fulfill this function a free interchange of ideas is necessary not only within its walls but with the world beyond as well. It follows that a university must do everything possible to ensure within it the fullest degree of intellectual freedom. The history of intellectual growth and discovery clearly demonstrates the need for unfettered freedom, the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable. To curtail free expression strikes twice at intellectual freedom, for whoever deprives another of the right to state unpopular views necessarily also deprives others of the right to listen to those views.*

(*Id.*)(emphasis in original). In Section II.B. of the Handbook, Yale emphasized that Yale faculty, including all University administrators with faculty appointments, were responsible for "preserving the conditions necessary to advance [Yale's] mission, including protection of the freedom of inquiry . . . ." (Handbook Section II.B. & fn. 2, JA-79.)

In addition to the paragraph of the Woodward Report that the Handbook specifically quoted and emphasized, the Woodward Report explained why it was essential for Yale to protect free expression:

> We value freedom of expression precisely because it provides a forum for the new, the provocative, the disturbing, and the unorthodox. Free speech is a barrier to the tyranny of authoritarian or even majority opinion as to the rightness or wrongness of particular doctrines or thoughts.

If the priority assigned to free expression by the nature of a university is to be maintained in practice, clearly the responsibility for maintaining that priority rests with its members. By voluntarily taking up membership in a university and thereby asserting a claim to its rights and privileges, members also acknowledge the existence of certain obligations upon themselves and their fellows. Above all, every member of the university has an obligation to permit free expression in the university. No member has a right to prevent such expression. Every official of the university, moreover, has a special obligation to foster free expression and to ensure that it is not obstructed.

The strength of these obligations, and the willingness to respect and comply with them, probably depend less on the expectation of punishment for violation than they do on the presence of a widely shared belief in the primacy of free expression. Nonetheless, we believe that the positive obligation to protect and respect free expression shared by all members of the university should be enforced by appropriate formal sanctions, because obstruction of such expression threatens the central function of the university. We further believe that such sanctions should be made explicit, so that potential violators will be aware of the consequences of their intended acts.

In addition to the university's primary obligation to protect free expression there are also ethical responsibilities assumed by each member of the university community, along with the right to enjoy free expression. Though these are much more difficult to state clearly, they are of great importance. If freedom of expression is to serve its purpose, and thus the purpose of the university, it should seek to enhance understanding. Shock, hurt, and anger are not consequences to be weighed lightly. No member of the community with a decent respect for others should use, or encourage others to use, slurs and epithets intended to discredit another's race, ethnic group, religion, or sex. It may sometimes be necessary in a university for civility and mutual respect to be superseded by the need to guarantee free expression. The values superseded are nevertheless important, and every member of the university community should consider them in exercising the fundamental right to free expression.

We have considered the opposing argument that behavior which violates these social and ethical considerations should be made subject to formal sanctions, and the argument that such behavior entitles others to prevent speech they might regard as offensive. Our conviction that the central purpose of the university is to foster the free access of knowledge compels us to reject both of these arguments. They assert a right to prevent free expression. They rest upon the assumption that speech can be suppressed by anyone who deems it false or offensive. They deny what Justice Holmes termed 'freedom for the thought that we hate.' They make the majority, or any willful minority, the arbiters of truth for all. If expression may be prevented, censored or punished, because of its content or because of the motives attributed to those who promote it, then it is no longer free. It will be subordinated to other values that we believe to be of lower priority in a university.

The conclusions we draw, then, are these: even when some members of the university community fail to meet their social and ethical responsibilities, the paramount obligation of the university is to protect their right to free expression. This obligation can and should be enforced by appropriate formal sanctions. If the university's overriding commitment to free expression is to be sustained, secondary social and ethical responsibilities must be left to the informal processes of suasion, example, and argument.

(Woodward Report, Section I, available at https://yalecollege.yale.edu/get-know-

yale-college/office-dean/reports/report-committee-freedom-expression-yale.)[1]

---

[1] In addition to the fact that the Amended Complaint relied on, referred to, and quoted directly from, the Woodward Report (Am. Compl. ¶ 49, JA-42), and the Handbook referred to, quoted directly from, and included a link to the full, Woodward Report (Handbook, Section II.A. & fn. 1, JA-79), it is appropriate for this Court to take judicial notice of the full Woodward Report because it is publicly available on Yale's website and its authenticity should not be questioned. *Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 549 (2d Cir. 2002); *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 295 fn. 27 (S.D.N.Y. 2016)(and cases cited therein).

Yale's commitments to protecting academic freedom and freedom of expression, and Yale's commitment to the principles of the Woodward Report, are reflected on various materials published by Yale on its website, in addition to the Handbook. (Am. Compl. ¶ 44, JA-40.) For instance, the website for Yale's Office of the Secretary and Vice President for University Life confirms that Yale "adopted" the Woodward Report in 1975 "as providing the standard for university policy." https://secretary.yale.edu/student-life/guidance-regarding-free-expression-and-peaceable-assembly-students-yale. Yale's website also confirms that "[t]he Yale College Faculty has formally endorsed as an official policy of Yale College" the paragraphs from the Woodward Report quoted above. (Yale College Undergraduate Regulations 2019-2020, Free Expression, available at http://catalog.yale.edu/archive/2019-2020/undergraduate-regulations/policies/free-expression/.)[2]

Yale's President has also invoked the Woodward Report in public remarks, which Yale republished on its website, to emphasize and reiterate Yale's commitment to protecting freedom of expression. For instance, in his 2014 Freshman Address that Yale published on its website, Yale's President repeatedly

---

[2] This Court can take judicial notice of information published by Yale on its website as its authenticity is not in question. *Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 549 (2d Cir. 2002); *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 295 fn. 27 (S.D.N.Y. 2016)(and cases cited therein).

invoked the Woodward Report to demonstrate Yale's fundamental commitment to protecting free and open expression. (President Salovey's Freshman Address – Professor Woodward's Legacy after 40 Years: Free Expression at Yale, August 22, 2014, available at https://news.yale.edu/2014/08/22/professor-woodwards-legacy-after-40-years-free-expression-yale). In a message to the campus community the following year, Yale's President and one of its Deans stated, "[w]e also affirm Yale's bedrock principle of the freedom to speak and be heard, without fear of intimidation, threats, or harm, and we renew our commitment to this freedom not as a special exception for unpopular or controversial ideas for but for them especially," and made clear that they gave the principles in the Woodward Report their "fullest support." (Affirming our community values: a message from the President and Yale College Dean, November 10, 2015, available at https://news.yale.edu/2015/11/10/affirming-our-community-values-message-president-and-yale-college-dean).[3]

Yale's commitment to protect free expression, as expressed by Yale in the Handbook, the Woodward Report, and elsewhere on Yale's website, was "part of the essential employment understandings between members of the faculty [such as Plaintiff] and the University." (Am. Compl. ¶¶ 43-44, JA-40; Handbook Introduction, JA-75.)

---

[3] See footnote 2, *supra*.

14

C.    Plaintiff Exercised Free Expression and Academic Freedom on Matters of Public Concern

In March 2017, shortly after former President Trump's inauguration, the American Psychiatric Association ("APA") reinterpreted its *Goldwater Rule* in a way that created a gag order, recommending that APA members not comment on public figures, even without diagnosing them and even where there is a responsibility to society to protect public health.  (Am. Compl. ¶ 22, JA-34.)  The APA is a voluntary professional organization of psychiatrists.  Plaintiff has not been a member of the APA since 2007.  (Am. Compl. ¶¶ 23-24, JA-34.)

In 2017, Plaintiff believed that former President Trump posed a dangerous threat to this country and the world.  (Am. Compl. ¶ 25, JA-34.)  In light of that belief, Plaintiff viewed the newly reinterpreted *Goldwater Rule* as contrary to psychiatrists' duties, responsibilities, and role in the interest of public health.  (*Id.*).  For this reason, Plaintiff convened an ethics conference at Yale in April 2017 with some of the most respected members of her profession.  Although Yale did not officially sponsor the conference, Plaintiff discussed the conference with Yale and Yale allowed her to use one of its auditoriums without charge.  The conference drew national attention and led to the public-service book, *The Dangerous Case of Donald Trump: 27 Psychiatrists and Mental Health Experts Assess a President* (hereinafter "*Dangerous Case*").  (*Id.*)

In *Dangerous Case*, Plaintiff and other authors assert that former President Trump's mental health was affecting the mental health of the people of the United States, and further, that he was placing the country at grave risk of involving it in multiple forms of violence and undermining democracy itself as a result of objective signs of dangerous pathology. Consequently, Plaintiff and other authors claim that Trump's presidency represented an emergency which not only allowed, but required, psychiatrists in the United States to sound the alarms. The authors maintain that pointing out danger and calling for an evaluation differs from the medical processes of patient diagnosis, and they have criticized the APA for manipulating professional norms and standards, by changing reasonable ethical guidelines into a gag order under political pressure, because mental health professionals sometimes provide a check against dangerous mental pathology. (Am. Compl. ¶ 27, JA-35.)

The authors featured in *Dangerous Case* represented only a small sample of the many thousands of mental health professionals who came forth in historically unprecedented ways. These psychiatrists formed a professional organization, which expanded internationally to become the World Mental Health Coalition ("WMHC") by the end of 2017. (Am. Compl. ¶ 26, JA-34-35.) The WMHC is the only professional organization to address the issue of dangerous leadership, intending to step in where the APA demurred, and it remains the largest organization of mental

health professionals to speak up against Donald Trump's presidency. (Am. Compl. ¶ 26, JA-35.)

In July 2019, Alan Dershowitz, who was under public scrutiny following revelations about his ties to the late financier Jeffrey Epstein, claimed on Fox News that he had a "perfect, perfect sex life." Dershowitz was a known supporter of Donald Trump. (Am. Compl. ¶ 29, JA-35.)

In December 2019, the United States Congress initiated impeachment proceedings against former President Trump for, among other things, abuse of power following a telephone call with the President of Ukraine in late July 2019. (Am. Compl. ¶ 30, JA-36.) Following the call, Trump repeatedly defended the call as a "perfect conversation" or a "perfect call." Dershowitz was a member of former President Trump's legal team during the impeachment proceedings, which concluded in February 2020. (Am. Compl. ¶ 30, JA-30.)

On January 2, 2020, before the completion of the impeachment proceedings, University of Minnesota Law Professor and Yale Law School alumnus Richard Painter tweeted and tagged Plaintiff to Dershowitz's characterization of his "perfect sex life," stating that Dershowitz's phrasing was similar to Trump's recount of the "perfect" call. Plaintiff responded, "Alan Dershowitz's employing the odd use of 'perfect' … might be dismissed as ordinary influence in most contexts," but she added that "given the severity and spread of 'shared psychosis' among just about all

17

of Trump's followers, a different scenario is more likely," and that scenario was "that he has wholly taken on Trump's symptoms by contagion." (Am. Compl. ¶ 31, JA-36.) When Plaintiff stated "symptoms by contagion," she was not diagnosing or providing a professional opinion about Dershowitz, but was instead making a general statement on a widespread psychological phenomenon of "shared psychosis," which refers to the contagion of symptoms that can happen when a highly symptomatic individual is placed in an influential position. (Am. Compl. ¶ 32, JA-36-37.) Under such conditions, the influential person's symptoms may spread through the population through emotional bonds. Plaintiff has extensive experience with this phenomenon, and she believed that former President Trump's followers were likely to be influenced to some degree by his pathology because of the level of exposure and the exaggerated sense of self and impunity they seemed to share. (*Id.*)

D. Yale Discontinued Plaintiff's Employment and Appointment Because of Her Public Statements, Free Expression, and Exercise of Academic Freedom, and Offered Pretextual and Arbitrary Explanations

On January 11, 2020, Dershowitz complained to Yale, alleged that Plaintiff violated the ethics rules of the APA (an organization of which she is not a member), and requested that Yale take action to discipline Plaintiff and determine whether Plaintiff violated any of Yale's rules. (Am. Compl. ¶ 33, JA-37.) Two days later, on January 13, 2020, Dr. John Krystal, Chair of the Psychiatry Department, took

18

action in response to Mr. Dershowitz's complaint. (Am. Compl. ¶ 34, JA-37.) In his January 13, 2020, e-mail to Plaintiff, Krystal criticized Plaintiff for statements that she reportedly made about former President Trump and about Dershowitz, and warned Plaintiff that if her behavior did not change, Yale would need to terminate Plaintiff's teaching role, which would result in the termination of her faculty appointment. (Am. Compl. ¶ 34, JA-37-38; JA-52.)

Four days later, on January 17, 2020, Krystal called Plaintiff to a meeting that included three additional faculty members, in what was essentially an ambush. In advance of the meeting, Plaintiff was led to believe that she had been invited to a private discussion with her chair and division head. Plaintiff was neither advised that two additional faculty members would be present, nor that the meeting constituted a "review committee," nor that the meeting was called to review her faculty appointment. During the meeting, Plaintiff was accused of breaching psychiatric ethics by "diagnosing" Dershowitz, a conclusion with which Plaintiff strongly disagreed. Plaintiff requested a discussion and an investigation, as she felt that psychiatric ethics had been distorted during the Trump presidency. Yale refused Plaintiff's requests for further discussion and an investigation. (Am. Compl. ¶ 36, JA-38.)

Plaintiff received no further communications from Yale regarding the matter until four months later, on May 17, 2020, when Krystal notified Plaintiff that Yale

was terminating Plaintiff's faculty appointment as of June 30, 2020. (Am. Compl. ¶ 37, JA-38; JA-60.) In the May 17, 2020, letter, Krystal stated that Plaintiff's faculty appointment was ending because "[i]n reviewing your candidacy for reappointment to the voluntary faculty of the Yale Department of Psychiatry, we became aware that you no longer have a formal teaching role in the Division of Law and Psychiatry." (JA-60.)

In response to the May 17, 2020, letter, after unsuccessfully seeking an opportunity to be heard from her department, Plaintiff appealed to the Dean of the School of Medicine, then to the Provost, and then to Yale's President, but Yale denied each of these appeals or requests for review. (Am. Compl. ¶¶ 51, 55, JA-42-43, 45.) However, on September 4, 2020, Krystal sent Plaintiff a letter which purported to explain the basis for the decision to terminate Plaintiff's faculty appointment. (Am. Compl. ¶ 52, JA-43.) While Krystal's May 17, 2020, letter explained the decision, in passive voice, as the result of Yale "bec[oming] aware that [Plaintiff] no longer ha[d] a formal teaching role" as part of its "review of [Plaintiff's] candidacy for reappointment," (JA 60), Krystal's September 4, 2020, letter shifted to different reasons to explain the decision, (Am. Compl. ¶ 52, JA-43; JA-55-58).

In the September 4, 2020, letter, Krystal stated, in part, that "[Plaintiff's] diagnostic impressions of President Trump and several other public figures and [her]

20

recommendations for treating President Trump played a role in our discussion," and specifically identified "public comments" in which Plaintiff allegedly stated "that President Trump was incapacitated by a psychiatric disorder, and … identified symptoms such as aggressive speech, sexual misconduct, incitement to violence, belief in conspiracies, declining cognitive functioning, and neurological deficits," and that "President Trump exhibited a 'pattern of delusions,' was 'lacking rational decision-making capacity,' and had 'definitive signs of severe pathology,' that required 'an advanced level of care,'" and that Plaintiff "called for 'an involuntary evaluation' of President Trump" and expressed a belief that "a mental health hold … will become inevitable." Krystal's September 4, 2020, letter also alleged that Plaintiff "publicly suggested that President Trump, Rudolph Giuliani and Alan Dershowitz had a 'shared psychosis.'" (JA-56.) Krystal then claimed that Plaintiff's actions, and a subsequent discussion, implicated several core competencies and that based on the concerns identified in the letter, "the Committee concluded that the Department should not seek a new teaching role for [Plaintiff]" and the Executive Committee of the Department of Psychiatry then endorsed the recommendation that Plaintiff's teaching duties not be reinstated. (JA-56-57.) Without a formal teaching role, Krystal alleged, Plaintiff's voluntary appointment "lapsed." (JA-57.)

As Plaintiff explicitly alleged, Yale's stated reasons for terminating her faculty appointment are pretextual. (Am. Compl. ¶¶ 37, 53, JA-38, 44.) Plaintiff

also alleged facts, which the Court must accept as true, supporting the conclusion that Yale's stated reasons are arbitrary and pretextual, and demonstrate bad faith. First, Plaintiff clearly and explicitly alleges that Yale terminated her faculty appointment because of her protected speech and in violation of its commitments to not infringe upon Plaintiff's academic freedom and free expression. (Am. Compl. ¶¶ 50, 53, 54, 56, 60-62, 65, 71, JA-42-47.) Therefore, to the extent that Yale offered any reason for its decision other than Plaintiff's protected speech, it is a pretext.

Second, Yale offered shifting explanations for its decision, which also demonstrates pretext. (Am. Compl. ¶ 53, JA-44.)

Third, Yale's original claim that it could not offer Plaintiff a continuing appointment because it "became aware" that she lacked a formal teaching role was exposed as a pretext by Krystal's September 4, 2020, letter which makes clear that Yale could have reinstated Plaintiff's teaching role, but it chose not to do so because of her protected speech. (Am. Compl. ¶¶ 53-54, JA-44-45.) Yale's contention that Plaintiff could not be offered a continuing faculty appointment without a formal teaching role is also belied by the fact that Yale permitted other faculty members to remain on staff even though they lacked formal teaching roles and did not regularly attend seminars. In contrast to those individuals, Plaintiff continued to fully satisfy the requirements of her appointment. (Am. Compl. ¶ 37, JA-38-39.) The Handbook is also devoid of any requirement that faculty members in the rank held by Plaintiff

22

possess a formal teaching role. (Handbook, Section XII.I., JA-178.) Yale's contention that Plaintiff lacked a formal teaching role is also pretextual because the Division Head was aware that Plaintiff had been planning a course with multiple Yale Law School faculty for the Fall 2020 semester. Plaintiff had discussed the curriculum and timetable for the course with Division Head Dr. Zonana, who communicated approval and appreciation for Plaintiff's efforts. (Am. Compl. ¶ 38, JA-39.)

Fourth, the portions of Krystal's September 4, 2020, letter criticizing Plaintiff's public statements regarding President Trump and other public figures are contrary to previous actions and statements by Krystal and the Division Head supporting Plaintiff's work and public statements. (Am. Compl. ¶¶ 38-41, JA-39-40.)

Fifth, Yale violated the procedure required by the Handbook in connection with its decision to terminate Plaintiff's faculty appointment. (Am. Compl. ¶¶ 46-47, JA-41.)

E.    Plaintiff's Claims and Rulings Below

Plaintiff asserted claims for breach of contract (Am. Compl. Count One, JA-46), breach of the implied covenant of good faith and fair dealing (Am. Compl., Count Two, JA-46), violation of Conn. Gen. Stat. § 31-51q (Am. Compl., Count Three, JA-46-47), and negligent misrepresentation (Am. Compl., Count Four, JA-

48). On August 30, 2022, the District Court issued a Ruling and dismissed all four claims ("Ruling"). (SA-1-46.) Shortly thereafter, Plaintiff's previous counsel determined that they were not in a position to represent her in seeking a reversal of the Court's Ruling, or in an appeal. (Dist. Ct. CM/ECF No. 57, pp. 1-2.) Plaintiff acted diligently to retain new counsel and, on September 19, 2022, Plaintiff filed a motion seeking permission to file a motion for reconsideration. (JA-264-270.)

In said motion, Plaintiff notified the District Court that its Ruling misunderstood Plaintiff's contract claim, *see Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 59 (2d Cir. 1987)(reversing summary judgment on First Amendment retaliation claim, in part, because the District Court's decision misunderstood the plaintiff's claim); *Oblin Homes v. Vill. of Dobbs Ferry*, No. 96-9188, 1997 U.S. App. LEXIS 29859, at *2-3 (2d Cir. Oct. 30, 1997)(summary order)("Further, we note that after the district court issued its opinion so construing those statements, Oblin did not request reconsideration on the ground that the court had misunderstood."). (JA-264-267; Dist. Ct. CM/ECF No. 57, pp. 2-3.) Plaintiff also argued that the Court's Ruling found facts against Plaintiff and impermissibly considered hearsay statements offered by Yale for the truth. (JA-267-268; Dist. Ct. CM/ECF No. 57, p. 4.) Last, Plaintiff suggested that the Court should consider another definition of "employee" for purposes of Conn. Gen. Stat. § 31-51q. (JA-268-269.)

24

On September 21, 2022, the District Court extended Plaintiff's deadline to file her notice of appeal until October 17, 2022, so that the Court would have time to address Plaintiff's motion. (Dist. Ct. CM/ECF No. 55, JA-5.) On October 6, 2022, the District Court denied Plaintiff's motion (Dist. Ct. CM/ECF No. 58, JA-5-6), and Plaintiff filed her notice of appeal. (JA-271.)

This Court should reverse the District Court's Ruling dismissing Plaintiff's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Conn. Gen. Stat. § 31-51q, and vacate the judgment entered against Plaintiff.

# SUMMARY OF THE ARGUMENT

The District Court erred by dismissing Plaintiff's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation in violation of Connecticut General Statutes § 31-51q. This Court should reverse those decisions by the District Court and vacate the judgment that was entered against Plaintiff.

The District Court erred when it dismissed Plaintiff's breach of contract claim because Plaintiff alleged the existence of a contract between Plaintiff and Yale pursuant to which Yale agreed to not consider or rely upon Plaintiff's exercise of free expression and academic freedom when it was making decisions to terminate or renew Plaintiff's faculty appointment, that Yale terminated and non-renewed Plaintiff's faculty appointment because of her protected exercise of free expression and academic freedom in violation of that contract, and that Yale acted deceitfully and in bad faith by advancing pretextual and shifting explanations for its arbitrary decision. The District Court also erred by misconstruing Plaintiff's breach of contract claim, incorrectly accepting documents outside of the pleadings that Yale offered for the truth in violation of the controlling standards of Rule 12(b)(6) and rules of evidence precluding hearsay, and finding facts against Plaintiff in violation of Rule 12(b)(6) and Connecticut law regarding the adjudication of breach of contract claims.

The District Court erred in dismissing Plaintiff's claim alleging a breach of the covenant of good faith and fair dealing based on the incorrect finding that Plaintiff failed to allege the existence of a contract. That decision cannot stand because Plaintiff did allege the existence of a contract, and because Plaintiff has alleged sufficient facts to support a claim.

The District Court erred in dismissing Plaintiff's claim alleging a violation of Conn. Gen. Stat. § 31-51q on the grounds that Plaintiff does not qualify as an employee under the statute. The District Court's decision should be reversed because the Court applied an incorrect standard, and alternatively, because Plaintiff alleged sufficient facts to preclude dismissal of her claim under Rule 12(b)(6) based on the standard that the District Court did apply.

**ARGUMENT**

Standard of Review for Issues on Appeal:

Each of the issues raised on appeal is subject to *de novo* review.  *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016); *Roth v. Jennings*, 489 F.3d 499, 509-10 (2d Cir. 2007).

**I.**     **Court Erred by Dismissing Breach of Contract Claim**

A.     Plaintiff Successfully Alleged a Claim for Breach of Contract

Plaintiff stated a claim for breach of contract because: (i) Plaintiff's faculty appointment with Yale was a contractual relationship; (ii) an essential understanding of Plaintiff's faculty appointment was that Yale would not consider or rely upon Plaintiff's exercise of freedom of expression and academic freedom when deciding whether to terminate or renew Plaintiff's faculty appointment; (iii) Yale violated the contract when it considered and relied upon Plaintiff's exercise of freedom of expression and academic freedom in connection with its decision to terminate and non-renew Plaintiff's faculty appointment; and (iv) Yale's action caused Plaintiff to suffer damages.

Under Connecticut law, "All employer-employee relationships not governed by express contracts involve some type of implied 'contract' of employment. 'There cannot be any serious dispute that there is a bargain of some kind; otherwise, the employee would not be working.'"  *Gaudio v. Griffin Health Servs.*

28

*Corp.*, 249 Conn. 523, 532 (1999)(citations omitted). Connecticut law is also clear that faculty members can successfully bring claims for breach of contract against a college or university when the institution fails to comply with the commitments and obligations that it has made, including, but not limited to, commitments made by a university in a faculty handbook. "A faculty manual that sets forth terms of employment may be considered a binding employment contract." *Craine v. Trinity College*, 259 Conn. 625, 655 (2002). In *Craine*, the Connecticut Supreme Court affirmed the jury's verdict against a college on a breach of contract claim brought by a professor where the jury could have reasonably found that the college breached a contract by denying tenure based on alleged deficiencies and standards that were not previously communicated to the professor, contrary to the requirements of the faculty manual, *Craine*, 259 Conn. at 656-59, and by not "consider[ing] the plaintiff's candidacy under the affirmative action policy" set forth in the manual, *id.* at 660.

In *Jauhari v. Sacred Heart University*, No. 3:16-cv-680 (DJS), 2019 U.S. Dist. LEXIS 230470 (D. Conn. Aug. 13, 2019), the District Court for Connecticut denied summary judgment on a breach of contract claim brought by a professor because the university indicated, through its faculty handbook and previous communications to the plaintiff, that the plaintiff's tenure application would be assessed based on her publications in refereed, or peer-reviewed, journals.

29

However, in deciding the plaintiff's tenure application, the university relied on information it obtained from the internet to discount her publications in certain journals even though they were refereed.  *Jauhari*, 2019 U.S. Dist. LEXIS 230470 **33-36.

In *Byrne v. Yale University, Inc.*, 450 F. Supp. 3d 105 (D. Conn. 2020), the District Court for Connecticut applied Connecticut law and denied summary judgment on a breach of contract claim brought by a professor against Yale because Yale promised in its Handbook that individuals who have a conflict of interest must recuse themselves from tenure votes, and there was a factual issue concerning whether one of the individuals who voted on the plaintiff's tenure application possessed a conflict of interest within the meaning of the Handbook. *Byrne*, 450 F. Supp. 3d at 123-125.

In each case, *Craine*, *Jauhari*, and *Byrne*, Connecticut law allowed for a faculty member to bring a breach of contract claim against a private university in Connecticut based on allegations that the university made express commitments in a faculty handbook, but then deviated from those express commitments in violation of the reasonable expectation of the faculty member causing harm to the faculty member.   "In examining the terms of the handbook, we use the standard of reasonable expectation — what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Pollalis v.*

30

*President & Fellows of Harvard Coll.*, 95 Mass. App. Ct. 1103 (2019), quoting

*Cloud* v. *Trustees of Boston Univ.*, 720 F.2d 721, 724 (1st Cir. 1983), citing *Lyons*

v. *Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977), cert. denied, 435 U.S.

971, 98 S. Ct. 1611, 56 L. Ed. 2d 62 (1978) (internal quotation marks omitted);

*Berkowitz v. President & Fellows of Harvard Coll.*, 58 Mass. App. Ct. 262, 274

(2003.)  *See also Magnan v. Anaconda Indus., Inc.,* 193 Conn. 558, 567

(1984)(endorsing the reasonable expectations of the contracting parties as a rule of

construction for contracts).

Connecticut law is also clear that an employee can prevail on a breach of

contract claim based on a claim that the employer agreed to not rely on a particular

reason or justification as a basis for action against an employee.  For instance, in

*Coelho v. Posi-Seal International, Inc.*, 208 Conn. 106 (1988), the Connecticut

Supreme Court affirmed a jury verdict against an employer on a breach of contract

claim because the jury could have found that the plaintiff and defendant had an

implied agreement that the defendant would not terminate the plaintiff's

employment as a result of conflicts between the quality control and manufacturing

departments, as long as the plaintiff performed his job duties adequately.  *Id.* at

113-14.  Likewise, in *Meade v. Yale Univ.*, CV054016155, 2006 Conn. Super.

LEXIS 2720 *2 & **4-7 (Conn. Super. Sept. 7, 2006), the Connecticut Superior

Court held that a plaintiff who worked for Yale as an accountant stated a breach of

contract claim by alleging that Yale terminated her employment for a reason that a department chair previously assured her would not be a basis for terminating her employment. *Id.* (department chair promised that plaintiff would not be terminated in retaliation for her performing her duties, which included conducting a survey that contained negative comments about a person who became her supervisor).

The decision by then-District Court Judge Droney in *Hartwig v. Albertus Magnus College*, 93 F. Supp. 2d 200 (D. Conn. 2000), is also instructive. After a private, Catholic, college in Connecticut relieved Hartwig from his duties as non-tenured professor, *id.* at 202-205, Hartwig alleged that the college's non-renewal of his appointment breached three contractual commitments that it had made to him: that the college agreed to not discriminate against Hartwig based on his sexual orientation, that the college agreed to allow Hartwig academic freedom, and that the college agreed to follow certain procedures in connection with deciding whether to reappoint Hartwig. *Id.* at 205, 215-218. Hartwig's contract claims were based, in part, on a faculty handbook which "provided that the College would not discriminate against employees on the basis of sexual orientation, contained language concerning academic freedom for teachers, and set forth procedures for reappointment of non-tenured faculty members." *Id.* at 203. Judge Droney allowed Hartwig to present all three of his contract claims against the college to a jury. *Id.* at 215-218. *Hartwig* illustrates that a private college in Connecticut can

32

be held liable under Connecticut's law of breach of contract if it terminates or non-renews the appointment of a non-tenured faculty member based on a reason that it agreed to not rely upon (sexual orientation), or when it terminates or non-renews the faculty member for exercising academic freedom despite the presence of language in its faculty handbook concerning academic freedom.[4] *See also McAdams v. Marquette Univ.*, 914 N.W.2d 708 (Wisc. 2018)(judgment in favor of professor who university suspended for his exercise of academic freedom in violation of faculty handbook which protected professor's academic freedom).

Plaintiff sufficiently alleged that Yale breached an express or implied contract when it terminated or non-renewed Plaintiff's faculty appointment in violation of her academic employment agreement that was squarely based in the Yale Faculty Handbook. While Plaintiff's breach of contract claim is not based on a single document alone, the Handbook is one important source of the contractual rights that Yale violated in this case. Connecticut courts have previously held that Yale's faculty handbook constitutes a contract. *See Neiman v. Yale Univ.*, 270 Conn. 244, 251 (2004)(affirming decision by trial court that Yale's faculty handbook was a contract); *Byrne*, 450 F. Supp. 3d at 123-125 (denying summary

---

[4] The parties in *Hartwig* disagreed as to whether the plaintiff was terminated or non-renewed, but Judge Droney held that the plaintiff's breach of contract claims could proceed to trial regardless of which characterization was correct. *Hartwig*, 93 F. Supp. 2d at 205, fn. 6.

judgment on breach of contract claim brought by professor based on Yale's faculty handbook). In the Handbook, Yale confirmed that the policies that it "included and referred to" in the Handbook "form part of the essential employment understandings between members of the faculty and the University." (Am. Compl. ¶ 43, JA-40; Handbook Introduction, JA-75.)

As part of its policy on freedom of expression, which Yale included in the Handbook with particular emphasis, Yale communicated to Plaintiff and other faculty members that, to fulfill the primary function of a university such as Yale to discover and disseminate knowledge by means of research and teaching, "*a free interchange of ideas **is necessary** not only within its walls but with the world beyond as well*." (JA-79)(italics in original, bold and underline added). Yale further represented that "*a university **must do everything possible** to ensure within it the fullest degree of intellectual freedom*," and that "*[t]he history of intellectual growth and discovery clearly demonstrates **the need for unfettered freedom**, the **right to** think the unthinkable, discuss the unmentionable, and challenge the unchallengeable*." (JA-79)(italics in original, bold & underline added). In Section II.B of the Handbook, Yale further stated that protecting freedom of inquiry was a "condition necessary to advance [Yale's] mission" that was a primary responsibility of all faculty, including all administrators with faculty appointments.

Like other cases in which Connecticut courts have recognized breach of contract claims against a college or university based on the language of its faculty handbook, Yale's policy on freedom of expression employs words conveying a requirement or an obligation, such as "necessary," "*must*," and "need."  (JA-79.)  For instance, in *Craine*, the provisions of the faculty manual which supported the breach of contract claim provided that a committee "shall indicate as clearly as possible those areas to which a candidate *needs* to address . . . .," that "a negative decision *must* be based on failure to meet the standards . . . .," and that "the candidate's scholarly activities . . . *must* receive a fair and unbiased review," 259 Conn. at 656 (emphasis added).  In *Byrne*, another provision in Yale's Handbook was sufficient to support a breach of contract claim where it stated that an individual with a conflict of interest "*must* absent himself or herself . . . ."  *Byrne*, 450 F. Supp. 3d at 124 (emphasis added by court).

The Woodward Report that is expressly referenced in the Handbook and quoted in Plaintiff's amended complaint similarly speaks of the need to protect freedom of expression in mandatory terms, including when it sets forth the "obligations" of the university, its officials, and its members, to protect free expression:

- "By voluntarily taking up membership in a university and thereby asserting a claim to its *rights and privileges*, members also

35

acknowledge the existence of certain *obligations upon themselves and their fellows*."

- "Above all, *every member of the university has an obligation* to permit free expression in the university."

- "*Every official in the university, moreover, has a special obligation* to foster free expression and to ensure that it is not obstructed."

- "Nonetheless, we believe that *the positive obligation to protect and respect free expression shared by all members of the university* should be enforced . . . ."

- "In addition to *the university's primary obligation to protect free expression* . . . ."

- "The conclusions we draw, then, are these: even when some members of the university community fail to meet their social and ethical responsibilities*, the paramount obligation of the university is to protect their right to free expression. This obligation can and should be enforced by appropriate formal sanctions*."

(Woodward Report, Section 1, emphasis added, available at https://yalecollege.yale.edu/get-know-yale-college/office-dean/reports/report-committee-freedom-expression-yale; *See also supra*, pp. 11-14.)

If the obligations that Yale undertook to protect freedom of expression and academic freedom mean anything for the faculty members such as Plaintiff covered by the Handbook, then, at a minimum, those obligations *must* mean that Yale agreed to not consider or rely upon a faculty member's exercise of free expression and academic freedom when determining whether to terminate or renew a faculty member's appointment, or as a basis to discipline the faculty member, unless that expression was beyond the bounds of speech permitted by the broad policy – which, at most, would be a defense assumed by Yale in response to the breach of contract claim, but would not provide the basis to dismiss the complaint. The express commitments that Yale made to protect freedom of expression and academic freedom in the policies that it included and referred to in the Handbook, gave rise to a reasonable expectation that Yale would not consider or rely on Plaintiff's freedom of expression and academic freedom when it made decisions regarding the termination and renewal of her faculty appointment.

Like the plaintiff in *Craine* who prevailed on a breach of contract claim, in part, because the college failed to comply with the requirement in the faculty manual to consider her tenure application under the affirmative action policy, *Craine*, 259 Conn. at 660, Plaintiff in this case alleges that Yale breached an express or implied contract when it failed to apply and adhere to its policies

regarding freedom of expression and academic freedom when it decided to terminate and non-renew Plaintiff's faculty appointment.

Judge Droney's decision in *Hartwig* also supports the viability of Plaintiff's breach of contract claim against Yale because, like the plaintiff in *Hartwig*, Defendant terminated or non-renewed Plaintiff's faculty appointment based on Plaintiff's exercise of academic freedom, even though Yale maintained a policy concerning academic freedom in its Handbook; and because Yale failed to comply with its obligations, expressed in the Handbook, the Woodward Report, and elsewhere, that it would not considered or rely upon on Plaintiff's freedom of expression and academic freedom as a basis for a decision to terminate and non-renew Plaintiff's faculty appointment. *Hartwig*, 93 F. Supp. 2d at 215-216.

B.   The Court Misconstrued Plaintiff's Breach of Contract Claim

This Court should also reverse the District Court's Ruling dismissing Plaintiff's breach of contract claim because the District Court misconstrued Plaintiff's claim in several significant respects. *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 59 (2d Cir. 1987)(reversing summary judgment on First Amendment retaliation claim, in part, because the District Court's decision misunderstood the plaintiff's claim). At one point, the District Court stated that it construed Plaintiff's claim as based on a contract "that Yale would not decline to reappoint plaintiff, regardless of whether it found that plaintiff

38

was no longer qualified for the position, based at least in part on her public statements." (SA-20)(emphasis added). At other points, the Court repeated that same framing in concluding that Plaintiff's contract claim failed to state a claim. (SA-28-29.) On page 29, the Court construed Plaintiff's contract claim as effectively requesting that the Court "hold that a private university . . . undertakes a contractual commitment to guarantee reappointment to that faculty member, regardless of whether the university finds that the faculty member is no longer qualified for the position." (SA-29)(emphasis in original).

By construing Plaintiff's contract claim as one that disregarded whether Yale found that Plaintiff was no longer qualified for her position, the Court's Ruling construed and framed Plaintiff's breach of contract claim in a manner that did not conform to Plaintiff's actual claim as plead in the complaint. Plaintiff never defined her contract claim in that fashion.

The District Court also concluded that Plaintiff's contract claim failed because Plaintiff's allegations "d[id] not support a finding that Yale intended to guarantee plaintiff continued employment." (SA-24.) On the following pages, the Court also stated that Plaintiff's claim failed because the Court found that the Faculty Handbook and policies identified by Plaintiff did not demonstrate a "contractual commitment to guarantee plaintiff continued reappointment." (SA-25)(emphasis added)(*See also* SA-27)("not sufficient to manifest the intent to form

39

a contract for <u>guaranteed reappointment</u>.")(emphasis added); (SA-29)(construing Plaintiff's claim as a request for the Court to hold that private university undertook contractual commitment to guarantee reappointment).

However, Plaintiff does not claim that Defendant guaranteed her continued reappointment. Rather, Plaintiff's contract claim alleges that Defendant undertook a contractual commitment that took the form of a limitation on Yale's ability to end Plaintiff's appointment for a particular reason, i.e., Plaintiff's exercise of academic freedom and free expression, and then violated that commitment.

The issue of how long Defendant would have continued to reappoint Plaintiff, in the absence of Defendant's violation of its contractual commitment, is a question of fact regarding the extent of Plaintiff's damages that must be decided on a full record – not a reason to dismiss for failure to state a claim. *See, e.g., Weinstein v. Univ. of Conn.*, HHD-CV-11-6027112-S, 2022 Conn. Super. LEXIS 1421, at \*69-72 (Super. Ct. June 30, 2022)(in awarding damages for a period of years on an unlawful termination claim, trial court determined based on the trial record how long university would have continued reappointing plaintiff professor on an annual basis, even though plaintiff's appointments were annual appointments without guarantee of renewal); *Hartwig*, 93 F. Supp. 2d at 205, 215-217 (allowing non-tenured professor's breach of contract claims to proceed against private college even though the plaintiff worked on a series of one year appointments).

C.    Factual Issues Relating to Breach of Contract Claim Should be Resolved by Jury on Full Record, Not by the Court on a Rule 12(b)(b) motion

This Court should also reverse the District Court's Ruling because the District Court failed to accept the facts alleged in the Amended Complaint as true, draw all reasonable inferences in Plaintiff's favor, and construe ambiguities in the light most favorable to Plaintiff, *Doe v. Columbia Univ.*, 831 F.3d 46, 48-49 (2d Cir. 2016), and also because Connecticut law is clear that factual issues relating to breach of contract claims should be resolved by a jury on a full record.  *See Coelho*, 208 Conn. at 113; *Torosyan v. Boehringer Ingelheim Pharmaceuticals*, 234 Conn. 1, 14-17 (1995); *Gaudio,* 249 Conn. at 533-38; *Craine*, 259 Conn. at 654-660. The District Court erred by resolving factual issues against Plaintiff on a Rule 12(b)(6) motion, instead of allowing those questions to be resolved by a factfinder on a full record. *See Lynch v. City of N.Y.*, 952 F.3d 67, 74-76 (2d Cir. 2020)(discussing standards, including that "fact-specific question[s] cannot be resolved on the pleadings").

"In the absence of express language that definitively states the parties' obligations, the determination of what the parties intended to encompass as their contractual commitments and their compliance therewith are questions of fact for the jury."  *Byrne, Inc.*, 450 F. Supp. 3d at 123 (citing *Gaudio*, 249 Conn. at 533). *See also Byrne*, 450 F. Supp. 3d at 124 ("Interpretation of the written terms of a

contract and the degree of compliance by the parties are [also] questions of fact to be determined by the jury.")(quoting *Craine*, 259 Conn. at 655-66).

In deciding the proper interpretation of a document that underlies a contract claim, the jury is permitted to rely on witness testimony, in addition to relevant documents. For instance, in *Gaudio*, the personnel "manual [did] not contain express contract language that definitively stated that employees are at-will or that they may be terminated only for just cause." *Gaudio*, 249 Conn. at 533. However, the jury reasonably concluded that the language in the manual "inferred the presence of an implied contract not to terminate the plaintiff except for just cause." *Id.* at 536. In reaching that decision, the jury was permitted to rely on the testimony of other employees who confirmed such an interpretation. *Id.* at 537-38. *See also Coelho*, 208 Conn. at 113-14 (implied contract claim based on testimony regarding verbal statements by defendant's president).

In considering Plaintiff's contract claim, the District Court apparently accepted as true that Defendant actually found that Plaintiff was no longer qualified for her position, and cited to Dr. Krystal's letter on that issue. (SA-28-29.) However, just because Yale, or Dr. Krystal, made certain statements to Plaintiff, or included certain statements in a letter, does not conclusively demonstrate that they are true, or that Defendant actually believed, or determined in good faith, that Plaintiff's public statements rendered her not qualified. In fact,

42

Plaintiff's allegations in the complaint, which the Court must accept as true at this juncture, demonstrate that Yale based its decision to terminate and non-renew Plaintiff's faculty appointment on Plaintiff's statements which constituted free expression and academic freedom, and that any other rationale or justification offered by Yale to support its decision is a pretext. (*See* pp. 18-23, *supra*.) Even though Plaintiff expressly alleged that the rationales offered by Yale to support the decision to terminate Plaintiff's appointment were pretextual, and offered substantial facts supporting such a determination, the Court's Ruling failed to address Plaintiff's claims regarding pretext and instead accepted the validity of Yale's proffered explanation.

To the extent that Yale argues that its decision to not renew Plaintiff's faculty appointment constitutes an academic judgment (an issue which Plaintiff does not concede), Plaintiff is not precluded from pursuing her breach of contract claims when the decision involves a violation of expressed language in the faculty handbook. *See Craine*, 259 Conn. at 654 (rejecting college's argument that "courts and juries should not second-guess tenure decisions even when considering breach of contract claims"). "[A] university cannot claim the benefit of the contract it drafts but be spared the inquiries designed to hold the institution to its bargain. The principle of academic freedom does not preclude [the Court] from vindicating the contractual rights of a plaintiff who has been denied tenure in breach of an

43

employment contract." *Craine.*, 259 Conn. at 654 (citation and quotation omitted). *See also Byrne*, 450 F. Supp. 3d at 124; *Jauhari*, 2019 U.S. Dist. LEXIS 230470 *33. As Judge Droney's decision in *Hartwig* once again illustrates, even in an area where courts are more deferential to a college's asserted reason, a professor can still prevail on breach of contract claim involving a private college's decision who to employ as a faculty member by proving that the employer's reason is pretextual. *Hartwig*, 93 F. Supp. 2d at 216-218.

Furthermore, under Connecticut law, even if after discovery and on a full record, Yale's decision to not continue Plaintiff's faculty appointment is found to be an academic judgment, Plaintiff can still prevail by demonstrating that Yale acted arbitrarily, capriciously, or in bad faith. *Daley v. Wesleyan Univ.*, 63 Conn. App. 119, 134 (2001). The facts alleged by Plaintiff, and reasonable inferences drawn therefrom in Plaintiff's favor, which demonstrate pretext similarly support a finding that Yale acted arbitrarily, capriciously, or in bad faith. (See pp. 18-23, *supra*.)

### D. The District Court Erred by Considering Hearsay for the Truth

The District Court also erred by considering hearsay documents offered by Yale for the truth of the matter on a Rule 12(b)(6) motion, and not for the limited purpose of verifying the contents of a document. The District Court's reliance on those documents for the truth in order to interpret Plaintiff's complaint contrary to

44

what was alleged by Plaintiff as the basis for her breach of contract claim is contrary to controlling principles governing Rule 12(b)(6) motions, as well as Rules of Evidence precluding admissibility of hearsay.  See. Fed. R. Evid. 801, 802.

This Court has explained, in the context of cases alleging fraud based on the contents of filings with the S.E.C., that when a court is permitted to review documents outside the complaint on a Rule 12(b)(6) motion, it may consider them "only to determine what the documents stated, and not to prove the truth of their contents."  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)(citation and quotations omitted).  *See also Nielsen v. Rabin*, 746 F.3d 58, 63 & fn. 4 (2d Cir. 2014)(district court erred by relying on documents outside of the complaint offered by the defendants and inappropriately resolved issues of fact in deciding that granting leave to amend complaint would be futile, and also that it would "turn[] the Rule 12(b)(6) standard on its head" to rely on the medical records offered by defendant for the truth when the complaint referred to them for a more limited purpose); *Doe v. New York Univ.*, No. 1:20-cv-01343, 2021 U.S. Dist. LEXIS 62985 **39-43 (S.D.N.Y. Mar. 31, 2021)(refusing to consider documents offered by defendant for the truth).

To the extent that the District Court was entitled to consider certain documents outside the complaint that Yale submitted, such as the May 17, 2020,

45

and September 4, 2020, letters from Dr. Krystal, the Court was only entitled to consider them for the limited purpose of what the documents stated – not for the truth. *Roth*, 489 F.3d at 511 (district court ruling was flawed, in part, because "it improperly considered the representations in defendants' [SEC] filings for the truth of their assertions . . . Even assuming that those factual assertions were relevant, they raised issues of fact that should not have been determined at the pleading stage.").

The District Court also erred by considering the documents offered by Yale for the truth of their contents because the documents constitute hearsay when Yale attempted to rely upon them.  The following documents offered by Yale all constitute hearsay that could not be considered for the truth:  January 13, 2020, e-mail, JA-51-52; September 4, 2020, letter, JA-55-58; May 17, 2020, letter, JA-60; and July 28, 2017 e-mail, JA-263.  Therefore, under Rules 801 and 802 of the Federal Rules of Evidence, the Court could not have accepted those documents for the truth.  The District Court's Ruling renders it apparent that at least some of these documents offered by Defendant were considered for the truth, including the e-mails and letters from Dr. Krystal, which served as the basis for the Court's acceptance of the proposition that Yale determined that Plaintiff was not qualified for her position.

## II. **Court Erred by Dismissing Claim for Breach of Covenant of Good Faith and Fair Dealing**

The District Court also erred by dismissing Plaintiff's claim for breach of the covenant of good faith and fair dealing. (SA-32-33.) The District Court dismissed this claim solely based on the Court's erroneous determination that Plaintiff failed to allege the existence of a contract. (SA-33.) For the reasons previously stated, there was a contract between Plaintiff and Yale. Accordingly, that basis for the District Court's decision dismissing Plaintiff's claim for breach of the covenant of good faith and fair dealing should be reversed.

In addition, the District Court's Ruling dismissing Plaintiff's claim for breach of the covenant of good faith and fair dealing should be reversed because Plaintiff has alleged sufficient facts to support such a claim.

> To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Bad faith in general implies . . . actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose.' (Citation omitted; internal quotation marks omitted.) '[B]ad faith may be overt or may consist of inaction, and it may include evasion of the spirit of the bargain . . . . *Elm Street Builders, Inc. v. Enterprise Park Condominium Assn., Inc.*, 63 Conn. App. 657, 667, 778 A.2d 237 (2001), quoting 2 Restatement (Second), Contracts § 205, comment (d) (1981); see also 23 S. Williston, Contracts (4th Ed. Lord 2002) § 63:22, p. 508 (a party who evades the spirit of the contract . . . may be liable for breach of the implied

covenant of good faith and fair dealing . . .)." (Internal quotation marks omitted.) '[W]hen one party performs the contract in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied, there is a breach of the covenant of good faith and fair dealing, and hence, a breach of contract, for which damages may be recovered . . . ." (Internal quotation marks omitted.) Id., 44.

*Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 399-400 (2016)(internal citations omitted).  Interference with a party's reasonable expectations can be sufficient to state a claim for breach of the covenant of good faith and fair dealing. *See id*. at 404-406.

Plaintiff alleged that "Yale did not act in good faith when it deprived Dr. Lee of her right to academic freedom and/or the rights and guarantees provided by the Faculty Handbook, policy statements, guidance, regulations and rules applicable to her faculty appointment, thereby depriving Dr. Lee of the benefit of the contract." (Am. Compl., Count Two, ¶ 65, JA-46.)  In further support of this claim, Plaintiff incorporated the other facts alleged in the amended complaint.  Those facts, accepted as true and with all reasonable inferences drawn in Plaintiff's favor, indicate that Defendant undertook contractual obligations to Plaintiff pursuant to which Defendant agreed that it would not consider Plaintiff's free expression and academic freedom as part of its decisions relating to the termination or renewal of Plaintiff's faculty appointment, (*see* pp. 9-14, 27-37, *supra*), and that Defendant acted in bad faith, and with a dishonest purpose, when it terminated and non-

48

renewed Plaintiff's faculty appointment based on pretextual reasons (*see* pp. 18-23, *supra*).  Further, Yale's actions, as alleged by Plaintiff, demonstrate that Yale's actions defeated the spirit of the bargain and interfered with Plaintiff's reasonable expectations under the agreement.

## III.  Court Erred by Dismissing Section 31-51q Claim

### A. Meaning of "Employee" in Section 31-51q Should Be Consistent with Section 31-51m

Section 31-51q of the Connecticut General Statutes makes it illegal for an employer to subject an employee to discipline or discharge on the basis of the employee's exercise of rights guaranteed by the First Amendment, or Sections 3, 4, or 14 of Article First of the Connecticut Constitution.  (SA-51.[5])

This Court should reverse the District Court's Ruling dismissing Plaintiff's claim under Conn. Gen. Stat. § 31-51q.  In deciding that Plaintiff was not an "employee" under Conn. Gen. Stat. § 31-51q, the Court applied the remuneration test that the Connecticut Supreme Court adopted for claims under the Connecticut Fair Employment Practices Act ("CFEPA").  (SA-38-41.)  The meaning of "employee" in § 31-51q should be consistent with the definition of employee

---

[5] Section 31-51q was amended, effective July 1, 2022.  The version of the statute that was in effect when the events at issue in this case transpired, and when Plaintiff commenced this action, is included in the Special Appendix.  (SA-51.)

found in Conn. Gen. Stat. § 31-51m, and not controlled by the remuneration test adopted for CFEPA.

Under Connecticut law, "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes." Conn. Gen. Stat. § 1-2z. "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." Conn. Gen. Stat. § 1-1(a). "If the legislature's intent is clear from the statute's language, our inquiry ends. If, however, the statute is ambiguous or its plain meaning yields an absurd result, we go on to consider extratextual evidence of its meaning, such as the statute's legislative history, the circumstances surrounding its enactment, the legislative policy the statute implements, and the statute's relationship with existing legislation and common-law principles." *State v. Wright*, 320 Conn. 781, 801 (2016)(internal citation omitted). Since § 31-51q does not include a definition of the term "employee," (SA-51), it is appropriate to consider other evidence to discern a meaning that best serves the purpose of the statute.

One potential source is a dictionary definition. At the District Court, Plaintiff stated that "Black's Law Dictionary defines 'employee' as '[s]omeone

who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of the work performance.'" (Dist. Ct. CM/ECF No. 35, at 16)(quoting Black's Law Dictionary (11th ed. 2019)).

Under that definition, Plaintiff would qualify as an employee because she worked in the service of Yale under an express or implied contract of hire, and Yale possessed the right to control Plaintiff's performance. Plaintiff worked in the service of Yale for 17 years, and taught courses to Yale students. (See pp. 6-9, *supra*.) When Plaintiff worked in the service of Yale, Yale had a right to control certain aspects of her performance, including which courses she taught and which clinic cases were referred to her for consultation. Plaintiff was subject to the Handbook and other Yale policies which applied to similarly situated faculty members. Under Plaintiff's appointment, Yale required that she participate in four hours of student-related, teaching, or supervisory activities per week, such as teaching, lecturing, advising students, supervising residents, participating in seminars and rounds, engaging in scholarly activity, and participating in department administration. (Am. Compl. ¶ 12, JA-30-31.)

However, the definition from one dictionary, divorced from the statute's context and purpose and its relationship to other statutes, is not necessarily dispositive. *See State v. Wright*, 320 Conn. 781, 803, 135 A.3d 1, 17

51

(2016)(looking to sources other than Black's Law Dictionary, including consideration of caselaw and the statute's context and purpose, when there was more than one plausible definition of a statutory term).

Connecticut law also instructs that courts should consider a statute's "relationship to other statutes" to discern the meaning of legislation.  Conn. Gen. Stat. § 1-2z.  In that connection, § 31-51m of the Connecticut General Statutes defines an employee as "any person engaged in service to an employer in a business of his employer," Conn. Gen. Stat. § 31-51m(a)(3), and is devoid of any express requirement for "remuneration."

Section 31-51q has a much closer "relationship" to § 31-51m than it does to CFEPA.  Section 31-51m and § 31-51q are in the same chapter, of the same title, of the Connecticut General Statutes, while CFEPA is in a different title altogether, § 46a-51 *et seq.*  Section 31-51q, which the legislature enacted shortly after it passed § 31-51m, follows a similar structure as § 31-51m that includes a prohibition against discipline or discharge of an employee for engaging in protected conduct, and Connecticut courts have interpreted "discipline" in both statutes to have the same meaning, *see, e.g., Weinstein v. Univ. of Conn.*, HHD-CV-11-6027112-S, 2022 Conn. Super. LEXIS 1421, at *4 (Super. Ct. June 30, 2022).

In *Cotto*, the Connecticut Supreme Court identified § 31-51m as one of the other "analogous" Connecticut "statutes that safeguard an employee from discharge for expressions of opinion at a private workplace." *Cotto*, 251 Conn. at 13-14.

The decision by the Appellate Court in *Young v. City of Bridgeport*, 135 Conn. App. 699 (2012), also supports interpreting the meaning of "employee" in § 31-51q consistent with § 31-51m. In *Young*, the Connecticut Appellate Court was required to decide whether the plaintiff was an "employee" for purposes of both § 31-51q and § 31-51m and resolved the question under both statutes with a single analysis, which focused on the employer's right to control test. *Young*, 135 Conn. App. at 706-710.

Adopting a broader interpretation of "employee" in § 31-51q that is consistent with the definition of employee set forth in § 31-51m would also be consistent with Connecticut caselaw which requires that courts give § 31-51q a generous construction. Section 31-51q "plainly was intended to protect the first amendment and related state constitutional rights of working men and women. As a remedial statute, § 31-51q deserves a generous construction that implements its purpose at one of the important places, the private workplace, in which those rights may be impaired." *Cotto v. United Techs. Corp.*, 251 Conn. 1, 8-9 (1999). When faced with opportunities to interpret § 31-51q, the Connecticut Supreme Court has

consistently favored an interpretation which affords greater rights to individuals. *See, e.g., Cotto*, 251 Conn. 1 (holding that statute prohibited private employers from retaliating against employees for speech in the private workplace); *Trusz v. UBS Realty Investors LLC*, 319 Conn. 175 (2015)(refusing to extend the rule adopted in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), to claims under § 31-51q based on the Connecticut Constitution).

In contrast to the close "relationship" between § 31-51q and § 31-51m, the connection between § 31-51q and CFEPA is much more distant. In addition to the fact that CFEPA appears in a different title and chapter of the Connecticut General Statutes, Conn. Gen. Stat. § 46a-51 *et seq.*, CFEPA has a different statutory purpose and design. Section 31-51q and § 31-51m are both intended to protect citizens and employees who engage in protected speech or disclosures; even though they define the protected speech and disclosures differently, they are designed to protect people from retaliation at work because they engage in conduct as citizens. In contrast, CFEPA, like the federal employment discrimination statutes to which the Connecticut Supreme Court looked for guidance in answering the question under CFEPA, *Comm'n on Human Rights & Opportunities v. Echo Hose Ambulance*, 322 Conn. 154 (2016), is limited to prohibiting discriminatory *employment practices*, Conn. Gen. Stat. § 46a-60; the anti-retaliation provision of CFEPA is similarly limited to prohibiting retaliation against employees who

oppose discriminatory *employment practices*, Conn. Gen. Stat. § 46a-60(b)(4).

Therefore, the narrower standard for "employee" that controls CFEPA should not

be dispositive for a statute like § 31-51q that is not limited to protecting speech

relating to discriminatory employment practices.

This Court should hold that the definition of "employee" in § 31-51q should

be interpreted consistent with the definition of employee in § 31-51m(a)(3). Under

that standard, Plaintiff qualifies as an employee because she was a "person

engaged in service to an employer in a business of his employer." Conn. Gen. Stat.

§ 31-51m(a)(3). Furthermore, there is no basis on a Rule 12(b)(6) motion to

conclude that Plaintiff was an independent contractor under the right to control test

applied to both § 31-51m and § 31-51q claims in *Young*. Plaintiff held a faculty

appointment and taught courses to Yale students, mentored Yale students, and

engaged in numerous other services to Yale for a period of 17 years. (*See* pp. 6-9,

*supra*.) Over that period of time, Plaintiff and Yale were parties to a contractual

relationship pursuant to which Plaintiff provided services to Yale, and in return,

Plaintiff received consideration in the form of various benefits, privileges, and

opportunities. (*Id.*) Plaintiff's relationship with Yale was also governed by the

Handbook, which indicated that the policies included and referred to in the

Handbook formed "part of the essential *employment* understandings between

members of the faculty and the University." (Am. Compl. ¶ 43, JA-40; Handbook Introduction, JA-75)(emphasis added).

## B. Alternatively, the District Court Erred by Dismissing Plaintiff's Section 31-51q Claim Based on the Remuneration Test

Alternatively, even if this Court determines that the District Court correctly applied the remuneration test, it should still reverse the Ruling dismissing Plaintiff's § 31-51q claim for failing to satisfy that test. "The remuneration test instructs courts to 'conduct a [two step] inquiry by requiring that a volunteer first show remuneration as a threshold matter before proceeding to the second step-analyzing the putative employment relationship under the [common-law] agency test. Remuneration may consist of either direct compensation, such as a salary or wages, or indirect benefits that are not merely incidental to the activity performed.'" *Comm'n on Human Rights & Opportunities v. Echo Hose Ambulance*, 322 Conn. 154, 161-62 (2016)(citation omitted).

This remuneration need not be a salary, but must consist of 'substantial benefits not merely incidental to the activity performed.' Once plaintiff furnishes proof that her putative employer remunerated her for services she performed, we look to 'the thirteen factors articulated by the Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 104 L. Ed. 2d 811, 109 S. Ct. 2166 (1989)' to determine whether an employment relationship exists." *United States v.*

56

*City of N.Y.*, 359 F.3d 83, 92 (2d Cir. 2004)(citations omitted). "These factors, which derive from the federal common law of agency, are

> the hiring party's right to control the manner and means by which the product is accomplished[;] the skill required; the sources of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*United States v. City of N.Y.*, 359 F.3d 83, 92 (2d Cir. 2004)(citation omitted).

For purposes of a Rule 12(b)(6) motion, Plaintiff has alleged sufficient facts to withstand dismissal of her § 31-51q claim based on these factors. Plaintiff held a faculty appointment with Yale for more than a decade during which time she taught numerous courses to Yale students and provided other services to Yale and its students. (*See* pp. 6-9, supra.) The Handbook which governed Plaintiff's faculty appointment explicitly stated that the policies included and referred to in the Handbook formed "part of the essential *employment* understandings between members of the faculty and the University." (Am. Compl. ¶ 43, JA-40; Handbook Introduction, JA-75)(emphasis added).

Yale certainly possessed the right to control certain aspects of Plaintiff's work. As part of her faculty appointment, Plaintiff was required to provide services to Yale and/or its students which exceeded a certain threshold, and Yale

57

could exercise control over which courses Plaintiff taught and the time and location of those courses, and which services Plaintiff performed.  Plaintiff's work for Yale was also part of Yale's regular business, and Yale is certainly in business. Yale also classified dozens of other faculty members in the School of Medicine as serving in a similar faculty appointment as Plaintiff, as part of its regular business. (Am. Compl. ¶ 45, JA-40.)

In exchange for fulfilling her obligations, Yale directly provided Plaintiff with various benefits, privileges, and opportunities, that were worth tens of thousands of dollars per year, which constitute remuneration.  In addition, Plaintiff received other forms of remuneration for work that she did involving third parties that she was only able to perform because of her affiliation with Yale.  (*See* pp. 6-9, supra.)

C.    <u>Dismissal on Rule 12(b)(6) motion was improper</u>

Regardless of which test is applied, it was improper for the Court to find against Plaintiff on a Rule 12(b)(6) motion that she was not an employee entitled to the protections of § 31-51q.  Under any standard, this issue presents a factual question that should not have been resolved against Plaintiff without a full record.

## <u>CONCLUSION</u>

The Court should reverse the District Court's decision dismissing Plaintiff's claims for breach of contract, breach of the covenant of good faith and fair dealing, and alleging retaliation in violation of Conn. Gen. Stat. § 31-51q, and vacate the judgment entered in favor of Defendant and against Plaintiff.

Respectfully submitted, this 23rd day of December 2022.

By: /s/ Todd Steigman
      Todd Steigman
      Madsen, Prestley & Parenteau, LLC
      402 Asylum Street
      Hartford, CT  06103
      (860) 246-2466 (phone)
      (860) 246-1794 (fax)
      tsteigman@mppjustice.com

      *Counsel for Plaintiff-Appellant*

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**

Pursuant to Fed. R. App. P. 32(a)(7)(C), undersigned counsel certifies that:

1.  This brief complies with the type-volume limitation of 2nd Circuit Local Rule 32.1(a)(4)(A) because it contains 13,319 words, excluding the table of contents, table of citations, signature block, and certifications; and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

*/s/Todd Steigman*
Todd Steigman

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of December, 2022, a true and accurate copy of the foregoing was filed electronically with the Court of Appeals for the Second Circuit via the Court's CM/ECF System.  Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/Todd Steigman*
Todd Steigman