# 22-2634

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

BANDY LEE,

*Plaintiff-Appellant,*

v.

YALE UNIVERSITY,

*Defendant-Appellee.*

On Appeal from the United States District Court
For the District of Connecticut
Case No. 3:21-cv-00389
The Honorable Sarah A.L. Merriam U.S.D.J.

JOINT APPENDIX

Todd D. Steigman
Madsen, Prestley & Parenteau, LLC
402 Asylum Street
Hartford CT 06103
Tel.: (860) 246-2466
tsteigman@mppjustice.com
*Counsel for Plaintiff-Appellant*

Dated: December 23, 2022

# **TABLE OF CONTENTS**

**Page**

United States District Court Docket …………………………………………… JA000001-06

Federal Court Complaint 3/22/21 …………………………………………… JA000007-27

Amended Complaint 8/21/21 ………………………………………….. JA000028-50

Exhibit A, Email 1/13/20 …………………………………………… JA000051-53

Exhibit B, Yale University letter Bandy Lee 9/4/20 ………………………….. JA000054-58

Exhibit C, Yale University letter Bandy Lee 5/17/20 ………………………… JA000059-60

Exhibit D, Email 9/25/20 …………………………………………… JA000061-63

Exhibit E, Yale University Faculty Handbook 8/22/19 ……………………….. JA000064-257

Exhibit F, Yale University letter Bandy Lee 8/21/20 ………………………… JA000258-259

Exhibit G, Yale Provost letter Bandy Lee 9/8/20 ……………………………… JA000260-261

Exhibit H, Email 7/28/17 Bandy Lee Reappointment ………………………… JA000262-263

Motion for Reconsideration 9/19/22 ………………………………………… JA000264-270

Notice of Appeal 10/6/22 …………………………………………… JA000271-272

APPEAL,CLOSED,EFILE

**U.S. District Court**
**District of Connecticut (New Haven)**
**CIVIL DOCKET FOR CASE #: 3:21-cv-00389-SALM**

Lee v. Yale University
Assigned to: Judge Sarah A. L. Merriam
Cause: No cause code entered

Date Filed: 03/22/2021
Date Terminated: 08/30/2022
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Bandy Lee**
*MD, MDiv*

represented by **Jacques J. Parenteau**
Madsen, Prestley & Parenteau, LLC-NL
105 Huntington St., PO Box 1631
New London, CT 06320
860-442-2466
Fax: 860-447-9206
Email: jparenteau@mppjustice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robin B. Kallor**
Rose Kallor, LLP
750 Main Street
Suite 309
Hartford, CT 06103
860-361-7999
Fax: 860-270-0710
Email: rkallor@rosekallor.com
*TERMINATED: 09/21/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd D. Steigman**
Madsen, Prestley & Parenteau, LLC-HTFD
402 Asylum Street
Hartford, CT 06103
860-246-2466
Fax: 860-246-1794
Email: tsteigman@mppjustice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cindy M. Cieslak**
Rose Kallor, LLP
750 Main Street
Suite 309
Hartford, CT 06103
860-361-7999
Fax: 860-270-0710
Email: ccieslak@rosekallor.com
*TERMINATED: 09/21/2022*
*ATTORNEY TO BE NOTICED*

**Melinda A. Powell**
Rose Kallor, LLP
750 Main Street
Suite 309
Hartford, CT 06103
860-361-7999
Fax: 860-270-0710
Email: mpowell@rosekallor.com

*TERMINATED: 09/21/2022*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Yale University**                                    represented by **Caroline B Park**
                                                       Wiggin & Dana-NH
                                                       265 Church St.
                                                       P.O. Box 1832
                                                       New Haven, CT 06510
                                                       203-498-4317
                                                       Fax: 203-782-2889
                                                       Email: cpark@wiggin.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jonathan Freiman**
                                                       Wiggin and Dana LLP
                                                       One Century Tower
                                                       Wiggin and Dana LLP
                                                       265 Church Street
                                                       New Haven, CT 06510
                                                       203-498-4400
                                                       Email: jfreiman@wiggin.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/22/2021 | 1 | COMPLAINT against Yale University ( Filing fee $402 receipt number ACTDC-6440443.), filed by Bandy Lee. (Kallor, Robin) (Entered: 03/22/2021) |
| 03/22/2021 | 2 | EXHIBIT *Civil Cover Sheet* by Bandy Lee re 1 Complaint. (Kallor, Robin) (Entered: 03/22/2021) |
| 03/22/2021 |  | Judge Michael P. Shea added. (Nuzzi, Tiffany) (Entered: 03/22/2021) |
| 03/22/2021 | 3 | Order on Pretrial Deadlines: Amended Pleadings due by 5/21/2021. Discovery due by 9/21/2021. Dispositive Motions due by 10/26/2021.<br>Signed by Clerk on 03/22/2021. (Peterson, M) (Entered: 03/22/2021) |
| 03/22/2021 | 4 | ELECTRONIC FILING ORDER FOR COUNSEL - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER<br>Signed by Judge Michael P. Shea on 03/22/2021. (Peterson, M) (Entered: 03/22/2021) |
| 03/22/2021 | 5 | STANDING PROTECTIVE ORDER<br>Signed by Judge Michael P. Shea on 03/22/2021. (Peterson, M) (Entered: 03/22/2021) |
| 03/22/2021 | 6 | Notice re Initial Discovery Protocols<br>Signed by Clerk on 03/22/2021. (Attachments: # 1 Initial Discovery Protocols Attachment) (Peterson, M) (Entered: 03/22/2021) |
| 03/22/2021 | 7 | NOTICE TO COUNSEL/SELF-REPRESENTED PARTIES : Counsel or self-represented parties initiating or removing this action are responsible for serving all parties with attached documents and copies of 5 Protective Order, 4 Electronic Filing Order, 2 Exhibit filed by Bandy Lee, 1 Complaint filed by Bandy Lee, 3 Order on Pretrial Deadlines, 6 Notice Signed by Clerk on 03/22/2021. (Peterson, M) (Entered: 03/22/2021) |
| 03/23/2021 | 8 | NOTICE of Appearance by Cindy M. Cieslak on behalf of Bandy Lee (Cieslak, Cindy) (Entered: 03/23/2021) |
| 03/23/2021 | 9 | NOTICE of Appearance by Melinda A. Powell on behalf of Bandy Lee (Powell, Melinda) (Entered: 03/23/2021) |
| 04/19/2021 | 10 | WAIVER OF SERVICE Returned Executed as to Yale University waiver sent on 3/22/2021, answer due 5/21/2021 filed by Bandy Lee. (Kallor, Robin) (Entered: 04/19/2021) |
| 05/11/2021 | 11 | NOTICE of Appearance by Jonathan M. Freiman on behalf of Yale University (Freiman, Jonathan) (Entered: 05/11/2021) |
| 05/11/2021 | 12 | NOTICE of Appearance by Caroline B Park on behalf of Yale University (Park, Caroline) (Entered: 05/11/2021) |
| 05/11/2021 | 13 | Consent MOTION for Extension of Time until June 11, 2021 to Answer or Otherwise Respond to 1 Complaint by Yale University. (Freiman, Jonathan) (Entered: 05/11/2021) |

| 05/12/2021 | 14 | ORDER. The 13 motion for extension is hereby GRANTED. Defendant shall file a responsive pleading by **June 11, 2021**. Signed by Judge Michael P. Shea on 5/12/2021. (Super, John) (Entered: 05/12/2021) |
|---|---|---|
| 05/12/2021 | | Answer deadline updated for Yale University to 6/11/2021. (Johnson, D.) (Entered: 05/13/2021) |
| 06/11/2021 | 15 | MOTION to Dismiss *Plaintiff's Complaint* by Yale University.Responses due by 7/2/2021 (Attachments: # 1 Memorandum in Support of Defendant's Motion to Dismiss Plaintiff's Complaint, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G)(Freiman, Jonathan) (Entered: 06/11/2021) |
| 06/11/2021 | 16 | Corporate Disclosure Statement by Yale University. (Freiman, Jonathan) (Entered: 06/11/2021) |
| 06/14/2021 | 17 | ORDER. Defendant has filed a 15 Motion to Dismiss. On or before **July 2, 2021**, Plaintiff shall either file a response to the motion or file an amended complaint in which it pleads as many facts as possible, consistent with Rule 11, to address the alleged defects discussed in Defendant's memorandum of law. The Court will not allow further amendments after **July 2, 2021**. If Plaintiff chooses to amend and if Defendant renews its motion to dismiss, Defendant may incorporate by reference any prior briefing. Signed by Judge Michael P. Shea on 6/14/2021. (Super, John) (Entered: 06/14/2021) |
| 06/14/2021 | | Set Deadlines as to 15 MOTION to Dismiss *Plaintiff's Complaint*.(Responses due by 7/2/2021, ) or ( Amended Complaint due by 7/2/2021) (Johnson, D.) (Entered: 06/15/2021) |
| 06/16/2021 | 18 | MOTION for Extension of Time until August 2, 2021 *to* file an Amended Complaint or oppose or otherwise Respond to Defendant's Motion to Dismiss by Bandy Lee. (Kallor, Robin) (Entered: 06/16/2021) |
| 06/17/2021 | 19 | ORDER. The 18 motion for extension is hereby GRANTED. Plaintiff's deadline to file an amended complaint or response to the 15 motion to dismiss is **August 2, 2021**. Signed by Judge Michael P. Shea on 6/17/2021. (Super, John) (Entered: 06/17/2021) |
| 06/17/2021 | | Set Deadlines as to 15 MOTION to Dismiss *Plaintiff's Complaint*.(Responses due by 8/2/2021, ),or ( Amended Complaint due by 8/2/2021) (Johnson, D.) (Entered: 06/17/2021) |
| 06/24/2021 | 20 | REPORT of Rule 26(f) Planning Meeting. (Kallor, Robin) (Entered: 06/24/2021) |
| 06/25/2021 | 21 | MOTION to Stay *Discovery Pending Ruling on Motion to Dismiss* by Yale University.Responses due by 7/16/2021 (Attachments: # 1 Exhibit A)(Freiman, Jonathan) (Entered: 06/25/2021) |
| 07/09/2021 | 22 | OBJECTION re 21 MOTION to Stay *Discovery Pending Ruling on Motion to Dismiss* filed by Bandy Lee. (Cieslak, Cindy) (Entered: 07/09/2021) |
| 07/22/2021 | 23 | Memorandum in Support re 21 MOTION to Stay *Discovery Pending Ruling on Motion to Dismiss Reply Memorandum in Further Support of 21* filed by Yale University. (Freiman, Jonathan) (Entered: 07/22/2021) |
| 07/23/2021 | 24 | MOTION for Extension of Time to File Response/Reply *or file an Amended Complaint* as to 15 MOTION to Dismiss *Plaintiff's Complaint* until August 23, 2021 by Bandy Lee. (Cieslak, Cindy) (Entered: 07/23/2021) |
| 07/29/2021 | 25 | ORDER. The 24 motion for extension is hereby GRANTED. Plaintiff's deadline to respond to Defendant's motion to dismiss or to file an amended complaint is now **August 23, 2021**. Signed by Judge Michael P. Shea on 7/29/2021. (Silva, Madeline) (Entered: 07/29/2021) |
| 07/29/2021 | | Reset deadline as to 15 MOTION to Dismiss Plaintiff's Complaint: Response or amended complaint is now due by 8-23-2021 per Dkt. 25 Order. (Shafer, J.) (Entered: 07/29/2021) |
| 08/10/2021 | 26 | ORDER. The 21 motion to stay discovery pending the Court's ruling on the motion to dismiss is hereby GRANTED. Should the Court deny the motion to dismiss (in whole or in part), the parties shall file a revised Rule 26(f) Report within 14 days of the Court's ruling. Signed by Judge Michael P. Shea on 8/10/2021. (Silva, Madeline) (Entered: 08/10/2021) |
| 08/21/2021 | 27 | AMENDED COMPLAINT against Yale University, filed by Bandy Lee.(Cieslak, Cindy) (Entered: 08/21/2021) |
| 08/26/2021 | 28 | Consent MOTION for Extension of Time until September 17, 2021 to Respond to 27 Amended Complaint by Yale University. (Park, Caroline) (Entered: 08/26/2021) |
| 08/27/2021 | 29 | ORDER. In light of the plaintiff's filing of an amended complaint, the 15 motion to dismiss is DENIED AS MOOT. In addition the 28 motion to extend is GRANTED. The defendant's deadline to respond to the amended complaint or to renew its motion to dismiss is **September 17, 2021**. Signed by Judge Michael P. Shea on 8/27/2021. (Silva, Madeline) (Entered: 08/27/2021) |
| 08/27/2021 | | Answer deadline updated for Yale University to 9/17/2021. (Johnson, D.) (Entered: 08/30/2021) |

| 09/13/2021 | 30 | Consent MOTION for Leave to File Excess Pages *re their Motion to Dismiss* by Yale University. (Freiman, Jonathan) (Entered: 09/13/2021) |
|---|---|---|
| 09/14/2021 | 31 | ORDER. The 30 motion for leave to file excess pages is hereby GRANTED. |
| | | Signed by Judge Michael P. Shea on 9/14/2021. (Silva, Madeline) (Entered: 09/14/2021) |
| 09/17/2021 | 32 | MOTION to Dismiss *Plaintiff's Amended Complaint* 27 by Yale University.Responses due by 10/8/2021 (Attachments: # 1 Memorandum in Support of Motion to Dismiss Plaintiff's Amended Complaint, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H)(Freiman, Jonathan) (Entered: 09/17/2021) |
| 09/23/2021 | 33 | Consent MOTION for Extension of Time until November 8, 2021 to Respond to Defendant's Motion to Dismiss by Bandy Lee. (Cieslak, Cindy) (Entered: 09/23/2021) |
| 09/28/2021 | 34 | ORDER. The 33 motion for extension is hereby GRANTED, as follows: The plaintiff's deadline to respond to the defendant's motion to dismiss is now **November 8, 2021**. |
| | | Signed by Judge Michael P. Shea on 9/28/2021. (Silva, Madeline) (Entered: 09/28/2021) |
| 09/28/2021 | | Set Deadlines as to 32 MOTION to Dismiss *Plaintiff's Amended Complaint* 27 . Responses due by 11/8/2021 (Johnson, D.) (Entered: 09/28/2021) |
| 11/08/2021 | 35 | Memorandum in Opposition re 32 MOTION to Dismiss *Plaintiff's Amended Complaint* 27 filed by Bandy Lee. (Powell, Melinda) (Entered: 11/08/2021) |
| 11/12/2021 | 36 | Consent MOTION for Extension of Time until December 13, 2021 to Reply to 35 Memorandum in Opposition to Motion by Yale University. (Freiman, Jonathan) (Entered: 11/12/2021) |
| 11/15/2021 | 37 | ORDER. The 36 motion for extension is hereby GRANTED, as follows: the defendant shall file its reply brief in further support of its motion to dismiss by **December 13, 2021**. |
| | | Signed by Judge Michael P. Shea on 11/15/2021. (Silva, Madeline) (Entered: 11/15/2021) |
| 11/15/2021 | | Set Deadlines as to 32 MOTION to Dismiss *Plaintiff's Amended Complaint* 27 . Responses due by 12/13/2021 (Johnson, D.) (Entered: 11/16/2021) |
| 12/13/2021 | 38 | REPLY to Response to 32 MOTION to Dismiss *Plaintiff's Amended Complaint* 27 *Reply in Further Support of Defendant's Motion to Dismiss Plaintiff's Amended Complaint* filed by Yale University. (Freiman, Jonathan) (Entered: 12/13/2021) |
| 12/22/2021 | 39 | ORDER OF TRANSFER. Case reassigned to Judge Sarah A. L. Merriam for all further proceedings. Signed by Clerk on 12/22/2021.(Hushin, Z.) (Entered: 12/22/2021) |
| 08/04/2022 | 40 | MOTION for To Lift Stay of Discovery Order by Bandy Lee. (Attachments: # 1 Memorandum in Support, # 2 Affidavit)(Cieslak, Cindy) (Entered: 08/04/2022) |
| 08/25/2022 | 41 | Memorandum in Opposition re 40 MOTION for To Lift Stay of Discovery Order filed by Yale University. (Attachments: # 1 Exhibit A)(Freiman, Jonathan) (Entered: 08/25/2022) |
| 08/30/2022 | 42 | RULING. For the reasons set forth in the attached Ruling, defendant's Motion to Dismiss (Doc. # 32 ) is **GRANTED**. The Clerk shall close this case. It is so ordered. Signed by Judge Sarah A. L. Merriam on 8/30/2022. (Teague, J.) (Entered: 08/30/2022) |
| 08/30/2022 | 43 | JUDGMENT entered in favor of Yale University against Bandy Lee. |
| | | For Appeal Forms please go to the following website: http://www.ctd.uscourts.gov/forms/all-forms/appeals_forms Signed by Clerk on 8/30/2022.(Caffrey, A.) (Entered: 08/30/2022) |
| 08/30/2022 | | JUDICIAL PROCEEDINGS SURVEY - FOR COUNSEL ONLY: The following link to the confidential survey requires you to log into CM/ECF for SECURITY purposes. Once in CM/ECF you will be prompted for the case number. Although you are receiving this survey through CM/ECF, it is hosted on an independent website called SurveyMonkey. Once in SurveyMonkey, the survey is located in a secure account. The survey is not docketed and it is not sent directly to the judge. To ensure anonymity, completed surveys are held up to 90 days before they are sent to the judge for review. We hope you will take this opportunity to participate, please click on this link: |
| | | https://ecf.ctd.uscourts.gov/cgi-bin/Dispatch.pl?survey (Caffrey, A.) (Entered: 08/30/2022) |
| 09/19/2022 | 44 | NOTICE of Appearance by Todd D. Steigman on behalf of Bandy Lee (Steigman, Todd) (Entered: 09/19/2022) |
| 09/19/2022 | 45 | NOTICE of Appearance by Jacques J. Parenteau on behalf of Bandy Lee (Parenteau, Jacques) (Entered: 09/19/2022) |
| 09/19/2022 | 46 | Emergency MOTION For Permission to File Motion for Reconsideration, Nunc Pro Tunc by Bandy Lee.Responses due by 9/29/2022 (Steigman, Todd) Modified text to reflect revised response deadline per Order #50 on 9/20/2022 (Caffrey, |

JA-000004

| | | A.). (Entered: 09/19/2022) |
|---|---|---|
| 09/20/2022 | 47 | MOTION for Robin B. Kallor to Withdraw as Attorney by Bandy Lee. (Kallor, Robin) (Entered: 09/20/2022) |
| 09/20/2022 | 48 | MOTION for Cindy M. Cieslak to Withdraw as Attorney by Bandy Lee. (Cieslak, Cindy) (Entered: 09/20/2022) |
| 09/20/2022 | 49 | MOTION for Melinda A. Powell to Withdraw as Attorney by Bandy Lee. (Powell, Melinda) (Entered: 09/20/2022) |
| 09/20/2022 | 50 | ORDER. Plaintiff has filed an "Emergency Motion for Leave to File Motion for Reconsideration Nunc Pro Tunc[.]" Doc. # 46 at 1. Defendant shall file any response to the motion on or before **September 29, 2022**. It is so ordered. Signed by Judge Sarah A. L. Merriam on 09/20/2022. (Powers, L.) (Entered: 09/20/2022) |
| 09/20/2022 | | Reset Deadlines as to 46 Emergency MOTION For Permission to File Motion for Reconsideration, Nunc Pro Tunc. Responses due by 9/29/2022. (Powers, L.) (Entered: 09/20/2022) |
| 09/20/2022 | 51 | MOTION for Extension of Time until October 29, 2022 To File Notice of Appeal by Bandy Lee. (Steigman, Todd) (Entered: 09/20/2022) |
| 09/21/2022 | 52 | ORDER granting 47 Motion for Robin B. Kallor to Withdraw as Attorney. The appearance of Attorney Robin B. Kallor is hereby terminated. It is so ordered. Signed by Judge Sarah A. L. Merriam on 09/21/2022. (Powers, L.) (Entered: 09/21/2022) |
| 09/21/2022 | 53 | ORDER granting 48 Motion for Cindy M. Cieslak to Withdraw as Attorney. The appearance of Attorney Cindy M. Cieslak is hereby terminated. It is so ordered. Signed by Judge Sarah A. L. Merriam on 09/21/2022. (Powers, L.) (Entered: 09/21/2022) |
| 09/21/2022 | 54 | ORDER granting 49 Motion for Melinda A. Powell to Withdraw as Attorney. The appearance of Attorney Melinda A. Powell is hereby terminated. It is so ordered. Signed by Judge Sarah A. L. Merriam on 09/21/2022. (Powers, L.) (Entered: 09/21/2022) |
| 09/21/2022 | 55 | ORDER granting, in part, and denying, in part, over objection 51 MOTION for Extension of Time until October 29, 2022 To File Notice of Appeal. Plaintiff moves "for a thirty-day extension of time, until October 29, 2022, to file a notice of appeal." Doc. # 51 at 1. Defendant objects. The Court finds that the need for the Court to address the (untimely) motion for reconsideration provides good cause for a limited extension, and that no significant prejudice to defendant will result from such an extension. <br> Plaintiff shall file any Notice of Appeal on or before **October 17, 2022**. The Court does not anticipate granting further extensions of this deadline. It is so ordered. Signed by Judge Sarah A. L. Merriam on 09/21/2022. (Powers, L.) (Entered: 09/21/2022) |
| 09/22/2022 | 56 | Memorandum in Opposition *Nunc Por Tunc* re 46 Emergency MOTION For Permission to File Motion for Reconsideration, Nunc Pro Tunc filed by Yale University. (Freiman, Jonathan) (Entered: 09/22/2022) |
| 09/23/2022 | 57 | REPLY to Response to 46 Emergency MOTION For Permission to File Motion for Reconsideration, Nunc Pro Tunc filed by Bandy Lee. (Steigman, Todd) (Entered: 09/23/2022) |
| 10/06/2022 | 58 | ORDER denying 46 Emergency Motion for Permission to File Motion for Reconsideration. On August 30, 2022, the Court issued a Ruling granting defendant's Motion to Dismiss, and closed this case. See Doc. # 42 . On September 19, 2022, plaintiff, through new counsel, filed a motion seeking "permission to file a motion for reconsideration, nunc pro tunc, with respect to the Court's Ruling granting Defendant's motion to dismiss." Doc. # 46 at 1. Local Rule 7(c) provides that any motion for reconsideration "shall be filed and served within seven (7) days of the filing of the decision or order from which relief is sought[.]" D. Conn. L. Civ. R. 7(c)(1). The instant motion was filed twenty days after the Court's Ruling. The Court has evaluated the arguments plaintiff asserts she would make if permitted to file an untimely motion to reconsider, and finds that any such motion would be futile. <br><br> "Motions for reconsideration shall not be routinely filed and shall satisfy the strict standard applicable to such motions. Such motions will generally be denied unless the movant can point to controlling decisions or data that the court overlooked in the initial decision or order." D. Conn. L. Civ. R. 7(c)(1). A motion to reconsider may not be used "solely to relitigate an issue already decided." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). A motion for reconsideration is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012) (citation and quotation marks omitted). <br><br> Plaintiff chose to retain new counsel after the Court issued its ruling. See Docs. # 44 , # 45 . The fact that plaintiff's new counsel might have made different arguments about the sufficiency of the claims in the Amended Complaint does not warrant reconsideration. Courts have consistently held that the "mere appearance of [new] counsel does not" provide grounds for reconsideration. J.P. Morgan Chase Bank, N.A. v. Caires, No. 3:17CV01298(JCH), 2017 WL 4071137, at *1 n.1 (D. Conn. Sept. 14, 2017); see also Lopes v. First Unum Ins. Co., No. 09CV02642(RRM), 2011 WL 13298876, at *2 (E.D.N.Y. Dec. 27, 2011) ("Reconsideration is not the proper remedy, where... plaintiff has submitted no new facts or law but merely questions the effectiveness of her attorney's tactical decisions[.]"). <br><br> Plaintiff's new counsel "may be dissatisfied with its predecessor's arguments to the Court, but on a reconsideration motion, [plaintiff's] new counsel is bound by those arguments." Pierre v. Planet Auto., Inc., No. 13CV00675(MKB), 2016 WL 6459617, at *4 (E.D.N.Y. Oct. 24, 2016). Plaintiff simply "seeks a fresh attempt with new counsel to |

|  |  | persuade the Court on the merits of its interpretation, which is simply not the appropriate use of a [reconsideration] motion." Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, No. 19CV06957(AJN), 2022 WL 889209, at *2 (S.D.N.Y. Mar. 25, 2022). Plaintiff's new counsel fails to "point to controlling decisions or data that the court overlooked in the initial decision or order." D. Conn. L. Civ. R. 7(c).<br><br>In fact, the Court did not "overlook" any of the matters raised in plaintiff's proposed motion. See Doc. # 46 . When considering a motion to dismiss, the Court's task is to determine whether the complaint, apart from any of its conclusory allegations, alleges "enough facts to state a claim [for] relief that is plausible on its face[.]" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). The substance of plaintiff's proposed, untimely motion would not alter the Court's conclusion that the Amended Complaint, on its face, failed to state a cognizable claim. "Some of these arguments were previously asserted before the Court, whereas some are new or repackaged[.]... Not one of these arguments, however, provides a basis for reconsideration." Hertz Glob. Holdings Inc., 2022 WL 889209, at *2. Plaintiff merely seeks to "tak[e] a second bite at the apple." Analytical Surveys, Inc., 684 F.3d at 52. That is not the purpose of a motion for reconsideration. Therefore, plaintiff's motion for permission to file an untimely motion for reconsideration is **DENIED**.<br><br>It is so ordered. Signed by Judge Sarah A. L. Merriam on 10/06/2022. (Powers, L.) (Entered: 10/06/2022) |
| 10/06/2022 | 59 | NOTICE OF APPEAL re: 42 Ruling, 43 Judgment, 58 Order by Bandy Lee. Filing fee $ 505, receipt number ACTDC-7093467. (Steigman, Todd) Modified on 10/7/2022 TO LINK TO DOC #42, #43 and #58 (Oliver, T.). (Entered: 10/06/2022) |
| 10/06/2022 | 60 | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: 59 Notice of Appeal. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Dinah Milton Kinney, Clerk. Documents manually filed not included in this transmission: none (Oliver, T.) (Entered: 10/07/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/19/2022 15:27:37 | | |
| PACER Login: Tsteigman | Client Code: | |
| Description: | Docket Report | Search Criteria: 3:21-cv-00389-SALM |
| Billable Pages: 7 | Cost: | 0.70 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **BANDY LEE, MD, MDiv,** | : | **CASE NO.** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **YALE UNIVERSITY,** | : | |
| **Defendant.** | : | **MARCH 22, 2021** |

**COMPLAINT**

## I. PRELIMINARY STATEMENT

1. This is an action for damages, declaratory and injunctive relief, and other equitable relief, arising out of Yale University's ("Yale") unlawful termination of Dr. Bandy Lee's ("Dr. Lee" or "Plaintiff") faculty appointment on its own and at the behest of Professor Alan Dershowitz ("Mr. Dershowitz"), due to her exercise of free speech about the dangers of Donald Trump's presidency. Her public statements, which further included commentary about the influence that President Trump's persona had on his "inner circle", including Mr. Dershowitz, and opposition to the American Psychiatric Association's ("APA") gag order of its member psychiatrists under a reinterpretation of the Goldwater Rule were protected by the First Amendment of the Connecticut and United States Constitutions as codified in Conn. Gen. Stat. § 31-51q and by Yale's guarantees of academic freedom. Yale violated its contractual obligations to Dr. Lee and violated the implied covenant of good faith and fair dealing. Yale further committed the tort of negligent misrepresentation by not adhering to its policies on academic freedom, upon which Dr. Lee had relied.

## II.    THE PARTIES

2.    Dr. Lee graduated from Yale School of Medicine in 1994 and earned a Masters of Divinity from Yale Divinity School in 1995.  After completing a psychiatric residency at Massachusetts General Hospital and a fellowship at Harvard Medical School, in 2003, Dr. Lee was appointed as Assistant Clinical Professor, Law and Psychiatry Division, Yale School of Medicine.  Her research focuses on formulating the multiple, interlinked determinants of violence by exploring the interaction between biological, psychological, social, and environmental processes for effective prevention.

3.    Dr. Lee is a resident of the State of New York.

4.    Yale is a university incorporated in Connecticut, with its principal place of business in New Haven, Connecticut.  Yale School of Medicine is a medical school within Yale University.  Yale Law School is a law school within Yale University.

## III.    JURISDICTION AND VENUE

5.    Dr. Lee is alleging, *inter alia*, retaliation based upon her exercise of free speech rights guaranteed by the United States and Connecticut Constitutions in violation of Conn. Gen. Stat. § 31-51q.  Accordingly, this Court has federal question jurisdiction over Plaintiff's § 31-51q claim and supplemental jurisdiction over Dr. Lee's remaining state law tort claims pursuant to 28 U.S.C. § 1367.

6.    This Court also has subject matter jurisdiction over the dispute due to diversity of citizenship, as there is complete diversity between the parties, and the amount in controversy is in excess of $75,000.  In addition to the economic loss Dr. Lee suffered as a result of Defendant's actions, Conn. Gen. Stat. § 31-51q provides for recovery of attorney's fees for a prevailing plaintiff.

2

7.     This Court has personal jurisdiction over the parties, as Yale is domiciled in Connecticut, and all of the acts that give rise to this action occurred within the State of Connecticut.

8.     Venue is proper in Connecticut as all of the acts giving rise to this action occurred in Connecticut.

## IV.    FACTS

9.     Dr. Lee served as a faculty member of the Law and Psychiatry Division at Yale School of Medicine for 17 years. She taught at Yale Law School for 15 of those years, covering the mental health aspects of asylum law, criminal justice, and immigration legal services.  Her reappointment was renewed every three years, ending on June 30, and renewing on July 1.

10.     Dr. Lee's appointment required that she participate in four hours of student-related, teaching, or supervisory activities per week.  These activities could be satisfied through teaching a course, through advising students in connection with their thesis preparation, supervising residents, participating in seminars and grand rounds, engaging in scholarly activity, participating in department administration, and other activities. Dr. Lee more than satisfied this weekly requirement on an annual basis.

11.     In exchange for her student-related and teaching activities, Dr. Lee received benefits, privileges, and opportunities, as well as related compensation and other indirect but significant remuneration, that she would not have otherwise received but for her academic affiliation with Yale.

12.     Through her appointment at Yale, Dr. Lee was entitled to receive and did receive benefits, privileges, opportunities, and related compensation and other indirect but significant remuneration, including but not limited to: office space, facilities, libraries, subscription-based access to research databases and journal articles, statisticians, laboratories, statistical programs and

JA-000009

software, IT and technology services, computer programs and software, media studios (radio and television), and campus transportation, all of which she used for her research, writing, to assist with her speaking engagements, advocacy and other professional obligations.  Notably, Dr. Lee was informed by the Law & Psychiatry Division Head, Dr. Howard Zonana, that in connection with her faculty appointment, she was covered by Yale's professional malpractice insurance policy for her forensic consultations. Through her faculty appointment, she was given additional "perks" in the form of discounts on food items sold on campus, as well as other retail stores in New Haven, and access to workout facilities. These benefits, privileges, opportunities, and related compensation or other indirect but significant remuneration would cost Dr. Lee thousands, if not tens of thousands, of dollars if she were to obtain the same on her own.

13.     Through her faculty appointment, she was able to provide clinical work consisting of psychiatric services at maximum-security prisons and in state hospitals, in addition to working as an expert witness for the state and federal courts.

14.     Additionally, through this faculty appointment with Yale, she became a Resident Consultant for the World Health Organization in Geneva, Switzerland and later became the Director of the Violence and Health Study Group of the MacMillan Center for International and Area Studies at Yale University, with membership in the Violence Prevention Alliance, World Health Organization as the project leader of an academic collaborators group, a position she held from 2011 until the termination of her faculty appointment from Yale Medical School effective on June 30, 2020.  She also served as the Director of Research for the Center for the Study of Violence at Harvard, University of Pennsylvania, New York University, and Yale.  Through her faculty appointment with Yale, she obtained opportunities to consult with governments on prison reform and community violence prevention, such as for France, Ireland, Alabama, California,

Connecticut, Massachusetts, and New York. Further, Yale Law School and its Legal Clinics referred asylum, criminal justice, and veteran cases to her for expert review and consultation in support of the applicants' petitions for asylum in the federal immigration courts, criminal cases in the State of Connecticut Judicial Branch of New Haven, and veteran claims in the United States Court of Appeals for Veterans Claims. These opportunities directly resulted from her academic affiliation with Yale.

15.     Through her faculty appointment at Yale, she contributed to the launch of Yale's Global Health Initiative and created a popular Global Health Studies course at Yale College, "Violence: Causes and Cures," which led to the most comprehensive textbook on the subject to date, *Violence: An Interdisciplinary Approach to Causes, Consequences, and Cures* (Wiley-Blackwell, 2019). Also, through her faculty appointment, she was able to publish over 100 peer-reviewed articles and chapters, 17 edited scholarly books and journal special issues, almost 300 op-eds in outlets such as *The Guardian*, *The New York Times*, *The Boston Globe*, *The Independent*, and *Politico*, as well as *The New York Times* bestseller, *The Dangerous Case of Donald Trump: 27 Psychiatrists and Mental Health Experts Assess a President* (Macmillan, 2017 and 2019).

16.     Through the resources and benefits she received due to her faculty appointment at Yale, as well as the courses she taught, Dr. Lee became a well-known and reputable scholar on violence prevention, with students seeking to study with her from both within and outside of Yale. Her appointment allowed her to be retained to serve as an expert witness. Further, Dr. Lee received grants that she could only obtain based upon her academic affiliation.

17.     A majority of Dr. Lee's income was derived from her faculty appointment and relationship with Yale.

18. In March 2017, shortly after Donald Trump's inauguration, the American Psychiatric Association (APA) reinterpreted its *Goldwater Rule*. The reinterpreted *Goldwater Rule* created a gag order, recommending that its members not comment on public figures, even without diagnosing them and even where there is a responsibility to society to protect public health.

19. The American Psychiatric Association (APA) is a voluntary professional organization of psychiatrists.

20. Dr. Lee has not been a member of the APA since 2007.

21. Dr. Lee believed the newly reinterpreted *Goldwater Rule* was in conflict with psychiatrists' duties, responsibilities, and role in the interest of public health in light of her belief that Donald Trump posed a dangerous threat to this country and the world. For this reason, she held an ethics conference at Yale in April 2017 with some of the most respected members of her profession. This conference initially had approximately two dozen attendees and then drew national attention and led to the public-service book, *The Dangerous Case of Donald Trump: 27 Psychiatrists and Mental Health Experts Assess a President*. Although Yale did not officially sponsor the conference, Dr. Lee discussed the conference with Yale, and she was able to use an auditorium at Yale without charge.

22. That book became an unprecedented *New York Times* bestseller of its kind. The featured authors represented only a small sample of the many thousands of mental health professionals who came forth in historically unprecedented ways. These psychiatrists formed a professional organization, the National Coalition, which then expanded internationally, becoming the World Mental Health Coalition (WMHC), by the end of 2017. It is the only professional organization to address the issue of dangerous leadership, intending to step in where the American

6

Psychiatric Association demurred. It also remains the largest organization of mental health professionals to speak up against Donald Trump's presidency.

23.     Dr. Lee and the other authors assert in the book that President Trump's mental health was affecting the mental health of the people of the United States, and further, that he was placing the country at grave risk of involving it in multiple forms of violence and undermining democracy itself as a result of objective signs of dangerous pathology. Consequently, Dr. Lee and the other authors claim that Trump's presidency represented an emergency which not only allowed, *but required*, psychiatrists in the United States to sound the alarms. The authors maintain that pointing out danger and calling for an evaluation differs from the medical processes of patient diagnosis, and they have criticized the American Psychiatric Association for manipulating professional norms and standards, from reasonable ethical guidelines into a gag order under political pressure, because mental health professionals provide a check against mental pathology.

24.     Following the assassination of Qasem Soleimani in January 2020, these professionals opined that Donald Trump would meet the criteria for an involuntary mental health evaluation, and some of these professionals in the WMHC were contemplating seeking court intervention.

25.     In July 2019, Mr. Dershowitz, who was under public scrutiny following revelations about his ties to the late financier Jeffrey Epstein, claimed on Fox News that he had a "perfect, perfect sex life." Prior to July 2019, Mr. Dershowitz was a known supporter of Donald Trump. Indeed, he has been quoted in articles dating back to at least 2018 complaining that he was shunned by his political allies "who have stopped inviting him to dinners" and friends who have excluded him from "social circles on Martha's Vineyard." *See* "Alan Dershowitz Says 'Friends on Martha's Vineyard are Shunning Him For Defending Trump," *Washington Post*, July 3, 2018.

7

26.     In December 2019, the United States Congress initiated impeachment proceedings against President Trump for, among other things, abuse of power following, *inter alia*, a telephone call between President Trump and the Ukrainian President Volodymyr Zalensky on or about July 25, 2019. Since September 2019, and again in November 2019, President Trump had publicly and repetitively defended said call as a "perfect conversation" or "perfect call." The impeachment proceedings were completed in February 2020. Mr. Dershowitz was one of many lawyers on Trump's legal team.

27.     Before the completion of impeachment proceedings, on January 2, 2020, University of Minnesota Law Professor and Yale Law School alumnus Richard Painter tweeted and tagged Dr. Lee to Mr. Dershowitz's characterization of his "perfect sex life," stating that Dershowitz's phrasing was similar to Trump's recount of the "perfect" call. Dr. Lee responded, "Alan Dershowitz's employing the odd use of 'perfect'…might be dismissed as ordinary influence in most contexts." She added that "given the severity and spread of 'shared psychosis' among just about all of Trump's followers, a different scenario is more likely," and that scenario was "that he has wholly taken on Trump's symptoms by contagion."

28.     When Dr. Lee stated "symptoms by contagion," she was not diagnosing Mr. Dershowitz, but rather commenting on a widespread phenomenon of "shared psychosis," also known as "folie à plusieurs," which refers to the contagion of symptoms that can happen in a situation where a highly symptomatic individual is placed in an influential position. Under such conditions, the person's symptoms may spread through the population through emotional bonds: heightening existing pathologies ("folie simultanée"), triggering personality predisposition ("folie impose"), or inducing symptoms in previously healthy individuals ("folie communiquée"). Despite the English phrase, "psychosis" is not always present, but the more commonly induced symptoms

8

are delusions, paranoia and propensity for violence. Dr. Lee has extensive experience with this phenomenon, having worked almost exclusively in public-sector and prison settings, where severely symptomatic individuals often go untreated and influence entire families or gangs. She believed that President Trump's followers were likely to be influenced to some degree by his pathology because of the level of exposure, not necessarily because of the specific use of the word "perfect" but by the exaggerated sense of self and impunity they seemed to share.

29.     Following this tweet, on January 11, 2020, Mr. Dershowitz sent an email to, *inter alia*, Yale spokesperson Karen Peart, University President Peter Salovey's Chief of Staff Joy McGrath, and Yale Law School Dean Heather Gerken, asserting "Dr. Bandy Lee of the Yale Medical School has publicly 'diagnosed' me as 'psychotic,' based on my legal and political views, and without ever examining or even meeting me." He continued, "This constitutes a serious violation of the ethics rules of the American Psychiatric Association. I am formally asking that association to discipline Dr. Lee. By this email, I also formally ask Yale University, Yale Law School and its medical school to determine whether Dr. Lee violated any of its rules."

30.     As a result of and in immediate response to Mr. Dershowitz's actions, in an email dated January 13, 2020, Dr. John Krystal, the Chair of the Psychiatry Department, warned Dr. Lee that the department would be compelled to "terminate [her] teaching role at Yale University" if her "behavior d[id] not change." He indicated that Yale would terminate her faculty appointment. Referring to public statements Dr. Lee had made regarding the mental health of President Donald Trump and Mr. Dershowitz, Dr. Krystal stated, "It seems to me ... that the published quotes suggest that you are not making cautious, reasoned statements qualified by the limitations of the information you have .... Worse, the recklessness of your comments creates the appearance that they are self-serving in relation to your personal political beliefs and other possible personal

9

aspirations." He added, "You are putting me in a position where I have to ask, 'Is this the sort of person that I can trust to teach medical students, residents, and forensic psychiatry fellows?'"

31.     Following Mr. Dershowitz's January 11, 2020 complaint, Yale Law School and its Legal Clinic ceased its referral of student cases to Dr. Lee, including one that was actively in process.

32.     On January 17, 2020, in immediate response to Mr. Dershowitz's January 11, 2020 complaint, Dr. Krystal called Dr. Lee to a meeting that included three additional faculty members during which Dr. Lee was told that she had breached psychiatric ethics by "diagnosing" Mr. Dershowitz, a conclusion with which Dr. Lee strongly disagreed. Dr. Lee expressed her desire for a discussion and asked for an investigation, as she felt that what constitutes psychiatric ethics had been distorted under the Trump presidency. Yale refused to have further discussions with Dr. Lee and refused to investigate the matter.

33.     No further word came before the notice of her termination on May 17, 2020. That termination letter cited that the reason for her termination was because she did not have a formal teaching role. That reason was pretextual, as other faculty members were permitted to remain on staff who had not had formal teaching roles and who had not attended seminars regularly. In fact, Dr. Lee had been attending three hours of seminar and one hour of grand rounds per week. Further, she was assisting multiple students with their theses, and another student with a research project, all who had sought her out on the basis of her affiliation with the Law and Psychiatry Division.

34.     Prior to Mr. Dershowitz's communication to Yale, Division Head Dr. Zonana complimented her on how she was handling her public statements. Prior to the publication of her book, she discussed it with her Division Head, who agreed to its publication and her involvement

and understood her position regarding the APA's change in its interpretation of its *Goldwater Rule*, which was a recommendation without enforcement mechanisms even for APA members.

35.     Prior to Mr. Dershowitz's communication to Yale, Dr. Krystal also commended Dr. Lee's work.

36.     Yale administration, including Dr. John Krystal, had no concerns about Dr. Lee's involvement in the World Mental Health Coalition or her speaking engagements. In late 2017, Yale requested that she disclaim that her opinions were her own and were not endorsed by Yale. Dr. Lee complied with the request.

37.     Dr. Lee's faculty appointment was covered by the Faculty Handbook.

38.     The latest version of the Faculty Handbook, dated August 22, 2019, states: "The policies included and referred to in this *Handbook* form part of **the essential employment understandings** between members of the faculty and the University." (emphasis added).

39.     Rights of academic freedom and freedom of expression are expressly preserved in the Faculty Handbook, and elsewhere on Yale's website.

40.     Dr. Lee's appointment as Assistant Clinical Professor is listed under the "Voluntary Ranks" for the School of Medicine within the Faculty Handbook.  The Faculty Handbook states "Voluntary faculty are typically clinicians or others who are employed outside of the School but make significant contributions to department programs at the medical center or at affiliate institutions. Each department has **established guidelines** for the nature of required participation, such as the relative importance of teaching students, supervising residents, engaging in scholarly activity, participating in department administration, and other activities. Voluntary faculty typically do not receive compensation or benefits from the School." (emphasis added). Notwithstanding Dr. Lee's designation as "voluntary," Dr. Lee maintained a mutually beneficial

11

contractual employment relationship with Yale: in return for her requirements to engage in teaching and other scholarly activities, she received benefits, privileges, and other opportunities through her faculty appointment, as well as related compensation and other indirect but significant remuneration, as described herein.

41.    The Faculty Handbook also provides in Section III.L.1 (emphasis added):

> In making ***any*** appointment to the faculty, the University seeks to appoint the best candidate for the position. Faculty members on term appointments do not have a right to reappointment or promotion, and decisions on reappointment, like initial decisions on appointment, are subject to the exercise of professional and scholarly judgment by competent University authorities.
>
> To ensure that there is no misunderstanding about the availability of positions, that extra-department and extra-school interests of the University have not been overlooked, and that the department or school consideration of each member of the non-tenured faculty has been adequate, deans will, as a matter of course (and prior to any formal action on appointments by the department or school), discuss with a representative of the Office of the Provost all members of their faculties who might expect to be considered for reappointment or promotion. ***When a decision not to reappoint or promote is made on a candidate who has held an appointment at Yale for more than one year, the school submits to the Provost a brief report of the action to be taken before that decision is conveyed to the candidate. In the School of Medicine, departments submit such reports to its Office for Faculty Affairs***. In the FAS, departments submit such reports to the Office of the Dean of the FAS.

42.    Upon information and belief, the procedures described in the previous paragraph were not followed in connection with Yale's termination of Dr. Lee's faculty appointment.

43.    Yale's website also provides for additional procedures relating to investigation of allegations of academic misconduct against faculty members. Upon information and belief, the procedures describe on Yale's website were not followed in connection with Yale's termination of Dr. Lee's faculty appointment.

44.    Further, Yale has adopted a formal policy and practice of providing for academic freedom for all its faculty, whether tenured or not.  It regularly and publicly publishes its policy

12

through various means. One such statement provides: "Yale University is committed to the free expression of ideas by members of the University community, including expression of political views; and to the freedom of students and faculty to engage in scholarship related to political life and discourse. The Woodward Report (http://yalecollege.yale.edu/deans-office/policies-reports/report-committee-freedom-expression-yale) reinforces these commitments, and reminds us that within the diversity of the Yale community there coexist many points of view." The so-called Woodward Report states:

> We value freedom of expression precisely because it provides a forum for the new, the provocative, the disturbing, and the unorthodox. Free speech is a barrier to the tyranny of authoritarian or even majority opinion as to the rightness or wrongness of particular doctrines or thoughts.

> If the priority assigned to free expression by the nature of a university is to be maintained in practice, clearly the responsibility for maintaining that priority rests with its members. By voluntarily taking up membership in a university and thereby asserting a claim to its rights and privileges, members also acknowledge the existence of certain obligations upon themselves and their fellows. Above all, every member of the university has an obligation to permit free expression in the university. No member has a right to prevent such expression. Every official of the university, moreover, has a special obligation to foster free expression and to ensure that it is not obstructed.

> The policy of academic freedom is incorporated in the Faculty Handbook, and other policy statements, rules, guidelines and regulations of the University, and constitutes an essential restraint against interference by the administration and university of its exercise by the faculty.

45.     By terminating Dr. Lee's faculty appointment, Yale did not maintain its commitment to its faculty and students.

46.     After multiple informal attempts to elicit an opportunity to be heard from her department failed, Dr. Lee filed an appeal related to her termination on or about August 14, 2020 with Dr. Nancy J. Brown, Dean of the School of Medicine. Her appeal was not considered. Rather, on or about August 21, 2020, her appeal was dismissed by Dr. Brown, for procedural reasons. On

13

or about August 25, 2020, Dr. Lee filed a letter of appeal with Dr. Scott A. Strobel, Yale's Provost, and then to President Salovey, Yale's President, on or about September 24, 2020. These appeals and subsequent requests for review were summarily denied.

47.     On September 4, 2020, Dr. Krystal sent Dr. Lee a letter explaining the basis of the decision to terminate her faculty appointment. In his letter, Dr. Krystal stated, in part:

> The key question in our minds was whether you had the clinical judgment and professionalism to teach trainees key aspects of their profession.   Your diagnostic impressions of President Trump and several other public figures and your recommendations for treating President Trump played a role in our discussion. This was not because of the political content of your speech. … As detailed below, the Committee's concern was what your diagnoses and treatment recommendations said about your clinical abilities and professionalism.
>
> Since 2017, you have taken the position that you have a "duty to warn" the public that President Trump presents a threat to public safety.  The duty to warn derives from the Tarasoff decision and subsequent legal developments, and it applies to clinicians in a treatment relationship with a potentially dangerous person. It has never been applied outside that context. In public comments, you said that President Trump was incapacitated by a psychiatric disorder, and you identified symptoms such as aggressive speech, sexual misconduct, incitement to violence, belief in conspiracies, declining cognitive functioning, and neurological deficits. Initially, you did not identify the disorder causing these supposed symptoms.   In December 2019, you said publicly that President Trump exhibited a "pattern of delusions," was "lacking rational decision-making capacity," and had "definitive signs of severe pathology" that required "an advanced level of care."  In January 2020, you called for "an involuntary evaluation" of President Trump, and you said, "I am beginning to believe a mental health hold . . . will become inevitable."  That same month, you publicly suggested that President Trump, Rudolph Giuliani and Alan Dershowitz had a "shared psychosis."
>
> I want to emphasize that you did not make these statements as a layperson offering a political judgment; you made them explicitly in your professional capacity as a psychiatrist and on the basis of your psychiatric knowledge and judgment.  For that reason, the committee decided it was appropriate to consider how these statements reflected your ability to teach trainees.

14

\*\*\*

Our discussion then turned to your statement that President Trump and Mr. Dershowitz had a shared psychosis.

\*\*\*

Following our discussion with you, the committee considered whether the information that you shared with us was relevant to your capacity to teach trainees the core competencies required by the ACGME. We decided that our discussion with you implicated three of the six competencies: medical knowledge, interpersonal and communication skills, and professionalism.

\*\*\*

Finally, the ACGME requires trainees "to demonstrate a commitment to carrying out professional responsibilities, adherence to ethical principles, and sensitivity to a diverse patient population." Although the committee does not doubt that you are acting on the basis of your personal moral code, your repeated violations of the APA's Goldwater Rule and your inappropriate transfer of the duty to warn from the treatment setting to national politics raised significant doubts about your understanding of crucial ethical and legal principles in psychiatry.

In light of the above concerns, the Committee concluded that the Department should not seek a new teaching role for you. The Committee report was shared with the Executive Committee of the Department of Psychiatry and discussed at length. Its recommendation, that your teaching duties not be reinstated, was endorsed unanimously by the Executive Committee. In the absence of a formal teaching role, your voluntary appointment lapsed.

I hope that this letter clarifies the process leading to the Department decision to not reinstate your teaching responsibilities. We recognize that without formal teaching responsibilities your appointment could not be reinstated.

48.     The September 4, 2020 correspondence from Dr. Krystal provided new and distinct reasons for terminating Dr. Lee's faculty appointment than those expressed in the May 17, 2020 correspondence, thereby further demonstrating that the reasons stated for terminating Dr. Lee's faculty appointment are pretextual.  Further, the September 4, 2020 correspondence demonstrates that the decision to terminate Dr. Lee's faculty appointment directly resulted from Dr. Lee's protected speech. The May 17, 2020 correspondence stated that the reason for her termination was because she did not have a formal teaching role; however, the September 4, 2020 letter clarified

15

Yale could have reinstated Dr. Lee's teaching role, but it chose not to do so because of her protected speech.

49.     On or about December 4, 2020, Dr. Lee sent President Salovey a letter inquiring whether Yale would consider a reappointment following its decision to terminate her longstanding relationship with Yale after it received communication from Mr. Dershowitz in January 2020.  Dr. Lee requested that they meet to discuss how Dr. Lee could continue her role at the University. Yale declined the request.

50.     The extramural speech that Dr. Krystal cited as a basis for Dr. Lee's non-reappointment is protected expression under principles of academic freedom. Moreover, the speech is protected by the First Amendment of the United States Constitution and the First Amendment of the Connecticut Constitution.

51.     Dr. Lee has suffered damages as a result of Defendant's actions.  Dr. Lee's speech was not self-serving or self-aggrandizing.  Dr. Lee has not profited from her fulfilment of her responsibility to society as a psychiatrist. The effects of the pandemic, as well as the insurrection on the Capitol, demonstrate that Dr. Lee was not speaking frivolously or without deep deliberation, and that she was not off-base in invoking a responsibility to society, as outlined in the preamble of the American Psychiatric Association's own ethics code. Since she was acting on a citizen's duty to contribute her gifts to society, including her professional training and knowledge, and not as a psychiatrist under private employment, her speech is protected under the First Amendment. At the same time, this freedom happens to be compatible with her professional responsibility to protect society as specified in the APA's ethics code and with her non-collusion with a destructive government as clarified under the Declaration of Geneva.

16

V.      **FIRST CAUSE OF ACTION – BREACH OF CONTRACT AGAINST YALE**

52.     Dr. Lee realleges Paragraphs 1 - 51 as if fully set forth herein.

53.     As set forth above, Dr. Lee and Yale had a contractual and beneficial relationship through Dr. Lee's faculty appointment.

54.     As set forth above, Dr. Lee enjoyed academic freedom in her faculty appointment.

55.     As set forth above, Dr. Lee's faculty appointment was governed by a Faculty Handbook, policy statements, guidance, regulations, and rules, which provided the essential employment understandings between members of the faculty and Yale.

56.     Yale terminated Dr. Lee's faculty appointment in violation of her right to academic freedom, and other rights contained within Yale's Faculty Handbook, policy statements, guidance, regulations, and rules applicable to her faculty appointment.

57.     Dr. Lee has suffered and continues to suffer damages as a result of Yale's conduct.

VI.     **SECOND CAUSE OF ACTION – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST YALE**

58.     Dr. Lee realleges Paragraph 1 - 57 as if fully set forth herein.

59.     Yale did not act in good faith when it deprived Dr. Lee of her right to academic freedom and/or the rights and guarantees provided by the Faculty Handbook, policy statements, guidance, regulations and rules applicable to her faculty appointment, thereby depriving Dr. Lee of the benefit of the contract.

60.     Dr. Lee has suffered and continues to suffer damages as a result of Yale's conduct.

VII.    **THIRD CAUSE OF ACTION - WRONGFUL TERMINATION IN VIOLATION OF CONN. GEN. STAT. § 31-51q AGAINST YALE**

61.     Dr. Lee realleges Paragraphs 1 - 60 as if fully set forth herein.

62.     Dr. Lee and Yale entered into an employment relationship when Yale appointed

17

Dr. Lee to Assistant Clinical Professor, Law and Psychiatry Division, Yale School of Medicine. This relationship was ongoing at all material times, and it was contractual and mutually beneficial in nature.

63.     Dr. Lee was exercising rights protected by the First Amendment to the United States Constitution and the Connecticut Constitution when she tweeted as set forth in Paragraph 29 of the Complaint.

64.     Yale terminated Dr. Lee's faculty appointment on account of her exercise of her protected speech rights.

65.     Dr. Lee's exercise of her free speech rights was not disruptive in the workplace and did not substantially or materially interfere with her bona fide job performance or with her working relationship with Yale.

66.     Yale's termination of Dr. Lee's faculty appointment on account of Dr. Lee exercising rights guaranteed by the first amendment to the United States Constitution or section 3, 4, or 14 of article first of the Connecticut Constitution violated Conn. Gen. Stat. § 31-51q.

67.     Plaintiff has suffered and continues to suffer damages as a result of Yale's conduct, including but not limited to lost income, lost benefits, loss of resources, loss of enjoyment of profession, emotional distress, harm to reputation and loss of enjoyment of life, as well as attorneys' fees and costs.

## VIII.  FOURTH CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION AGAINST YALE

68.     Dr. Lee realleges Paragraphs 1 - 67 as if fully set forth herein.

69.     Yale provided Dr. Lee the Faculty Handbook, which included provisions relating to the faculty's right to academic freedom and the right to freedom of expression. The Handbook

18

provided the essential employment understandings between members of the faculty and the University.

70.     Yale also issued policy statements, guidance, regulations, and rules related to academic freedom, the right to free expression, and other rights applicable to Dr. Lee's faculty appointment.

71.     Dr. Lee, therefore, believed that she was protected by academic freedom and the right to free expression.

72.     Dr. Lee relied on Yale's representations when she tweeted about Mr. Dershowitz.

73.     Dr. Lee's faculty appointment was terminated due to her conduct that was supposed to be protected by academic freedom and freedom of expression.

74.     Yale did not abide by its own terms relating to academic freedom and freedom of expression when it terminated Dr. Lee's faculty appointment for pretextual reasons.  Thus, the representations made in the Handbook, as well as its policy statements, guidance, regulations, and rules, were false, and they were known or should have been known to be false by Yale.

75.     Dr. Lee has suffered and continues to suffer damages as a result of Yale's conduct.

## IX.     FIFTH CAUSE OF ACTION – DECLARATORY JUDGMENT AGAINST YALE

76.     Dr. Lee realleges Paragraphs 1 - 75 as if fully set forth herein.

77.     An actual, present, and justiciable controversy has arisen between Plaintiff and Yale as alleged in this Complaint.

78.     Pursuant to 28 U.S.C. § 2201, Dr. Lee seeks declaratory judgment from this Court declaring the rights and legal relations Plaintiff has with Yale, including but not limited to Plaintiff's legal rights, contractual rights, employment rights, and civil rights, available by statute and/or common law. Specifically, Plaintiff requests the Court to declare that Yale violated Dr.

JA-000025

Lee's rights, including but not limited to:

    a.  Yale breached its contract with Plaintiff.

    b.  Yale breached the implied covenant of good faith and fair dealing.

    c.  Yale violated Plaintiff's employment rights.

    d.  Yale retaliated against Plaintiff in violation of Conn. Gen. Stat. § 31-51q.

    e.  Yale negligently misrepresented its commitment to academic freedom and the right to freedom of expression as it relates to Plaintiff's faculty appointment.

    f.  Yale did not comply with its commitment to academic freedom and the right to freedom of expression as it relates to Plaintiff's faculty appointment.

WHEREFORE, Plaintiff claims a trial by jury, judgment against defendant, and damages as follows:

1.   Reinstatement;

2.   Compensatory economic and non-economic damages, including lost income, lost benefits, lost resources, lost privileges, lost indirect but significant remuneration, future economic losses, emotional distress, harm to reputation and loss of enjoyment of life;

3.   Injunctive and other equitable relief;

4.   A declaratory judgment pursuant to 28 U.S.C. § 2201;

5.   Punitive damages as provided by Conn. Gen. Stat. § 31-51q and/or common law;

6.   Interest pursuant to Conn. Gen. Stat. § 37-3a and costs;

7.   Attorney's fees and costs; and

8.   Such other relief in law or equity the Court deems appropriate.

20

PLAINTIFF,
BANDY LEE, MD, MDiv

By     /s/ Robin B. Kallor
     Robin B. Kallor (ct26536)
     Cindy M. Cieslak (ct29117)
     Melinda A. Powell (ct17049)
     Rose Kallor, LLP
     750 Main Street, Suite 309
     Hartford, CT 06103
     Tel #: (860) 361-7999
     Fax #: (860) 270-0710
     Email: rkallor@rosekallor.com
     ccieslak@rosekallor.com
     mpowell@rosekallor.com

21

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

BANDY LEE, MD, MDiv,          :
                                  :    **CASE NO. 3:21-cv-00389-MPS**

      Plaintiff,           :

                                    :

v.                              :

YALE UNIVERSITY,          :

                                    :

      Defendant.         :    **AUGUST 21, 2021**

## AMENDED COMPLAINT

## I.    PRELIMINARY STATEMENT

1.      This is an action for damages, declaratory and injunctive relief, and other equitable relief, arising out of Yale University's ("Yale") unlawful termination of Dr. Bandy Lee's ("Dr. Lee" or "Plaintiff") faculty appointment on its own and at the behest of Professor Alan Dershowitz ("Mr. Dershowitz"), due to her exercise of free speech about the dangers of Donald Trump's presidency. Her public statements, which further included commentary about the influence that President Trump's persona had on his "inner circle", including Mr. Dershowitz, and opposition to the American Psychiatric Association's ("APA") gag order of its member psychiatrists under a reinterpretation of the Goldwater Rule were protected by the First Amendment of the Connecticut and United States Constitutions as codified in Conn. Gen. Stat. § 31-51q and by Yale's guarantees of academic freedom. Yale violated its contractual obligations to Dr. Lee and violated the implied covenant of good faith and fair dealing. Yale further committed the tort of negligent misrepresentation by not adhering to its policies on academic freedom, upon which Dr. Lee had relied.

## II.     THE PARTIES

2.      Dr. Lee graduated from Yale School of Medicine in 1994 and earned a Masters of Divinity from Yale Divinity School in 1995.  After completing a psychiatric residency at Massachusetts General Hospital and a fellowship at Harvard Medical School, in 2003, Dr. Lee was appointed as Assistant Clinical Professor, Law and Psychiatry Division, Yale School of Medicine.  Her research focuses on formulating the multiple, interlinked determinants of violence by exploring the interaction between biological, psychological, social, and environmental processes for effective prevention.

3.      Dr. Lee is a resident of the State of New York.

4.      Yale is a university incorporated in Connecticut, with its principal place of business in New Haven, Connecticut.  Yale School of Medicine is a medical school within Yale University. Yale Law School is a law school within Yale University.

## III.     JURISDICTION AND VENUE

5.      Dr. Lee is alleging, *inter alia*, retaliation based upon her exercise of free speech rights guaranteed by the United States and Connecticut Constitutions in violation of Conn. Gen. Stat. § 31-51q.  Accordingly, this Court has federal question jurisdiction over Plaintiff's § 31-51q claim and supplemental jurisdiction over Dr. Lee's remaining state law tort claims pursuant to 28 U.S.C. § 1367.

6.      This Court also has subject matter jurisdiction over the dispute due to diversity of citizenship, as there is complete diversity between the parties, and the amount in controversy is in excess of $75,000.  In addition to the economic loss Dr. Lee suffered as a result of Defendant's actions, Conn. Gen. Stat. § 31-51q provides for recovery of attorney's fees for a prevailing plaintiff.

2

7.      This Court has personal jurisdiction over the parties, as Yale is domiciled in Connecticut, and all of the acts that give rise to this action occurred within the State of Connecticut.

8.      Venue is proper in Connecticut as all of the acts giving rise to this action occurred in Connecticut.

## IV.    FACTS

9.      Dr. Lee served as a faculty member of the Law and Psychiatry Division at Yale School of Medicine for 17 years. She taught at Yale Law School for 15 of those years, covering the mental health aspects of asylum law, criminal justice, and immigration legal services.

10.     Dr. Lee was not required to apply for any "renewal" of her appointment; it appeared to be automatic. Oftentimes, Dr. Lee would not receive any written notification about any purported "renewal" of her appointment; it was understood by both the Plaintiff and Defendant that her appointment was ongoing, and she would continue in her role without any specific end date. She served on Yale's faculty and Yale accepted her services through a continuing course of dealing. Approximately two or three times over the course of her appointment of 17 years – but not with any regularity between those times – Dr. Lee was asked to complete a form documenting her seminar hours and other hours that she committed to working with students.

11.     Dr. Lee served as the only regular junior faculty liaison from the Dept. of Law and Psychiatry to the Law School. She was told by Law & Psychiatry Division Head, Dr. Howard Zonana that he wanted her to continue to serve in this role, which she did continuously except for one brief interruption in 2009, when she was abroad for a consultative role to the French Ministry of Justice.

12.     Dr. Lee's appointment required that she participate in four hours of student-related, teaching, or supervisory activities per week.  These activities could be satisfied through teaching

a course, lectures, through advising students in connection with their thesis preparation, supervising residents, participating in seminars and grand rounds, engaging in scholarly activity, participating in department administration, and other activities. Dr. Lee more than satisfied this weekly requirement on an annual basis.

13.     In exchange for her student-related and teaching activities, Dr. Lee received benefits, privileges, and opportunities, as well as related compensation and other indirect but significant remuneration, that she would not have otherwise received but for her academic affiliation with Yale.

14.     Through her appointment at Yale, Dr. Lee was entitled to receive and did receive benefits, privileges, opportunities, and related compensation and other indirect but significant remuneration, including but not limited to: office space, facilities, libraries, subscription-based access to research databases and journal articles, statisticians, laboratories, statistical programs and software, IT and technology services, computer programs and software, media studios (radio and television), and campus transportation, all of which she used for her research, writing, to assist with her speaking engagements, advocacy and other professional obligations.  Notably, Dr. Lee was informed Division Head Dr. Howard Zonana, that in connection with her faculty appointment, she was covered by Yale's professional malpractice insurance policy for her forensic consultations. Through her faculty appointment, she was given additional "perks" in the form of discounts on food items sold on campus, as well as other retail stores in New Haven, and access to workout facilities. These benefits, privileges, opportunities, and related compensation or other indirect but significant remuneration would cost Dr. Lee thousands, if not tens of thousands, of dollars if she were to obtain the same on her own.

15.     Through her faculty appointment, as well as partnerships that Yale had with other entities, she was able to provide clinical work consisting of psychiatric services at maximum-security prisons and in state hospitals, in addition to working as an expert witness for the state and federal courts.  These were services for which she was paid, and the matters were referred to her solely due to her faculty appointment and affiliation with Yale.

16.     Additionally, through this faculty appointment with Yale, she became a Resident Consultant for the World Health Organization in Geneva, Switzerland and later became the Director of the Violence and Health Study Group of the MacMillan Center for International and Area Studies at Yale University, with membership in the Violence Prevention Alliance, World Health Organization as the project leader of an academic collaborators group, a position she held from 2011 until the termination of her faculty appointment from Yale Medical School effective on June 30, 2020.  She also served as the Director of Research for the Center for the Study of Violence at Harvard, University of Pennsylvania, New York University, and Yale, a consultant for the United Nations, and speaker for the World Economic Forum.  Through her faculty appointment with Yale, she obtained opportunities to consult with governments on prison reform and community violence prevention, such as for France, Ireland, Alabama, California, Connecticut, Massachusetts, and New York.  Further, Yale Law School and its Legal Clinics referred asylum, criminal justice, and veteran cases to her for expert review and consultation in support of the applicants' petitions for asylum in the federal immigration courts, criminal cases in the State of Connecticut Judicial Branch of New Haven, and veteran claims in the United States Court of Appeals for Veterans Claims. These opportunities directly resulted from her academic affiliation

with Yale. Conversely, these opportunities benefited Yale by bringing important and high-profile nationwide and international collaborations.

17.    Through her faculty appointment at Yale, she contributed to the launch of Yale's Global Health Initiative and created a popular Global Health Studies course at Yale College, "Violence: Causes and Cures," which led to the most comprehensive textbook on the subject to date, *Violence: An Interdisciplinary Approach to Causes, Consequences, and Cures* (Wiley-Blackwell, 2019).  The popularity of her Global Health Studies course led the Education Studies program at Yale College to also recruit Dr. Lee to teach a course.

18.    Through her faculty appointment, Dr. Lee was able to publish over 100 peer-reviewed articles and chapters, 17 edited scholarly books and journal special issues, almost 300 op-eds in outlets such as *The Guardian*, *The New York Times*, *The Boston Globe*, *The Independent*, and *Politico*, as well as *The New York Times* bestseller, *The Dangerous Case of Donald Trump: 27 Psychiatrists and Mental Health Experts Assess a President* (Macmillan, 2017 and 2019).  Dr. Lee received compliments and praise from renowned members of the field regarding these publications.

19.    Through the resources and benefits she received due to her faculty appointment at Yale, as well as the courses she taught, Dr. Lee became a well-known and reputable scholar on violence prevention, with students seeking to study with her from both within and outside of Yale. Her appointment allowed her to be retained to serve as an expert witness in high-profile cases or as an expert consultant for state governments looking to reform their prisons.

20.    Further, Dr. Lee received research grants that she could only obtain based upon her academic affiliation.

6

21.     A majority of Dr. Lee's income was derived from her faculty appointment, affiliation, and relationship with Yale.

22.     In March 2017, shortly after Donald Trump's inauguration, the American Psychiatric Association (APA) reinterpreted its *Goldwater Rule*.  The reinterpreted *Goldwater Rule* created a gag order, recommending that its members not comment on public figures, even without diagnosing them and even where there is a responsibility to society to protect public health.

23.     The American Psychiatric Association (APA) is a voluntary professional organization of psychiatrists.

24.     Dr. Lee has not been a member of the APA since 2007.

25.     Dr. Lee believed the newly reinterpreted *Goldwater Rule* was in conflict with psychiatrists' duties, responsibilities, and role in the interest of public health in light of her belief that Donald Trump posed a dangerous threat to this country and the world.  For this reason, she held an ethics conference at Yale in April 2017 with some of the most respected members of her profession.  This conference initially had approximately two dozen attendees and then drew national attention and led to the public-service book, *The Dangerous Case of Donald Trump: 27 Psychiatrists and Mental Health Experts Assess a President*.  Although Yale did not officially sponsor the conference, Dr. Lee discussed the conference with Yale, and she was able to use an auditorium at Yale without charge.

26.     That book became an unprecedented *New York Times* bestseller of its kind.  The featured authors represented only a small sample of the many thousands of mental health professionals who came forth in historically unprecedented ways.  These psychiatrists formed a professional organization, the National Coalition, which then expanded internationally, becoming

7

the World Mental Health Coalition (WMHC), by the end of 2017. It is the only professional organization to address the issue of dangerous leadership, intending to step in where the American Psychiatric Association demurred. It also remains the largest organization of mental health professionals to speak up against Donald Trump's presidency.

27.     Dr. Lee and the other authors assert in the book that President Trump's mental health was affecting the mental health of the people of the United States, and further, that he was placing the country at grave risk of involving it in multiple forms of violence and undermining democracy itself as a result of objective signs of dangerous pathology. Consequently, Dr. Lee and the other authors claim that Trump's presidency represented an emergency which not only allowed, *but required*, psychiatrists in the United States to sound the alarms. The authors maintain that pointing out danger and calling for an evaluation differs from the medical processes of patient diagnosis, and they have criticized the American Psychiatric Association for manipulating professional norms and standards, by changing reasonable ethical guidelines into a gag order under political pressure, because mental health professionals sometimes provide a check against dangerous mental pathology.

28.     Following the assassination of Qasem Soleimani in January 2020, these professionals opined that Donald Trump would meet the criteria for an involuntary mental health evaluation, and some of these professionals in the WMHC were contemplating seeking court intervention.

29.     In July 2019, Mr. Dershowitz, who was under public scrutiny following revelations about his ties to the late financier Jeffrey Epstein, claimed on Fox News that he had a "perfect, perfect sex life." Prior to July 2019, Mr. Dershowitz was a known supporter of Donald Trump. Indeed, he has been quoted in articles dating back to at least 2018 complaining that he was shunned

by his political allies "who have stopped inviting him to dinners" and friends who have excluded him from "social circles on Martha's Vineyard." *See* "Alan Dershowitz Says 'Friends on Martha's Vineyard are Shunning Him For Defending Trump," *Washington Post*, July 3, 2018.

30.     In December 2019, the United States Congress initiated impeachment proceedings against President Trump for, among other things, abuse of power following, *inter alia*, a telephone call between President Trump and the Ukrainian President Volodymyr Zalensky on or about July 25, 2019. Since September 2019, and again in November 2019, President Trump had publicly and repetitively defended said call as a "perfect conversation" or "perfect call." The impeachment proceedings were completed in February 2020. Mr. Dershowitz was one of many lawyers on Trump's legal team.

31.     Before the completion of impeachment proceedings, on January 2, 2020, University of Minnesota Law Professor and Yale Law School alumnus Richard Painter tweeted and tagged Dr. Lee to Mr. Dershowitz's characterization of his "perfect sex life," stating that Dershowitz's phrasing was similar to Trump's recount of the "perfect" call. Dr. Lee responded, "Alan Dershowitz's employing the odd use of 'perfect'…might be dismissed as ordinary influence in most contexts." She added that "given the severity and spread of 'shared psychosis' among just about all of Trump's followers, a different scenario is more likely," and that scenario was "that he has wholly taken on Trump's symptoms by contagion."

32.     When Dr. Lee stated "symptoms by contagion," she was not diagnosing or providing a professional opinion about Mr. Dershowitz, but rather she was making a general statement on a widespread psychosocial phenomenon of "shared psychosis," also known as "folie à plusieurs," which refers to the contagion of symptoms that can happen in a situation where a highly symptomatic individual is placed in an influential position. Under such conditions, the

9

person's symptoms may spread through the population through emotional bonds: heightening existing pathologies ("folie simultanée"), triggering personality predisposition ("folie imposée"), or inducing symptoms in previously healthy individuals ("folie communiquée"). Despite the English phrase, "psychosis" is not always present, but the more commonly induced symptoms are delusions, paranoia, and propensity for violence. Dr. Lee has extensive experience with this phenomenon, having worked almost exclusively in public-sector and prison settings, where severely symptomatic individuals often go untreated and influence entire families or gangs. She believed that President Trump's followers were likely to be influenced to some degree by his pathology because of the level of exposure, not necessarily because of the specific use of the word "perfect" but by the exaggerated sense of self and impunity they seemed to share.

33.     Following this tweet, on January 11, 2020, Mr. Dershowitz sent an email to, *inter alia*, Yale spokesperson Karen Peart, University President Peter Salovey's Chief of Staff Joy McGrath, and Yale Law School Dean Heather Gerken, asserting "Dr. Bandy Lee of the Yale Medical School has publicly 'diagnosed' me as 'psychotic,' based on my legal and political views, and without ever examining or even meeting me." He continued, "This constitutes a serious violation of the ethics rules of the American Psychiatric Association. I am formally asking that association to discipline Dr. Lee. By this email, I also formally ask Yale University, Yale Law School and its medical school to determine whether Dr. Lee violated any of its rules."

34.     As a result of and in immediate response to Mr. Dershowitz's actions, in an email dated January 13, 2020, Dr. John Krystal, the Chair of the Psychiatry Department, warned Dr. Lee that the department would be compelled to "terminate [her] teaching role at Yale University" if her "behavior d[id] not change." He indicated that Yale would terminate her faculty appointment. Referring to public statements Dr. Lee had made regarding the mental health of President Donald

JA-000037

Trump and Mr. Dershowitz, Dr. Krystal stated, "It seems to me ... that the published quotes suggest that you are not making cautious, reasoned statements qualified by the limitations of the information you have .... Worse, the recklessness of your comments creates the appearance that they are self-serving in relation to your personal political beliefs and other possible personal aspirations." He added, "You are putting me in a position where I have to ask, 'Is this the sort of person that I can trust to teach medical students, residents, and forensic psychiatry fellows?'"

35.     Following Mr. Dershowitz's January 11, 2020 complaint, Yale Law School and its Legal Clinic ceased its referral of student cases to Dr. Lee, including one that was actively in process.

36.     On January 17, 2020, in immediate response to Mr. Dershowitz's January 11, 2020 complaint, Dr. Krystal called Dr. Lee to a meeting that included three additional faculty members. Dr. Lee was not informed that this meeting constituted a "review committee" or that it was otherwise called to review her faculty appointment.  Indeed, Dr. Lee was not advised before the meeting that two of the additional faculty members would be in attendance.  Rather, Dr. Lee was led to believe that it would be a private discussion with her chair and her division head. During the meeting, Dr. Lee was told that she had breached psychiatric ethics by "diagnosing" Mr. Dershowitz, a conclusion with which Dr. Lee strongly disagreed. Dr. Lee expressed her desire for a discussion and asked for an investigation, as she felt that what constitutes psychiatric ethics had been distorted under the Trump presidency. Yale refused to have further discussions with Dr. Lee and refused to investigate the matter.

37.     No further word came before the notice of her termination on May 17, 2020.  That termination letter cited that the reason for her termination was because she did not have a formal teaching role.  That reason was pretextual, as other faculty members were permitted to remain on

11

staff who had not had formal teaching roles and who had not attended seminars regularly. In fact, in or about 2016, when Dr. Lee "yielded" one of his classes to Dr. Zonana upon his request, Dr. Lee was told that she would continue in her appointment so long as she did her seminar hours and took cases "on referral." At this time, Dr. Lee had been attending at least, and often more than, three hours of Law and Psychiatry Division seminars and one hour of Department of Psychiatry grand rounds per week, which, upon information and belief, is the manner in which others who held her appointment satisfied their student-related teaching or supervisory requirements. In addition, she was assisting multiple students with their theses, and another student with a research project, all who had sought her out on the basis of her affiliation with the Law and Psychiatry Division.

38.     Furthermore, Dr. Lee had been planning a course with multiple Yale Law School faculty, including Fiona Doherty, with whom she had collaborated previously, to begin in the Fall 2020 semester. Prior to Mr. Dershowitz's communication with Yale, Dr. Lee discussed with Division Head Dr. Zonana the curriculum and timetable for the course to commence, and he indicated approval and appreciation for her efforts

39.     Prior to Mr. Dershowitz's communication to Yale, Division Head Dr. Zonana complimented her on how she was handling her public statements. Prior to the publication of her book, she discussed it with her Division Head, who agreed to its publication and her involvement and understood her position regarding the APA's change in its interpretation of its *Goldwater Rule*, which was a recommendation without enforcement mechanisms even for APA members.

40.     Prior to Mr. Dershowitz's communication to Yale, Dr. Krystal also commended Dr. Lee's work.

41.     Yale administration, including Dr. John Krystal, had no concerns about Dr. Lee's involvement in the World Mental Health Coalition or her speaking engagements. In late 2017, Yale requested that she disclaim that her opinions were her own and were not endorsed by Yale. Dr. Lee complied with the request.

42.     Dr. Lee's faculty appointment was covered by the Faculty Handbook.

43.     The latest version of the Faculty Handbook, dated August 22, 2019, states: "The policies included and referred to in this *Handbook* form part of **the essential employment understandings** between members of the faculty and the University." (emphasis added).

44.     Rights of academic freedom and freedom of expression are expressly preserved in the Faculty Handbook, and elsewhere on Yale's website.

45.     Dr. Lee's appointment as Assistant Clinical Professor is listed under the "Voluntary Ranks" for the School of Medicine within the Faculty Handbook.  Upon information and belief, there are approximately 60-65 individuals who serve in the "voluntary ranks" in the School of Medicine; however, others, who have identical duties and responsibilities, and who once served as voluntary faculty, are in non-voluntary ranks. The Faculty Handbook states "Voluntary faculty are typically clinicians or others who are employed outside of the School but make significant contributions to department programs at the medical center or at affiliate institutions. Each department has **established guidelines** for the nature of required participation, such as the relative importance of teaching students, supervising residents, engaging in scholarly activity, participating in department administration, and other activities. Voluntary faculty typically do not receive compensation or benefits from the School." (emphasis added). Notwithstanding Dr. Lee's designation as "voluntary," Dr. Lee maintained a mutually beneficial contractual employment relationship with Yale: in return for her requirements to engage in teaching and other scholarly

13

activities, she received benefits, privileges, and other opportunities through her faculty appointment, as well as related compensation and other indirect but significant remuneration, as described herein.

46. The Faculty Handbook also provides in Section III.L.1 (emphasis added):

In making ***any*** appointment to the faculty, the University seeks to appoint the best candidate for the position. Faculty members on term appointments do not have a right to reappointment or promotion, and decisions on reappointment, like initial decisions on appointment, are subject to the exercise of professional and scholarly judgment by competent University authorities.

To ensure that there is no misunderstanding about the availability of positions, that extra-department and extra-school interests of the University have not been overlooked, and that the department or school consideration of each member of the non-tenured faculty has been adequate, deans will, as a matter of course (and prior to any formal action on appointments by the department or school), discuss with a representative of the Office of the Provost all members of their faculties who might expect to be considered for reappointment or promotion. ***When a decision not to reappoint or promote is made on a candidate who has held an appointment at Yale for more than one year, the school submits to the Provost a brief report of the action to be taken before that decision is conveyed to the candidate. In the School of Medicine, departments submit such reports to its Office for Faculty Affairs***. In the FAS, departments submit such reports to the Office of the Dean of the FAS.

47. Upon information and belief, the procedures described in the previous paragraph were not followed in connection with Yale's termination of Dr. Lee's faculty appointment.

48. Yale's website also provides for additional procedures relating to investigation of allegations of academic misconduct against faculty members. Upon information and belief, the procedures describe on Yale's website were not followed in connection with Yale's termination of Dr. Lee's faculty appointment.

49. Further, Yale has adopted a formal policy and practice of providing for academic freedom for all its faculty, whether tenured or not. It regularly and publicly publishes its policy through various means. One such statement provides: "Yale University is committed to the free

14

expression of ideas by members of the University community, including expression of political views; and to the freedom of students and faculty to engage in scholarship related to political life and discourse. The Woodward Report (http://yalecollege.yale.edu/deans-office/policies-reports/report-committee-freedom-expression-yale) reinforces these commitments, and reminds us that within the diversity of the Yale community there coexist many points of view." The so-called Woodward Report states:

> We value freedom of expression precisely because it provides a forum for the new, the provocative, the disturbing, and the unorthodox. Free speech is a barrier to the tyranny of authoritarian or even majority opinion as to the rightness or wrongness of particular doctrines or thoughts.
>
> If the priority assigned to free expression by the nature of a university is to be maintained in practice, clearly the responsibility for maintaining that priority rests with its members. By voluntarily taking up membership in a university and thereby asserting a claim to its rights and privileges, members also acknowledge the existence of certain obligations upon themselves and their fellows. Above all, every member of the university has an obligation to permit free expression in the university. No member has a right to prevent such expression. Every official of the university, moreover, has a special obligation to foster free expression and to ensure that it is not obstructed.
>
> The policy of academic freedom is incorporated in the Faculty Handbook, and other policy statements, rules, guidelines and regulations of the University, and constitutes an essential restraint against interference by the administration and university of its exercise by the faculty.

50. By terminating Dr. Lee's faculty appointment, Yale did not maintain its commitment to its faculty and students.

51. After multiple informal attempts to elicit an opportunity to be heard from her department failed, Dr. Lee filed an appeal related to her termination on or about August 14, 2020 with Dr. Nancy J. Brown, Dean of the School of Medicine. Her appeal was not considered. Rather, on or about August 21, 2020, her appeal was dismissed by Dr. Brown, for procedural reasons. On or about August 25, 2020, Dr. Lee filed a letter of appeal with Dr. Scott A. Strobel, Yale's Provost,

and then to President Salovey, Yale's President, on or about September 24, 2020. These appeals and subsequent requests for review were summarily denied.

52.      On September 4, 2020, Dr. Krystal sent Dr. Lee a letter explaining the basis of the decision to terminate her faculty appointment. In his letter, Dr. Krystal stated, in part:

> The key question in our minds was whether you had the clinical judgment and professionalism to teach trainees key aspects of their profession. Your diagnostic impressions of President Trump and several other public figures and your recommendations for treating President Trump played a role in our discussion. This was not because of the political content of your speech. … As detailed below, the Committee's concern was what your diagnoses and treatment recommendations said about your clinical abilities and professionalism.
>
> Since 2017, you have taken the position that you have a "duty to warn" the public that President Trump presents a threat to public safety. The duty to warn derives from the Tarasoff decision and subsequent legal developments, and it applies to clinicians in a treatment relationship with a potentially dangerous person. It has never been applied outside that context. In public comments, you said that President Trump was incapacitated by a psychiatric disorder, and you identified symptoms such as aggressive speech, sexual misconduct, incitement to violence, belief in conspiracies, declining cognitive functioning, and neurological deficits. Initially, you did not identify the disorder causing these supposed symptoms.  In December 2019, you said publicly that President Trump exhibited a "pattern of delusions," was "lacking rational decision-making capacity," and had "definitive signs of severe pathology" that required "an advanced level of care."  In January 2020, you called for "an involuntary evaluation" of President Trump, and you said, "I am beginning to believe a mental health hold . . . will become inevitable."  That same month, you publicly suggested that President Trump, Rudolph Giuliani and Alan Dershowitz had a "shared psychosis."
>
> I want to emphasize that you did not make these statements as a layperson offering a political judgment; you made them explicitly in your professional capacity as a psychiatrist and on the basis of your psychiatric knowledge and judgment.  For that reason, the committee decided it was appropriate to consider how these statements reflected your ability to teach trainees.
> ***
> Our discussion then turned to your statement that President Trump and Mr. Dershowitz had a shared psychosis.
> ***
> Following our discussion with you, the committee considered whether the information that you shared with us was relevant to your capacity to teach

trainees the core competencies required by the ACGME. We decided that our discussion with you implicated three of the six competencies: medical knowledge, interpersonal and communication skills, and professionalism.

***

Finally, the ACGME requires trainees "to demonstrate a commitment to carrying out professional responsibilities, adherence to ethical principles, and sensitivity to a diverse patient population." Although the committee does not doubt that you are acting on the basis of your personal moral code, your repeated violations of the APA's Goldwater Rule and your inappropriate transfer of the duty to warn from the treatment setting to national politics raised significant doubts about your understanding of crucial ethical and legal principles in psychiatry.

In light of the above concerns, the Committee concluded that the Department should not seek a new teaching role for you. The Committee report was shared with the Executive Committee of the Department of Psychiatry and discussed at length. Its recommendation, that your teaching duties not be reinstated, was endorsed unanimously by the Executive Committee. In the absence of a formal teaching role, your voluntary appointment lapsed.

I hope that this letter clarifies the process leading to the Department decision to not reinstate your teaching responsibilities. We recognize that without formal teaching responsibilities your appointment could not be reinstated.

53.     The September 4, 2020 correspondence from Dr. Krystal provided new and distinct reasons for terminating Dr. Lee's faculty appointment than those expressed in the May 17, 2020 correspondence, thereby further demonstrating that the reasons stated for terminating Dr. Lee's faculty appointment are pretextual. Further, the September 4, 2020 correspondence demonstrates that the decision to discipline Dr. Lee by not seeking a formal teaching role for her, which it could have done, and the subsequent decision to discharge Dr. Lee by terminating her faculty appointment was made on account of Dr. Lee's protected speech. The May 17, 2020 correspondence stated that the reason for her termination was because she did not have a formal teaching role; however, the September 4, 2020 letter clarified Yale could have reinstated Dr. Lee's teaching role, but it chose not to do so because of her protected speech.

17

54.     In other words, Dr. Lee's teaching role was kept from her on account of her protected speech, and thus, Yale was motivated by Dr. Lee's speech when it decided to terminate her faculty appointment for that reason.

55.     On or about December 4, 2020, Dr. Lee sent President Salovey a letter inquiring whether Yale would consider a reappointment following its decision to terminate her longstanding relationship with Yale after it received communication from Mr. Dershowitz in January 2020. Dr. Lee requested that they meet to discuss how Dr. Lee could continue her role at the University. Yale declined the request.

56.     The extramural speech that Dr. Krystal cited as a basis for Dr. Lee's non-reappointment is protected expression under principles of academic freedom. Moreover, the speech is protected by the First Amendment of the United States Constitution and the First Amendment of the Connecticut Constitution.

57.     Dr. Lee has suffered damages as a result of Defendant's actions. Dr. Lee's speech was not self-serving or self-aggrandizing. Dr. Lee has not profited from her fulfilment of her responsibility to society as a psychiatrist. The effects of the pandemic, as well as the insurrection on the Capitol, demonstrate that Dr. Lee was not speaking frivolously or without deep deliberation, and that she was not off-base in invoking a responsibility to society, as outlined in the preamble of the American Psychiatric Association's own ethics code. Since she was acting on a citizen's duty to contribute her gifts to society, including her professional training and knowledge, and not as a psychiatrist under private employment, her speech is protected under the First Amendment. At the same time, this freedom happens to be compatible with her professional responsibility to protect society as specified in the APA's ethics code and with her non-collusion with a destructive government as clarified under the Declaration of Geneva.

18

## V.   FIRST CAUSE OF ACTION – BREACH OF CONTRACT AGAINST YALE

58.     Dr. Lee realleges Paragraphs 1 - 57 as if fully set forth herein.

59.     As set forth above, Dr. Lee and Yale had a contractual and beneficial relationship through Dr. Lee's faculty appointment.

60.     As set forth above, Dr. Lee enjoyed academic freedom in her faculty appointment.

61.     As set forth above, Dr. Lee's faculty appointment was governed by a Faculty Handbook, policy statements, guidance, regulations, and rules, which provided the essential employment understandings between members of the faculty and Yale.

62.     Yale terminated Dr. Lee's faculty appointment in violation of her right to academic freedom, and other rights contained within Yale's Faculty Handbook, policy statements, guidance, regulations, and rules applicable to her faculty appointment.

63.     Dr. Lee has suffered and continues to suffer damages as a result of Yale's conduct.

## VI.   SECOND CAUSE OF ACTION – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST YALE

64.     Dr. Lee realleges Paragraph 1 - 63 as if fully set forth herein.

65.     Yale did not act in good faith when it deprived Dr. Lee of her right to academic freedom and/or the rights and guarantees provided by the Faculty Handbook, policy statements, guidance, regulations and rules applicable to her faculty appointment, thereby depriving Dr. Lee of the benefit of the contract.

66.     Dr. Lee has suffered and continues to suffer damages as a result of Yale's conduct.

## VII.  THIRD CAUSE OF ACTION - WRONGFUL TERMINATION IN VIOLATION OF CONN. GEN. STAT. § 31-51q AGAINST YALE

67.     Dr. Lee realleges Paragraphs 1 - 66 as if fully set forth herein.

68.     Dr. Lee and Yale entered into an employment relationship when Yale appointed

19

Dr. Lee to Assistant Clinical Professor, Law and Psychiatry Division, Yale School of Medicine. This relationship was ongoing at all material times, and it was contractual and mutually beneficial in nature.

69. Dr. Lee was exercising rights protected by the First Amendment to the United States Constitution and the Connecticut Constitution when she tweeted as set forth in Paragraph 29 of the Complaint.

70. Dr. Lee was subject to discipline and discharge on account of her exercise of her protected speech rights.

71. Yale terminated Dr. Lee's faculty appointment on account of her exercise of her protected speech rights.

72. Dr. Lee's exercise of her free speech rights was not disruptive in the workplace and did not substantially or materially interfere with her bona fide job performance or with her working relationship with Yale.

73. Yale's termination of Dr. Lee's faculty appointment on account of Dr. Lee exercising rights guaranteed by the first amendment to the United States Constitution or section 3, 4, or 14 of article first of the Connecticut Constitution violated Conn. Gen. Stat. § 31-51q.

74. Plaintiff has suffered and continues to suffer damages as a result of Yale's conduct, including but not limited to lost income, lost benefits, loss of resources, loss of enjoyment of profession, emotional distress, harm to reputation and loss of enjoyment of life, as well as attorneys' fees and costs.

20

## VIII.  FOURTH CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION AGAINST YALE

75.     Dr. Lee realleges Paragraphs 1 - 74 as if fully set forth herein.

76.     Yale provided Dr. Lee the Faculty Handbook, which included provisions relating to the faculty's right to academic freedom and the right to freedom of expression. The Handbook provided the essential employment understandings between members of the faculty and the University.

77.     Yale also issued policy statements, guidance, regulations, and rules related to academic freedom, the right to free expression, and other rights applicable to Dr. Lee's faculty appointment.

78.     Dr. Lee, therefore, believed that she was protected by academic freedom and the right to free expression.

79.     Dr. Lee relied on Yale's representations when she tweeted about Mr. Dershowitz.

80.     Dr. Lee's faculty appointment was terminated due to her conduct that was supposed to be protected by academic freedom and freedom of expression.

81.     Yale did not abide by its own terms relating to academic freedom and freedom of expression when it terminated Dr. Lee's faculty appointment for pretextual reasons.  Thus, the representations made in the Handbook, as well as its policy statements, guidance, regulations, and rules, were false, and they were known or should have been known to be false by Yale.

82.     Dr. Lee has suffered and continues to suffer damages as a result of Yale's conduct.

WHEREFORE, Plaintiff claims a trial by jury, judgment against defendant, and damages as follows:

1.     Reinstatement;

JA-000048

2.  Compensatory economic and non-economic damages, including lost income, lost benefits, lost resources, lost privileges, lost indirect but significant remuneration, future economic losses, emotional distress, harm to reputation and loss of enjoyment of life;

3.  Injunctive and other equitable relief;

4.  A declaratory judgment pursuant to 28 U.S.C. § 2201;

5.  Punitive damages as provided by Conn. Gen. Stat. § 31-51q and/or common law;

6.  Interest pursuant to Conn. Gen. Stat. § 37-3a and costs;

7.  Attorney's fees and costs; and

8.  Such other relief in law or equity the Court deems appropriate.


PLAINTIFF,
BANDY LEE, MD, MDiv

By     /s/ *Cindy M. Cieslak*    
    Robin B. Kallor (ct26536)
    Cindy M. Cieslak (ct29117)
    Melinda A. Powell (ct17049)
    Rose Kallor, LLP
    750 Main Street, Suite 309
    Hartford, CT 06103
    Tel #: (860) 361-7999
    Fax #: (860) 270-0710
    Email: rkallor@rosekallor.com
    ccieslak@rosekallor.com
    mpowell@rosekallor.com

JA-000049

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 21st day of August, 2021 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

     Jonathan M. Freiman, Esq.
     Caroline B. Park, Esq.
     Wiggin and Dana LLP
     265 Church Street
     New Haven, CT 06508
     Email: jfreiman@wiggin.com
     cpark@wiggin.com

                 /s/ *Cindy M. Cieslak*
                Cindy M. Cieslak

# EXHIBIT A

**Park, Caroline B.**

| | |
|---|---|
| **From:** | Krystal, John <john.krystal@yale.edu> |
| **Sent:** | Monday, January 13, 2020 8:14 AM |
| **To:** | Lee, Bandy |
| **Cc:** | Zonana, Howard; DonoghoeH |
| **Subject:** | Follow-up |

Dear Bandy,

I would like to meet with you and Howard to review your recent public statements, particularly these two recent statements:

-(Salon): advocating for the involuntary evaluation of President Trump and saying that a "mental health hold" is becoming inevitable.

-(Raw Story): stating that Alan Dershowitz and President Trump have a "shared delusion" based on a single public comment.

It seems to me, and my impression is supported by my discussion with Howard, that the published quotes suggest that you are not making cautious, reasoned, statements qualified by the limitations of the information that you have or considering alternatives to the conclusions that you present. Worse, the recklessness of your comments creates the appearance that they are self-serving in relation to your personal political beliefs and other possible personal aspirations.

Here is the problem for me. It seems to me that you have been increasingly reckless and irresponsible in your public statements. I have tried very hard to find a path that would enable you to continue your teaching role. However, you are putting me in a position where I have to ask, "Is this the sort of person that I can trust to teach medical students, residents, and forensic psychiatry fellows?" I have consulted Howard Zonana on this question and he is equally concerned that you are not showing good medical judgement in your public statements. It is our shared opinion that if your behavior does not change, we will have no alternative but to terminate your teaching role at Yale University. As you have no other duties at Yale, termination of your teaching role would also terminate your faculty appointment.

I think that the three of us should meet to review your recent comments and your plans for future comments. Perhaps we can find a path forward. I will ask Halppen Donoghoe to set up this meeting.

Sincerely,

John

John H. Krystal, M.D.
Robert L. McNeil, Jr., Professor of Translational Research
Professor of Psychiatry and Neuroscience
Chair, Department of Psychiatry
Co-Director, Yale Center for Clinical Investigation
Yale University School of Medicine
Professor of Psychology
Yale University Graduate School of Arts and Sciences

Chief of Psychiatry and Behavioral Health, Yale-New Haven Hospital
300 George Street, Suite #901
New Haven, CT 06511
T: 203-785-6396
F: 203-785-6196

This email message is a private communication. The information transmitted, including attachments, is intended only for the person or entity to which it is addressed and may contain confidential, privileged, and/or proprietary material. Any review, duplication, retransmission, distribution, or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is unauthorized by the sender and is prohibited. If you have received this message in error, please contact the sender immediately by return email and delete the original message from all computer systems. Thank you.

# EXHIBIT B

YALE UNIVERSITY
SCHOOL OF MEDICINE
DEPARTMENT OF PSYCHIATRY

JOHN H. KRYSTAL, M.D.
Chair, Department of Psychiatry
Chief of Psychiatry and Behavioral Health,
Yale-New Haven Hospital
Co-Director, Yale Center for Clinical Investigation

OFFICE OF THE CHAIR
Department of Psychiatry
300 George St., Suite 901.
New Haven, Connecticut 06511
Tel:  203-785-6396
Fax:  203-785-6196
Email:  john.krystal@yale.edu

September 4, 2020

Bandy X. Lee, M.D., M.Div.

Dear Dr. Lee:

Provost Strobel has shared with me your belief that you did not have an adequate opportunity to understand and respond to the concerns that caused the Department of Psychiatry to deny your request for reappointment.  Provost Strobel has asked me to explain to you the basis of the Department's decision, and I am happy to do so.

As you know, on January 17, 2020, a review committee, composed of Dr. Kapoor, Dr. Rohrbaugh, Dr. Zonana and me, met with you for an hour-long discussion of your role in the Department, which consisted of teaching and mentorship in the Division of Law and Psychiatry.  Although, at one time, you supervised forensic psychiatry fellows working with the Yale Law School clinics, you ceased doing so a few years ago.  In recent years, you mainly provided case evaluations and acted as a consultant to law students in the clinical program.  At the beginning of this year, that role came to an end, partly due to a concern that your psychiatric opinions were open to challenge in court.  In addition, your attendance at key didactic seminars within the Department, such as Friday case conferences, dwindled in 2019.  By the beginning of this year, you had no formal Departmentally-sanctioned teaching activities. Your only teaching role was outside the Department, as supervisor to two undergraduates and a medical student doing projects on prison violence

Given these circumstances, the review committee needed to consider whether the Department could offer you a continuing teaching role, and we met with you to help us make that decision.  The key question in our minds was whether you had the clinical judgment and professionalism to teach trainees key aspects of their profession.  Your diagnostic impressions of President Trump and several other public figures and your recommendations for treating President Trump played a role in our discussion. This was not because of the political content of your speech.  As you know, the Department and the University publicly defended your academic freedom and your right to express your

opinions as a citizen. As detailed below, the Committee's concern was what your diagnoses and treatment recommendations said about your clinical abilities and professionalism.

Since 2017, you have taken the position that you have a "duty to warn" the public that President Trump presents a threat to public safety. The duty to warn derives from the *Tarasoff* decision and subsequent legal developments, and it applies to clinicians in a treatment relationship with a potentially dangerous person. It has never been applied outside that context. In public comments, you said that President Trump was incapacitated by a psychiatric disorder, and you identified symptoms such as aggressive speech, sexual misconduct, incitement to violence, belief in conspiracies, declining cognitive functioning, and neurological deficits. Initially, you did not identify the disorder causing these supposed symptoms. In December 2019, you said publicly that President Trump exhibited a "pattern of delusions," was "lacking rational decision-making capacity," and had "definitive signs of severe pathology" that required "an advanced level of care." In January 2020, you called for "an involuntary evaluation" of President Trump, and you said, "I am beginning to believe a mental health hold . . . will become inevitable." That same month, you publicly suggested that President Trump, Rudolph Giuliani and Alan Dershowitz had a "shared psychosis."

I want to emphasize that you did not make these statements as a layperson offering a political judgment; you made them explicitly in your professional capacity as a psychiatrist and on the basis of your psychiatric knowledge and judgment. For that reason, the committee decided it was appropriate to consider how these statements reflected your ability to teach trainees.

We began our discussion by asking you to address whether your diagnosis of President Trump and your treatment recommendations should have included a disclaimer regarding limited evidence, whether they adequately reflected the process of differential diagnosis, and whether you applied any recognized standards when you determined on the basis of his public statements that President Trump presented a danger to the public health. Your responses failed to address any of these points.

Our discussion then turned to your statement that President Trump and Mr. Dershowitz had a shared psychosis. You told us that "someone doesn't have to be psychotic in order to have a psychosis;" that your observations had convinced you that the strong emotional bond between President Trump and his followers "is a group phenomenon of shared psychosis;" and that, in the presence of this bond, "the default is that you would expect a shared psychosis." You further claimed that you were misquoted; that, in fact, you had said President Trump and Mr. Dershowitz "may" have a shared psychosis; and that you meant to say that they have a shared delusional disorder. We asked you to explain in detail the basis for this diagnosis, and none of the evidence you offered met the DSM-5 criteria for shared delusional disorder. The committee also noted that you

explored no other explanations that might have accounted for the data that led you to your diagnosis.

Following our discussion with you, the committee considered whether the information that you shared with us was relevant to your capacity to teach trainees the core competencies required by the ACGME. We decided that our discussion with you implicated three of the six competencies: medical knowledge, interpersonal and communication skills, and professionalism.

In regard to medical knowledge, the ACGME requires trainees "to demonstrate knowledge about established and evolving biomedical, clinical, and cognate sciences and the application of this knowledge to patient care." Our discussion of your diagnosis of shared psychosis or, as you preferred, shared delusional disorder convinced the committee that you do not adequately understand or choose not to follow current methods for diagnosing psychotic disorders, which are common in the psychiatric practice that our trainees will enter.

In regard to interpersonal communication skills, the ACGME requires trainees "to demonstrate interpersonal and communication skills that result in effective information exchange and teaming with patients, patients' families, and professional associates." In our lengthy discussion with you, you were unable to explain to four trained colleagues the basis of a very serious diagnosis. In addition, you have made many conflicting, confusing, and sometimes inaccurate public statements about psychiatric diagnosis and the profession's duty to warn.

Finally, the ACGME requires trainees "to demonstrate a commitment to carrying out professional responsibilities, adherence to ethical principles, and sensitivity to a diverse patient population." Although the committee does not doubt that you are acting on the basis of your personal moral code, your repeated violations of the APA's Goldwater Rule and your inappropriate transfer of the duty to warn from the treatment setting to national politics raised significant doubts about your understanding of crucial ethical and legal principles in psychiatry.

In light of the above concerns, the Committee concluded that the Department should not seek a new teaching role for you. The Committee report was shared with the Executive Committee of the Department of Psychiatry and discussed at length. Its recommendation, that your teaching duties not be reinstated, was endorsed unanimously by the Executive Committee. In the absence of a formal teaching role, your voluntary appointment lapsed.

I hope that this letter clarifies the process leading to the Department decision to not reinstate your teaching responsibilities. We recognize that without formal teaching responsibilities your appointment could not be reinstated.

Sincerely,

John H. Krystal, M.D.
Robert L. McNeil, Jr. Professor of Translational Research
Professor of Psychiatry, Neuroscience, and Psychology

# EXHIBIT C

YALE UNIVERSITY
SCHOOL OF MEDICINE
DEPARTMENT OF PSYCHIATRY

JOHN H. KRYSTAL, M.D.                                    OFFICE OF THE CHAIR
Chair, Department of Psychiatry                          Department of Psychiatry
Chief of Psychiatry and Behavioral Health,              300 George St., Suite 901.
Yale-New Haven Hospital                                  New Haven, Connecticut 06511
Co-Director, Yale Center for Clinical Investigation      Tel:  203-785-6396
                                                         Fax:  203-785-6196
                                                         Email:  john.krystal@yale.edu

May 17, 2020

Bandy X. Lee, M.D., M.Div
(bandy.lee@yale.edu)

Dear Dr. Lee (Bandy),

In reviewing your candidacy for reappointment to the voluntary faculty of the Yale
Department of Psychiatry, we became aware that you no longer have a formal teaching
role in the Division of Law and Psychiatry. As a result, your faculty appointment in our
Department and School of Medicine will end as of June 30, 2020. Thank you for your
service to the Department. We wish you all the best with your career.

Sincerely,

John H. Krystal, M.D.
Robert L. McNeil, Jr. Professor of Translational Research
Professor of Psychiatry, Neuroscience, and Psychology

# EXHIBIT D

| From: | Salovey, Peter |
| --- | --- |
| To: | Lee, Bandy |
| Cc: | Strobel, Scott |
| Subject: | RE: Request for a review |
| Date: | Friday, September 25, 2020 5:55:51 PM |

Dear Dr. Lee,

Thank you for your letter. I indeed remember meeting you in the context of the Global Health Studies program, and I am glad to hear of your success in that program and elsewhere.

I have given your letter careful thought and inquired about your communications with Provost Strobel. You have asked that I intervene to reverse or suspend a reappointment decision made by a Yale department. Such an action on my part would be highly unusual and serious because the right of the senior faculty to determine their department's members without interference is fundamental to Yale's tradition of faculty governance. In regard to your reappointment, the department made a reasoned decision based on legitimate academic concerns. Under these circumstances, it would not be appropriate for me to take the action that you request.

I know that this response will come as a disappointment to you, but I trust that your many accomplishments will hold you in good stead moving forward.

Sincerely,
Peter Salovey

Peter Salovey
President and Chris Argyris Professor of Psychology
Yale University
P.O. Box 208229
New Haven, CT 06520-8229

Telephone: (203) 432-2550

---

**From:** Lee, Bandy <bandy.lee@yale.edu>
**Sent:** Friday, September 25, 2020 8:25 AM
**To:** Salovey, Peter <peter.salovey@yale.edu>
**Cc:** Strobel, Scott <scott.strobel@yale.edu>
**Subject:** RE: Request for a review

Dear President Salovey:

Forgive me for this addendum. To inform you, my communications are not confidential, as my legal friends have involved themselves in my case. A postscript is added at their request.

Sincerely,

Bandy Lee

---

**From:** Lee, Bandy
**Sent:** Thursday, September 24, 2020 8:30 AM
**To:** Salovey, Peter <peter.salovey@yale.edu>
**Cc:** Strobel, Scott <scott.strobel@yale.edu>
**Subject:** Request for a review

Dear President Salovey:

Please find attached a letter with a request.

Best regards,

Bandy Lee

# EXHIBIT E

**YALE UNIVERSITY**

# Faculty Handbook

**August 22, 2019**

# CONTENTS

Introduction................................................................................................................1

I.   University Organization.................................................................................2

    A.  History.........................................................................................................2

    B.  The Yale Corporation................................................................................2

    C.  Officers of the University .........................................................................3

    D.  Schools and Faculties of the University...................................................3

II.   Academic Freedom and Faculty Standards of Conduct ..............................5

III.  Faculty Ranks, Appointments, and Policies: University-wide....................8

    A.  Equal Opportunity and Affirmative Action.............................................8

    B.  Faculty Ranks............................................................................................8

    C.  Recruitment and Approval Process for Faculty Appointments................9

    D.  Authority to Appoint.................................................................................9

    E.  Appointments and Terms of Employment .............................................10

    F.  Maximum Time in Non-tenure Ladder Ranks .......................................10

    G.  Notice of Termination and Non-reappointment ....................................12

    H.  Fully Joint and Secondary Faculty Appointments ...............................13

    I.   Part-time Appointment to the Ladder Ranks of Assistant Professor, Associate Professor, and Professor....................................................................14

    J.   Dual Appointments as Faculty and Managerial or Professional Employee.................15

    K.  Faculty Appointment Procedures...........................................................16

    L.  Decisions Not to Reappoint or Promote and their Review ...................19

M. Review Procedure for Complaints about Issues Other than Reappointment or Promotion..................................................................................................23

N. Review Procedures for Complaints about Violations of the Faculty Standards of Conduct.......................................................................................................23

IV. Faculty of Arts and Sciences..................................................................................29

A. Description...........................................................................................................29

B. Governance .........................................................................................................29

C. Academic Departments and Programs..............................................................32

D. Assignment to the Graduate School Faculty....................................................34

E. Appointments Procedures..................................................................................35

F. Voting Policies.....................................................................................................35

G. Meetings of the Faculty......................................................................................38

H. Ladder Faculty Ranks.........................................................................................40

I. Other Instructional Appointments.....................................................................48

J. Instructional Opportunities for Yale Graduate and Professional School Students........53

K. Research Appointments .....................................................................................54

L. Leaves of Absence ..............................................................................................54

V. School of Architecture............................................................................................58

A. Description...........................................................................................................58

B. Governance: The Executive Committee ...........................................................58

C. Composition and Ranks of Faculty...................................................................58

D. Appointment, Reappointment, and Promotion Policy and Procedures..........61

E. Leave Policy and Procedures .............................................................................63

F. Research/Travel Funds........................................................................................63

VI.   School of Art ................................................................................................................64

    A.  Description ................................................................................................64

    B.  The Governing Board and the Appointments Committee ..........................64

    C.  Composition and Ranks of Faculty ...........................................................64

    D.  Appointments ............................................................................................65

    E.  Leave Policy ..............................................................................................66

VII.   Divinity School and Institute of Sacred Music ........................................................67

    A.  Description ................................................................................................67

    B.  Governance ................................................................................................67

    C.  Faculty Ranks ...........................................................................................68

    D.  Appointments ............................................................................................68

    E.  Termination Policy ....................................................................................71

    F.  Leave Policy ..............................................................................................71

VIII.   School of Drama ......................................................................................................72

    A.  Description ................................................................................................72

    B.  Faculty Composition and Responsibilities .................................................72

    C.  Faculty Ranks ...........................................................................................73

    D.  Appointments ............................................................................................73

    E.  Reappointments and Promotions ...............................................................74

    F.  Leave Policy ..............................................................................................74

IX.   School of Forestry & Environmental Studies ..........................................................75

    A.  Description ................................................................................................75

B.  Governance ....................................................................................75

C.  Ladder Faculty Ranks and Appointments ......................................76

D.  Leave Policy .....................................................................................76

E.  Other Instructional and Research Appointments ..........................76

F.  Instructional Opportunities for Graduate Students (Ph.D., D.F.E.S. and Masters)......79

X.  Law School ..............................................................................................80

A.  Description .......................................................................................80

B.  Appointments: The Governing Board...............................................80

C.  Faculty Ranks...................................................................................80

D.  Leave Policy .....................................................................................82

XI.  School of Management ...........................................................................83

A.  Description .......................................................................................83

B.  Governance ......................................................................................83

C.  Ladder Faculty .................................................................................83

D.  Non-Ladder Faculty .........................................................................85

E.  Other Appointments ........................................................................87

F.  Procedures for Appointment ...........................................................88

G.Leave Policy......................................................................................88

XII.  School of Medicine .................................................................................90

A.  Description .......................................................................................90

B.  Departments ....................................................................................90

C.  Governance ......................................................................................91

D. Supervision of Students ...................................................................92

E. Appointments and Promotions Procedures .......................................92

F. Faculty Tracks ..................................................................................94

G. Professor in the Practice and Adjunct Faculty Ranks.....................103

H. Other Clinical Ranks ......................................................................103

I. Voluntary Ranks .............................................................................104

J. Research Ranks ...............................................................................104

K. Other Instructional Ranks ..............................................................105

L. Training Ranks ...............................................................................105

M. Coterminous Appointments ...........................................................106

N. Leave Policy ..................................................................................107

O. Joint Appointments ........................................................................107

XIII. School of Music and Institute of Sacred Music .................................108

A. Description ....................................................................................108

B. Governing Committees ..................................................................108

C. Faculty Ranks and Appointments ..................................................109

D. Joint Appointments with the Department of Music ........................110

E. Off-campus Professional Engagements ..........................................110

F. Leave Policy ..................................................................................110

G. Termination Policy ........................................................................110

XIV. School of Nursing ..............................................................................111

A. Description ....................................................................................111

B.  Governance .................................................................................111

C.  Faculty Composition and Responsibilities...................................112

D.  Faculty Ranks..............................................................................113

E.  Terms of Appointment ................................................................116

F.  Procedures for Appointments and Promotions ...........................117

G.  Coterminous Appointments ........................................................117

H.  Courtesy Faculty .........................................................................117

I.  Leave Policy.................................................................................118

XV.  Research Appointments: University-wide ........................................119

A.  General Policy .............................................................................119

B.  Description of Research Faculty Ranks ......................................119

C.  Postdoctoral and Other Non-faculty Research Ranks ................122

XVI.  Visiting Appointments: University-wide ...........................................126

A.  Visiting Teaching Faculty ...........................................................126

B.  Visiting Research Faculty ...........................................................126

C.  Visiting Fellow ............................................................................126

XVII. Leaves of Absence and Teaching Relief: University-wide ...............127

A.  General Conditions Governing All Leaves .................................127

B.  Leaves with Salary from University Funds ................................ 129

C.  Leaves without Salary from University Funds ............................132

D.  Child-Rearing Leaves, Caregivers Leaves, and Parental Leave Policies .................134

XVIII.Faculty Compensation, Benefits, and Services ................................138

A.  Salaries ................................................................................................138

B.  Summer Compensation from University-administered Funds ...................140

C.  Other Compensation from University-administered Funds........................141

D.  Fringe Benefits .......................................................................................142

E.  Services for International Faculty and Research Staff.............................149

F.  The Office of International Affairs ...........................................................152

G.  Resources and Accommodations for Faculty Who Have Disabilities .......153

H.  Business and Administrative Support ......................................................153

I.  Yale Travel Services...............................................................................154

J.  Parking ..................................................................................................154

K.  Identification Cards................................................................................154

L.  Identification Cards for Spouses and Partners ........................................154

M. Letters of Introduction ..........................................................................154

N.  Yale NetIDs............................................................................................155

O.  Technology and Computing Support for Faculty......................................155

XIX.  Retirement....................................................................................................156

A.  Full Retirement and Emeritus Rank........................................................156

B.  Phased Retirement Plan .........................................................................159

XX.  University Policies Concerning Teaching and Research ...................................160

A.  Instructional and Institutional Responsibilities........................................160

B.  Safety Issues..........................................................................................161

C.  Research and Scholarship ......................................................................162

D.  Patents, Copyrights, and Licenses .................................................................167

E.  Outside Interests and Employment ................................................................168

F.  University Equipment .....................................................................................174

XXI.  Other University Policies Affecting Faculty .......................................................175

A.  Sexual Harassment .........................................................................................175

B.  Teacher-Student Consensual Relations ..........................................................176

C.  Accommodations for Students with Disabilities ............................................177

D.  Employment of Members of the Same Family and Related Matters .............177

E.  Short-term and Long-term Medical Disability ..............................................178

F.  Standards of Business Conduct .....................................................................178

G.  Appropriate Use of Technology Resources ...................................................179

H.  Military Service ..............................................................................................179

I.  Jury Duty ........................................................................................................180

J.  Use of University Facilities ...........................................................................181

K.  Use of University E-mail Addresses, Websites, and Stationery ...................181

L.  University Federal Relations ..........................................................................182

M. Faculty Involvement in Community Activities ..............................................182

N.  University Tribunal .........................................................................................182

O.  Indemnification for Legal Expenses .............................................................182

P.  Workplace Violence Prevention Policy .........................................................182

Q.  Emeriti Titles ..................................................................................................183

# Introduction

The purpose of the *Yale University Faculty Handbook* is to present in a convenient form the most important University policies and practices as they apply to the faculties of the University. The policies included and referred to in this *Handbook* form part of the essential employment understandings between members of the faculty and the University.

The *Handbook* is meant to inform and serve members of the administration as well as the faculty. It is available on the Office of the Provost website. The text of the *Handbook* includes links to University policies and resources available on Yale websites.

The *Handbook* will be revised as University policies evolve and an updated version of the *Handbook* will be posted online so that faculty may stay aware of changes in University policies. A memorandum highlighting significant changes to the *Handbook* will be distributed to faculty with each new edition.

# I. University Organization

## A. History

The institution that became Yale University was founded in 1701 as the Collegiate School by ten Congregational ministers in Saybrook, Connecticut. In 1716, the school was moved to New Haven. The School of Medicine was opened in 1813, and a Department of Theology, predecessor to the Divinity School, was created in 1822. In 1824, a private law school conducted in New Haven by three Yale graduates became affiliated with Yale College, and the Bachelor of Laws degree was conferred by Yale for the first time in 1843. The Sheffield Scientific School and the Graduate School followed. The first Ph.D. awarded in America was conferred at Yale in 1861. In 1887, the institution was given the legal title of Yale University. Schools of Music, Forestry & Environmental Studies, Nursing, Engineering, Drama, Art, Architecture, and Management were founded later. The activities of the Sheffield Scientific School were assumed by Yale College and the Graduate School in 1945. The School of Engineering, part of the Sheffield Scientific School from 1861, was established as a separate school in 1932. In 1962, most of its academic responsibilities were transferred to the Department of Engineering and Applied Science, which has since been divided into several departments, called the Faculty of Engineering and headed by a Dean of Engineering. Women were admitted as regularly enrolled students to the Graduate School in 1892 and to Yale College in 1969. Since 2007 the Department of Epidemiology and Public Health, which is formally part of the School of Medicine, has been called the Yale School of Public Health. In 2008 the Faculty of Engineering became recognized as the School of Engineering & Applied Science, which is formally a part of the Faculty of Arts and Sciences (FAS) for the purposes of faculty appointments and governance. In 2014, Yale added the position of Dean of the Faculty of Arts and Sciences to its administrative structure, with oversight responsibility for the faculty and departments of the FAS.

## B. The Yale Corporation

Yale's Charter provides that the final authority in the "government, care and management" of the University is the Yale Corporation, a body of nineteen Fellows consisting of the President of the University, who presides at all meetings, the Governor and Lieutenant Governor of the state of Connecticut, *ex officiis*, ten Fellows who are the "Successors of the Original Trustees" and who may serve for two successive terms of six years each, and six Alumni Fellows, one elected each year by the graduates to serve for six years. Upon recommendation of the President, in special circumstances a Successor Trustee may be elected to an additional term of up to three years. Alumni Fellows are eligible for appointment as Successor Trustees. Meetings of the Corporation are held regularly during the academic year.

## C.  Officers  of the University

The Officers of the University are appointed by the Corporation. They are the President, Provost, Vice President of the University, Vice President for Finance and Business Operations, Vice President for Development, Vice President and General Counsel, Vice President for New Haven and State Affairs and Campus Development, Vice President for Human Resources and Administration, Secretary and Vice President for Student Life and such others as the Corporation may designate. A description of the authority vested in each of them and the responsibilities of their respective positions is given in The Yale Corporation By-Laws.

## D.  Schools and Faculties of the University

Yale considers itself to have twelve professional schools within the University. Ten of these schools have formal governance and faculty appointment procedures and have the authority to award degrees by recommendation of the Dean of the School. The two remaining schools – Public Health and Engineering & Applied Science – do not have the authority to appoint faculty, as they remain divisions of the Schools of Medicine and the Faculty of Arts and Sciences, respectively. They do, however, each have a Dean appointed by the President and approved by the Yale Corporation, who oversees development and administrative matters within the school.

Degrees and courses of study in the University are offered in the twelve schools listed here with the date each was founded: Yale College (1701); School of Medicine (1813); Divinity School (1822); Law School (1824); School of Art (1865); Graduate School of Arts and Sciences (1892); School of Music (1894); School of Forestry & Environmental Studies (1900); School of Nursing (1923); School of Drama (1955); School of Architecture (1972); School of Management (1974). Each school has its own Dean, faculty, and board of permanent officers or other governing body, as approved by the Yale Corporation. The faculties of Yale College and the Graduate School constitute the Faculty of Arts and Sciences, which is under the direction of the Faculty of Arts and Sciences Executive Committee, composed of the President, the Provost, the Dean of the Faculty of Arts and Sciences, the Dean of Yale College, the Dean of the Graduate School, and the Dean of the School of Engineering & Applied Science.

Subject to the overall authority of the Corporation, on recommendation by the President or Provost, the faculty of each school, acting through such committees and procedures as it may adopt, has the power to determine the school's educational policies. In the Faculty of Arts and Sciences, the full professors of that faculty meet together for the purpose of acting on appointments, and that

meeting is referred to as the meeting of the Joint Boards of Permanent Officers of Yale College and the Graduate School. In each of the professional schools, the full professors on permanent appointment, as well as, *ex officiis*, the Dean of the School and the President and Provost, constitute the board of permanent officers except where the appointment structure of a school requires a different governing body, as approved by the Corporation.

## II.  Academic Freedom and Faculty Standards of Conduct

### A.   University Policy on Freedom of Expression

In 1975, the Committee on Freedom of Expression at Yale,[1] chaired by Professor C. Vann Woodward, wrote the following:

> *The primary function of a university is to discover and disseminate knowledge by means of research and teaching. To fulfill this function a free interchange of ideas is necessary not only within its walls but with the world beyond as well. It follows that a university must do everything possible to ensure within it the fullest degree of intellectual freedom. The history of intellectual growth and discovery clearly demonstrates the need for unfettered freedom, the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable. To curtail free expression strikes twice at intellectual freedom, for whoever deprives another of the right to state unpopular views necessarily also deprives others of the right to listen to those views.*

Members of this University have freely associated themselves with Yale and in doing so have affirmed their commitment to a philosophy of mutual tolerance and respect. Physical restriction, coercion, or intimidation of any member of the community is contrary to the basic principles of the University. It is also a violation of these principles and of the University's rules of conduct for any member of the faculty, staff, or student body to prevent the orderly conduct of a University function or activity, such as a lecture, meeting, interview, ceremony, or other public event. It is similarly a violation of these principles to block the legitimate activity of any person on the Yale campus or in any Yale building or facility.

### B.   Faculty Standards of Conduct

Yale University's mission is to create, disseminate, and preserve knowledge through research and teaching. The Yale faculty[2] bears primary responsibility for preserving the conditions necessary to advance this mission, including protection of the freedom of inquiry; participation in the governance of the University; the application of fair and consistent standards and processes in

---

1  "Report of the Committee on Freedom of Expression at Yale" (Yale University, January 1975), available at: https://yalecollege.yale.edu/deans-office/reports/report-committee-freedom-expression-yale

2   The Yale faculty includes all University administrators with faculty appointments.

matters of promotion and tenure; and adherence to a shared set of principles governing faculty members in relation to each other, to their students and trainees, and to the University and its staff members. Yale faculty members understand the common-sense and reasonable responsibilities that arise from:

**Their Role as Educators**. The integrity of the teacher-student relationship is crucial to the University's educational mission. This relationship vests considerable trust in the faculty member, who, in turn, bears authority and accountability as mentor, educator, and evaluator. When acting in their role as teachers, members of the Yale faculty treat students and trainees with respect.[3] They set an example of academic integrity and educate their students and trainees in the requirements of honest scholarship. They evaluate their students' and trainees' work solely on the basis of its intellectual merit and adherence to course or program requirements. They maintain proper professional boundaries and never exploit the unequal institutional power inherent in the relationship between faculty member and student or trainee.

**Their Role as Scholars**.  As scholars, members of the Yale faculty devote their professional lives to seeking and disseminating knowledge, using the tools and resources provided by the University and the larger community. To protect their colleagues, their students, the University, and the record of knowledge in their field, and to preserve respect for scholarship in the larger community, members of the Yale faculty conduct and publish their research and writing with scrupulous honesty, and they do not allow pecuniary or other improper influences to compromise the integrity of their scholarship.

**Their Role as Members of the Yale Community**.  The overriding professional obligation of all full-time faculty members is to Yale and to its mission of creating, disseminating, and preserving knowledge. Faculty members recognize that the preservation of the University as a self-sustaining community of scholars requires that they accept their share of responsibility for University governance and that they comply with University policies. Faculty members participate constructively and without discrimination in hiring and promotion decisions. By freely associating themselves with the University, members of the faculty affirm their commitment to a philosophy of mutual tolerance and respect. In furtherance of Yale's mission, they have the right and obligation to criticize their colleagues, staff members, and the University, but they endeavor to do so without personal animus and without seeking to intimidate or coerce. Faculty members act as stewards of Yale's resources and treat Yale property and funds with care and prudence.

---

3.   For the purposes of this document, a student is a person enrolled in any Yale educational or training program. A trainee is a type of student, but the term is used separately here to emphasize the responsibilities that faculty members have toward post-doctoral fellows, medical residents, and persons in similar post-graduate positions. A teacher is anyone who holds a faculty position described in the Faculty Handbook and who teaches students or supervises trainees.

Faculty members should seek in good faith to fulfill the responsibilities that arise from their various roles. These responsibilities form the overarching aspirations for our common work.  They do not replace or supersede any other established Yale policies, such as those pertaining to academic misconduct, conflict of interest, discrimination, or sexual misconduct.

Responsibility for addressing a complaint that a faculty member has failed to comply with the Faculty Standards of Conduct normally lies with the faculty member's Dean. Deans may create and apply informal processes to resolve complaints of faculty misconduct, which may include the designation of a particular faculty member, such as a department chair, to receive and facilitate the resolution of complaints. Those who believe that a faculty member has violated the Faculty Standards of Conduct are encouraged to seek an informal resolution of the matter through the faculty member's Dean. Such informal processes may result in sanctions beyond the inherent administrative authority of the Dean only with the consent of the parties to the dispute.

If an alleged violation of the Faculty Standards of Conduct has not been resolved informally, or if the Dean was significantly involved in the matter under dispute, a member of the University community may ask the Provost to submit a complaint for formal faculty review under the procedures described in Section III.N.  Such complaints will be considered only if the alleged violation is reckless or intentional and has caused serious harm to the University or to a member of the University community.

## III.  Faculty Ranks, Appointments, and Policies: University-wide

Nothing is more important to a university than the quality of its faculty, and this recognition informs the policies that underlie the appointment and support of Yale faculty at all ranks. The definition and standards for appointment at each rank and the procedures that govern appointments, reviews, and promotions constitute the means by which the fairness and quality of faculty appointments and promotions are ensured. The various forms of support for teaching and research described in this book are designed to enhance the effectiveness and development of individual faculty members and therefore the quality of the academic programs they create. In addition to the policies below, please consult the sections relevant to each school for additional policies and information.

### A.  Equal Opportunity and Affirmative Action

The University is committed to basing judgments concerning the admission, education, and employment of individuals upon their qualifications and abilities and affirmatively seeks to attract to its faculty, staff, and student body qualified persons of diverse backgrounds. In accordance with this policy and as delineated by federal and Connecticut law, Yale does not discriminate in admissions, educational programs, or employment against any individual on account of that individual's sex, race, color, religion, age, disability, status as a special disabled veteran or veteran of the Vietnam era or other covered veteran, or national or ethnic origin; nor does Yale discriminate on the basis of sexual orientation or gender identity or expression. University policy is committed to affirmative action under law in the employment of women, minority group members, individuals with disabilities, special disabled veterans, and veterans of the Vietnam era or other covered veteran. Inquiries concerning this policy may be referred to the Office for Equal Opportunity Programs. Written affirmative action programs are maintained by the University for the employment of women, members of government-designated racial or ethnic minority groups, persons with disabilities, special disabled veterans, veterans of the Vietnam era, and other covered veterans. Copies of these programs are available for review in the Office for Equal Opportunity Programs.

### B.  Faculty Ranks

At Yale, distinctions are made among ladder faculty ranks, non-ladder instructional ranks (e.g., lecturers, lectors, adjunct and visiting faculty), and research ranks. Differences among these categories include the appointment and review procedures, leave and benefit policies, and maximum time in rank. Throughout the University, ladder ranks include: at the non-tenure level, lecturer convertible, assistant professor and associate professor on term; at the tenure level, associate professor with tenure and professor. For a more detailed description of the faculty ranks, see Sections IV through XVI.

## C.  Recruitment and Approval Process for Faculty Appointments

Faculty positions are announced and nominations for them solicited in ways that will ensure appointments of the highest possible quality and an appointments process that is consistent with the University's goals of open access and affirmative action. Usually recruitment for initial appointments will include advertisement, such as announcements in professional journals and newsletters and at professional meetings, as well as contact with representatives of relevant departments and schools by letter, e-mail, or telephone. When general announcements are unlikely to be successful, departments and schools are expected to undertake recruiting efforts that reflect the special characteristics of the position and relevant pool of candidates. In general, new appointments to the ranks of professor, associate professor, and assistant professor, including adjunct ranks, require written documentation of the entire search process. This documentation is reviewed by the Office for Equal Opportunity Programs and must be approved by the Provost's authorized representative before an appointment is offered. Affirmative Action Deputies are appointed in each of the professional schools, and individuals are asked to serve on search committees in the Faculty of Arts and Sciences, to assist search committees in their schools and departments with the recruitment of women and members of minority groups. More detailed information about appointments procedures can be found in memoranda prepared and distributed by the Provost and deans of the FAS and the professional schools.

## D.  Authority to Appoint

Appointments to all faculty positions are made by vote of the Yale Corporation, either upon nomination by the President, or upon nomination approved and transmitted by the President or Provost. Appointments to tenure are made after recommendation to the Provost by the board of permanent officers or otherwise designated governing body of a school. Other appointments may be recommended by the board of permanent officers or other governing body, by the Dean, or by the appropriate appointments committee depending on the school originating the appointment.

No offer of appointment or promotion is final until approved by the Corporation upon the recommendation of the President or Provost. No member of a faculty may commit the University to any academic appointment unless authorized by the Corporation to do so. With the approval of the Provost, chairs of departments or deans of schools, or of the FAS, or their representatives, may, however, discuss the terms of possible offers of academic appointment with prospective candidates. A notice of the Corporation's vote making the appointment is sent to the appointee by the appropriate department or school after authorization from the Office of the Secretary.

Case 3:21-cv-00389-SALM   Document 32-62   Filed 09/17/21   Page 27 of 194

*10   Yale University Faculty Handbook — August 22, 2019*

## E.   Appointments and Terms of Employment

No one appointed to a ladder and/or full-time faculty position at Yale may simultaneously hold a tenure or tenure-track, ladder-equivalent, or full-time position or the equivalent elsewhere.[4] Various kinds of other appointments at other institutions may be appropriate, as long as they are disclosed and do not create a conflict of interest or conflict of commitment (see Section XX.E). No member of the faculty at any rank employed full-time at Yale may hold a teaching position, whether full-time or part-time, even a visiting one, at another institution during the academic year without special permission from the Provost, and in such cases additional compensation is not permitted. With prior approval from the Provost, a faculty member may accept a temporary visiting appointment at another institution while on an unpaid leave of absence from Yale.

Appointments to the faculty are to a given rank and generally for a specified period of time ranging from one semester to five years. The only exceptions are (i) appointments to tenure positions and, in certain professional schools, appointments to continuing professorial ranks, neither of which are limited as to time; and (ii) appointments to the rank of associate professor on term in the Faculty of Arts and Sciences, which are made for a term equal to the faculty member's remaining eligible time in the non-tenure ranks, up to seven years under FASTAP 2007[5] (see Section IV.H.1) and up to eight years under FASTAP 2016[6]. Many term appointments are renewable, though the time permitted in non-tenure ladder ranks is generally limited. Most appointments carry with them an understanding of a full-time level of compensated effort, i.e., full-time employment, either for the academic year or the full calendar year. However, the level of compensated effort in appointments other than tenure appointments may be less than full-time and may vary from year to year. Tenure appointments of less than full-time are permitted only in exceptional circumstances and for a limited duration of time. Thus it is important to distinguish between the level and term of appointment and the understanding with respect to the fraction and duration of employment.

## F.   Maximum Time in Non-tenure Ladder Ranks (effective July 1, 2018)

Except for faculty in certain tracks in Medicine, Public Health, and Nursing, no one on the Yale faculty may be employed in the ranks of assistant professor and associate professor on term for longer than a total of ten years, plus any extensions as described below. In the Faculty of Arts and Sciences, the maximum is nine years under FASTAP 2007 (see Section IV.H.1) and eight years under FASTAP 2016 (see Section IV.H.2).  In the Schools of Architecture, Art,

---

4  Exceptions may be made, with the approval of the Corporation, to enable ladder faculty in a clinical specialty in the School of Medicine to hold tenure-track appointments in a cooperating academic institution, where there is a formal inter-institutional arrangement with such institution and where the clinical opportunity is not sufficient at Yale alone.
5  Report of the Faculty of Arts and Sciences Tenure and Appointments Policy Committee (2007).
6  Report of the Faculty of Arts and Sciences FASTAP Review Committee (2016).

JA-000084

Divinity, and Forestry and Environmental Studies, that maximum is nine years (see Section IV.H.1).  In all schools, the maximum may be extended by up to a total of three years for time during which the faculty member:

(a) has taken a leave of absence for public service,

(b) has taken an approved Caregiver's Leave of at least six weeks (see Section XVII.D.1),

(c) has taken an approved semester of Teaching Relief for Child Rearing; or has taken an approved Child-Rearing Leave, or has requested and been granted an extension in their term of appointment in connection with child rearing due to having provided significant and sustained care to a newly born or newly adopted child during the first year following the birth or adoption (see Section XVII.D), or

(d) has been granted an approved period of medical disability of at least six weeks (see Section XXI.E).

Extensions granted for any combination of these reasons are subject to a maximum of three additional years in the non-tenure ladder ranks and a maximum of two years for any one category. A single event may give rise to an extension in only one category.

Throughout the University, any full-time, non-tenured member of the ladder faculty holding an appointment of three years or more who is granted a Caregiver's Leave of at least six weeks, or a Child-Rearing Leave, will typically receive an extension of their current appointment and the maximum time in that rank and in the combined non-tenure ranks. This extension is normally for one semester.

Any full-time member of the ladder faculty who takes a semester of Teaching Relief for Child Rearing or provide significant and sustained care to a newly born or newly adopted child during the first year following the birth or adoption, or experiences any medical disability as described in Section XXI.E of at least six weeks at any time of the year, will typically receive an extension of their current appointment and the maximum time both in that rank and in the combined non-tenure ranks. This extension is normally for two semesters. Note that a faculty member who does not take Teaching Relief for Child Rearing does not need to elect to take this extension at the time of the birth or adoption, but should inform the chair or dean of their intent to accept the extension at least one year before a review or promotion consideration is scheduled to begin, to ensure that both the faculty member and the department or School have adequate planning time for the review. Also note that a faculty member who does not opt to take Teaching Relief for Child Rearing (or a Child-Rearing Leave) is not obligated to accept the extension and may instead elect to follow the original review schedule.

Any full-time member of the ladder faculty who is granted a leave for public service will typically receive an extension of their current appointment and the maximum time both in that rank and in the combined non-tenure ranks. This extension will normally be for one semester.

A faculty member may be granted up to two extensions for any particular category, thereby extending their appointment and time in the non-tenure ladder ranks for a maximum of two years (see Section III.F). Faculty who are no longer eligible for reappointment or promotion are not eligiblle for an extension due to any of the leaves or teaching relief described above.

An extension may also be allowed, on a pro-rata basis and subject to the same three-year limit on extensions, for time during which the faculty member holds a part-time ladder appointment at Yale. For example, a person working half-time over the course of two academic years would be entitled to a one-year extension of the eight-, nine-, or ten-year maximum.

In the School of Medicine and the School of Public Health, the ten-year maximum in the Traditional Track includes years of appointment to the ladder ranks at Yale and up to three years served in the ladder ranks at other institutions.

## G.  Notice of Termination and Non-reappointment

The reappointment of persons holding term appointments is not automatic at Yale. Schools and departments are expected to make a careful evaluation of each candidate's work and promise, as well as the programmatic needs of the school or department, before deciding whether or not to recommend reappointment or promotion. Notice of non-reappointment for persons holding full-time term appointments will be given in writing according to the following schedule, although failure to provide such notice does not create any right to extension or reappointment.

For full-time faculty in the ladder ranks appointed to terms of three or more years, notice of non-reappointment normally will be given at least one year before the terminal date of the appointment, even when a review for promotion is underway.

In extraordinary circumstances, persons at the ladder rank of assistant professor holding an appointment of at least three years may request, in writing, a waiver of the one-year notification by asking for postponement of the required review until the fall term of their final year of appointment. Schools and departments are not obligated to grant such requests and may do so only after approval by the Office of the Provost following consultation with the appropriate dean. In such cases, the decision of the department on promotion, reappointment, or termination should be communicated to the individual no later than December 1 of the terminal academic year. Only in extraordinary circumstances will permission be granted to postpone the review until the final  year in the non-tenure ladder ranks.

For full-time faculty in the fifth or any subsequent year of successive one- or two-year appointments in the non-ladder ranks, notice of non-reappointment normally will be given by October 31 of the final year of appointment.

For specific notice of non-reappointment as lector, senior lector, adjunct, and lecturer in the Faculty of Arts and Sciences, see Section IV.J.

For notice of termination in research faculty appointments as a result of lack of external salary support, see Section XV.

For notice of termination specific to certain professional schools see Sections V through XIV, and consult the appointments procedures of the appropriate school.

## H.   Fully Joint and Secondary Faculty Appointments

**Fully joint appointments**. Faculty members with fully joint appointments have full appointments in two or more academic units at Yale. The faculty member should participate in the work of each department, program, and/or school to which the person is fully appointed, for example, by conducting research, teaching, advising students, supervising theses and dissertations, serving on committees, attending faculty meetings, and voting in each unit.

**Appointment procedures.** Joint appointments require approval through the normal procedures of each department, program, and/or school in which the appointment would be made. Additionally, the deans of the appointing units and faculty appointee must agree on clear expectations for teaching, service, financial issues, and other administrative details of the appointment. For ladder joint appointments at all ranks other than professor, deans should provide an extra measure of clarity: they should agree on how the appointing units will interact when conducting reviews for reappointment, tenure, and promotion (e.g., joint or separate review committees, selection of external evaluators, timing of votes, etc.). These plans must be articulated in writing and approved by the office of the provost.

When a new school, department, or program is established at Yale, the President and Provost may implement an ad hoc process to make appointments, including joint appointments, of the inaugural faculty.

**Secondary appointments**. Faculty who hold a primary appointment in one department, program, or school may hold a secondary (sometimes called "courtesy") appointment in another. Faculty holding a secondary appointment may be eligible to teach, advise students,

and supervise dissertations in the secondary department, program, or school, depending on its customs and policies. Voting rights in the secondary unit follow department, program, or school customs, except that faculty holding secondary appointments may not vote on tenure appointments in the department, program, or school in which they hold the secondary appointment (see section IV.F for exceptions in FAS voting policies). The secondary appointment will normally be either for a time not to exceed the term in the primary department or school or for five years, whichever is less. Under most conditions the secondary appointment may be initiated and renewed by vote of the faculty in the secondary department or school with approval of its dean.

## I.   Part-time Appointment to the Ladder Ranks of Assistant Professor, Associate Professor, and Professor

### 1.   Definition  and Purpose

The primary purpose of allowing part-time appointments to the ladder ranks is to accommodate persons whose pressing personal or professional responsibilities cannot be adjusted to full-time appointments at the University. For positions with tenure (and in the School of Medicine, positions held on a continuing basis), part-time appointments are permitted only in exceptional circumstances and only for a limited period of time. The proportion of time designated in a part-time appointment applies to the full range of faculty responsibilities, including committee work and other administrative obligations.

### 2.   Terms and Conditions of Part-time Appointments

An appointment in the ladder ranks on a part-time basis requires approval by the Provost, except in the School of Medicine, where approval may be granted by the Dean. Normally, the proportion of time specified at the outset of a part-time appointment will apply throughout the appointment. Changes in the proportion of time require the approval of the Provost (or in the School of Medicine, the Dean).

Part-time appointments are made in accordance with the standards and procedures for full-time appointments to these same ranks. Such appointments will be made as a percentage of full-time (not less than fifty percent) occurring throughout the academic year. With the exception of faculty on Phased Retirement, appointments will ordinarily be made for the full academic year, rather than on the basis of one-term-on, one-term-off. A person holding a part-time appointment in the rank of assistant professor, associate professor, or professor is required to obtain approval from the Provost or relevant dean before undertaking outside employment during the academic year.

### 3. Extension of Time in Rank

The ten-year limit (eight[7] or nine[8] years in the Faculty of Arts and Sciences, and nine years in the Schools of Architecture, Art, Divinity, and the Forestry & Environmental Studies) on non-tenure appointments and the limits on time in a particular rank may be extended for a faculty member who has held part-time appointment in a ladder rank, up to a maximum of three additional years. The Provost, on the recommendation of the appropriate dean, will determine whether to grant such an extension. However, in no case may an individual be on part-time status or a combination of part-time and full-time status in term appointments to the ladder ranks for a period that exceeds thirteen years (eleven[9] or twelve[10] in the Faculty of Arts and Sciences, and twelve in the Schools of Architecture, Art, Divinity, and Forestry & Environmental Studies), including any extensions as described in Section III.F.

### 4. Leaves and Benefit

Persons holding part-time appointments (with proportional compensation) are eligible for most leaves available to full-time faculty members in those faculties in proportion to the percentage of time worked. For full information about leaves, consult the Office of the Provost. For information about benefits, consult the Benefits Office.

### J. Dual Appointments as Faculty and Managerial or Professional Employee

### 1. Primary and Secondary Appointments

When an individual holds both a faculty appointment and an appointment as a managerial or professional employee, one appointment is primary and the other is secondary. In rare cases, an individual can hold a fully joint appointment. The designation is normally made either at the time of hire or at the time the second appointment is made, but it may be done at any time by the relevant dean or Provost. If a primary faculty appointment is changed to secondary during the term of appointment, that designation becomes effective after the expiration of a period equal to the required notice of non-reappointment for that position, as specified in Section III.G. If no formal designation is made, a dual faculty appointment in a ladder or research rank is presumed to be primary, and a dual faculty appointment in any other rank is presumed to be secondary.

---

7  As governed by FASTAP 2016 (see Section IV.H.2).
8  As governed by FASTAP 2007 (see Section IV.H.1).
9  As governed by FASTAP 2016 (see Section IV.H.2).
10 As governed by FASTAP 2007 (see Section IV.H.1).

## 2.   Termination

The termination of a primary appointment, whether faculty or managerial or professional, automatically terminates a secondary dual appointment, without any notice, grievance or similar rights with respect to the secondary appointment otherwise afforded by the *Faculty Handbook* or the policies and procedures available on the Human Resources website. The termination of a secondary appointment is effective at the same time as the termination of the primary appointment, except that if the individual is teaching a course during the current academic term under the secondary appointment, the termination may be made effective at the end of the academic term. Termination of (or other personnel action directed toward) only the secondary appointment will not automatically affect the primary appointment. In such instances, the individual will be extended such notice, grievance and similar rights as are afforded by the *Faculty Handbook* or Human Resources Policies with respect to the secondary appointment.

## K.   Faculty Appointment Procedures

## 1.   General

Specific details and documents regarding the appointments process in the Faculty of Arts and Sciences can be found on the Faculty of Arts and Sciences website. Similar material is normally circulated by the deans of professional schools to their faculties. The normal procedure for appointment and promotion begins with the consideration by the department or school of its needs and a request to the Provost for a defined position. In the Schools of Medicine, Nursing, and Public Health only tenure and continuing positions must be specifically approved by the Provost. In the Faculty of Arts and Sciences, an annual meeting is held between the Provost and the Dean of the FAS to discuss approved ladder searches for the forthcoming year; non-ladder searches in the FAS do not require specific provostial approval. Once the position has been authorized, the department, program, unit or school takes the initiative on the appointments process, except that the Office of the Provost, the appropriate dean's office, and the Office for Equal Opportunity Programs are involved in various stages as set forth in the appointments memoranda.

**a.   Ladder Positions in the Faculty of Arts and Sciences**. When a person is recommended for a ladder position through the search and voting processes of a department in the Faculty of Arts and Sciences, the recommendation is reviewed by the relevant FAS body. Appointments to the rank of assistant professor are reviewed by the Dean of the FAS. The Tenure and Appointments Committees (TACs) review all appointments to the ranks of associate professor on term, associate professor with tenure, or professor for the area in which the candidate is recommended under FASTAP 2007 (see Section IV.C and Section IV.H.1).  The TACs review

all reappointments within the non-tenure ranks and all appointments and promotions to the tenure ranks for the area in which a candidate is recommended under FASTAP 2016 (see Section IV.C. and Section IV.H.2.). On the initiative of the Provost or the Dean of the FAS, and *ad hoc* committee may be impaneled by the Provost or Dean as a supplement to, or as a substitute for, the Tenure and Appointments Committee.

**b.  Positions in the Professional Schools**. In each of the professional schools of the

University, ladder faculty appointments are initiated either by a school-wide appointments committee or by a department followed by a school-wide appointments committee. They are then voted upon by the board of permanent officers or other authorized governing body of the school. In the case of small or diversified faculties, the Provost will, as a matter of course, impanel either a standing committee (normally called the Standing Advisory and Appointments Committee) or an *ad hoc* committee to conduct an advisory review of the recommendations for ladder appointments at the ranks of associate professor on term, associate professor with tenure, professor with tenure, and the non-ladder rank of professor in the practice made by the board of permanent officers or other authorized governing body of such faculties. In the schools of Architecture, Art, Drama, and Music, recommendations of appointments to the ranks of professor adjunct and associate professor adjunct are reviewed in the same way. No appointments are final until voted by the Corporation on the recommendation of the President or Provost.

**2.  Voting on Appointments and Promotions**

When meeting to discuss a faculty appointment or promotion, the permanent officers or other authorized governing body of a school may invite to attend, with vote, other members of their faculty who hold a rank equal or superior to that of the position to be filled. However, regardless of rank, faculty with secondary appointments in a department or school may not vote on promotions or appointments to tenure. An exception to this is made for faculty holding secondary appointments in certain interdisciplinary departments and programs (see Section III.H and Section IV.H). Also, faculty on term appointments may not vote on reappointments to ranks equivalent to or above their own.

In the Faculty of Arts and Sciences and most professional schools, voting on all appointments and promotions for terms of more than one year must be conducted with secret ballots. This secret ballot requirement also applies to preliminary votes to decide among candidates. Informal, "straw" voting about an individual candidate is prohibited. For an appointment to be approved the candidate must receive affirmative votes from a majority of those present and eligible to vote. Absentee ballots may not be accepted, counted, or recorded. Should a

discussion of a particular candidate extend beyond a single meeting, ballots may be accepted only from those members of the faculty present and eligible to vote at the final meeting.

For purposes of the foregoing, in exigent circumstances and with prior permission of the relevant dean, a department, program, or school may treat as present a faculty member who participates inthe discussion preceding a vote via two-way audiovisual technology enabling that faculty member to see and hear, and be seen and heard by, all other faculty members participating in the vote. A faculty member deemed present by such technological means may submit their ballot in a manner that keeps it secret, and a ballot so transmitted shall not be considered an absentee ballot.

## 3.   Confidentiality  of Letters of Evaluation

It is University policy that only those who by usual practice transmit or vote on a particular candidate's appointment or promotion may see the letters of evaluation used in the appointments process. The letters of evaluation are confidential, and their contents may not be shared with the person being evaluated. They may be seen by a review committee in the course of a grievance and may have to be produced in the course of administrative proceedings or legal actions.

## 4.   Dates of Initial Appointments and Resignations

Except in extraordinary circumstances and with the approval of the Provost, in all schools except Drama, Medicine, Nursing, and Public Health, initial appointments to the ladder and non-ladder faculty begin on either July 1 or January 1, and resignations from those ranks can take place only on June 30 or December 31.

In the Schools of Drama, Medicine, Nursing, and Public Health, initial appointments may be made, and resignations accepted, at any time during the calendar year.

Faculty appointments to the research ranks are normally made on a 12-month basis and may begin and end at any time of the year.

## 5.   Schedule of Salary Payments

Faculty on nine-month appointments who are paid over a twelve-month period are paid in advance during July and August of each year of appointment and must complete the academic year to have earned that salary (see Section XVIII.A.1).

Ladder faculty in the Faculty of Arts and Sciences and the School of Forestry and Environmental Studies on nine-month appointments who conduct scholarly or research activities during the academic year that are supported by external funding sources may elect

to participate in an alternative compensation schedule wherein academic year salaries will be paid over the nine academic months. This program permits faculty who charge a portion of their academic year salaries to sponsored projects to establish from those salary savings a special research account that may be used (a) to provide up to three months of summer salary, (b) as bridge funding, (c) to support ne intitiatives, or (d) for research-related expenses not normally allowable as direct costs on sponsored projects. This program is described in detail on the website of the Office of Research Administration.

One-year appointees are normally appointed and paid from September through May, and one-semester appointees from September through December, or January through May, as appropriate. When circumstances warrant, and with prior permission from the Office of the Provost, one-semester appointments may be made from July through December or from January through June, as appropriate. Similarly, one-year appointments may be made from July through June or from January through December.

## L.  Decisions Not to Reappoint or Promote and their Review

### 1.  General

In making any appointment to the faculty, the University seeks to appoint the best candidate for the position. Faculty members on term appointments do not have a right to reappointment or promotion, and decisions on reappointment, like initial decisions on appointment, are subject to the exercise of professional and scholarly judgment by competent University authorities.

To ensure that there is no misunderstanding about the availability of positions, that extra-department and extra-school interests of the University have not been overlooked, and that the department or school consideration of each member of the non-tenured faculty has been adequate, deans will, as a matter of course (and prior to any formal action on appointments by the department or school), discuss with a representative of the Office of the Provost all members of their faculties who might expect to be considered for reappointment or promotion. When a decision not to reappoint or promote is made on a candidate who has held an appointment at Yale for more than one year, the school submits to the Provost a brief report of the action to be taken before that decision is conveyed to the candidate. In the School of Medicine, departments submit such reports to its Office for Faculty Affairs. In the FAS, departments submit such reports to the Office of the Dean of the FAS.

### 2.  Review Procedures Initiated by the Provost

The Provost may ask a department or school that has decided not to recommend a reappointment or promotion to reconsider the case.

If the Provost has substantial questions about the adequacy of the consideration of a candidate for reappointment or promotion, they may request a review committee to review the decision

and to offer advice on the matter. The views of the department or the school are presented in any such reappraisal.

### 3.   Review Procedures Initiated by Faculty Members Concerning Decisions on Reappointment and Promotion

**a.   Purpose**. The review procedures described below are intended for any faculty member[11] who believes (i) that a University policy has not been properly observed in the case of their reappointment or promotion; (ii) that their reappointment or promotion has not been adequately or fairly considered due to a procedural error that likely changed the outcome of the case; or (iii) that they have been discriminated against in matters of reappointment or promotion on the basis of race, color, religion, age, sex, sexual orientation, disability, national or ethnic origin, veteran status, or gender identity or expression. The review procedures shall not be used to reevaluate the merits of the candidate's case.

**b.   Process**

**Informal Consultation and Resolution**. A faculty member is encouraged initially to seek an equitable solution to the problem through direct discussion with the responsible persons. The Dean of the School, the Dean of the FAS, or the Provost will, if requested, recommend a faculty member or administrator who may be consulted for advice in a confidential manner by any member of the faculty who believes that they may have cause for complaint.

**Submission to the Provost**. Where any informal consultation has not resolved the problem, the complainant shall submit a letter to the Provost explaining the complaint and the redress sought and requesting consideration of the complaint.[12] If the Provost was significantly involved in the matter under dispute, the President will assume the Provost's role in these review procedures. The complainant's letter must be received by the Provost within 45 days of the final action giving rise to the complaint. The Provost will furnish a copy of this letter to the individual respondent(s) who are the subject of the complaint.

---

11  These procedures are available to all members of the teaching and research faculty, with the exception of voluntary faculty in the Schools of Medicine and Nursing. Research faculty (as described in Section XV) may not seek review of reappointment or promotion decisions related to termination of funding or nonrenewal of the grant or contract from which they are funded.

12  In the School of Medicine, the complainant must first submit a letter of complaint to the Dean. If the complainant believes the Dean has been significantly involved in the matter under dispute, they shall submit the letter directly to the Provost. The Dean must receive the letter within 45 days of the final action giving rise to the complaint. The Dean may attempt to resolve the complaint informally and/or order a review by a designee or an *ad hoc* School of Medicine faculty review committee. The Dean's review will be carried out within a reasonable period (normally 90 days) and will conclude with a written response from the Dean. In cases where the Dean appoints a review committee, the complainant may challenge the procedural propriety of the Dean's review by submitting a written complaint to the Provost within 14 days of the date of the Dean's written response.

The Provost, or at the request of the Provost, the relevant dean or other designee, may conduct a preliminary review of the complaint and, if appropriate, attempt to resolve the matter informally. If the matter cannot be resolved informally, the Provost will consider whether the complaint falls within the purview of a review committee and merits review. For example, the Provost will reject any complaint based on a disagreement with the professional judgment of the department or the appointments committee. As soon as possible, but normally within 30 days after the Provost's receipt of the complaint, the Provost will forward to a review committee those issues raised by the complainant that have not been resolved, except for any that the Provost has concluded are not within the purview of the procedures or are clearly without merit.

**Faculty Review Committee Procedures**. A panel of the Faculty Review Committee ("Committee") will consider complaints referred to the Committee by the Provost. The Faculty Review Committee is a standing committee, appointed each year by the Provost in consultation with the University Cabinet and consisting of approximately thirty senior faculty members from the Faculty of Arts and Sciences and the faculties of the professional schools. Review Committee members must be tenured faculty, except that in the case of the School of Music and the School of Drama they may be professors of the practice or professors adjunct, and in the School of Medicine they may be professors in the clinician-scholar, clinician-educator, clinical or investigator tracks. For the review of any particular complaint, the Provost will select a panel of five faculty members from the Faculty Review Committee membership, with one of these individuals designated chair of the particular review.

When required by the number of reviews underway or by the inability of Faculty Review Committee members to participate in a particular review, the Provost will supplement the Faculty Review Committee with additional tenured faculty members. In these circumstances, the panel hearing a case will consist of five members, including no fewer than two members of the Faculty Review Committee and no more than three supplemental members.

No faculty member who is directly involved in the complaint may serve as a member of the panel hearing the complaint. When a member is excused for this reason or is otherwise unable to participate, the Provost may designate a substitute. During its inquiry, the panel may review documents from any office of the University that are relevant to the underlying complaint and that were prepared prior to the decisions about which the faculty member is complaining. However, the panel may not review documents covered by a legal privilege (for example, psychiatric patient records and attorney-client communications). It is expected that all members of the Yale community will cooperate fully with the panel in its inquiry.

The proceedings are not intended to be adversarial. The complaining faculty member must meet with the panel and may be accompanied by an adviser when doing so. The complainant and the

respondent(s) will have the opportunity to present information and to propose that the panel interview relevant witnesses. The complainant and the respondent(s) may be permitted to inspect documents or parts of documents that the panel deems directly relevant to the specific complaint and that were not written under a presumption of confidentiality. As its inquiry proceeds, the panel may interview the witnesses proposed by the complainant or the respondent(s) and any other person it deems relevant. The panel may at its discretion pursue its inquiry with or without the presence of the complainant and their adviser. The panel may consult separately with the adviser only with the consent of the complainant.

Where a complaint alleges sex discrimination or discrimination on the basis of disability in a matter of reappointment or promotion, the panel will also consult, respectively, with the Title IX Coordinator of the University or the Director of the Office for Equal Opportunity Programs.

The panel, having conducted its inquiry, will deliberate in closed session and will present to the Provost a written report stating its findings of fact and its conclusions as to whether University policy has been violated or the appointment or promotion was not adequately or fairly considered. In a separate section of the report, the panel will state its recommendations, if any, regarding redress and outline whatever other actions or changes in policies or procedures, if any, it recommends to the Provost in light of the information it has gathered in the course of its review. The report of the panel will be adopted only upon the majority vote of the members of the panel who participated in the inquiry.

**Resolution.** The panel will submit its report within a reasonable period of time, normally within 90 days of its receipt of a complaint. The Provost will furnish copies of the panel's findings of fact and conclusions, but not its recommendations, to the complainant and the respondent(s). If the complainant or the respondent(s) wish to provide a written response, this response must be submitted to the Provost within 14 days of receiving the findings of fact and conclusions.

On the basis of their own concerns or concerns raised in response to the report, the Provost may ask the panel to re-examine or clarify findings of fact. If necessary, the panel may submit a revised report to the Provost. The Provost will then accept the panel's findings of fact. The Provost may accept, modify, or reject the conclusions of the panel and any of its recommendations. However, in any case where the Provost has reservations about the panel's conclusions or recommendations, the Provost will discuss the matter with the panel in advance of a final decision and explain their reasons for disagreement. The Provost will then decide the matter and convey their decision in writing to the complainant, the panel, the respondent(s) and, where appropriate, the relevant appointments committee.

The Provost's decision ordinarily should be rendered within 14 days after receiving the responses of the complainant and the respondent(s).

A decision by the Provost to sustain a decision not to reappoint or promote a member of the faculty shall be final. Any other decision by the Provost will be implemented in accordance with rules or practices of the University. For example, an *ad hoc* appointments committee might be impaneled.

**Time Periods**. In instances where additional time may be required during the review process – for example, delays caused by the absence of faculty members over the summer months – the Provost may extend the time periods set out above. If a time period is extended, the complainant and respondent(s) will be informed.

## M. Review Procedure for Complaints about Issues Other than Reappointment or Promotion

Members of the teaching or research faculty who believe that they have suffered as a result of a breach of University policy by a committee, department, or other unit of the University in a matter not involving reappointment or promotion and who seeks a review of the matter may request a review in accordance with the procedure set forth above.[13] If the complaint is submitted to a committee for review, the Provost, at their discretion, may submit the complaint either to the Faculty Review Committee composed as described above or to an *ad hoc* panel of no fewer than three members appointed by the Provost. A decision of the Provost regarding a complaint brought under this section shall be final.

## N. Review Procedures for Complaints about Violations of the Faculty Standards of Conduct

A person who wishes to complain that a faculty member has committed academic or sexual misconduct or has engaged in other behavior that is addressed by specific University procedures must follow those procedures.

Other allegations that a faculty member has violated the Faculty Standards of Conduct normally will be resolved by the Dean of the faculty member against whom the allegation is made, in keeping with the authority of Deans to administer their schools. Deans may create and apply informal processes to resolve complaints of faculty misconduct, which may include

---

13   These procedures are available to all members of the faculty, with the exception of the voluntary clinical faculty of the School of Medicine and the School of Nursing.

the designation of a particular faculty member, such as a department chair, to receive and facilitate the resolution of complaints. Such informal processes may result in sanctions beyond the inherent administrative authority of the Dean[14] only with the consent of the parties to the dispute.

If an alleged violation of the Faculty Standards of Conduct has not been resolved by the Dean using the Dean's administrative authority or an informal process, or if the Dean was significantly involved in the matter under dispute,[15] a complaint may be submitted by the Provost for formal faculty review under the procedures described below.

## 1.   The Faculty Standards Review Committee

The Faculty Standards Review Committee ("the Committee") consists of faculty members elected for three-year terms. The Faculty of Arts and Sciences and the School of Medicine shall each elect five members, and the other professional schools shall each elect two members. The Faculty of Arts and Sciences and each professional school shall determine how it wishes to elect its Committee members. The elected members shall elect a Committee Chair.

## 2.   Jurisdiction of the Committee

The Provost[16] may submit a complaint to the Committee on the Provost's own initiative or at the request of the cognizant Dean[17] or the Dean's designee. The Provost will submit a complaint to the Committee only if the Provost and the Committee Chair determine that the complaint provides a reasonable basis to believe that (i) a faculty member's actions were substantially inconsistent with the Faculty Standards of Conduct; (ii) the actions were reckless or intentional; (iii) the actions caused serious harm to the University[18] or to an identified member of the University community; and (iv) no other process or procedure is

---

14   If a Dean imposes a sanction that the affected faculty member believes exceeds the Dean's inherent administrative authority, the faculty member may write a letter of complaint to the Provost within seven days after being informed of the sanction.  If the Provost, in the Provost's sole discretion, concludes that the sanction exceeded the Dean's authority, the Provost will return the matter to the Dean, who may impose a lesser sanction or request that the matter be referred for formal faculty review under the procedures described below.
15  If the Dean was significantly involved in the matter under dispute, the Provost may designate a member of the Provost's office to attempt to resolve the matter informally, before invoking these procedures.
16  If the Provost was significantly involved in the matter under dispute, the President will assume the Provost's role in these review procedures.
17  For complaints against faculty members whose primary appointment is in FAS, the cognizant Dean is the Dean of FAS. The Deans of the professional schools are the cognizant Deans for complaints against members of their faculties.
18  For example, the University may suffer serious harm when funds are misappropriated, legally protected information is improperly disclosed, or essential teaching obligations are ignored.

available to address the matter.[19] Complaints must be submitted to the Committee within one year after the most recent action complained of, unless the Provost and the Committee Chair agree that extenuating circumstances warrant a waiver of the time limit. The Provost and the Chair shall not submit a complaint to the Committee if the Committee has previously reviewed a complaint based substantially on the same set of facts or if the respondent faculty member is no longer employed by Yale.

### 3.   Faculty Standards Review Panel Procedures

Once a complaint has been submitted to the Committee, the Committee Chair will appoint five members from the Committee to serve as a hearing panel and will designate one of those members as panel chair.   Whenever possible, panels shall include a member of the FAS division or the professional school in which respondents have their primary appointment. No faculty member who is directly involved in the complaint or who has any other significant conflict of interest may serve as a member of the panel hearing the complaint.

In cases where the University has suffered an alleged harm, the Provost or the Dean who requested that the complaint be heard will appoint a representative to act as the complainant. In cases brought to address harm specific to an identified member of the University community, that person shall act as the complainant.[20] In order to protect the University or an individual complainant or other members of the Yale community, the Provost may impose interim measures while the matter is pending.

The Committee Chair will provide the names of the panel members to the respondent faculty member and the complainant ("the parties"). If a party objects to the participation of any panel member, the party must notify the Committee Chair and provide the basis for the objection within five business days after receiving the panel list. The Committee Chair, in the Committee Chair's sole discretion, will decide whether an objection justifies the removal of a panel member. If the Committee Chair denies an objection, the Committee Chair will explain the decision to the parties. When a member is excused because of a conflict of interest or is otherwise unable to participate, the Committee Chair may designate a substitute.

---

19  If the Provost decides that a matter can be resolved by a responsible administrator or through another University process, the Provost may refer the matter for appropriate disposition. If the Provost believes that a faculty member's conduct, if proven, might warrant the faculty member's dismissal from the University or another sanction that is beyond those provided by Section III.N.3, the Provost will refer the matter to the President, who will consider whether it should be heard by the University Tribunal, rather than through the process described here.

20  If a complaint is based on an allegation that a faculty member's actions harmed a person, the complaint must name the person allegedly harmed.

During its inquiry, the panel may ask any office of the University to provide documents that are relevant to the underlying complaint and that were prepared prior to the most recent event complained of. However, the panel may not review documents covered by a legal privilege (for example, psychiatric patient records and attorney-client communications). It is expected that all members of the Yale community will cooperate fully with the panel in its inquiry.[21]

The parties must meet with the panel and each may be accompanied by an adviser when doing so. The parties will have the opportunity to present information and to propose that the panel interview relevant witnesses. The parties shall be permitted to inspect documents or parts of documents that the panel has identified as directly relevant to the specific complaint and that were not written under a presumption of confidentiality. As its inquiry proceeds, the panel may interview the witnesses proposed by the parties, and it may also interview any other person it believes may have relevant information. Both parties will have the opportunity to hear the testimony of all witnesses. The panel may not consult separately with a party's adviser.

The panel, having conducted its inquiry, will deliberate in closed session to determine whether the respondent has violated the Faculty Standards of Conduct. In order to determine that a violation has occurred, the panel must find by clear and convincing evidence that (i) the respondent's actions were substantially inconsistent with the Faculty Standards of Conduct; (ii) the actions were taken recklessly or intentionally; and (iii) the actions caused serious harm to the University or to an individual complainant.

The panel will present to the Provost a written report stating its findings of fact and its conclusions.[22] All of the panel's findings of fact and conclusions must be based on clear and convincing evidence. If the panel concludes that the respondent has violated the Faculty Standards of Conduct, it will state its recommendations, if any, regarding further action by the University. The actions that a panel may recommend, alone or in combination, include, but are not limited to, loss of eligibility for leave for one leave cycle, temporary limitations on work with students or trainees, limitations on eligibility for grant funding, reduction in salary, financial restitution, and suspension without pay. If the panel believes that more severe penalties are justified, it may recommend that the Provost forward the matter to the President, who may convoke the University Tribunal.

---

21   Where a complaint alleges sex discrimination or discrimination on the basis of disability, the panel shall also inform, respectively, the Title IX Coordinator of the University or the Director of the Office for Equal Opportunity Programs. (Sex discrimination in the form of sexual misconduct must be addressed by the University-Wide Committee on Sexual Misconduct, not the Faculty Standards Review Committee.)

22   A "finding of fact" is a relevant event, action, or statement that has been proven to the panel by clear and convincing evidence. A "conclusion" is the panel's determination as to whether or not its findings of fact amount to a violation of the Faculty Standards of Conduct.

The panel's report, including its conclusions and recommendations, must be adopted by a majority vote of all panel members, and abstentions are not permitted. The Committee's report will include the vote tally, but it will not identify the positions of individual panel members.

## 4.   Decision by the Provost

The panel will submit its report within a reasonable period of time, normally within 90 days of its receipt of a complaint. The Provost will furnish copies of the report to the parties. If the complainant or the respondent wishes to provide a written response, this response must be submitted to the Provost within 14 days of the party's receipt of the report.

On the basis of the Provost's own concerns or concerns raised in response to the panel's report, the Provost may ask the panel to re-examine or clarify findings of fact or conclusions. If necessary, the panel may submit a revised report to the Provost. The Provost will then accept the panel's findings of fact. The Provost may accept, modify, or reject the conclusions of the panel or any of its recommendations. However, in any case where the Provost has reservations about the panel's conclusions or recommendations, the Provost will explain those reservations to the panel in advance of a final decision. The Provost will then decide the matter and convey a written decision to the parties and the panel. The Provost's decision ordinarily should be rendered within 14 days after receiving the responses of the parties.

## 5.   Appeals

Either party may appeal the Provost's decision by submitting a letter to the President[23] within seven days after receiving the decision. The only grounds for an appeal are (i) a procedural error that prevented the panel or the Provost from judging the matter fairly; (ii) the discovery of material facts that were reasonably unavailable to the appealing party prior to the Provost's decision; or (iii) the imposition of a penalty grossly disproportionate to the behavior found by the panel. The President ordinarily will issue a written decision to the parties and the panel within 14 days after receiving an appeal. If the appeal is granted, the matter will be returned to the panel for reconsideration. In the appeal decision, the President may give the panel instructions regarding the nature and extent of its reconsideration. The panel will act promptly to reconsider the matter and will issue a revised report to the Provost. The Provost will promptly issue a new decision, which is not subject to appeal.

---

23   If the President has assumed the role of the Provost as discussed in Section III.N.2, the General Counsel will appoint a person to hear the appeal.

**6.    Retaliation**

Retaliation against a person for participating in the process provided in this Section is a violation of the Faculty Standards of Conduct. For the purposes of these procedures, "retaliation" shall mean an act that is intended to cause a person significant harm and to punish or deter participation in the Faculty Standards Review Committee process.

**7.    Time Periods**

In instances where additional time may be required during the review process – for example, delays caused by the absence of faculty members over the summer months – the Provost may extend the time periods set out above. If a time period is extended, the parties will be informed.

**8.    Annual Report**

For each academic year, the Committee will issue a report to the faculty stating the number of matters that were received by the Provost and the number of matters that were heard by a panel.  The report shall also include the number of matters that concluded with a finding of a violation of the Faculty Standards of Conduct and the standards that were violated in each case.

## IV. Faculty of Arts and Sciences

*N.B.*: Policy changes resulting from the *Report of the Faculty of Arts and Sciences FASTAP Review Committee* (2016) (hereafter "FASTAP 2016") which was approved by vote of the FAS faculty on September 15, 2016 at a special meeting of the FAS faculty, are noted within this chapter. Ladder faculty whose appointments are governed by the *Report of the Faculty of Arts and Sciences Tenure and Appointments Policy Committee* (2007) (hereafter "FASTAP 2007") should refer to the policies in Section IV.H.1 and Section IV.L.2. Ladder faculty whose appointments are governed by FASTAP 2016 should refer to the policies in Section IV.H.2 and Section IV.L.3. Generally, those ladder appointments beginning on or after July 1, 2017, and all new ladder appointments beginning on or after January 1, 2018 are governed by FASTAP 2016.

### A. Description

The Faculty of Arts and Sciences (FAS) is composed of the faculty members who hold primary or fully joint appointments in the departments and programs (as enumerated in Section IV.C below) that provide instruction to the students of Yale College and the Graduate School of Arts and Sciences in the Humanities, Social Sciences, Biological Sciences, Physical Sciences, and Engineering and Applied Sciences. Through joint appointments and other affiliations, members of the FAS also carry out their work in Yale's professional schools.

### B. Governance

### 1. Departments and Programs

The Faculty of Arts and Sciences is organized into departments and interdisciplinary programs. Departments recommend faculty appointments and, where appropriate, promotion to tenure. If authorized by the President, a program may nominate candidates for a limited number of ladder faculty appointments. Each department and most programs are assigned to one of three divisions: Humanities, Social Sciences, or Sciences. Departments within the School of Engineering & Applied Science are part of the Sciences Division of the FAS.

### 2. Divisional deans, divisional/area advisory committees, and tenure and appointment committees

Each division has a dean, appointed by the President, who takes a leadership role in identifying and articulating its intellectual and academic priorities. In addition, the Dean of the School of Engineering and Applied Science exercises administrative oversight over the FAS departments that have been assigned to that School. These deans are also charged with fostering collaborations among faculty within and across the divisions.

In the case of the Humanities and Social Sciences, the divisional dean serves as chair of its associated area advisory committee. In the Sciences, the division comprises two distinct area committees: one for the Biological Sciences and one for the Physical Sciences and Engineering, each of which has an area chair, also appointed by the President. The divisional dean for the Sciences typically serves as chair of one of these areas; the other is chaired by a tenured faculty member in that area.

The members of these committees, also appointed by the President, are full professors drawn from the departments in that area. These committees have two related functions. They meet regularly with chairs of departments and programs or among themselves in order to provide advice to the Deans of the FAS, the Graduate School, and Yale College, and the relevant divisions and school, and to the FAS Faculty Resource Committee about the quality and effectiveness, as well as the appointments needs, of the departments and programs in their area. These meetings are chaired by the chair of the relevant area committee.

In supplemented form, these divisional/area committees serve as the Tenure and Appointments Committees (TACs) for their divisions/areas, overseeing ladder appointments, reappointments, and promotions. Meetings of the TACs involving appointments or promotions to tenure in the Humanities, Social Sciences, and Physical Sciences and Engineering are chaired by the Dean of the FAS. Meetings of the TAC involving appointments or promotions to tenure in the Biological Sciences are chaired in alternate years by the Dean of the FAS and the Dean of the School of Medicine, both of whom sit as voting members of the committee. Each TAC includes, in addition to the members of the divisional/area advisory committee, a representative from a department or program outside the division/area. In cases where the Physical Sciences and Engineering TAC is hearing a case involving a faculty member from a department that is part of the School of Engineering & Applied Science, the Dean of the School of Engineering & Applied Science also sits on the committee as a voting member. The TACs review:

> • for faculty under FASTAP 2007, all appointments and promotions to the ranks of associate professor on term, associate professor with tenure, or professor; and
> • for faculty under FASTAP 2016, all reappointments within the non-tenure ladder ranks and all appointments and promotions to the tenure ranks.

In special cases where the proposed candidate's field does not fall clearly within the disciplines represented by a single division/area, the Dean of the FAS may augment a divisional/area Tenure and Appointments Committee with additional voting members from other divisions/areas, chosen for the expert advice and judgment they can bring to bear on the proposed appointment.

The Creative Arts Advisory Committee (CAAC), appointed by the Dean of the FAS, is made up of FAS faculty and administrators in areas related to the arts. It is chaired by a full professor in an area of the FAS related to arts practice, and may be joined by representatives from the arts schools as needed in its work. CAAC is responsible for advising the Teaching Resource Advisory Committee and the Dean of the FAS on matters relating to the intersection of arts practice with the historical, theoretical, and critical study and teaching of the arts in the FAS.

## 3. The Executive, Expanded Executive, and Steering Committees of the Faculty of Arts and Sciences

The Faculty of Arts and Sciences Executive Committee, composed of the President, the Provost, and the Deans of the FAS, the Graduate School, and Yale College is the final authority for all matters of FAS policy. The divisional deans and the Dean of the School of Engineering & Applied Science meet periodically with the Executive Committee to discuss matters affecting the FAS. This augmented group is the Expanded Executive Committee of the Faculty of Arts and Sciences.

The Steering Committee of the Faculty of Arts and Sciences is chaired by the Dean of the FAS and includes the Deans of Yale College, the Graduate School, the FAS divisions, and the School of Engineering & Applied Science, as well as other members who are invited by the Dean as voting or non-voting attendees. The Steering Committee advises the Executive and Expanded Executive Committees on matters of policy.

## 4. Faculty Resource Committee and Teaching Resource Advisory Committee

The responsibility for allocating faculty resources within the FAS resides with the Dean of the FAS, who chairs the Faculty Resource Committee (FRC), which includes the Deans of the Graduate School, Yale College, the FAS divisions, and the School of Engineering & Applied Science, area advisory committee chairs, and several FAS faculty members. The FRC reviews requests from departments and programs for ladder faculty resources and searches and recommends approved searches to the FAS Dean. The FAS Dean's Office monitors the search and appointment process by which faculty positions in FAS departments and programs are filled, from advertisement to final approval of the successful candidate.

The FRC's counterpart in the area of non-ladder instructional faculty in the FAS is the Teaching Resource Advisory Committee (TRAC), which advises the Dean of the FAS on such appointments. TRAC includes the Associate Deans of the FAS (one of whom serves as chair), relevant deans from Yale College and the Graduate School, and other deans and directors. When warranted, the committee can expand to include the Dean of the FAS and other members of the Dean's office.

## C.  Academic Departments and Programs

The Faculty of Arts and Sciences is divided into departments, each with the capacity to propose its own appointments and with its own chair. Chairs are appointed by the Corporation on nomination by the President after consultation with the deans and faculty, normally for a term of three years. In addition, certain interdisciplinary units, programs, and centers have specified powers of appointment. Some of these programs offer courses and majors in Yale College and have the authority to propose non-ladder (instructional and research) faculty appointments independently and ladder appointments jointly with an FAS department or professional school. All faculty appointments in the FAS must be approved by the Dean of the FAS as described in Section IV.B.4 above.

The following is a list of departments and programs in the FAS. Programs are labeled as such, and those marked with † are cross-divisional.

### Humanities

African American Studies† (also Social Science)

American Studies Program† (also Social Science)

Classical Languages and Literatures

Cognitive Science Program† (also Social Science and Science)

Comparative Literature

East Asian Languages and Literatures

English Language and Literature

Ethnicity, Race, and Migration Program† (also Social Science)

Film and Media Studies Program

French Language and Literature

Germanic Languages and Literatures

History

History of Art

Humanities Program

Italian Language and Literature

Judaic Studies Program

Music

Near Eastern Languages and Civilizations

Philosophy

Religious Studies

Slavic Languages and Literatures

## Humanities - continued

Spanish and Portuguese Languages and Literatures

Theater Studies Program

Women's, Gender, and Sexuality Studies Program† (also Social Science)

## Social Sciences

African American Studies† (also Humanities)

American Studies Program† (also Humanities)

Anthropology

Cognitive Science Program† (also Humanities and Sciences)

Economics

Ethnicity, Race, and Migration Program† (also Humanities)

Linguistics

Political Science

Psychology

Sociology

Statistics and Data Science

Women's, Gender, and Sexuality Studies Program† (also Humanities)

## Biological Sciences

Cognitive Science Program† (also Humanities and Social Sciences)

Ecology and Evolutionary Biology

Molecular Biophysics and Biochemistry

Molecular, Cellular, and Developmental Biology

## Physical Sciences

Applied Physics

Astronomy

Chemistry

Geology and Geophysics

Mathematics

Physics

## Engineering and Applied Sciences

Biomedical Engineering

Chemical and Environmental Engineering

Computer Science

Electrical Engineering

Mechanical Engineering and Materials Science

The departments of Biomedical Engineering, Chemical and Environmental Engineering, Computer Science, Electrical Engineering, and Mechanical Engineering and Materials Science constitute the School of Engineering & Applied Science and these departments and other engineering programs are overseen by the Dean of the School of Engineering & Applied Science.

### D.  Assignment to the Graduate School Faculty

Principal advisors of doctoral candidates must have assignments to the Graduate School of Arts and Sciences. An appointment to the ladder ranks (lecturer convertible, assistant professor, associate professor on term or with tenure, and professor) in one of the departments in the Faculty of Arts and Sciences or in certain of the departments or sections of the School of Medicine[24] simultaneously confers an assignment to the Graduate School faculty. Assignment to the Graduate School faculty is also simultaneously conferred when a member of the ladder faculty in a professional school is given a fully-joint appointment in an FAS department or a fully-joint or secondary appointment in one of the specified departments or sections in the School of Medicine. A fully-joint appointment reflects the appointing department or section's determination that a faculty member is fully qualified to teach and advise doctoral candidates in that department.

For professional schools that have graduate programs leading to the Ph.D. degree (Architecture, Forestry & Environmental Studies, Law, Management, Medicine, Nursing, and Public Health), the Dean of the FAS, in consultation with the Dean of the Graduate School, will make the final assignment.

Faculty members in professional schools that do not have graduate programs leading to the Ph.D. may be assigned to the Graduate School with the approval of the Dean of the FAS in consultation with the Dean of the Graduate School. Requests for such assignments must be made by the chair of the faculty member's home department and must be submitted by the home school's dean to the FAS Dean's Office. The request must be accompanied by the candidate's vita, a statement from the faculty member's dean explaining the grounds for the assignment, and acknowledgment that the faculty member has been consulted in the process. The faculty member seeking the assignment and the dean of the school must agree to the financial arrangement in force in the student's graduate program.

Decisions about assignments to the Graduate School will normally be made twice annually by the Dean of the FAS in consultation with the Dean of the Graduate School or their designees.

---

24  Relevant departments and sections within the School of Medicine include: Cellular and Molecular Physiology, Cell Biology, History of Medicine, Immunobiology, Microbial Pathogenesis, Molecular Biophysics & Biochemistry (also FAS), Neuroscience, Pharmacology, Comparative Medicine, Genetics, and Pathology. Departments in the School of Public Health include: Biostatistics, Chronic Disease Epidemiology, Environmental Health Sciences, Epidemiology of Microbial Diseases, Health Policy and Management, and Social and Behavioral Sciences.

## E. Appointments Procedures

General appointment procedures outlined in Section III.K apply to the Faculty of Arts and Sciences. For all appointments to the ladder faculty, the text of advertisements and the composition of the search committee are approved in advance by the Dean of the FAS or the Dean's designee. Search committees may include members of the faculty from outside the department proposing the appointment. Advertisements and procedures for appointments to non-ladder instructional faculty positions are reviewed by the Teaching Resource Advisory Committee. Specific guidance and documents regarding the appointments process can be found on the Faculty of Arts and Sciences website. These documents describe in detail the steps taken to ensure appointments of the highest quality through a process guided by the principles of open access and diversity.

*Secondary appointments*: persons currently holding an appointment in one Faculty of Arts and Sciences department may be granted a secondary appointment in another for a renewable term of up to five years with the approval of both departments and the Dean of the FAS. Persons holding an appointment in a professional school may be granted a secondary appointment in the Faculty of Arts and Sciences with the approval of the school, the department, and the Dean of the FAS. Persons holding an appointment in the Faculty of Arts and Sciences may be granted a secondary appointment in a professional school with the approval of the school's appointments committee, where appropriate, and board of permanent officers or other authorized governing board.

## F. Voting Policies

## 1. Voting in Departments and Programs

All voting on multi-year appointments and promotions must be done with secret ballots. For an appointment to be carried to the appropriate appointment and promotions committee, the candidate must receive affirmative votes from a majority of those present and eligible to vote. Note that voting criteria for associate professor on term (untenured) differs for appointments governed by FASTAP 2007 and those governed by FASTAP 2016.

| FACULTY: LADDER RANKS | |
| --- | --- |
| Full Professor | |
| PRIMARY or FULLY-JOINT APPOINTMENTS | May vote on all appointments, reappointments, and promotions. Faculty with fully-joint appointments may vote in both programs, including voting on a joint appointment proposed in both programs. |
| SECONDARY APPOINTMENTS | Consistent with department practices, may vote on all appointments, reappointments, and promotions *except* for promotions to tenure positions.** |
| Associate Professors without Term (Tenured) | |
| PRIMARY or FULLY-JOINT APPOINTMENTS | May vote on appointments and promotions to ladder ranks below or equivalent to their own; may vote on appointments and reappointments of assistant |

| PRIMARY or FULLY-JOINT APPOINTMENTS (Cont'd) | professors; may vote on all appointments, reappointments, and promotions in the non-ladder instructional ranks; may *not* vote on appointments or reappointments in the special ranks. |
|---|---|
| **Associate Professors without Term (Tenured)** | |
| SECONDARY APPOINTMENTS | May *not* vote on promotions and appointments to tenure positions**; consistent with department practices, however, may vote on appointments and reappointments of assistant professors and on promotions to associate professor on term; may vote on all appointments, reappointments, and promotions in the non-ladder instructional ranks; may *not* vote on appointment or reappointments in the special ranks. |
| **Associate Professors on Term (Untenured) as governed by FASTAP 2007** | |
| PRIMARY or FULLY-JOINT APPOINTMENTS | May vote on appointments and promotions to ranks below or equivalent to their own; may vote on all reappointments in the ladder or non-ladder instructional ranks; may *not* vote on appointments or reappointments in the special ranks. |
| SECONDARY APPOINTMENTS | Consistent with department practices, may vote on reappointments of assistant professors and on promotions to associate professor on term; may vote on all appointments, reappointments, and promotions in the non-ladder instructional ranks; may *not* vote on appointments or reappointments in the special ranks. |
| **Associate Professors on Term (Untenured) as governed by FASTAP 2016** | |
| PRIMARY or FULLY-JOINT APPOINTMENTS | May vote on appointments and reappointments of assistant professors; may vote on all appointments, reappointments, and promotions in the non-ladder instructional ranks; may *not* vote on appointments or reappointments in the special ranks . |
| SECONDARY APPOINTMENTS | Consistent with department practices, may vote on appointments and reappointments of assistant professors; may vote on all appointments, reappointments, and promotions in the non-ladder instructional ranks; may *not* vote on appointments or reappointments in the special ranks. |
| **Assistant Professors** | |
| PRIMARY or FULLY-JOINT APPOINTMENT | May vote on appointments of assistant professors; may vote on all appointments, reappointments, and promotions in the non-ladder instructional ranks; may not vote on appointments or reappointments in the special ranks. |

Case 3:21-cv-00389-SALM Document 32-2 Filed 09/17/21 Page 187 of 194

| Assistant Professors - continued | |
|---|---|
| SECONDARY APPOINTMENTS | Consistent with department practices, may vote on appointments of Assistant Professors; may vote on all appointments, reappointments, and promotion in the non-ladder instructional ranks; may *not* vote on appointments or reappointments in the special ranks. |

| FACULTY: NON-LADDER (INSTRUCTIONAL) RANKS | |
|---|---|
| PROFESSOR (ADJUNCT) | |
| ASSOCIATE PROFESSOR (ADJUNCT) | |
| ASSISTANT PROFESSOR (ADJUNCT) | |
| SENIOR LECTURER II | May, within their own ranks, vote on appointments and promotions to ranks of the type they hold below or equivalent to their own, but they may *not* vote on reappointments to ranks equivalent to their own. |
| SENIOR LECTURER | |
| LECTURER | |
| SENIOR LECTOR II | |
| SENIOR LECTOR I | |
| LECTOR | |

| FACULTY: SPECIAL RANKS | |
|---|---|
| PROFESSOR IN THE PRACTICE | May vote on appointments and promotions to the rank they hold, but may not vote on reappointments to the rank they hold; may vote on all appointments, reappointments, and promotions in the non-ladder instructional ranks. |
| PROFESSOR IN THE FIELD | |

| ALL RANKS |
|---|

\* A member of the faculty who has a conflict of interest concerning an individual on whom a vote is to be taken may not be present for any discussions and may not participate in any votes taken on that individual.

\*\* Within the Faculty of Arts and Sciences, faculty member holding secondary appointments in an interdisciplinary department (such as African American Studies) or certain interdisciplinary programs (such as American Studies) may have the same voting privileges as those with primary or fully joint appointments. For other interdisciplinary programs ( such as Ethnicity, Race, and Migration; and Women's Gender, and Sexuality Studies) an Executive Committee serves as the full voting body on all matters of curriculum and appointment. Faculty with Primary of fully joint appointments in these programs constitute the permanent members of the committee. The additional members of the Executive Committee may be drawn from ladder faculty in the FAS and typically serve 3-year, renewable terms.

## 2. Recording Department Votes

Departments must report the results of all votes, including abstentions, taken on a case being brought forward to a Tenure and Appointments Committee.

## 3. Absentee Ballots

Departments may not accept or report absentee ballots. Only those present at the meeting where the vote is taken may cast ballots. Remote participation is permitted only when it is in keeping with the principles articulated in Section III.K.2.

### 4.  Voting in Appointments and Promotions Committees

Members of the Tenure and Appointments Committees may not vote on candidates brought to the committee by departments in which they are eligible to vote, regardless of whether they voted in the department. Such committee members are counted as present and not eligible to vote. A quorum of six members eligible to vote is the minimum required for a vote to have force. For any appointment to be carried to the Joint Boards of Permanent Officers, the candidate must receive affirmative votes from a majority of those present and eligible to vote.

### 5.  Voting in the Joint Boards of Permanent Officers

Full professors whose primary or fully-joint appointments are in a Faculty of Arts and Sciences department may vote in the Joint Boards of Permanent Of cers, as may full professors of professional schools who have both secondary appointments in a Faculty of Arts and Sciences department and explicit Corporation approval for such voting rights. The only exception to this rule is for those faculty in Molecular Biophysics and Biochemistry who are assigned to vote in the School of Medicine's Board of Permanent Officers and therefore may not vote in the Joint Boards of Permanent Officers of Yale College and the Graduate School.

By long-standing custom, a quorum for the conduct of business at a meeting of the Joint Boards consists of 37 members eligible to vote. No vote has force if the number of votes, plus recorded abstentions, falls short of that number. Tenure appointments are forwarded to the Corporation only upon an affirmative vote by two-thirds of the members present and eligible to vote. All other appointments are approved by majority vote.

### 6.  Abstentions

Because a majority of those present and eligible to vote is required to bring an appointment forward to the next level, abstentions have the same effect as votes cast against the appointment in departments, Tenure and Appointments Committees, and the Joint Boards of Permanent Officers.

### G.   Meetings of the Faculty

### 1.  Joint Boards of Permanent Officers

Meetings of the Joint Boards of Permanent Officers (JBPO) are chaired by the Dean of the FAS and occur at least two times each semester. The JBPO votes on ladder faculty appointments within the FAS (as described in Section IV.F.5), and addresses issues of fundamental concern to the long-term well-being of the FAS, taking formal votes where appropriate. Matters requiring Corporation approval are then submitted for Corporation review.

Meetings of the JBPO are restricted to faculty who are eligible to vote at the JBPO (see Section IV.F.5).

## 2.  FAS Faculty Meetings

Meetings of the FAS are chaired by the Dean of the FAS and are called on an ad hoc basis when significant matters of FAS-wide faculty concern arise. At such meetings, matters of critical import to the FAS faculty, such as major new FAS policies and practices regarding governance and resources are discussed and voted on. Matters requiring Corporation approval are then submitted for Corporation review.

Ladder faculty with primary or fully-joint appointments in departments in the Faculty of Arts and Sciences, as listed in Section IV.C above, may attend and vote in meetings of the Faculty of Arts and Sciences.

## 3. Yale College Faculty Meetings

Yale College Faculty Meetings are chaired by the Dean of Yale College and occur, by long-standing custom, on the first Thursday of every month during the academic year and on other occasions as announced by the Dean of Yale College. Such meetings address matters involving curriculum, methods of instruction, and scholastic requirements, such as approval of undergraduate course offerings, changes to the requirements of undergraduate majors, and other matters involving policies and practices related to the life of the College.

All ladder faculty of departments and programs in the Faculty of Arts and Sciences are invited to attend and vote in the Yale College Faculty Meetings. In addition, full-time paid adjuncts in all ranks, full-time senior lectors, full-time lectors with appointments for more than one year, full-time senior lecturers, and full-time lecturers with appointments for more than one year are also invited to attend and vote. Certain other individuals who have continuing and significant interactions with undergraduates may also attend and vote. This group includes non-ladder instructional faculty who serve as chairs, directors of undergraduate studies, or residential college deans or heads; ladder faculty in professional schools who regularly teach in Yale College, deans in the FAS Dean's Office; assistant, associate, and deputy provosts; and Officers of the University.

## 4. Graduate School Faculty Meetings

Graduate School faculty meetings are chaired by the Dean of the Graduate School and are traditionally held at least twice annually, once before the November or December meeting of the Corporation and once before its May meeting, and on other occasions as needed. Such meetings address matters involving curriculum, methods of instruction, and scholastic requirements, such as approval of new graduate programs and the certification of candidates for graduate degrees.

All ladder faculty of departments in the Faculty of Arts and Sciences or in one of the basic science departments of the School of Medicine are automatically members of the Graduate School Faculty and may attend and vote in meetings of the Graduate School. Ladder faculty of professional schools who have fully-joint, or in certain cases, secondary appointments in one of these departments are also members of the Graduate School faculty and may vote. In certain cases, other members of professional school faculty may be assigned to the Graduate School Faculty (see Section IV.D).

### 5. The Faculty of Arts and Sciences Advisory Senate

Meetings of the Faculty of Arts and Sciences Senate are called by the Senate's Executive Council and occur monthly. The advisory FAS Senate serves as a forum and deliberative body for the discussion of FAS issues. At such meetings, FAS faculty hear and discuss reports from committees such as the Committee on the Economic Status of the Faculty, the ITS Advisory Committee, and the Faculty Resource Committee, and consider other matters of concern to the FAS as a whole. The FAS Senate also provides a forum for the President, Provost, Dean of the FAS, and other deans to present on issues that affect the FAS.

The voting members of the advisory FAS Senate are its 22 elected representatives, who are elected according to the procedures described in the "Report of the Faculty of Arts and Sciences Senate Implementation Committee" of November 21, 2014. The President, Provost, and Deans of the FAS, Yale College, the Graduate School, the FAS divisions, and the School of Engineering & Applied Science may attend all regular meetings as *ex officio* non-voting members of the Senate. Members of the FAS ladder and non-ladder faculty eligible to vote in FAS Faculty Senate elections may also attend regular meetings in a non-voting capacity.

### H.  Ladder Faculty Ranks

The FAS faculty adopted changes to the FAS tenure and appointments policy ("FASTAP") in 2007[25] and again in 2016[26]. The policies adopted in 2007 apply—in general—to faculty whose initial ladder appointments began prior to July 1, 2017; these policies are referred to as those of "FASTAP 2007." Most ladder appointments that began on or after July 1, 2017, and all such appointments that began on or after January 1, 2018, are governed by policies and procedures referred to as "FASTAP 2016." These two sets of policies are posted in distinct sections below: see Section IV.H.1 for FASTAP 2007 policies, and Section IV.H.2 for FASTAP 2016 policies.

The Faculty of Arts and Sciences does not make research appointments to its ladder ranks but rather has specific ranks for appointments that are predominantly for research.  Faculty

---

25  Report of the Faculty of Arts and Sciences Tenure and Appointments Policy Committee (2007).
26  Report of the Faculty of Arts and Sciences FASTAP Review Committee (2016).

members who hold ladder appointments, regardless of whether and to what extent their salaries are supported by research grants, are expected over time to devote at least half of their time to teaching and related instructional duties (see Section XV).

## 1. FASTAP 2007 Policies Governing Ladder Faculty Ranks

The policies in this section apply to faculty members whose initial ladder appointments began prior to July 1, 2017, except those who were eligible and have formally opted to adopt FASTAP 2016. The policies in this section also apply to those faculty members whose initial ladder appointments began on July 1, 2017, and who were eligible and have formally opted to adopt the policy below.

### a. Appointments on Term (FASTAP 2007)

Cumulative time in the ranks of assistant professor and associate professor on term in the Faculty of Arts and Sciences may not exceed nine years (plus any extensions as provided in Section III.F). This nine-year maximum includes any year in which the individual holds the rank of lecturer convertible.

Reappointment of persons holding term appointments is not automatic and requires careful evaluation of a candidate's work by the members of the department eligible to vote on reappointment. Chairs, in consultation with the Dean of the FAS or the Dean's designees are responsible for ensuring the development and effectiveness of mentoring programs for non-tenured faculty. Chairs or their delegates are expected to keep non-tenured faculty members informed of the department's procedure for appointments and promotions and every year to discuss with all individuals the department's assessment of their progress and prospects. The chair or chair's delegate is also expected to inquire about those faculty members' teaching (including that in interdisciplinary programs), ongoing and published research and scholarship, and University service. Chairs should also advise non-tenured ladder faculty on the optimal timing and use of their leaves of absence in developing their research and teaching excellence. (Please see Section XVII).

For non-tenured members of the faculty whose terms of appointment are three years or more, it is a department's responsibility to review formally their accomplishments and promise as members of the profession. Such a review should take place during the penultimate year of each appointment in the non-tenure ranks. Each individual faculty member should be notified in writing that such a review will take place and asked to submit any relevant publications or works in progress. The chair should also ask any appropriate program or institute director(s) about the individual's contributions to that program or institute.

Assistant professors may be reviewed for promotion to associate professor on term at any time. They must be reviewed no later than their sixth year in the rank of assistant professor. Those promoted to associate professor on term will be appointed for a term equal to their remaining eligible time in the non-tenure ranks (plus any extensions as provided in Section III.F). Faculty in either non-tenure rank may be reviewed for promotion to tenure at any time, but all those promoted to the rank of associate professor on term will be reviewed for tenure no later than their penultimate year in the non-tenure ranks (plus any extensions as provided in Section III.F). This tenure review will include assessments by experts outside of Yale.

Non-tenured faculty who choose to be reviewed for reappointment or promotion before their last year of eligibility may not undergo another review for the same reappointment or promotion if the initial review did not result in a reappointment or promotion. Assistant professors whose review for associate professor on term did not result in promotion but who subsequently demonstrate notable and broad advances reflecting exceptional new achievements in scholarship, teaching, and service may, following a request submitted by the department or program and approved by the Dean of the FAS, undergo a review for tenure before the end of the penultimate year of the faculty member's term. Associate professors with tenure can be formally considered at the department level and, if appropriate, at the TAC level for promotion to professor more than once, but normally no more frequently than at two-year intervals.

**Assistant Professor (FASTAP 2007)**. The position of assistant professor is normally open only to persons who hold the Ph.D. degree or its equivalent. Qualifications for initial appointment include promise as a teacher and scholar or creative artist. Reappointment requires evidence of success as a teacher and achievement as a scholar or artist.

The initial term of appointment is normally for four years, including years on convertible appointments. A review for reappointment for an additional three years must be conducted no later than during the penultimate year of the initial appointment.

No person may serve as assistant professor at Yale for more than seven years (plus any extensions as provided in Section III.F). This seven-year maximum will include any years in the lecturer convertible rank. It will also include leaves, paid or unpaid, granted for professional purposes.

**Lecturer Convertible (FASTAP 2007)**. Successful candidates for assistant professorships who have not completed their Ph.D. at the time their appointments begin are appointed for one year at the rank of lecturer convertible. Appointments to this rank assume that the Ph.D. will be completed within that year. This appointment is renewable, but the rank of lecturer convertible may not be held for more than a total of four semesters. Conversion to assistant professor takes place when evidence of completion of the degree and a recommendation of the promotion are submitted by the applicable department or program to the FAS Dean's Office and receipt is acknowledged. The

conversion is retroactive to July 1 if the degree is received by October 1. If the degree is received after October 1 but before February 1, conversion is retroactive to January 1. For purposes of this conversion, the FAS Dean's Office will accept a letter from the candidate's graduate school dean or other appropriate academic administrator indicating that all the degree requirements have been met and that the degree will be awarded at the next opportunity.

**Associate Professor on Term (FASTAP 2007)**. Associate professor on term is normally the rank of promotion from assistant professor or the rank of initial appointment at Yale for an individual with scholarly or artistic achievement and substantial previous teaching experience. To be considered for this appointment candidates must present significant published research and scholarship representing early demonstrations of disciplinary or interdisciplinary leadership, excellent teaching and mentoring of students, and engaged University citizenship. These accomplishments will be assessed by the relevant departments and programs and by experts outside Yale.

This appointment as associate professor on term is always for a term equal to the individual's remaining eligible time in the non-tenure ranks (plus any extensions as provided in Section III.F). There are no reappointments to this rank. No person may serve in the rank of associate professor on term at Yale for a period exceeding seven years (plus any extensions as provided in Section III.F). Associate professors on term may be reviewed for promotion to tenure at any time, but must be reviewed for promotion to tenure no later than during their penultimate year in the rank.

## b. Appointments to Tenure (FASTAP 2007)

The following description of standards for appointments to tenure in the Faculty of Arts and Sciences is derived from the Dahl Report of June 1965[27], which was prepared by a committee of faculty members. These standards were reviewed and affirmed by faculty committees chaired by Professor Tobin (1981), Professor Hartigan (1985), and Deans Butler and Salovey (2007).

A candidate for appointment or promotion to a tenure position, whether at the rank of professor or associate professor, must have attained scholarly or creative distinction of a high quality as demonstrated by both written work and teaching. Consideration for tenure emphasizes the impact and continuing promise, at the very highest levels, of the candidate's research and scholarship, as well as excellent teaching and engaged University citizenship within and beyond a department or program.

A tenure appointment, whether at the rank of professor or associate professor, is a permanent forward-looking commitment. Appraisals of past contributions must be supplemented by other evidence and estimates of future contributions to the profession and the teaching program. In

---

27  Report to the Executive Committee of the Faculty of Arts and Sciences of the *Ad Hoc* Committee on Policies and Procedures on Tenure Appointments (1965).

choosing among available candidates, the faculty may decide that a particular candidate's accomplishments to date and indicated promise justify appointment, even though their publications may be fewer than those of other candidates.

While the several manifestations of intellectual distinction are prerequisite to an appointment with tenure, it is recognized that the balance among them may vary from candidate to candidate and from field to field; there may be variation in the quantity of the written or creative work, although the quality must always be high. Unusually effective teaching or an unusually significant contribution to the community's well-being will serve as strong support for the evidence of quality provided by the candidate's scholarly writings, but cannot compensate for an absence of the most tangible and enduring demonstration of a scholar's distinction.

The criteria for appointment or promotion to the rank of associate professor with tenure differ from those for professors in degree rather than in kind. Tenured faculty at Yale are expected to stand among the foremost leaders in their fields throughout the world. Associate professors with tenure are expected to develop the qualities of scholarship that earned them their permanent appointments, so that within a reasonable period of time their value to the University and their national or international standing will make them suitable candidates for the rank of professor.

**Professor (FASTAP 2007)**. Candidates for the rank of professor are expected to stand among the foremost leaders in their fields throughout the world. It is expected that professors will continue to develop the qualities of scholarship, creativity, teaching and University citizenship that earned them their appointments.

**Associate Professor with Tenure (FASTAP 2007)**. Candidates for this rank are expected to have shown evidence of exceptional accomplishments and future promise that makes the sponsoring department confident that within five years they will merit promotion at Yale to the rank of professor. Tenured associate professors must be reviewed by their department for promotion within five years. In exceptional cases, when at least seven years have passed from the date of appointment or promotion to associate professor with tenure, the Provost, in consultation with the department chair, may recommend that individual directly to the Corporation for promotion to professor.

## 2.  FASTAP 2016 Policies Governing Ladder Faculty Ranks

The policies in this section apply to faculty whose initial ladder appointments began on or after July 1, 2017, except those whose initial ladder faculty appointments began on July 1, 2017 and who were eligible and have formally opted to adopt FASTAP 2007. The policies in this section also apply to those faculty whose initial ladder appointments began prior to July 1, 2017, and who were eligible and have formally opted to adopt the policy below.

### a. Appointments on Term (FASTAP 2016)

Cumulative time in the rank of assistant professor in the Faculty of Arts and Sciences may not exceed eight years (plus any extensions as provided in Section III.F). This eight-year maximum includes any year in which the individual holds the rank of lecturer convertible.

Reappointment of persons holding term appointments is not automatic and requires careful evaluation of a candidate's work by the members of the department eligible to vote on reappointment. Chairs, in consultation with the Dean of the FAS or the Dean's designees are responsible for ensuring the development and effectiveness of mentoring programs for non-tenured faculty. Chairs or their delegates are expected to keep non-tenured faculty members informed of the department's procedure for appointments and promotions and every year to discuss with all individuals the department's assessment of their progress and prospects. The chair or chair's delegate is also expected to inquire about those faculty members' teaching (including that in interdisciplinary programs), ongoing and published research and scholarship, and University service. Chairs should also advise non-tenured ladder faculty on the optimal timing and use of their leaves of absence in developing their research and teaching excellence. (Please see Section XVII).

For non-tenured members of the faculty, it is a department's responsibility to review formally their accomplishments and promise as members of the profession. Such a review should take place during the penultimate year of each appointment. Each individual faculty member should be notified in writing that such a review will take place and asked to submit any relevant publications or works in progress. The chair should also ask any appropriate program and institute director(s) about the individual's contributions to interdisciplinary programs and institutes.

Non-tenured faculty may be reviewed for promotion to a rank with tenure at any time. They must be reviewed no later than their seventh year (plus any extensions as provided in Section III.F).

Non-tenured faculty who choose to be reviewed for reappointment or promotion before their last year of eligibility may not undergo another review for the same reappointment or promotion if the initial review did not result in a reappointment or promotion.  Assistant professors whose review for a second term as assistant professor did not result in reappointment but who subsequently demonstrate notable and broad advances reflecting exceptional new achievements in scholarship, teaching, and service may, following a request submitted by the department and approved by the Dean of the FAS, undergo a review for tenure before the end of the penultimate year of the faculty member's term.  Associate professors with tenure can be formally considered at the department level and, if appropriate, at the TAC level for promotion to (full) professor more than once, but normally no more frequently than at two-year intervals.

**Assistant Professor (FASTAP 2016)**. The position of assistant professor is normally open only to persons who hold the Ph.D. degree or its equivalent who demonstrate promise as a teacher and scholar or creative artist.

Candidates hired at the rank of assistant professor should exhibit the potential for significant research and scholarly publications; their work should exhibit qualities that give the department grounds to think that, if this potential is realized, then by the time the candidate is considered for tenure, their work would significantly extend the boundaries of their disciplines, such that the candidate will stand among the foremost leaders in their field in the world in a broad field of knowledge. They should demonstrate excellent prospects for effective and creative teaching and mentoring, and display the potential for a career of engaged departmental, professional, and University citizenship.

The initial term of appointment is normally for five years, including years on convertible appointments. A review for reappointment for an additional three years must be conducted no later than during the penultimate year of the initial appointment. Reappointment (without tenure) at the rank of assistant professor requires that the candidate demonstrate measurable progress towards the criteria for tenure in research, teaching, and service. The reappointment review will conclude with detailed feedback for the candidate outlining strengths, weaknesses, and opportunities for growth. This is not a pro forma review with expectations of an automatic pass; it is the occasion for substantive assessment of the candidate's work to date.

No person may serve as assistant professor at Yale for more than eight years (plus any extensions as provided in Section III.F). This eight-year maximum will include any years in the lecturer convertible rank. It will also include leaves, paid or unpaid, granted for professional purposes.

**Lecturer Convertible (FASTAP 2016)**. Successful candidates for assistant professorships who have not completed their Ph.D. at the time their appointments begin are appointed for one year at the rank of lecturer convertible. Appointments to this rank assume that the Ph.D. will be completed within that year. This appointment is renewable, but the rank of lecturer convertible may not be held for more than a total of four semesters. Conversion to assistant professor takes place when evidence of completion of the degree and a recommendation of the promotion are submitted by the applicable department or program to the FAS Dean's Office and receipt is acknowledged. The conversion is retroactive to July 1 if the degree is received by October 1. If the degree is received after October 1 but before February 1, conversion is retroactive to January 1. For purposes of this conversion, the FAS Dean's Office will accept a letter from the candidate's graduate school dean or other appropriate academic administrator indicating that all the degree requirements have been met and that the degree will be awarded at the next opportunity.

**Associate Professor on Term (FASTAP 2016)**. In rare instances, candidates may initially be appointed at the rank of associate professor on term in recognition of their considerable scholarly or artistic achievement and substantial previous teaching experience. Faculty members appointed to this rank under FASTAP 2016 are, for the purposes of promotion and tenure, governed by the policies associated with the rank of assistant professor as governed by FASTAP 2016. Assistant professors under FASTAP 2016 are not eligible for promotion to this rank.

**b.  Appointments to Tenure (FASTAP 2016)**

The following description of standards for appointments to tenure in the Faculty of Arts and Sciences is derived from the Dahl Report of June 1965[28], which was prepared by a committee of faculty members. These standards were reviewed and affirmed by faculty committees chaired by Professor Tobin (1981), Professor Hartigan (1985), Deans Butler and Salovey (2007), and Dean Gendler (2016).

A candidate for appointment or promotion to a tenure position, whether at the rank of professor or associate professor, must stand among the foremost leaders in the world in a broad field of knowledge. Tenure is reserved for candidates whose published work significantly extends the horizons of their disciplines(s). A tenure appointment is a permanent, forward-looking commitment, and therefore requires evidence of an ongoing and ambitious research agenda. An assessment of candidates' leadership is based on the impact, at the very highest levels, of their research and peer-reviewed scholarship. Excellent teaching and engaged University and professional citizenship within and beyond a department or program are also expected. Tenure at Yale may be awarded at the associate or full professor rank.

**Associate Professor with Tenure (FASTAP 2016)**. Tenure is awarded at this rank to scholars who meet the standard for tenure as articulated in the Report of the Faculty of Arts and Sciences FASTAP Review Committee (2016). Associate professors are expected to build upon the accomplishments that earned them their permanent appointments, so that within a reasonable period of time—typically between three and five years after the initial promotion—they will merit successful consideration for full professor as described below.

**Professor (FASTAP 2016)**. The title of full professor is earned by those individuals who meet the FASTAP 2016 tenure standard who have a body of distinguished achievements in their record of research, with a commensurate national and international reputation, and who (continue to) display the excellence in teaching and service that is expected of all tenured professors at Yale. It is expected that professors will continue to develop the qualities of scholarship, creativity, teaching, and University citizenship that earned them their appointments.

---

28  Report to the Executive Committee of the Faculty of Arts and Sciences of the *Ad Hoc* Committee on Policies and Procedures on Tenure Appointments (1965).

While the several manifestations of intellectual distinction are prerequisite to an appointment with tenure, it is recognized that the balance among them may vary from candidate to candidate and from field to field; there may be variation in the quantity of the written or creative work, although the quality must always be high. Unusually effective teaching or an unusually significant contribution to the community's well-being will serve as strong support for the evidence of quality provided by the candidate's scholarly writings, but cannot compensate for an absence of the most tangible and enduring demonstration of a scholar's distinction.

## I. Other Instructional Appointments

The following positions are not among the ladder ranks, and appointments to these positions are not counted in the calculation of the maximum time that a faculty member may serve in any ladder rank or ranks. Recommendations for appointment to these ranks are reviewed by the Teaching Resource Advisory Committee (TRAC). Depending upon department practices, these faculty may participate in appropriate departmental deliberations but are not eligible to vote on appointments or promotions in the ladder faculty. Fringe benefits and other privileges are not necessarily the same as those for ladder appointments (see Section XVIII.D). In all these positions where the term of appointment exceeds one year, the individual will be carefully reviewed in the penultimate year of appointment (see also Section III.G for notice of termination and non-reappointment). Reappointment depends on the continued budgetary authorization of the position, the teaching needs of the department, and an evaluation of the performance of the individual.

**Professor Adjunct, Associate Professor Adjunct, and Assistant Professor Adjunct**. Note: as of July 1, 2017, new appointments at these ranks in the FAS are expected to be rare; instead, the ranks of senior lecturer and professor in the practice will be used. The policy below generally applies to existing appointments. In the Faculty of Arts and Sciences, the adjunct ranks have been used for the appointment of individuals with special qualifications who play important roles in the teaching of undergraduate or graduate students, but who may not be fully engaged in the research activities characteristic of ladder faculty in disciplines represented by Yale's Faculty of Arts and Sciences departments and programs.

The clearest examples of individuals who qualify for these ranks are professional writers and performing artists. Other examples include business leaders, individuals with specific competencies relevant to a need in the teaching program, or individuals with academic qualifications in fields normally not represented at Yale. In some cases, adjunct faculty may be appointed full-time, but more often, they will spend a significant amount of time engaged in administrative or professional

activities either at Yale or outside Yale. In the latter case, the fraction of time they are employed by Yale will depend on the level of those activities and the amount of their contribution to Yale. In some cases, particularly in the sciences, members of the adjunct faculty may be employed full-time at another institution or company, and they may contribute to the University's teaching program, may make other contributions to a department or program or may contribute to the larger Yale community.

Adjunct faculty may not vote on ladder faculty appointments or serve as the principal advisers of dissertations. With special approval of the Dean of the FAS, adjunct faculty may become principal investigators of grants. Depending upon department practices, adjunct faculty participate in deliberations on matters other than appointments. Because adjunct faculty who are appointed primarily as teachers are not expected to participate in many of the research, advising, and administrative responsibilities of ladder faculty, their teaching responsibilities are more extensive than those of ladder faculty. For the same reasons, they do not qualify for research leaves of absence or funds meant to support research and the presentation of research at professional meetings. Full-time adjunct faculty may be eligible to compete for a limited number of paid Professional Development Leaves (see Section IV.L.4). Depending upon department needs, adjunct faculty may from time to time be allowed to take leaves of absence without salary.

Appointments to the adjunct ranks may vary in length from one semester to five years and are renewable, depending upon the continued teaching needs of the department, the Teaching Resource Advisory Committee's (TRAC) authorization for the appointment, and the performance of the individual. Recommendations for appointments for terms of more than one year must be supported by letters from outside Yale and approved by TRAC. Shorter terms of appointment also require supporting letters and are also approved by TRAC. Although appointments to these ranks may be renewed, they carry no presumption of reappointment and no expectation of long-term employment at Yale. An appointment may be made for a given number of years without specifying a particular amount of teaching or the level of salary. The responsibilities and compensation may be determined subsequently, and in some cases the appointment may carry no remuneration.

The level of the adjunct rank is dependent upon the qualifications and experience of the individual. An assistant professor adjunct will normally just have completed the Ph.D. or other terminal professional degree or have had fewer than six years of full-time teaching experience at the beginning of the appointment. The appointment must be supported by written evidence that the individual will be an effective teacher in the field of appointment. Appointment or promotion to the rank of associate professor adjunct requires substantial teaching experience at a high level of effectiveness; evidence of significant professional development, either at Yale or elsewhere; and demonstrated excellence in the area of expertise, whether in performance, scholarship, or

professional achievement. Appointment or promotion to the rank of professor adjunct requires scholarly or professional achievement of the highest quality, as reflected by visible impact at a national level.

**Professor in the Field**. Note: effective July 1, 2016, new initial appointments at this rank will not be made; instead, the rank of professor in the practice will be used. The policy below generally applies to existing appointments. Persons who have achieved exceptional distinction as practitioners or performers in a field may be candidates for appointment as professor in the field. Candidates must show evidence of exemplary ability to teach the skills of their field. They must also show evidence, through past achievement and future promise, that they will advance the practice and understanding of their field at the highest level. Appointments to this rank shall be full-time for terms of three to five years; they may be renewed, after review by the sponsoring department or program and the appropriate Tenure and Appointments Committee. Persons holding this rank have all the responsibilities and privileges of ladder faculty except for membership in the Joint Boards of Permanent Officers and the right to vote on ladder appointments in their departments. They are eligible for most of Yale's benefits, but they are not eligible for the Early, Planned, or Phased Retirement Programs. Appointments to this rank are expected to be rare.

**Professor in the Practice**. Professors in the practice will be distinguished practitioners who demonstrate eminence in the field, sustained accomplishment, and sustained activity in their area of practice. They will hold national or international reputations for their innovative and transformational contributions to their practice, through creative work, professional leadership, practice-centered publications, or other demonstrations of significant accomplishment. Exceptional contributions as a practitioner are the basis of evaluation. This appointment is not intended for those whose field of practice is primarily that of teaching or pedagogy. Terms will be up to five years, with the possibility of reappointment in accordance with applicable policies and procedures. Initial appointment or promotion to this rank will require review by the appropriate Tenure and Appointments Committee and approval of the Corporation.

**Lecturer, Senior Lecturer, and Senior Lecturer II**. Appointment to these ranks is appropriate only for persons whose responsibilities include regular teaching. Lecturers, senior lecturers, and senior lecturers II will normally have earned the Ph.D. or its equivalent or another appropriate terminal degree. Appointment to the rank of senior lecturer requires at least six years of full-time teaching experience, at Yale or elsewhere, in a faculty rank, including the rank of lecturer. Individuals appointed or promoted to that rank must also have established a documented record of excellent teaching and committed service as further described in criteria set forth by the Steering Committee of

the Faculty of Arts and Sciences.  Appointment to the rank of senior lecturer II requires at least ten years of full-time teaching experience, at Yale or elsewhere, in a faculty rank, including at least five years at Yale at the rank of senior lecturer.  Individuals promoted to the rank of senior lecturer II must also have established a sustained and documented record of excellent teaching, be a central and essential component of a relevant teaching program, and be recognized on campus as a model of excellence in the areas of teaching, learning, and service as further described in criteria set forth by the Steering Committee of the Faculty of Arts and Sciences.

Appointments to the rank of lecturer may be part- or full-time for one semester, for one year, or for a period of up to three years. Appointments to the ranks of senior lecturer  and senior lecturer II may be part- or full-time for one semester, for one year, or for a period of up to five years. Recommendations for appointments of more than one year must be approved by the Teaching Resource Advisory Committee (TRAC). Shorter terms of appointment are approved by the FAS Dean's Office. Although appointments to these ranks may be renewed, they carry no presumption of reappointment and no expectation of long-term employment at Yale. Reappointment will depend on the continued need for the position, the availability of resources for the position, and the performance of the individual.

An individual with an appointment in one of these ranks for a term of three or more years is normally reviewed for possible reappointment by the end of the penultimate year. An individual with an appointment of one or two years will be reviewed only if a reappointment is contemplated by the department and authorized by TRAC. Individuals who have held a combination of non-ladder ranks, e.g., lecturer and lector, on a full-time basis for four or more consecutive years will be given written  notice of non-reappointment at least one year before the expiration of their current term of appointment (see Section III.G).

**Lector and Senior Lector I and II**. Individuals engaged in the teaching of foreign languages at Yale may be appointed to one of these ranks. They are characterized by an increasing level of programmatic and pedagogical responsibility and by the qualifications and experience of the individuals appointed to them.  Although appointments to these ranks may be renewed, they carry no presumption of reappointment and no expectation of long-term employment at Yale. Reappointment will depend on the continued need for the position, the availability of resources for the position, and the performance of the individual.  Recommendations for appointments of more than one year must be approved by the Teaching Resource Advisory Committee. Shorter terms of appointment are approved by the FAS Dean's Office.

In the case of appointments for terms of three years or more, individuals are normally reviewed by the end of the penultimate year of the appointment. Individuals who have held any combination of

appointments in the non-ladder ranks, e.g., lecturer, lector and senior lector, on a full-time basis for four or more consecutive years and who are not to be reappointed will normally be given written notice of non-reappointment at least one year before the expiration of their current term of appointment (see Section III.G).

The rank of lector is appropriate for individuals who have native or near-native language proficiency and some training in language pedagogy, have earned a bachelor's degree or its equivalent, but who have had relatively little teaching experience. That experience might range from teaching during graduate training to fewer than three years of full-time teaching at the college level. Lectors may be appointed for terms varying from one semester to three years, renewable to a combined maximum of six years in that rank. Promotion to senior lector I may be considered at any time.

The rank of senior lector has two levels, characterized by programmatic and pedagogical responsibility and the qualifications and experience of the individuals appointed to them. Senior lectors with appropriate qualifications may be asked to engage in a limited amount of teaching in non-language courses at the undergraduate or graduate level.

Qualification for appointment to senior lector I includes: a bachelor's degree or its equivalent; substantial teaching experience with documented evidence of excellence; the capacity to carry out administrative or other departmental responsibilities such as directing courses, contributing to the training of language teachers, or serving on departmental committees; and evidence of professional growth and activity, either at Yale or nationally, in support of the department's language teaching mission as further described in criteria set forth by the Language Study Committee with the concurrence of the Steering Committee of the Faculty of Arts and Sciences. Senior lectors I may be appointed for terms varying from one semester to three years, and their terms are renewable following a favorable review and a recommendation from the department. There is no limit on the number of terms to which senior lectors I may be reappointed, depending on continued high performance and need for the position. Senior lectors I who have served at least five years at that rank may be considered for promotion to senior lector II. In rare circumstances, senior lectors I may be considered for promotion before serving five years in the rank.

Qualification for appointment to senior lector II includes: a bachelor's degree or its equivalent; superlative record of teaching as a senior lector I; continued professional growth as evidenced by special achievements or innovation in support of the department's language teaching mission; and demonstrated capacity for leadership in the language teaching profession outside the University as further described in criteria set forth by the Language Study Committee with the concurrence of the Steering Committee of the Faculty of Arts and Sciences.

Appointment or promotion to senior lector II requires thorough review of the candidate by members of the department, including the Language Program Director if the department has such a position, and by the University's Director of Language Study. Senior lectors II may be appointed for terms varying from one semester to five years, and their terms are renewable following a favorable review and a recommendation from the department. There is no limit on the number of terms to which senior lectors II may be reappointed, depending on continued high performance and need for the position. Departmental recommendations for appointment, reappointment, or promotion to senior lector II will be reviewed by the Language Study Committee before going forward to the Teaching Resource Advisory Committee for final approval.

**Gibbs Assistant Professor.** The rank of Gibbs assistant professor exists in the Mathematics department and is open only to persons who hold a Ph.D. degree or its equivalent. A Gibbs assistant professor is normally appointed for three years without the possibility of reappointment in that rank. For this reason, this rank is not considered a ladder faculty rank. Individuals holding this rank are not eligible for paid leaves, and no special notice of non-reappointment is necessary. Gibbs assistant professors are eligible for teaching relief for child rearing for non-ladder teaching faculty (see Section XVII.D.4). In most other respects, however, Gibbs assistant professors have the same responsibilities and benefits as assistant professors, but on a term basis.

## J. Instructional Opportunities for Yale Graduate and Professional School Students

Instructional appointments for graduate and professional school students are not faculty appointments, and individuals holding them must remain registered students of their schools.

**Part-time Acting Instructor**. Yale graduate and professional school students who are appointed as part-time acting instructors are responsible for teaching one or more courses, seminars, or sections of a multi-section course, subject to department or program guidance and supervision. Graduate students in years one through six may not teach more than one course in any semester at the rank of part-time acting instructor (PTAI). Graduate students no longer on the financial aid package and professional students may teach up to three such courses per year. Generally, graduate students are first eligible for this appointment at the beginning of the term after they have advanced to candidacy. In certain departments or programs, however, students are expected to teach as PTAIs in their third year, prior to advancing to candidacy, according to a standard teaching schedule.

**Teaching Fellow**. Teaching fellows are students registered in the Graduate School of Arts and Sciences or in one of the professional schools who have formal teaching duties assisting members of the faculty and involving regular classroom or laboratory contact with students. Teaching fellows may have responsibility for leading sections of a multi-section course if supervision is provided by a regular member of the faculty. Supervision by the faculty will be expected to include assistance both in planning the sections and in helping teaching fellows and teaching assistants to improve their teaching. Teaching fellows may also serve as graders and tutors.

Appointments will ordinarily be made at various levels according to policies established by the Graduate School of Arts and Sciences.

## K.   Research Appointments

Research appointments in the FAS other than Department (or Program) Scholar, below, conform to University-wide policies (see Section XV).

**Department (or Program) Scholar**. This appointment is available to former ladder faculty members who have exhausted their eligible time in the combined non-tenure ranks (see Section IV.H.1.a and Section IV.H.2.a) and may not exceed twelve months that immediately follow the conclusion of their ladder appointments. Department Scholar is an unpaid and non-renewable appointment available only to those who do not hold a faculty or other academic appointment outside of Yale. Department Scholars are provided a Yale ID, email address, and on-campus library privileges. This appointment requires the recommendation of the department(s) or program(s) where the candidate was previously appointed and the approval of the FAS Dean's Office. Department Scholars are not eligible to attend Yale College Faculty meetings, vote in department faculty meetings, teach courses, or advise other credit-bearing work within the FAS.

## L.   Leaves

Faculty in the Faculty of Arts and Sciences are eligible for a variety of leaves, both paid and unpaid. Please see Section XVII for university-wide policies that govern all leaves, paid and unpaid. The policies and leaves below apply to and are available only to FAS faculty. They are governed by (and constitute a subset of) university-wide policy as stated in Section XVII.

## 1.   Outside Funding for FAS Faculty Leaves

Ladder faculty members who are eligible for any paid leave are encouraged to seek support from sources outside the University. If an FAS faculty member who has been granted a paid

leave is successful in obtaining from outside sources any portion of the salary that the individual is eligible to receive from Yale for the term of that leave, one half of the resulting salary savings to the University, up to a total of $25,000, will be used to create an individual research account that may fund any legitimate research expenses (see https://provost.yale.edu/policies/appropriate-use-university-research-funds for University policy on appropriate research expenses).

## 2. FASTAP 2007 Leave Policy

FAS non-tenured ladder faculty whose appointments are governed by the FASTAP 2007 policies are eligible for the following leaves.

### a. Assistant Professor Fellowships (FASTAP 2007)

Assistant professors in the Humanities are eligible for a Morse Fellowship. Assistant professors in the Social Sciences, Sciences, and Engineering are eligible for a Junior Faculty Fellowship. These fellowships are intended to provide time for research and writing at a crucial point in the careers of recently appointed scholars at the rank of assistant professor. The fellowships pay full salary and the University contributions to fringe benefits.

Assistant professors who have had no leave of any kind while at Yale are eligible to hold Morse or Junior Faculty Fellowships in the second, third, or fourth year of teaching at that rank at Yale. The fellowships may be awarded to assistant professors who present, during the fall of the previous academic year, a research proposal that is approved by the department chair and the FAS Dean.

The holder of a Morse Fellowship or a Junior Faculty Fellowship is relieved of all duties to the University for the period of the fellowship. Each fellowship holder is expected to devote full-time effort to the proposed project.

### b. Associate Professor on Term Leave (FASTAP 2007)

Assistant professors in the Faculty of Arts and Sciences who are promoted to the rank of associate professor on term are eligible for an Associate Professor Leave, a full year's leave at full salary, provided that two semesters of full-time teaching in residence have elapsed since their last paid leave. Faculty members appointed at Yale to the rank of associate professor on term are eligible for the Associate Professor Leave in the second, third, or fourth year of appointment. These leaves may be awarded to associate professors who

present, during the fall of the previous academic year, a research proposal that is approved by the department chair and the FAS Dean. A faculty member who is awarded such a leave must return to Yale for a full year of full-time teaching.

A faculty member awarded either a Morse or Junior Faculty Fellowship must return to Yale after that fellowship for a full year of full-time teaching.

### 3.   FASTAP 2016 Leave Policy

FAS non-tenured ladder faculty whose appointments are governed by the FASTAP 2016 policies are eligible for the following leaves.

Leaves prior to tenure review are intended to provide time for research and writing at crucial points in the careers of recently appointed scholars in the FAS non-tenure ladder ranks. Faculty members who receive reappointment will be eligible for up to three semesters of paid leave before tenure review. At least one semester and no more than two semesters may be taken before the reappointment review. Semesters of leave may be but need not be taken consecutively. At the request of the faculty member, and with the permission of the department and the FAS Dean's Office, a single-semester leave may be taken as a full year of half-time teaching.

#### a.   Initial Appointment Leave (FASTAP 2016)

During their initial five-year appointment, assistant professors will be eligible for up to two semesters of paid leave prior to their reappointment review, typically to be taken during years two and/or three. In consultation with the department chair and with the approval of the FAS Dean's Office, leave(s) may be taken during other years. For faculty engaged in laboratory-based research, leave during the first semester of the initial appointment may be approved.

#### b.   Post-Reappointment Leave (FASTAP 2016)

Upon reappointment, assistant professors are eligible for one or two semesters of additional paid leave to be taken in years five and/or six such that the total number of semesters of leave during their combined terms of appointment as assistant professors does not exceed three.

For both the initial term of appointment and the term of reappointment, assistant professors are expected to return to Yale for a minimum of a full year of full-time teaching after their final semester of leave.

#### c.   Associate Professor on Term Leave (FASTAP 2016)

Associate professors on term in the Faculty of Arts and Sciences follow the same schedule of

leaves as assistant professors. Faculty members will be eligible for three semesters of leave before tenure review. At least one semester and no more than two semesters may be taken before the end of their third year. Otherwise, the timing of the leaves will be arranged by individual candidates in consultation with their chair and the FAS Dean's Office, who will provide guidelines about recommended leave patterns. Semesters of leave need not be taken consecutively, and only two terms of leave may be taken consecutively. At the request of the faculty member, and with the permission of the department and the FAS Dean's Office, a single-semester leave may be taken as a full year of half-time teaching.

### 4. Professional Development Leaves

Full-time members of the non-ladder instructional faculty may apply for a limited number of one-semester Professional Development Leaves. While on leave they receive full salary and benefits and are relieved of teaching and administrative responsibilities. To be eligible, individuals must have served as full-time teachers in the Faculty of Arts and Sciences for at least three years and must hold multi-year appointments that extend through the year following the proposed leave. A faculty member awarded such a leave must return to Yale for a year of full-time teaching. At least six years of full-time teaching at Yale must be completed before an individual who has been awarded a leave becomes eligible for another.

**a. Lecturers, Senior Lecturers, Senior Lecturers II, and Assistant, Associate, and full Professors Adjunct** who are eligible may submit a written proposal, which must be supported by a department or program, for review by the Steering Committee of the Faculty of Arts and Sciences or its designate. The Committee will judge proposals on the basis of quality and feasibility and on the likelihood that the completed project would enhance the teaching program of the department or program and advance the professional development of the candidate.

**b. Lectors, Senior Lectors, and Senior Lectors II** who are eligible may submit a written proposal, which must be supported by a department or program, for review by the Language Study Committee. The Committee will judge proposals on the basis of quality and feasibility and on the likelihood that the completed project would enhance the language teaching program of the department or program as well as advance the professional development of the candidate. Those proposals reviewed favorably by the Language Study Committee will be forwarded for review by the Steering Committee of the Faculty of Arts and Sciences, or its designate, which will judge proposals on the basis of the same criteria. All awards of Professional Development Leaves are made by the Steering Committee of the Faculty of Arts and Sciences or its designate.

# V. School of Architecture

## A.  Description

The School of Architecture offers graduate and post-professional education in the fields of architecture and environmental design. It also offers a program that leads to a Ph.D. and programs of study to Yale College students that may lead to an undergraduate major in architecture.

For the School of Architecture, policies and practices specified in this section take precedence over conflicting policies and practices designated in other sec ions of the *Handbook*.

## B.  Governance: The Executive Committee

The Executive Committee is the governing board of the School and consists of all tenured faculty members holding appointments in the School and others appointed by the Dean from the ranks of associate professor on term, associate professor adjunct, professor adjunct, and professor in the practice. The Dean may invite non-voting members from other ranks at the School to meet with the Executive Committee in an advisory capacity. The Executive Committee participates in the formulation of educational and administrative policies and reviews proposed faculty appointments and promotions.

## C.  Composition and Ranks of Faculty

The faculty in the School of Architecture is composed of scholars and professional practitioners. Faculty members are expected to devote a portion of their time to research or practice in their areas of professional interest and expertise. The faculty is composed as follows:

### 1.  Ladder Faculty

The ladder faculty comprises the ranks of assistant professor, associate professor on term, associate professor with tenure, and professor. With modifications as appropriate for faculty holding appointments in the School of Architecture or as modified in this section, ladder faculty appointments in the School of Architecture follow the definitions, policies, and procedures for appointment and reappointment of these ranks as established for the Faculty of Arts and Sciences under FASTAP 2007 protocol (see Section IV.H.1). Appointees within this category are considered members of the regular faculty; are considered full-time faculty members; and are responsible for teaching and other duties, such as participation in faculty meetings, juries, School committees, student advising, and other forms of School and University service.

**a.  Term Appointments.** Assistant professor and associate professor on term are non-tenure

appointments made for a stated number of years. Initial appointments of assistant professors are normally for four years. No one may serve in the rank of assistant professor for more than seven years plus any extensions as described in Section III.F. The cumulative time on term appointments in the ranks of assistant professor and associate professor on term may not exceed nine years plus any extensions as described in Section III.F.

**b.   Tenure Appointments**. Associate professor with tenure and professor are tenure appointments and are made without term.

**2.   Non-Ladder Faculty**

**a.   Adjunct Faculty**

The adjunct faculty comprises the ranks of assistant professor adjunct, associate professor adjunct, and professor adjunct. Appointees within these ranks are considered members of the regular faculty. Appointments in these ranks are given to those who are active as practitioners in their professional field, and are defined as requiring less than full-time participation in teaching and other activities expected of faculty holding full-time appointments in the School. Adjunct faculty will not be appointed to less than half of full-time employment. Appointments to these ranks are normally for a term of one to five years and may be renewed one or more times without either the expectation or the promise of tenure. Adjunct faculty members are responsible for teaching and other duties, such as participation in faculty meetings, juries, School committees, and student advising.

**b.   Instructor, Lecturer, Senior Lecturer, Critic, and Senior Critic**

Appointments as an instructor, lecturer, senior lecturer, critic, and senior critic may be offered to outstanding scholars and distinguished professionals who may or may not have hold any rank from another academic institution.  Such appointments may be full- or part-time.  Faculty members appointed within these ranks are responsible for teaching and may be responsible for other duties, such as participation in faculty meetings, juries, School committees, and student advising. The ranks of instructor, lecturer, or senior lecturer are normally given to those who are involved in the teaching of non-design studio courses, such as lecture or seminar courses. The ranks of critic and senior critic are normall given to those who are involved in the teaching of design studio courses or who are involved in the teaching of both design studio and non-design studio courses. Faculty appointed as senior lecturers or senior critics are expected to hold advanced standing in their fields and have four or more years of teaching experience or its equivalent.

Appointments to the ranks of instructor, lecturer, or critic, may be for a term of one year or less. Appointments and reappointments at the rank of senior lecturer or senior critic may be for a term of up to three years.

**c.    Endowed Visiting Professor, Endowed Professor in Practice, and Endowed Visiting Fellow**

Appointments as endowed visiting professors, endowed professor in practice, and endowed visiting fellows may be offered to distinguished professionals who may or may not hold an academic rank from another academic institution. Faculty members appointed within these ranks are responsible for teaching.  Although endowed visiting professors, endowed professors in practice, endowed visiting fellows normally are not required to participate in administrative responsibilities within the School, those appointed to these ranks may be required to participate in faculty meetings, juries, School committees, and student advising. Appointments at the ranks of endowed visiting professor and endowed visiting fellow are normally for a term of one year or less. Appointments at the rank of endowed professor in practice are normally for a term of up to five years and may be renewed one or more times without either the expectation or the promise of tenure.

**d.    Professor in the Practice**

Professors in the practice will be distinguished practitioners who demonstrate eminence in the field, sustained accomplishment, and sustained activity in their area of practice. They will hold national or international reputations for their innovative and transformational contributions to their practice, through creative work, professional leadership, practice-centered publications, or other demonstrations of significant accomplishment. Exceptional contributions as a practitioner are the basis of evaluation. This appointment is not intended for those whose field of practice is primarily that of teaching or pedagogy. Appointments in this rank are for terms of up to five years, with the possibility of reappointment in accordance with applicable policies and procedures. Initial appointment or promotion to this rank will require review by the appropriate Standing Advisory and Appointments Committee (SAAC), approval of the Provost, and approval of the Corporation.

**e.    Visiting Appointments**

Visiting appointments may be given to distinguished scholar-professionals who hold an academic rank from another academic institution. Their visiting Yale appointment will carry the same

rank as they hold at the other institution. These appointments normally carry only teaching responsibilities and are made in lengths of time varying from one week to nine months. These appointments are made in accordance with Section XVI and are subject to benefit limitations as described in Section XVIII.D.2.

**D.   Appointment, Reappointment, and Promotion Policy and Procedures**

Open searches are required to fill initial appointments within the ranks of ladder and adjunct faculty. Searches are not required for appointments to any other ranks or for reappointments or promotions within the ranks of ladder and adjunct faculty. Ladder positions are normally open only to persons who hold the Ph.D. degree, its equivalent, or an appropriate terminal professional degree. Rules governing ladder appointments and promotions are consistent with FAS policies as described in Section IV under the protocol for FASTAP 2007.

Qualifications for an initial appointment as assistant professor include promise of success as a teacher and achievement as a scholar or professional. Reappointment as assistant professor requires evidence of success as a teacher and achievement as a scholar or professional. To be considered

for appointment or promotion as associate professor on term, candidates must present original significant creative and professional accomplishments or published research and scholarship representing early demonstrations of disciplinary or interdisciplinary leadership, excellent teaching and mentoring of students, and engaged university citizenship. For candidates being considered for promotion to associate professor on term, review criteria shall include, if appropriate, a statement of professional practice together with documentation of built or design work.

**1.   Term Appointments, Reappointments, and Promotions**

**a.   Non-tenured Ladder, Adjunct Faculty, and Professor in the Practice**. Proposed term appointments, reappointments, and promotions to the ranks of non-tenured ladder, adjunct faculty, and professors in the practice are presented by the Dean to the Executive Committee for review and recommendation. Voting is limited to members of the Executive Committee at the rank under consideration or higher without distinction between ladder and non-ladder status, e.g., all professor, professor adjunct, professor in the practice, associate professor on term, and associate professor adjunct members of the Executive Committee may vote on appointment or reappointment for an associate professor on term. The Dean forwards appointments, reappointments, and promotions recommended by the Executive Committee to the Provost. If the Provost approves an appointment, reappointment, or promotion, in consultation

with the Provost's Standing Advisory and Appointments Committee (SAAC) when appropriate, the recommendation is forwarded to the Corporation for final approval.

**b.   Other Term Faculty**. Proposed term appointments and reappointments of one year or less

to ranks other than mentioned above are made by the Dean and forwarded to the Provost for approval. Those appointments longer than one year are proposed by the Dean for approval by the Executive Committee, with voting as described in the above section, and then forwarded to the Provost for approval.

**2.   Tenure Appointments and Promotions**

A candidate for appointment or promotion to a tenure position, whether at the rank of professor or associate professor, must have attained distinction of a high quality in scholarly, creative, or professional accomplishment as demonstrated by both (i) written or professional work and (ii) teaching. Candidates for the rank of associate professor with tenure will be expected to have produced a substantial body of significant professional work or have published or have accepted for publication a substantial work or body of scholarship. Criteria for promotion shall include, if appropriate, documentation of built or design work.

Proposed appointments to tenure as well as proposed promotions from associate professor with tenure to professor are presented by the Dean to the Executive Committee for review and recommendation. Only tenured members of the Executive Committee at the rank under consideration or higher may vote. The Dean forwards appointments and promotions recommended by the Executive Committee to the Provost. If the Provost approves an appointment or promotion, with the advice of the Provost's Standing Advisory and Appointments Committee (SAAC), the recommendation is forwarded to the Corporation for final approval.

Associate professors with tenure are expected to be reviewed for promotion to professor within five year of hire or promotion to that rank. At any time after seven years have passed from the date of appointment or promotion to associate professor with tenure, the Provost, in consultation with the Dean, may recommend that individual directly to the Corporation for promotion to professor.

**3.   Non-reappointment Notification   Policy for Term Appointments**

**a.   Ladder, Adjunct Faculty, and Professor in the Practice**. Faculty members in the ladder, adjunct, and professor in the practice ranks holding appointments of three or more years shall receive written notice of non-reappointment at least one year before the terminal date of the appointment.

Appointments for terms of fewer than three academic years shall receive notice of non-reappointment at least six months before the expiration of the appointment. Failure to provide such notice does not create any right to extension or reappointment.

**b.   Other Faculty**. For full-time faculty in the fifth or any subsequent year of successive years of

appointment in the non-ladder and non-adjunct ranks, notice of non-reappointment normally will be given by December 31 of the final year of appointment. There is no requirement of notification of non-reappointment for any ranks not mentioned above.

### E.   Leave Policy and Procedures

Leave policies for the School of Architecture conform in general to those set forth in Section XVII and Section III.I. Tenured faculty are eligible for Triennial Leaves of Absence, Sabbatical Leaves of Absence, and Senior Faculty Fellowships. Adjunct faculty and professors in the practice are eligible for Sabbatical Leaves of Absence after having taught in those ranks at Yale for twelve semesters without a paid leave.

### 1.   Assistant Professor Leaves

Assistant professors are eligible for a one-year leave at full pay in the second, third, or fourth year of teaching at that rank at Yale, provided they return to Yale for a full year of teaching. Such leaves are awarded to assistant professors who present, in the fall of the previous academic year, a leave proposal that is evaluated by a subcommittee of the Executive Committee and then approved by the Dean and the Office of the Provost. The leave proposal shall consist of a five-page single-spaced explanation of the scope and significance of the proposed research or professional practice and the opportunities for publication and realization. It shall include a detailed plan to achieve the stated intention regarding research, publication, or professional practice.

### 2.   Associate Professor Leaves

Assistant professors who are appointed or promoted to the rank of associate professor on term are eligible for a one-year leave at full pay provided that at least two semesters of full-time teaching in residence have elapsed since their last leave and that they return to Yale after the leave for a full year of teaching. Such leaves follow the same application process and criteria as leaves afforded assistant professors.

### F.   Research/Travel Funds

Faculty members may apply to the Dean for research or travel funds.

# VI.  School of Art

## A.  Description

The School of Art offers professional instruction in the fields of painting/printmaking, graphic design, sculpture, and photography. Each of these areas is headed by a director of graduate studies. The School also offers programs of study to Yale College students that may lead to an undergraduate major in art.

## B.  The Governing Board and the Appointments Committee

All members of the tenured faculty (associate professors and professors) and the Dean constitute the Governing Board of the School of Art. The Appointments Committee includes a chair, who is a tenured professor, and other members of the faculty representing different areas of study. The committee is appointed by the Dean.

## C.  Composition and Ranks of the Faculty

Faculty in the School of Art are expected to be established professional artists who bring to their teaching a high level of accomplishment in their creative work. Consequently, most members of the faculty begin teaching after they are established in professional practice, and as a matter of School policy they are expected to continue to devote a considerable portion of their time to practice in their areas of professional interest.

### 1.  Ladder Faculty Ranks (Term and Tenure)

The definitions of and terms of appointment for the ranks of assistant professor, associate professor, and professor are in accordance with the Faculty of Arts and Sciences as described in Section IV.H.1, following the FASTAP 2007 protocol.

### 2.  Non-Ladder Ranks

**Professor in the Practice.** Professors in the practice will be distinguished practitioners who demonstrate eminence in the field, sustained accomplishment, and sustained activity in their area of practice. They will hold national or international reputations for their innovative and transformational contributions to their practice, through creative work, professional leadership, practice-centered publications, or other demonstrations of significant accomplishment. Exceptional contributions as a practitioner are the basis of evaluation. This appointment is not intended for those whose field of practice is primarily that of teaching or pedagogy. Terms will be up to five years, with the possibility of reappointment in accordance with applicable policies and procedures. Initial appointment or promotion to this rank will require review by the appropriate Standing Advisory and Appointments Committee (SAAC), approval of the Provost, and approval of the Corporation.

**Adjunct Ranks.** Appointments to the ranks of associate professor adjunct and professor adjunct are defined as requiring less than full-time participation in teaching and other activities expected of faculty holding full-time appointments in the School. Adjunct appointments are made for terms of one to five years and may be renewed one or more times in accordance with applicable policies and procedures.

**3.　Part-time Appointments and Other Non-Ladder Instructional Appointments**

In accordance with University procedures it is possible for some individuals to serve part-time in the regular academic ranks (see Section III.I) or to hold other instructional appointments (see Section IV.J).

**4.　Visiting Appointments**

Visiting appointments may be made in the regular academic ranks by the Dean on the advice of the department for a term of up to one year (see Section XVI).

**5.　Senior Critic, Critic, and Lecturer**

Appointments as lecturer, critic, and senior critic may be offered to outstanding scholars and distinguished artists who may or may not hold any rank from another academic institution. Such appointments may be full- or part-time.　Faculty members appointed within these ranks are responsible for teaching and may be responsible for other duties, such as participation in faculty meetings, juries, School committees, and student advising. The rank of lecturer is normally given to those who are early in their careers as artists and teachers. The ranks of critic and senior critic are normally given to those with several years' experience in artistic practice and teaching. Faculty appointed as senior critics are expected to hold advanced standing in their fields and have five or more years of teaching experience or its equivalent. Appointments and reappointments to the ranks of lecturer or critic may be for a term of one year or less. Appointments and reappointments at the rank of senior critic may be for a term of up to three years.

**D.　Appointments**

**1.　Procedure**

Recommendations for new term and tenure appointments will be made only after an open search has been conducted with regard to the position.

**a.　Term Appointments.** All proposed appointments, promotions and reappointments are reviewed by the Appointments Committee and forwarded with recommendation to the Governing Board for a vote. Only those individuals at the rank under consideration or higher may vote. No non-tenured faculty may vote on reappointment to ranks equivalent to their own. Appointments recommended by the Governing Board are sent to the Dean and forwarded by the Dean to the Provost.　If approved by the Provost, those recommendations are forwarded to the Corporation

for final approval. Recommendations for appointments to the ranks of associate professor adjunct, professor adjunct, professor in the practice, associate professor on term, associate professor with tenure, and professor are reviewed by the Provost in consultation with the Provost's Standing Advisory and Appointments Committee (SAAC). If the Provost approves, those recommendations are then forwarded to the Corporation for final approval.

**b.  Tenure Appointments.** Recommendation for tenure is voted by the Appointments Committee and the Governing Board and sent to the Provost, who will review the recommendation in consultation with the Provost's SAAC. If the Provost approves, the recommendation is forwarded to the Corporation for final approval.

## 2.  Promotion

Tenure Appointments. Recommendation for tenure is voted by the Appointments Committee and the Governing Board and sent to the Provost, who will review the recommendation in consultation with the Provost's SAAC. If the Provost approves, the recommendation is forwarded to the Corporation for final approval.

## 3.  Termination

Written notice of non-reappointment of ladder and adjunct faculty members will be given according to the duration of the applicable appointment. Faculty holding term appointments of three or more years will receive notification of termination at least one year before the expiration of the appointment, and faculty holding appointments of fewer than three academic years will receive notice of termination at least six months before the expiration of the appointment. For one-year appointments, there will normally be three months' notice given. For further information on terminations, see Section III.G.

## E.  Leave Policy

Leave policies for the School of Art conform in general to those set forth in Section XVII. Faculty holding the ranks of associate professor with tenure and professor are eligible for Senior Faculty Fellowships and Triennial and Sabbatical Leaves of Absence. Adjunct faculty and professors in the practice are eligible for Sabbatical Leaves of Absence after having taught in those ranks at Yale for twelve semesters without a paid leave. Assistant professors are eligible for a one-year leave at full pay in the second, third, or fourth year of teaching at that rank at Yale, provided they return to Yale after the leave for a full year of teaching. Faculty at the the rank of associate professor on term are eligible for a one-year leave at full pay provided that at least two semesters of full-time teaching in residence have elapsed since their last leave and that they return to Yale after the leave for a full year of teaching.  For further information on leaves, consult the Dean.

# VII. Divinity School and Institute of Sacred Music

## A. Description

The Divinity School is a graduate professional school whose primary purpose is to educate men and women for the churches' lay and ordained ministries, including pastoral leadership, Christian education, pastoral care, and chaplaincies. The Divinity School also offers theological resources for persons who anticipate professional, public, and social service careers. Finally, the Divinity School offers programs preparatory to Ph.D. studies in the theological fields. Through the Graduate School, members of the Divinity School faculty participate in Ph.D. instruction, educating future scholars and teachers in the fields of religious studies.

The Berkeley Divinity School is one of the seminaries of the Episcopal Church, with its own Board of Trustees and resources. By action of both schools, the Berkeley Divinity School affiliated with the Yale Divinity School on July 1, 1971, with a fully integrated faculty, student body, and program. All degrees are granted by Yale University, and Berkeley resources are used to support the academic program of the Divinity School and to supervise the formation of Episcopal students for ordination.

In 2017 Andover Newton Theological School, the oldest graduate theological school in the country, affiliated with the Yale Divinity School as Andover Newton Seminary at Yale Divinity School, becoming its third partner institution. The focus of Andover Newton is its celebrated tradition of ministerial formation and specialization in the training of ministers within locally governed congregational traditions.

## B. Governance

### 1. Governing Board

The Governing Board consists of the Dean and all tenured faculty with primary or fully joint appointments in the Divinity School. The Board is responsible for recommending candidates for academic and research appointments to the Provost. It also advises the Dean on academic planning.

### 2. The General Faculty

All ladder faculty appointed on term or with tenure participate with voice and vote in the General Faculty, which is responsible for educational policy and curricular affairs. Adjunct and visiting faculty members may attend faculty meetings, but do not vote. Associate deans and other members of the administration who do not hold faculty appointment may be invited by the Dean to attend and vote.

## C.  Faculty Ranks

Ladder ranks in the Divinity School include assistant professor, associate professor on term, tenured associate professor, and tenured professor. Non-ladder ranks include lector, senior lector, lecturer, senior lecturer, associate professor adjunct, professor adjunct, and professor in the practice. Research ranks and visiting appointments conform to those described in Section XV and Section XVI.

## D.  Appointments

### 1.  Non-Ladder Appointments

#### a.  Professor in the Practice

Professors in the practice will be distinguished practitioners who demonstrate eminence in the field, sustained accomplishment, and sustained activity in their area of practice. They will hold national or international reputations for their innovative and transformational contributions to their practice, through creative work, professional leadership, practice-centered publications, or other demonstrations of significant accomplishment. Exceptional contributions as a practitioner are the basis of evaluation. This appointment is not intended for those whose field of practice is primarily that of teaching or pedagogy. Terms will be up to five years, with the possibility of reappointment in accordance with applicable policies and procedures.

#### b.  Other Non-ladder Instructional Appointments

The standards and length of appointment for the non-ladder instructional ranks generally are the same as those in the Faculty of Arts and Sciences (see Section IV.I).

#### c.  Procedures for Non-ladder Instructional Appointments and Promotions

Reappointment of persons holding non-ladder term appointments is not automatic but depends on the School's need for the appointment and its available resources. A candidate's eligibility for reappointment requires a review that includes careful evaluation of the candidate's work by the appropriate faculty of the School.

To consider non-ladder instructional appointments, reappointments, and promotions, the Dean may appoint review committees to make recommendations to the Governing Board. An appointment recommended by the Board is forwarded to the Provost. Initial appointments to the rank of professor in the practice require review by the Provost's Standing Advisory and Appointments Committee (SAAC), approval of the Provost, and consent of the Corporation. Other non-ladder term appointments, when approved by the Governing Board, are forwarded to the Provost; if approved by the Provost, the recommendation is forwarded to the Corporation.

## 2. Ladder Appointments

### a. Appointments on Term

Term appointments in the ladder ranks include assistant professor and associate professor on term. These are intended for candidates who demonstrate the potential for significant research and scholarly publications. Their work should exhibit qualities that give the School grounds to think that, if this potential is realized, then by the time such candidates are considered for tenure, their work would significantly extend the boundaries of their disciplines, such that they will stand among the foremost leaders in their field in the world in a broad field of knowledge. They should demonstrate excellent prospects for effective and creative teaching and mentoring, and display the potential for a career of engaged citizenship in the School, profession, and University. There are no reappointments to these ranks. Non-tenured ladder faculty who undergo review for promotion may not undergo another review for the same promotion if the initial review did not result in promotion.

**Assistant Professor**. Appointments to the rank of assistant professor can be made for up to five years (and may be extended as provided in Section III.F). A review for promotion to associate professor on term will be conducted no later than the penultimate year of the appointment. If the review for promotion is successful, the new appointment as associate professor takes effect at the culmination of the current year of the assistant professor appointment, in lieu of the final year of the initial appointment.

**Associate Professor on Term**. Appointments and promotions to the rank of associate professor on term require that the candidate demonstrate measurable progress towards the criteria for tenure in research, teaching, and service. To be considered for this appointment candidates must present significant published research and scholarship representing early demonstration of disciplinary or interdisciplinary leadership, excellent teaching and mentoring of students, and engaged university service. Evidence for significant scholarship may consist of published monographs or articles, or a manuscript in preparation for publication. In addition to material already published, the candidate should show evidence of another major research project that is likely to be completed before a review for tenure, which normally takes place in the candidate's eighth year. This project should not simply be a repetition of previous work.

Appointments to this rank can be made for up to five years (and may be extended as provided in Section III.F). The review for promotion to a tenured appointment will be conducted no later than the penultimate year of the appointment, i.e., the fourth year at this rank if there are no extensions.

Cumulative time in the ranks of assistant professor and associate professor on term may not exceed nine years (plus any extensions as provided in Section III.F). If the review for promotion to assistant professor or associate professor on term is not successful, the faculty member is notified of termination one year prior to the end of the appointment.

### b.  Appointments to Tenure

Tenure at Yale is awarded to scholars who stand among the foremost leaders in the world in a broad field of knowledge. It is reserved for candidates whose published work significantly extends the horizons of their discipline(s). A tenure appointment is a permanent, forward-looking commitment, and therefore requires evidence of an ongoing and ambitious research agenda. An assessment of candidates' leadership is based on the impact, at the very highest levels, of their research and peer-reviewed scholarship. Excellent teaching and engaged University and professional citizenship within and beyond the School, department, or program are also expected. Tenure at Yale may be awarded at the associate or full professor rank.

Associate professors with tenure are expected to build upon the accomplishments that earned them their permanent appointments, so that within a reasonable period of time their body of work will merit their consideration for full professor.

**Associate Professor with Tenure**.  Faculty who are appointed or promoted to the rank of associate professor with tenure are expected to produce work that would merit promotion to the rank of full professor within six years of the initial appointment. The timing of consideration for promotion is not a requirement, but a strong expectation. Associate professors with tenure can be formally considered by the School and, if appropriate, by the Provost's SAAC for promotion to professor more than once, but normally no more frequently than at two-year intervals.

**Professor**.  The criteria for appointment or promotion to the rank of associate professor with tenure differ from those for professors in degree rather than in kind. The title of full professor is earned by those individuals who have a body of distinguished achievements in their record of research, with a commensurate national and international reputation, and who (continue to) display the excellence in teaching and service that is expected of all tenured professors at Yale. It is expected that professors will continue to develop the qualities of scholarship, creativity, teaching, and University citizenship that earned them their appointments.

### c.  Review procedures for Ladder Appointments and Promotions

The Dean appoints review committees which make recommendations regarding appointments and promotions to the Governing Board. An appointment recommended by the Board is forwarded to the Provost. Appointments to the rank of assistant professor, when approved by the Provost, are

forwarded to the Corporation. Recommendations on appointments to associate professor on term, associate professor with tenure, and professor will be made by the Provost with the advice of the Provost's Standing Advisory and Appointments Committee (SAAC). If the Provost approves, those recommendations are then forwarded to the Corporation for final approval.

## 3. Visiting Fellows

A limited number of professors, ministers, priests, and other appropriate persons may be appointed as visiting fellows for a semester or an academic year. Visiting fellows are not members of the faculty, but they are entitled to use the University libraries, consult with members of the faculty, and audit Divinity School courses (see Section XV.C.3).

## E. Termination Policy

For information regarding notice of termination, see Section III.G.

## F. Leave Policy

Leave policy for senior faculty in the Divinity School generally conforms to the University leave policies in Section XVII. Assistant professors are eligible for a paid year of research eave in the second, third, or fourth year of their service at that rank. Newly promoted associate professors on term are eligible for a paid year of research leave upon their appointment to the rank, provided that two semesters of full-time teaching in residence have elapsed since their last paid leave. Associate professors with tenure, during the initial six years of the appointment, may apply to postpone the first triennial leave of absence (TLA) for which they are eligible and instead take a full year of leave at full pay at the time they would be eligible for their second TLA, if doing so would enhance their research productivity. In all cases, a faculty member must submit a proposal for the research to be pursued during the leave to the Dean in the fall semester of the prior academic year. A faculty member awarded a leave must return to Yale after the leave concludes for a full year of teaching. For complete information on leaves, consult the Dean.

## VIII. School of Drama

### A. Description

The School of Drama is a professional school offering graduate degrees in nine programs covering all major disciplines within theater: Acting, Design, Sound Design, Directing, Dramaturgy and Dramatic Criticism, Playwriting, Stage Management, Technical Design and Production, and Theater Management. In addition, the Drama School is a conservatory for theater training utilizing Yale Repertory Theatre as a laboratory in which theoretical study in the classroom can be related continuously to professional practice in production work.

For the School of Drama, policies and practices specified in this section take precedence over conflicting policies and practices contained in other sections of the *Handbook*.

### B. Faculty Composition and Responsibilities

Appointments in the School of Drama are based primarily on professional theater qualification rather than on academic credentials. Faculty members take responsibility for both teaching and the practice of theater at Yale. These standards are applicable to all faculty members regardless of how their responsibilities are divided between teaching and their work on productions at the School or at Yale Repertory Theatre.

### 1. Scope of Responsibilities

The training process extends into project and performance situations that take place beyond the classroom setting. Therefore, faculty members maintain a substantial responsibility for students' applied work and must be available to examine, consult, and evaluate students' involvement in rehearsal and production, and in the administration of the School of Drama and Yale Repertory Theatre productions.

While appointments to the faculty are normally for nine months, faculty responsibilities in administrative, supervisory or production areas will often require faculty presence to extend to ten, eleven or twelve months.

### 2. Outside Interests and Employment

The School of Drama encourages its faculty to engage in professional work, just as other schools and departments encourage their faculties to publish scholarly work. However, the School seeks to balance the enhancement of a faculty member's professional competence with the individual's obligation not only to meet classes but also to be available to students outside the classroom and to participate in the life of the School. No full-time member of the faculty or staff may undertake an outside professional commitment without permission. All such requests should be submitted to the appropriate program chair in sufficient time to be reviewed and

approved by both the program and the Dean. The approval of such requests will be guided by the general principles cited in this *Handbook* under Outside Interests and Employment in Section XX.E.

## C.  Faculty Ranks

The School of Drama does not make tenure appointments. Therefore all appointments are non-ladder and for a specific term. Ranks include lecturer, assistant professor adjunct, associate professor adjunct, professor adjunct, and professor in the practice. All ranks can include either full-time or part-time appointments.

Visiting faculty members can be appointed at the Dean's discretion in any proportion of full time. All appointments for visiting faculty will be at the rank of lecturer unless an individual currently holds a professorial rank at another university. For further information see Section XVI.

## D.  Appointments

Proposed appointments above the rank of lecturer will be reviewed by a committee appointed by the Dean and composed of a chair and two or more members of the faculty representing different areas of study. The committee will forward recommendations to the Dean, who will then forward them to the Provost for review.

Professors in the practice will be distinguished practitioners who demonstrate eminence in the field, sustained accomplishment, and sustained activity in their area of practice. They will hold national or international reputations for their innovative and transformational contributions to their practice, through creative work, professional leadership, practice-centered publications, or other demonstrations of significant accomplishment. Exceptional contributions as a practitioner are the basis of evaluation. This appointment is not intended for those whose field of practice is primarily that of teaching or pedagogy. Terms will be up to five years, with the possibility of reappointment in accordance with applicable policies and procedures. Initial appointment or promotion to this rank will require review by the Provost's Standing Advisory and Appointments Committee (SAAC), approval of the Provost, and approval of the Corporation.

Recommendations on appointments to the rank of professor adjunct and associate professor adjunct will be made by the Provost with the advice of the Provost's SAAC. The Provost will forward approved recommendations to the Corporation.

Recommendations for initial appointments to the ranks of assistant professor adjunct, associate professor adjunct, professor adjunct, and professor in the practice will be made only after an advertised national or international search has been conducted with regard to the position.

**1.   Term of Appointments**

Initial appointments are normally made for one year. The Dean, in consultation with the faculty of the appropriate departments, makes reappointments for terms of one to five years following a review.

**2.   Notice of Termination**

Faculty members will be given notice of non-reappointment in accordance with Section III.G.

**E.   Reappointments and Promotions**

**1.   Lecturer**

There are no limits to the number of years an individual may serve in the rank of lecturer.

**2.   Assistant Professor Adjunct**

There are no limits to the number of years an individual may serve in the rank of assistant professor adjunct. However, at least six years at the assistant professor adjunct level are normally required before promotion to associate professor adjunct is considered. Those proposed for promotion should have demonstrated that they are excellent teachers and are recognized professionals of national standing. Promotion, if approved, will normally be to the rank of associate professor adjunct.

**3.   Associate Professor Adjunct and Professor Adjunct**

There are no limits to the numbers of years an individual may serve in the rank of associate professor adjunct. However, at least four years at the associate professor adjunct level are normally required before promotion to professor adjunct is considered. Those proposed for promotion to professor adjunct should have demonstrated exemplary teaching skills and must have achieved the highest recognition of distinction in the profession.

**F.   Leave Policy**

Leave policies for the School of Drama conform in general to those set forth in Section XVII. Faculty at the rank of Associate Professor Adjunct or Professor in the Practice are eligible to apply for a paid leave after having taught at Yale for 12 semesters without a paid leave. The maximum leave period is six months, paid at full salary, during which the faculty member is relieved of all teaching and administrative duties, except for supervising dissertations. Upon returning from leave, the faculty member is expected to teach for a full year.  To apply, faculty must submit leave proposals which articulate the reasons for the leave, highlight the professional development/practice opportunities that will be undertaken, explain why the leave is necessary to engage in these activities, and describe how the leave will enhance the faculty member's teaching at Yale. A limited number of leaves are available. Approval of leave requests is granted by the Dean.

# IX.  School of Forestry & Environmental Studies

## A.  Description

The School of Forestry & Environmental Studies (F&ES pursues teaching, research, and practice in the natural, physical, and policy sciences most relevant to the management of natural resources and the environment. Within that broad range of disciplines and problem areas, the School offers the degrees of: Master of Environmental Management (M.E.M.; Master of Forestry (M.F., accredited by Society of American Foresters; and two research-oriented master's degrees: Master of Environmental Science (M.E.Sc. and Master of Forest Science (M.F.S.. The School also acts as a department of the Graduate School to offer the Doctor of Philosophy (Ph.D. degree.

## B.  Governance

### 1.  Governing Board

The Board of Permanent Officers is the governing board of the School. It includes the Dean and all tenured faculty with primary or fully joint appointments in the School. The Board participates in formulating educational policy and in recommending candidates for academic and research positions.

### 2.  Appointments Committees

For all ladder and some other faculty positions, the Dean appoints individual *ad hoc* committees to run searches and make recommendations to the Board of Permanent Officers on hiring and promotions.

### 3.  Standing Advisory and Appointments Committee (SAAC)

The Provost's SAAC reviews all promotions to associate professor on term, professor in the practice,  and  all appointments to tenure. The SAAC is advisory to the Provost. Decisions on appointment and tenure are made by the Provost, who forwards appointments to the Corporation for final approval. Proposed areas of appointment are presented to the SAAC for consideration of field and resources in the context of the programmatic mission of the School.

## C.  Ladder Faculty Ranks and Appointments

### 1.   Term Appointments

The definitions of rank and the maximum length of time in rank for persons holding term ladder appointments are the same as those for the Faculty of Arts and Sciences under FASTAP 2007 protocol (see Section IV.H). An appointment approved by the Board of Permanent Officers is forwarded to the Provost. If approved by the Provost, the recommendation is forwarded to the Corporation.

### 2.   Tenure Appointments

Appointments to tenure are generally made at the full professor level. A recommendation for promotion to tenure voted by the Board of Permanent Officers is forwarded to the Provost's SAAC. If then approved by the Provost, the recommendation is forwarded to the Corporation.

In the case of a fully-joint tenure appointment in the School of Forestry & Environmental Studies and another school or department in the Faculty of Arts and Sciences, the appointment procedures of each unit must be followed.

### 3.   Termination Policy

The termination policy conforms in general to that established for the University (see Section III.G).

## D.  Leave Policy

The leave policy conforms in general to that established for the University (see Section XVII) and under FASTAP 2007 protocol (see Section IV.H).

## E.  Other Instructional and Research Appointments

Most recommendations for appointment to these ranks are reviewed and voted on by the Board of Permanent Officers. Among the exceptions are associate research scientist/scholar, visiting research scientist/scholar, visiting fellow, and senior visiting fellow. These appointments are approved by the Dean. Appointments approved by the School are forwarded to the Provost who, on approval, transmits them to the Corporation. In all term positions where the term of appointment is three years or more, the individual will be reviewed in the penultimate year of appointment. Reappointment depends on the needs of the School and the performance of the individual. Compensation and benefits are described in Section XVIII.

### 1.   Professor Adjunct, Associate Professor Adjunct, and Assistant Professor Adjunct

In Forestry & Environmental Studies, the adjunct teaching ranks are normally intended for the appointment of persons whose interests, as well as the interest of the University, are served by their continuing in a professional capacity outside of the University while teaching less than full time. They do not serve as the principal advisers of dissertations or vote on ladder faculty appointments, though with the approval of the Dean of the School, adjunct faculty may become principal investigators of grants. Adjunct appointments are normally less than full-time and are made for terms of up to five years. Following a review, individuals in these ranks may be renewed upon the recommendation of the Board of Permanent Officers, but such renewal is made without the expectation or the promise of tenure or of subsequent reappointment. The adjunct rank to which a candidate might be appointed or promoted reflects the individual's accomplishments and distinction.

### 2.   Professor in the Field

Candidates for appointment to the ranks of professor in the practice or in the field must show evidence of significant accomplishment as either a practitioner or scholar in an area integral to the practice of natural resource or environmental management, or in another field highly relevant to the School's mission. They must also show promise of exemplary performance in teaching the fundamental skills of that area of practice to others. Professors in the practice will typically have emphasized the practical application of these skills in their area of specialty; professors in the field will typically have spent more time developing new knowledge as evidenced by a record of publication in academic or professional journals. Appointments to these ranks are typically full-time, may be made for terms of up to five years, and may be renewed one or more times. Persons holding appointment to these ranks have all the responsibilities and privileges of ladder faculty except for membership on the Board of Permanent Officers and the right to vote on ladder appointments. They are eligible for most of Yale's benefits but not for Early, Phased, or Planned Retirement or the Early Retirement Subsidy. New appointments to this rank will not be made after July 1, 2016.

### 3.   Professor in the Practice

Professors in the practice will be distinguished practitioners who demonstrate eminence in the field, sustained accomplishment, and sustained activity in their area of practice. They will hold national or international reputations for their innovative and transformational contributions to their practice, through creative work, professional leadership, practice-centered publications, or

other demonstrations of significant accomplishment. Exceptional contributions as a practitioner are the basis of evaluation. This appointment is not intended for those whose field of practice is primarily that of teaching or pedagogy. Terms will be up to five years, with the possibility of reappointment in accordance with applicable policies and procedures. Initial appointment or promotion to this rank will require review by the Provost's Standing Advisory and Appointments Committee (SAAC), approval of the Provost, and approval of the Corporation.

## 4.   Lecturer and Senior Lecturer

Appointments to these ranks are made only for persons whose responsibilities include regular teaching. Lecturers will normally hold a Ph.D. or its equivalent or another appropriate terminal degree. Appointment to the rank of senior lecturer requires the experience of at least six years of full-time teaching. Individuals appointed to that rank must also have established a documented record of excellent teaching. Appointments to the rank of lecturer or senior lecturer may be part- or full-time for one semester, for one year, or for a period of up to three years for lecturers and five years for senior lecturers. Although appointments to these ranks may be renewed, they carry no presumption of reappointment and no expectation of permanent employment by the University. A lecturer or senior lecturer with an appointment for a period of at least three years will be reviewed for possible reappointment in the penultimate year. Persons who have held the rank of lecturer or senior lecturer on a full-time basis for two or more consecutive one-year appointments and are not to be reappointed will normally be given three months' notice of non-reappointment. Persons who have held the rank of lecturer or senior lecturer on a full-time basis for five consecutive years or more will be given written notice of non-reappointment at least one year before the expiration of their term of appointment.

## 5.   Visiting Faculty

Visiting faculty appointments conform to University policies (see Section XVI). The Board of Permanent Officers and the Dean pass approved appointments to the Provost, who, upon approval, transmits them to the Corporation.

## 6.   Visiting Fellows and Senior Visiting Fellows

In addition to visiting fellows, described in Section XVI.C, the School of Forestry & Environmental Studies also appoints senior visiting fellows. This title is given to established scholars and other distinguished individuals whose association with the University and residence in the community for an extended period (greater than one year) will be of mutual benefit. Appointments may be for two to five years. No teaching or work for the University is required.

As with visiting fellows, senior visiting fellows are not members of the faculty, nor are they Yale employees, and they receive no compensation from the University. They are not eligible for participation in Yale's fringe benefit plans

## 7. Executive Fellows

For a visiting appointment as an executive fellow, a candidate must provide experience and expertise that the school views as essential but otherwise lacks or have a professional reputation that enhances the reputation of the School of Forestry and Environmental Studies. An executive fellow is normally appointed for one semester or one year, with the possibility of renewal for additional terms, not to exceed three consecutive years. Executive fellows are not members of the faculty, and no teaching or paid work for the University is required. If an executive fellow is given responsibility for a course, the individual must also have a faculty appointment.

## 6. Research Appointments

Research appointments conform to University policies (see Section XV). For senior research scientist/scholar and research scientist/scholar positions, the Appointments Committee recommends individuals to the Board of Permanent Officers and the Dean, who then passes approved appointments to the Provost and then to the Corporation. For the position of associate research scientist/scholar, the Dean may approve appointments and then pass them on to the Provost, who, after approval, transmits them to the Corporation.

## F. Instructional Opportunities for Graduate Students (Ph.D., D.F.E.S. and Masters)

For a description of these opportunities, refer to Section IV.J. The Associate Dean for Academic Affairs, in consultation with the faculty member responsible for each course, must determine which level of appointment is appropriate. The faculty member will have primary responsibility for seeing that undue demands are not made of the teaching fellows. The rules governing part-time acting instructors described in Section IV.J apply also to D.F.E.S. students in the School.

## X. Law School

### A. Description

The primary educational purpose of Yale Law School is to train lawyers; its primary scholarly role is to pursue research in law. Throughout much of the School's history, its teachers, students, and Deans have taken a broad view of the role of law and lawyers in society. The School has sought to train lawyers for public service and teaching as well as for private practice and to advance inquiry at the boundaries of the law as well as to inculcate knowledge at the core. This professional and academic orientation is enriched by a setting hospitable to a wide variety of intellectual currents and is designed to produce lawyers who are creative, sensitive, and open to new ideas.

### B. Appointments: The Governing Board

All teaching appointments to the Law School are reviewed by the Governing Board (Board of Permanent Officers), which consists of persons holding the rank of professor. In the case of all clinical teaching appointments and promotions to the rank of clinical professor of law, however, the set of persons eligible to vote shall be expanded to include all faculty holding the rank of clinical professor of law. Clinical professors of law may attend and participate in all meetings of the Governing Board and the Expanded Governing Board though the only appointments and promotions on which they vote are those of clinical teachers. Associate professors on term, clinical associate professors on term, professorial lecturers, and associate deans may participate in meetings of the Expanded Governing Board and may discuss new appointments, but they do not vote and may not participate in discussion of the status of existing non-tenured faculty. An appointment approved by the Governing Board is forwarded to the Provost, who reviews it; if approved, the recommendation is forwarded to the Corporation. In general, appointment procedures conform to those set forth in Section III, with some variations, mainly resulting from the nature of the appointments process at the Law School. For more information on appointments, consult the Dean of the Law School. For information concerning terminations, see Section III.G.

### C. Faculty Ranks

### 1. Appointments on Term and to Tenure

The definitions of rank for persons holding the following two ladder appointments in the Law School are the same as those for the Faculty of Arts and Sciences (see Section IV.H) with the following modifications: wherever reference is made to the Ph.D. degree, it should be read to refer to the J.D. degree, or the equivalent.

**Associate Professor on Term.** All non-tenure appointments to ladder positions are made at this rank. An initial appointment is made for a period of three years. It is presumed that this

first appointment will be renewed for a second term of four years. In exceptional circumstances the presumption may be rebutted and denied. A decision on whether or not the individual will be appointed to a tenure position will be made by the close of the sixth year of the candidate's appointment.

**Professor.** This is the only rank with tenure in the Law School. Individuals are promoted to this rank from associate professor on term when the Governing Board is satisfied that the individual has demonstrated achievement in scholarship and teaching appropriate to the rank. This decision ordinarily must be made within seven years of initial appointment to the faculty in any rank. Appointment directly to this rank for individuals not currently holding an appointment as an associate professor on term is usually preceded by a visiting year or semester. It is made only when the individual has a record of extraordinary distinction in teaching, scholarship, or the practice of law.

**Associate Professor (Adjunct) of Law.** This rank is given to an individual teaching at Yale Law School who holds the rank of Associate Professor in another school at Yale University. Associate Professor (Adjunct) appointments are term appointments and may be granted for a term, academic year, or multiple academic years.

**Professor (Adjunct) of Law.** This rank is given to an individual teaching at Yale Law School who holds or has held the rank of professor in any school at Yale University. Professor (Adjunct) appointments are term appointments and may be granted for a term, academic year, or multiple academic years.

## 2.    Clinical Ranks

**Clinical Associate Professor of Law.** Initial appointment to this rank normally will be for a three-year term as associate professor. It is presumed that this first appointment will be renewed for a second term of four years.  In exceptional circumstances, the presumption may be rebutted and denied Normally, consideration for promotion to clinical professor will occur no later than the sixth year after the initial appointment.

**Clinical Professor of Law.** This appointment is normally without term, subject to termination on two years' notice following a two-thirds vote of the Governing Board.

**Supervising Attorney.** This faculty rank is coterminous with a clinical faculty appointment in the Law School and is used for persons who supervise students engaged in legal services, student practice, and forensic programs.

## 3. Other Non-Ladder Instructional Ranks

**Professor in the Practice.** Professors in the practice will be distinguished practitioners who

demonstrate eminence in the field, sustained accomplishment, and sustained activity in their area of practice. They will hold national or international reputations for their innovative and transformational contributions to their practice, through creative work, professional leadership, practice-centered publications, or other demonstrations of significant accomplishment. Exceptional contributions as a practitioner are the basis of evaluation. This appointment is not intended for those whose field of practice is primarily that of teaching or pedagogy. Terms will be up to five years, with the possibility of reappointment in accordance with applicable policies and procedures. Initial appointment or promotion to this rank will require approval of the Corporation.

**Professorial Lecturer of Law.** This appointment following retirement may be for a term of ten years within a period of 13 consecutive years or without term, depending on the plan the appointee selects, and is available to retired professors teaching at least one semester course per year but less than one-half a full teaching load.

**Visiting Lecturer.** This designation is used for members of the profession who teach a seminar or course for credit. The appointment is normally for one year and may be renewed.

**Lecturer.** This designation is used for individuals who have non-ladder faculty appointments or administrative appointments in the University who teach a seminar or course for credit. The appointment is normally for one year and may be renewed.

**Clinical Lecturer of Law.** This designation is used for individuals who have non-ladder faculty appointments or administrative appointments in the University who teach a clinical or experiential seminar or course for credit. The appointment is normally for one year and may be renewed.

**Visiting Clinical Lecturer of Law.** This designation is used for members of the profession who teach a clinical or experiential seminar or course for credit. The appointment is normally for one year and may be renewed.

**Tutor in Legal Studies.** This rank is used for law school graduates who assist members of the faculty in courses or seminars on a part-time basis. The appointment is for a term or year and may be renewed.

**Teaching Assistant.** This designation is for third-year students at the Law School who assist members of the faculty teaching in the first-term program. The appointment is for the fall term and is not renewable.

## D. Leave Policy

The policy in the Law School generally conforms to that of the University (see Section XVII) with some minor differences. For more information, consult the Dean.

# XI. School of Management

## A. Description

The School of Management prepares leaders for the global business environment by providing students with a broad intellectual framework and the business skills necessary to manage in the ever-changing marketplace. The principal scholarly role of the School is research in the disciplines and functional fields of management, broadly understood, including accounting, economics, finance, marketing, operations, o ganizational behavior, and politics.

The School seeks to develop innovative research in management from its own resources and to make functional use of the scholarly work of the social science departments and of other professional schools at Yale.

## B. Governance

### 1. Board of Permanent Officers

The Board of Permanent Officers (BPO) includes the Dean and all faculty members at the rank of full professor holding appointments in the School, with the President and the Provost *ex officiis*. The BPO participates in formulating educational policy and faculty promotion and appointments policy, and it participates in recommending candidates for faculty appointments.

### 2. The Senior Faculty

The Senior Faculty consists of the BPO and all professors in the practice. The Senior Faculty participates in formulating educational policy.

### 3. Appointments, Curriculum, and Strategy Committee

The Appointments, Curriculum, and Strategy (ACS) Committee, consisting of the Dean and members of the Board of Permanent Officers appointed by the Dean, oversees and coordinates the reviews of all candidates for appointment, reappointment, or promotion at the School. The ACS also serves to provide guidance to the Dean's Office on School-wide curriculum, strategy, and policy.

## C. Ladder Faculty

In the School of Management, the maximum number of years in the non-tenure ranks is ten. Appointment to the non-tenure ranks normally includes two consecutive three-year appointments as assistant professor and, following a promotion review in the fifth year, one five-year term at the rank of associate professor. Tenure is granted at the rank of professor.

## 1.    Professor (Tenured)

Tenure at SOM is awarded to scholars who stand among the foremost leaders in the world in a broad field of knowledge. It is reserved for candidates whose published work significantly extends the horizons of their discipline(s) with a commensurate national and international reputation. A tenure appointment is a permanent, forward-looking commitment, and therefore requires evidence of an ongoing and ambitious research agenda.

An assessment of candidates' leadership is based on the impact, at the very highest levels, of their research and peer-reviewed scholarship. Candidates are expected to meet a demanding standard of effective teaching and to be engaged citizens of the School, University, and their professions. Tenure at Yale SOM is awarded at the full professor rank.

## 2.    Associate Professor (Term)

Associate professor on term is normally the rank of promotion from assistant professor, or the rank of initial appointment at SOM for an individual with substantial previous scholarly and teaching experience. To meet SOM's standard for appointment at the associate professor rank, candidates must present:

- significant published research and scholarship representing early demonstrations of intellectual leadership such as to indicate that the candidate has a credible path to meeting the standards for tenure at SOM or a comparable institution within the term of the appointment;
- effective teaching and mentoring of students; and
- engaged institutional citizenship.

Terms are typically five years. Review for promotion normally takes place in the penultimate year of the term.

## 3.    Assistant Professor (Term)

To be considered for an initial appointment as assistant professor, a candidate must show exceptional promise as a scholar and a teacher. Initial terms are typically three years. To be considered for re-appointment at this rank, candidates should be actively engaged in research and teaching, with promise of meeting the standards for promotion to associate professor by the end of the term. Terms are typically three years. The reappointment review takes place in the third and final year of the initial assistant professor term. In the event that the initial term is not renewed, the initial term will be extended by one year. Review for promotion normally takes place in the penultimate year of the second term.

Candidates for assistant professorship who have not yet completed their Ph.D. at the time their appointment begins will be appointed with the title of lecturer convertible as described in Section IV.H.

## D. Non-Ladder Faculty

SOM benefits from the participation of faculty members with experience and expertise that the School views as essential but is unlikely to find in a ladder-faculty member. In that case, the Dean may authorize a non-ladder position. SOM non-ladder faculty positions include professor in the practice, senior lecturer, and lecturer. SOM does not use the title of adjunct professor, except for faculty members already holding the title as of December 2013. Persons holding non-ladder faculty appointments where the term of appointment exceeds one year are entitled to a review in the penultimate year of their contract, using the standards described below.

## 1. Professor in the Practice

Professors in the practice will be distinguished practitioners who demonstrate eminence in the field, sustained accomplishment, and sustained activity in their area of practice. They will hold national or international reputations for their innovative and transformational contributions to their practice, through creative work, professional leadership, practice-centered publications, or other demonstrations of significant accomplishment. Exceptional contributions as a practitioner are the basis of evaluation. This appointment is not intended for those whose field of practice is primarily that of teaching or pedagogy.

This is a term position for practitioners or scholars whose appointments are based primarily on their distinction in one of the areas integral to the practice of management. Such appointments may be made for terms of up to five years and may be renewed with no limit on the number of reappointments without involving the University in either the expectation or promise of tenure. Appointment to the rank of professor in the practice typically requires at least six years of full-time teaching, at Yale or elsewhere, in a ladder or non-ladder rank, including the rank of lecturer. Appointments to the rank of professor in the practice are made for full-time faculty members only. The standards for an appointment as a professor in the practice are:

- superior teaching that effectively brings practice into the classroom in a way that is linked to a rigorous body of knowledge;

- demonstration of intellectual leadership in some area of practice through continuing written contributions, although such writings need not be research-based in the same way as the publications of ladder faculty members;

- intensive engagement in the activities of the school, such that the SOM position is the faculty member's primary career focus;

- through the foregoing teaching, writing, and engagement, the provision of experience and expertise that the school views as essential but otherwise lacks; and

• a professional reputation that enhances the reputation of SOM.

Initial appointment or promotion to this rank will require review by the Provost's Standing Advisory and Appointments Committee (SAAC), approval by the Provost, and approval of the Corporation.

## 2.   Senior Lecturer

Appointment to the rank of senior lecturer typically requires at least six years of full-time teaching, at Yale or elsewhere, in a ladder or non-ladder rank, including the rank of lecturer. Furthermore, a senior lecturer must either hold an earned terminal degree in the relevant field (academic qualification or have at least five years of experience in the relevant field (practice qualification.

For senior lecturers with only the practice qualification, the title used at SOM will be "senior lecturer in the practice (of relevant field." Initial appointments to the rank of senior lecturer are made for full-time faculty members only. Terms may be for a minimum of one semester or a maximum of five years. The standards for an appointment as a senior lecturer are:

• superior teaching that effectively brings practice into the classroom in a way that is linked to a rigorous body of knowledge;
• intensive engagement in the activities of the school, such that the SOM position is the faculty member's primary career focus; and
• through the foregoing teaching and engagement, the provision of experience and expertise that the school views as essential but otherwise lacks.

Re-appointments at this rank may be made at part-time status with the same standards, except that SOM need not be the faculty member's primary career focus.

## 3.   Lecturer

For an initial appointment as lecturer, the candidate must show evidence of promise as a superior teacher. Furthermore, a lecturer must either hold an earned terminal degree in the relevant field (academic qualification) or have at least five years of experience in the relevant field (practice qualification). For lecturers with only the practice qualification, the title used at SOM will be "lecturer in the practice (of relevant field)." Once a lecturer attains at least six years of full-time teaching experience, at Yale or elsewhere, in a ladder or non-ladder rank, they may request that a promotion to senior lecturer be considered at the time of their next re-appointment review. Terms may be for a minimum of one semester or a maximum of three years. The standards for an initial appointment as a full-time lecturer are:

- intensive engagement in the activities of the school, such that the SOM position is the faculty member's primary career focus; and
- the provision of experience and expertise that the school views as essential but otherwise lacks.

Initial appointments and re-appointments at this rank may be made at part-time status with the same standards, except that SOM need not be the faculty member's primary career focus. For re-appointments as a lecturer, the candidate must also demonstrate superior teaching that effectively brings practice into the classroom in a way that is linked to a rigorous body of knowledge or show evidence that this teaching standard could be satisfied during the term of the appointment.

## E.  Other Appointments

### 1.  Joint Ladder Faculty Appointments

SOM follows the University policy for joint ladder faculty appointments with other schools as described in Section III.H.

### 2.  Part-Time Appointments to Ladder Ranks

SOM follows the University policy for part-time ladder faculty appointments as described in Section III.I.

### 3.  Dual Appointments as a Faculty Member and Managerial or Professional Employee

SOM follows the University policy for dual appointment as a faculty member and professional or managerial employee as described in Section III.J. All such appointments are made at the rank of Lecturer or Senior Lecturer, following the standards set out above, except that SOM need not be the faculty member's primary career focus.

### 4.  Research Appointments

SOM follows University policy for research appointments as described in Section XV.

### 5.  Visiting Appointments

SOM follows University policy for visiting appointments as described in Section XVI, with the additional visiting appointment of executive fellow.

For a visiting appointment as an executive fellow, a candidate must provide experience and expertise that the school views as essential but otherwise lacks or have a professional reputation that enhances the reputation of SOM. An executive fellow is normally appointed for one semester or one year, with the possibility of renewal for additional terms, not to exceed three consecutive years. Executive fellows are not members of the faculty, and no teaching or

paid work for the University is required. An executive fellow may receive compensation for work in executive programs and for assisting with other programmatic activities at the school. If an executive fellow is given responsibility for a course, the individual must also have a faculty appointment.

## F.   Procedures for Appointment

The BPO is the ultimate authority at the school level for all faculty appointments. Unless stated otherwise in this section, the BPO alone votes on all appointments. As discussed below, the BPO may elect to include other members of the faculty in certain votes or delegate voting authority to a committee.

## 1.   Professor (Tenured)

Recommendations for appointments to tenure positions are reviewed by the BPO. Appointments approved by the BPO are sent to the Dean and then to the Provost for review and recommendation to the Corporation. The Provost will ask the Provost's Standing Advisory and Appointments Committee (SAAC) to review and make a recommendation on tenure appointments or in other cases where the Provost deems it appropriate. When tenure appointments are made jointly between the School and a department of the Faculty of Arts and Sciences, appointments are also sent to the appropriate divisional Tenure Appointments and Promotions Committee for review and concurrent approval. Tenure appointments proposed jointly with another School must also follow that School's appointments procedure. Appointments approved by the Provost are forwarded to the Corporation. For information concerning terminations, see Section III.G.

## 2.   Term Appointments

**Professor in the practice**.  For initial appointments to this rank, the Senior Faculty vote. If the vote is positive, the nomination will be sent to the Dean and then to the Provost for review and approval. The Provost's review will include formal evaluation and recommendation by the Provost's Standing Advisory and Appointments  Committee (SAAC). If positive, the Provost will submit the nomination to the Corporation for approval. For reappointments to this rank, the BPO votes. If the vote is positive, the nomination will be sent to the Dean and then to the Provost for review and approval. If positive, the Provost will submit the nomination to the Corporation for approval.

**Associate Professor appointments**.  The Senior Faculty vote on all appointments to the rank of associate professor. If a vote on an appointment to the rank of associate professor is positive, the nomination will be sent to the Dean and then to the Provost for review and approval. The Provost's review will include formal evaluation and recommendation by the Provost's Standing Advisory and Appointments Committee (SAAC). If positive, the Provost will submit the nomination to the Corporation for approval.

**Assistant Professor re-appointments**.  The Senior Faculty vote on all re-appointments to the rank of assistant professor. If the vote is positive, the nomination will be sent to the Dean and then to the Provost for review and approval. If positive, the Provost will submit the nomination to the Corporation for approval.

**Senior Lecturer initial appointments and re-appointments**.  The Senior Faculty vote on all initial appointments and re-appointments to the rank of Senior Lecturer. If the vote is positive, the nomination will be sent to the Dean and then to the Provost for review and approval. If positive, the Provost will submit the nomination to the Corporation for approval.

**Other term appointments**. The BPO delegates all votes for initial appointments of assistant professors, lecturers, research appointments, visiting appointments, and secondary appointments to the ACS Committee. If the vote is positive, the nomination will be sent to the Dean and then to the Provost for review and approval. If positive, the Provost will submit the nomination to the Corporation for approval.

**G.  Leave Policy**

For information on leaves, consult the Dean.

## XII.  School of Medicine

### A.   Description

The faculty of the School of Medicine is responsible for the instruction of students of medicine and public health, graduate students of the biomedical sciences, and students in the Physician Associate Program and Physician Assistant Online Program. The School provides graduate training programs for residents in medical disciplines and postdoctoral trainees in the biomedical and behavioral sciences. Continuing education programs are offered for physicians and other health care professionals. Clinical programs of instruction are available at the Yale-New Haven Medical Center, the Connecticut Mental Health Center, the Veterans Affairs Connecticut Healthcare System, and other medical facilities with which the School of Medicine holds formal affiliation agreements.

The faculty in the Department of Epidemiology and Public Health also serve as the faculty of Yale's accredited School of Public Health. The Chair of the Department of Epidemiology and Public Health serves as Dean of Public Health in the School of Medicine.

### B.   Departments

The faculty is organized into basic science departments and sections and clinical departments, each headed by a chair or director appointed by the Corporation upon the recommendation of the President.

#### Basic Science Departments and Sections

> Biomedical Engineering
> Cell Biology
> Cellular and Molecular Physiology
> Comparative Medicine
> History of Medicine
> Immunobiology
> Microbial Pathogenesis
> Molecular Biophysics and Biochemistry
> Neuroscience
> Pharmacology

#### Clinical Departments

> Anesthesiology

Child Study Center

Dermatology

Radiology & Biomedical Imaging

Emergency Medicine

Internal Medicine

Laboratory Medicine

Neurology

Neurosurgery

Obstetrics, Gynecology and Reproductive Sciences

Ophthalmology and Visual Sciences

Orthopaedics and Rehabilitation

Pediatrics

Psychiatry

Surgery

Therapeutic Radiology

Urology

### Bridge Departments

Epidemiology and Public Health

Genetics

Pathology

## C. Governance

### 1. Board of Permanent Officers

Faculty at the rank of full professor who are appointed without limit of term, together with the President and Provost, *ex officiis*, and the Dean of the School of Medicine, constitute the School's Board of Permanent Officers. This is the governing board of the School, entrusted with matters of educational policy and governance and responsible for recommendations to the President and Provost for appointments at the associate professor, professor, clinical professor, and professor adjunct ranks. The permanent officers may invite other faculty to attend meetings of the Board and to vote on appointments and promotions to ranks below or equal to their own. By longstanding policy, the Board of Permanent Officers has offered such rights to all faculty who hold the ranks of associate professor with tenure and clinical professor. In all meetings, action is taken by majority vote of those present and eligible to vote. Emeritus faculty are invited non-voting members of the Board of Permanent Officers.

## 2.   Voting Rights and Policies

Professors in the Traditional Track, Investigator Track, Clinician-Scholar Track, and the Clinician-Educator Track have full voting rights on appointments and promotions to all ranks in all tracks. Professors in the Clinical Track have full voting rights on appointments and promotions to all ranks in the Clinical Track. Associate professors with tenure may vote on all ranks in all tracks except for the rank of professor. Assistant and associate professors on term appointments in the faculty tracks may be invited by the professors in their departments to vote in their departments on appointments and promotions to ranks below or equivalent to their own, although associate professors may not vote on the reappointment of associate professors. Absentee ballots are not accepted in department voting. Regardless of rank, faculty with secondary appointments with a department or school may not vote on promotions or appointments to tenure. Recommendations for appointments or promotions to all ladder ranks above assistant professor are submitted for action to the appropriate appointment and promotion committee after a majority affirmative vote by the faculty qualified by rank to vote in the applicable department. Since a majority of those present and eligible to vote is necessary and sufficient to bring an appointment forward to the next level, abstentions have the same effect as votes against the appointment or promotion. All voting on appointments and promotions must be done with secret ballots.

## D.   Supervision of Students

The School of Medicine confers the Doctor of Medicine (M.D.) degree, the Master of Medical Science (M.M.S.) degree, the Master of Health Science (M.H.S.) degree, and, through its relationship to the School of Public Health, the Master of Public Health (M.P.H.) degree. Students who are candidates for the Master of Science or Doctor of Philosophy in the biomedical sciences or in Public Health are enrolled not in the School of Medicine but in the Graduate School of Arts and Sciences. Faculty of the School of Medicine, including Public Health, who supervise Graduate School students must have an assignment to the Graduate School faculty (see Section IV).

## E.   Appointments and Promotions Procedures

Faculty in the School of Medicine, including Public Health, are appointed to a faculty track, a research rank, an adjunct rank, or a voluntary rank. In the School of Public Health, instructional faculty can also be appointed to the rank and title of Professor in the Practice, as described in Section XII.G. General appointment procedures, as described in Section III.K, apply to the School of Medicine, including Public Health. Some procedures, however, are specific to the School of Medicine.

Department chairs are appointed by the Yale Corporation upon recommendation of the President after nomination by the Dean. The academic appointments of individuals recruited to

serve as chairs are recommended by the search committee to the appropriate committee on appointments. If approved, the appointment is presented to the Board of Permanent Officers of the School of Medicine before being forwarded to the Yale Corporation.

Except for appointment of the chair, any faculty appointment at the rank of associate professor, professor, research scientist, or senior research scientist must be recommended by the professors and tenured associate professors in non-voluntary ranks of the department of primary and, where applicable, secondary appointment. When meeting to discuss a faculty appointment or promotion, the professors and tenured associate professors of a department may invite attendance by the other faculty of the department who hold rank equal to or higher than the rank of the position to be filled and may empower them to vote. Faculty with secondary appointments in a department may not vote on appointments or promotions to tenure. Faculty who hold appointments at the rank of associate professor on term may not vote on reappointments to the rank of associate professor. Absentee ballots are not accepted in department voting.

Appointments, reappointments, and promotions to the rank of assistant professor in any track or to research scientist or senior research scientist are initiated within the department and submitted by the chair to the Dean for endorsement and, if endorsed, for recommendation to the President and Provost. As noted, recommendations for appointment or promotion to all ladder ranks above assistant professor are submitted for action to the appropriate appointment and promotion committee after a majority affirmative vote of the faculty qualified by rank to vote in the applicable department.

The committee that has authority to recommend tenure appointments in the basic science departments and sections (excluding Comparative Medicine, Epidemiology and Public Health, and History of Medicine) is called the Biological Science Tenure Appointments Committee. All term appointments, as well as appointments and promotions to the rank of associate professor without term and professor in departments other than the basic science and sections are reviewed by the appointments and promotions committees appointed by the Dean and chaired by the Dean or the Dean's designee. The number of committees on appointment and promotion, as well as the constituency and responsibility of each, may change from time to time. *Ad hoc* members may be invited to join when circumstances require. When an assignment to the Graduate School is being considered, the Dean of the Faculty of Arts and Sciences or their designee is a voting member of an appointments and promotions committee of the School of Medicine. In the School of Public Health, appointments and promotions to the ranks of professor, associate professor without term, associate professor with term, and professor in the practice are reviewed by the Provost's Standing Advisory and Appointments Committee. However, appointments and promotions in the Clinician-Educator or Clinical Tracks in the School of Public Health are reviewed by the appointments and

promotions committees appointed by the Dean of the School of Medicine. The recommendations of any of the appointments and promotions committees are then presented to the Board of Permanent Officers of the School of Medicine for a vote. When meeting to vote on such recommendations, faculty in Molecular Biophysics and Biochemistry who are assigned to vote in the Joint Boards of Permanent Officers of Yale College and the Graduate School may not also vote in the School of Medicine's Board of Permanent Officers. Approved appointments and promotions in all faculty tracks and ranks are put forward by the Dean to the President and Provost for review and, when approved, for recommendation to the Yale Corporation for final approval.

## F.   Faculty Tracks

Ladder faculty appointments at the Schools of Medicine and Public Health are made in the Traditional Track, Investigator Track, Clinician-Scholar Track, Clinician-Educator Track, and the Clinical Track. Appointments and promotions are made in the context of department needs and the missions of the School. Faculty on term appointments have no entitlement to reappointment.

Appointment or promotion to assistant professor is conferred with an initial track designation that is determined by the needs of the department and as detailed in the offer letter. Qualifications for initial appointment are track specific and all tracks except for the Clinical Track require promise as a scholar. Promise as an educator is also required of faculty on the Traditional, Clinician-Scholar, and Clinician-Educator Tracks. Faculty who provide clinical care must have evidence of excellence as a practitioner in their field.

**Transfer of Track**. Faculty in any track may request a transfer of an appointment to another track, subject to the following restrictions:

Faculty at the assistant professor rank may request a transfer of track at any time during a term of appointment. In this way, entry-level faculty have flexibility to test their strengths and to define their interests. Transfer of track requires approval by the department or the Dean's office, and is made in the context of department needs and the faculty member's qualifications.

No transfer of track at the rank of associate professor will be permitted within two years of the expiration of an appointment. However, transfers from the rank of associate professor in any track to the Clinical Track are not subject to this time limitation provided that the faculty member has achieved excellence as a practitioner in their field and meets the requirements of the associate professor rank in the Clinical Track.

Transfer to the Traditional Track is permitted only for faculty who have served at the ranks of assistant professor and associate professor for a total of fewer than eight years. Such requests

must be reviewed and approved by the appropriate appointments and promotions committee.

Track changes between the Clinician-Educator Track and the Clinician-Scholar Track at the rank of professor are permitted rarely and only with the approval of the Dean. A change in career direction after the professor appointment or retrospective concerns that should have been raised at the time of the initial appointment are not sufficient reasons to consider a track change.

**1. Traditional Track**

Individuals who achieve excellence in research and teaching are eligible for appointment in this track.

**Appointments on Term**

**Assistant Professor**. Appointment at this rank may be considered for individuals who hold an M.D., Ph.D., or equivalent degree and who have completed appropriate postdoctoral training. Published scholarship of high quality is desirable along with promise as a teacher and scholar. Individuals who will contribute to graduate education and who hold a primary or secondary appointment in a basic science or bridge department may be eligible for assignment to the Graduate School of Arts and Sciences.

The initial appointment is usually for, but cannot exceed, three years. There is no entitlement to reappointment. Reappointment requires evidence of excellence as a scholar, teacher and, if applicable, as a practitioner in their field. Reappointments may bring a faculty member's total years in rank as assistant professor to no more than six years. Non-reappointment requires one-year's written notice, except in the case of current one-year appointments or reappointments, which require 30 days' written notice.

**Associate Professor**. Candidates for appointment or promotion to the rank of associate professor on term should have achieved recognition as independent investigators and have demonstrated excellence as teachers and, if applicable, as practitioners in their field. Their achievements and promise as teachers and scholars should be strong enough to suggest that they will be qualified for appointment to tenure at Yale or another major medical institution within four to five years. Individuals who will contribute to graduate education and who hold a primary or secondary appointment in a basic science department are eligible for assignment to the Graduate School.

The maximum initial term of this appointment is five years. If, at the end of the term, the individual has been a member of the faculty at the combined ranks of assistant and associate professor for less than ten years (inclusive of up to three years on ladder faculty at another institution, plus extensions described in Section III.F), the appointment may be extended for up to two years, subject to the approval of the Dean and the Provost and in accordance with limits on term appointments described below.

**Limits on Term Appointments**. No one shall be appointed in the Traditional Track at the combined ranks of assistant professor and associate professor on term for longer than a total of ten years, plus extensions described in Section III.F. Years of appointment to the ladder ranks at Yale and up to three years served in the ladder ranks at other institutions shall count towards this maximum.

## Appointments with Tenure

A tenure appointment, whether at the rank of professor or associate professor, is a permanent, forward-looking commitment. This commitment is made with consideration of the achievements of the individual and the programmatic needs of the department and the School. Appraisals of past contributions must be supplemented by strong evidence of future contributions to the profession and to the teaching and, if applicable, the clinical programs. In choosing among available candidates, the faculty may decide that outstanding promise of a person in the earlier stages of a career justifies appointment even though their published attainments to date may be fewer than those of more established candidates.

While several manifestations of intellectual distinction are prerequisite to an appointment with tenure, it is recognized that the balance among them may vary from candidate to candidate and from field to field; there may be variation in the quantity of the written or creative work, though the quality must always be high. Unusually effective teaching or an unusually significant contribution to the community's well-being may serve to supplement but not to substitute for evidence of scholarly achievement.

Individuals who will contribute to graduate education and who hold a primary or secondary appointment in a basic science department are eligible for assignment to the Graduate School.

**Associate Professor.** Candidates for appointment or promotion to the rank of associate professor with tenure must have produced a significant body of scholarship, must be able teachers and, if clinicians, must be accomplished in their clinical fields. They must be rising toward national and international leadership in their areas of specialty, and there must be clear evidence that academic growth will continue, with the expectation that their value to the institution and their national and international standing will make them suitable candidates for promotion to professor within a reasonable period of time.

**Professor.** Candidates for appointment or promotion to the rank of professor with tenure are expected to stand in competition with the foremost leaders in their fields throughout the world, as demonstrated by major scholarly achievements and by teaching. If they are clinicians they must be outstanding practitioners of their field of clinical medicine. There should be ample evidence that they will continue to make significant contributions as scholars, to serve as able and

influential teachers, and to contribute to the well-being of the academic community. The strength of commitment conferred by appointment to the rank of professor mandates that candidates in this track have attained the same level of achievement in their domains as candidates for professor in the other ladder tracks.

## 2.  Investigator Track

This track is intended for investigators who demonstrate conceptual and creative leadership in research that may be carried out either as an independent investigator or as a key participant in a research team or core facility. If working in a collaborative research effort, an investigator's creative contributions must be distinguished and identifiable. Faculty members in this track may engage in teaching, but their major responsibility will be the development of productive research programs. Individuals who will contribute to graduate education and who hold a primary or secondary appointment in a basic science or bridge department are eligible for assignment to the Graduate School of Arts and Sciences.

**Assistant Professor**. Appointment at this rank may be considered for individuals who hold an M.D., Ph.D., or equivalent degree and who have completed appropriate postdoctoral training. Published scholarship of high quality is desirable along with promise as a scholar as an independent investigator or as a member of a research team or core facility. If working in a collaborative research effort, an investigator's creative contributions must be distinguished and identifiable. Individuals who will contribute to graduate education and who hold a primary or secondary appointment in a basic science or bridge department may be eligible for assignment to the Graduate School of Arts and Sciences.

The initial appointment is usually for, but cannot exceed, three years.  There is no entitlement to reappointment.   Reappointment requires evidence of excellence as a scholar, either independently or as part of a team, along with sustained funding for salary and research activities. Reappointments may bring a faculty member's total years in rank as assistant professor to no more than six years.   Non-reappointment requires one-year's written notice, except in the case of current one-year appointments or reappointments, which require 30 days' written notice.

**Associate Professor.** Candidates for appointment or promotion to the rank of associate professor in the Investigator Track must have demonstrated a strong record of conceptual and creative research leadership in independent research or in collaborative efforts as part of a team. If working in a collaborative research effort, an investigator's creative contributions must be distinguished and identifiable. There must be clear evidence that academic growth will continue with the expectation that the investigator will be a suitable candidate for promotion to professor within

ten years. There must be a record of sustained funding sufficient to cover the proportion of salary and research activities required by the investigator's department.

The initial term of appointment may be up to five years. Reappointments may be made for terms of up to five years, provided that the total number of years in the rank of associate professor does not exceed ten. Non-reappointment requires one year's written notice except in the case of one-year appointments or reappointments, which require 30 days' written notice.

**Professor**. Candidates for appointment or promotion to the rank of professor in the Investigator Track are expected to stand in competition with the foremost leaders in their fields throughout the world. A strong record of conceptual and creative research leadership that has significantly advanced the frontiers of knowledge must be demonstrated in independent research or in collaborative efforts as part of a team. If working in a collaborative research effort, an investigator's creative contributions must be distinguished and identifiable. There must be a record of sustained funding sufficient to cover the proportion of salary and research activities required by the investigator's department.

The strength of commitment conferred by appointment to the rank of professor mandates that candidates in this track have attained the same level of achievement in their domains as candidates for professor in the other ladder tracks. Appointments at the rank of professor in the Investigator Track are made on a continuing basis without term but do not confer tenure. Appointments continue without extra-departmental review as long as the faculty member generates funding sufficient to cover the proportion of salary and research activities required by the investigator's department. Funding is reviewed annually by the department. If, for any three years in a five-year period, the individual's funding is not sufficient, as determined by the department and the Office of the Dean, the appointment reverts to a term appointment that expires at the end of two additional years. Non-reappointment requires one year's written notice.

### 3.   Clinician-Scholar Track

Individuals who achieve excellence as clinicians, public health practitioners, teachers, and scholars are eligible for appointment to the Clinician-Scholar Track. Individuals who will contribute to graduate education and who hold a secondary appointment in a basic science department or bridge department may be eligible for assignment to the Graduate School of Arts and Sciences.

**Assistant Professor.** Appointment at this rank may be considered for individuals who hold an M.D., Ph.D., or equivalent degree and who have completed appropriate postdoctoral training. Evidence of excellence in clinical practice as well as published scholarship of high quality is desirable along with promise as a teacher and scholar.

The initial appointment is usually for, but cannot exceed, three years.  There is no entitlement to reappointment.  Reappointment requires evidence of excellence as a scholar, teacher, and

clinician. Reappointments may bring a faculty member's total years in rank as assistant professor to no more than six years. Non-reappointment requires one year's written notice, except in the case of one-year appointments or reappointments, which require 30 days' written notice.

**Associate Professor.** Candidates for appointment or promotion to the rank of associate professor in the Clinician-Scholar Track must excel in patient care and teaching and must have an emerging national reputation for outstanding scholarship. Appointments are made for terms of up to five years. They may be renewed if clinical productivity, scholarship, and teaching expertise continue and if programmatic needs of the department and school justify renewal.

There is no limit to the number of terms a faculty member may serve at this rank, but there is no entitlement to reappointment. Non-reappointment requires one year's written notice.

**Professor**. Candidates for appointment or promotion to the rank of professor in the Clinician-Scholar Track must be national or international leaders in their fields. In addition to excellence in patient care or public health practice, and teaching, they must have produced outstanding, nationally or internationally recognized scholarship which has substantially advanced the field. The strength of commitment conferred by appointment to the rank of professor mandates that candidates have attained the same level of achievement in their domains as candidates for professor in the other ladder tracks.

Such appointments will be made on a continuing basis without term. Continuing appointments may be terminated for reasons of financial stringency and with written notice of not less than two years. Under such circumstances, termination shall be applied to a class of individuals holding continuing appointments (e.g., all those in one or more departments or all those with fewer than a certain number of years of service) and not to any single individual.

**4.   Clinician-Educator Track**

Individuals who achieve excellence as clinicians or public health practitioners and teachers are eligible for appointment in the Clinician-Educator Track. Faculty in this track must play an integral role in the department's clinical and teaching programs. They must also participate in the research endeavors of the School and develop a body of scholarship for advancement.

Support for salary and professional activities is expected to come predominantly from the faculty member's clinical or public health practice, supplemented as appropriate from department funds.

**Assistant Professor**. Appointment at this rank may be considered for individuals who hold an M.D., Ph.D., or equivalent degree and who have completed appropriate postdoctoral training. They must show evidence of excellence in clinical practice and must contribute significantly to

educational programs. They must also demonstrate a commitment to scholarship and contribute to the research mission of the School.

The initial appointment is usually for, but cannot exceed, three years. Total time in this rank generally does not exceed nine years. There is no entitlement to reappointment. Reappointment requires evidence of excellence as a clinical practitioner, teacher and promise as a scholar. Non-reappointment requires one year's written notice, except in the case of one-year appointments or reappointments, which require 30 days' written notice.

**Associate Professor**. Candidates for appointment or promotion to the rank of associate professor in the Clinician-Educator Track must have an outstanding record of patient care or public health practice. Equally important, they must be exemplary teachers and active contributors to the educational mission of the School. They must have an emerging regional reputation in their field and are expected to influence the teaching or practice of medicine in a significant way including through scholarship. Appointments are made for terms of up to five years. They may be renewed if clinical productivity, scholarship, and teaching expertise continue and if programmatic needs of the department and School justify renewal. There is no limit to the number of terms a faculty member may serve at this rank, but there is no entitlement to reappointment. Non-reappointment requires one year's written notice.

**Professor**. Candidates for appointment or promotion to the rank of professor in the Clinician-Educator Track must be national or international leaders in their fields, as evidenced by scholarship that has had a national impact on clinical medicine, public health, or education, as well as by sustained excellence in patient care and teaching. The strength of commitment conferred by appointment to the rank of professor mandates that candidates in this track have attained the same level of achievement in their domains as candidates for professor in the other ladder tracks. Appointments are made on a continuing basis without term but do not confer tenure. Faculty at this rank must continue to contribute to the clinical and teaching missions of the School. Appointments are contingent upon continued faculty productivity and the capacity to generate financial support, which are reviewed annually by the department. If either is found unsatisfactory for three years in any five-year period, as determined by the department and the Office of the Dean, the appointment reverts to a term appointment that expires at the end of two additional years. Non-reappointment requires one year's written notice.

**5.    Clinical Track**

The Clinical Track is designed to assist in advancing the School's clinical mission and to enhance the capabilities of Yale Medicine. The primary role of faculty in this track is to provide the highest quality of patient care consistent with the policies, standards, and guidelines of the

School and Yale Medicine. Reflecting the track's emphasis on clinical excellence, appointments to this track are given the titles of Assistant Professor of Clinical [field], Associate Professor of Clinical [field], and Professor of Clinical [field], where "field" represents the specialty of the practice (e.g., Medicine, Surgery, Public Health).

Individuals who demonstrate excellence as practitioners in their field are eligible for appointment in the Clinical Track. Faculty in this track must play an integral role in the department's clinical programs. They may participate in teaching and in research/scholarly activities, but their primary focus must be as a practitioner. Appointments can be on a full- or part-time basis.

Appointments in this track are coterminous with maintenance of required clinical practice credentials. Appointments terminate upon a final determination of revocation or denial of clinical practice privileges. There is no entitlement to reappointment. Appointments may be renewed based on a number of factors, including the continued need for the position, the availability of resources for the position, and the clinical excellence and productivity of the individual.

In each of the clinical faculty ranks, appointments and compensation for faculty are conditioned upon the availability of salary support from specified sources. Reductions in salary support may result in commensurate reductions in compensation or, in the case of the absence of salary support, in termination of the appointment and compensation. In any case, termination prior to the end of an appointment for lack of salary support requires 90 days' written notice.

**Assistant Professor of Clinical [field]**. Candidates for appointment or promotion to the rank of assistant professor in the Clinical Track must have a demonstrated level of clinical skill and excellence commensurate with the requirements of the clinical specialty for which they are being appointed. They must also satisfy other clinical practice requirements of the department and Yale Medicine as set forth in the official offer letter. Faculty at this rank may also participate in teaching and research/scholarly activities; this participation will most frequently occur in the context of their practice.

Appointments are made for terms of up to three years. There is no limit to the number of years a faculty member may serve at this rank, but there is no entitlement to reappointment. Appointments are contingent upon the financial support for the position, which is reviewed annually by the department. Reappointments are based upon clinical excellence and productivity, financial support of the position, and programmatic needs of the department and School.

If any of these are found unsatisfactory, as determined by the department and the Office of the Dean, non-reappointment requires six months' written notice for terms of appointment greater than one year. One-year appointments require 60 days' written notice.

**Associate Professor of Clinical [field]**. Candidates for appointment or promotion to the rank of associate professor in the Clinical Track must have an outstanding record of patient care that is recognized by others within their field and in related fields. Appointments are made for terms of up to five years. There is no limit to the number of terms a faculty member may serve at this rank, but there is no entitlement to reappointment. Appointments are contingent upon the financial support for the position, which is reviewed annually by the department. Reappointments are based upon clinical excellence and productivity, financial support of the position, and programmatic needs of the department and School. If any are found unsatisfactory, as determined by the department and the Office of the Dean, non-reappointment requires one year's written notice. One-year appointments require 60 days' written notice.

**Professor of Clinical [field]**. Candidates for appointment or promotion to the rank of professor in the Clinical Track should be distinguished practitioners who demonstrate eminence in the field and sustained activity in their area of practice. They will be expected to be master clinicians who are recognized for their abilities and contributions to their practice, as for example through professional leadership. Faculty appointed to this rank must continue to contribute to the clinical mission of the School. Terms may be up to five years, with the possibility of reappointment in accordance with applicable policies and procedures. Appointments are contingent upon the financial support for the position, which is reviewed annually by the department. Reappointments are based upon clinical excellence and productivity, financial support of the position, and programmatic needs of the department and School. If any are found unsatisfactory, as determined by the department and the Office of the Dean, non-reappointment requires one year's written notice. One-year appointments require 60 days' written notice.

**G. Professor in the Practice and Adjunct Faculty Ranks**

**Professor in the Practice**. The School of Public Health may appoint professors in the practice, who will be distinguished practitioners who demonstrate eminence in the field, sustained accomplishment, and sustained activity in their area of practice. They will hold national or international reputations for their innovative and transformational contributions to their practice, through creative work, professional leadership, practice-centered publications, or other demonstrations of significant accomplishment. Exceptional contributions as a practitioner are the basis of evaluation. This appointment is not intended for those whose field of practice is primarily that of teaching or pedagogy. Terms will be up to five years, with the possibility of

reappointment in accordance with applicable policies and procedures. Initial appointment or promotion to this rank will require review by the Provost's Standing Advisory and Appointments Committee (SAAC), approval of the Provost, and approval of the Corporation.

**Professor Adjunct, Associate Professor Adjunct, and Assistant Professor Adjunct**. These ranks are intended for the appointment of persons whose interests, as well as the interests of the University, are served by their continuing in a professional capacity outside the University while teaching or engaging in research less than full time. Adjunct faculty members do not serve as the principal advisers of dissertations nor do they vote on faculty appointments. They typically do not receive Yale compensation or benefits. With the approval of the chair and the Dean or the Dean's designee, they may become principal investigators of grants and/or may receive compensation.

Appointments are made for terms of up to three years at the rank of assistant professor adjunct and five years at the rank of associate professor adjunct or professor adjunct. Following departmental review, they may be renewed upon the recommendation of the department. Such renewal is made without the expectation or the promise of tenure. The adjunct faculty rank to which a candidate may be appointed or promoted reflects the individual's accomplishments and distinction. There is no limit to the number of terms a faculty member may serve at this rank, but there is no entitlement to reappointment. Reappointment is dependent on the continued budgetary authorization of the position, the teaching needs of the department, and the performance of the individual.

**H. Other Clinical Ranks**

**1. Instructor of Clinical [field]**

Individuals with an M.D. or other terminal clinical degree who have completed clinical training and who are employed by Yale to provide clinical services are eligible for this title. Instructors of Clinical [field] must have a demonstrated level of clinical skill commensurate with the requirements of the clinical practice specialty for which they are being appointed. They must also satisfy other clinical practice requirements of the department as set forth in the offer letter. These faculty are eligible for benefits, as set forth in Section XVII.D.

Appointments are made for up to five years and are renewable. They may be renewed based on a number of factors, including the continued need for the position, the availability of resources for the position, and the clinical productivity and performance of the individual. Appointments carry no expectation of long-term employment at Yale and can be terminated immediately for cause. Appointments up to one year may be terminated with 30 days' written notice, for reasons other than cause. Appointments longer than one year may be terminated with 60 days' written notice for reasons other than cause or upon the determination by the Dean of the School of Medicine based on grounds as may be set forth in the offer letter.

**2.   Clinical Instructor or Assistant Clinical Professor of Social Work in Psychiatry or in the Child Study Center**

These ranks will be used for social workers who do not qualify for or do not desire a regular academic rank.

## I.   Voluntary Ranks

Voluntary faculty are typically clinicians or others who are employed outside of the School but make significant contributions to department programs at the medical center or at affiliate institutions. Each department has established guidelines for the nature of required participation, such as the relative importance of teaching students, supervising residents, engaging in scholarly activity, participating in department administration, and other activities. Voluntary faculty typically do not receive compensation or benefits from the School.

With the approval of the chair and the Dean's office, voluntary faculty may become principal investigators of grants. As a principal investigator, the voluntary faculty member must abide by all relevant university and school policies (see especially Section XX.C). They must be able to commit and devote the requisite effort with or without compensation from the grant. Voluntary faculty are expected to be board eligible, licensed, or certified in their specialties.

**Clinical Instructor.** Individuals who have completed clinical training will be eligible for this rank. Appointments are made for renewable one-year terms.

**Assistant Clinical Professor.** This rank is for those persons who have made academic contributions documented in at least one of the following ways: (1) publication or other evidence of substantial contribution to their disciplines; (2) exemplary teaching; (3) well-recognized clinical expertise. Appointments are made for renewable terms of up to three years.

**Associate Clinical Professor.** This rank is for those persons who have achieved recognition for their outstanding scholarship and sustained contribution to academic life documented in at least one of the following ways: (1) publication or substantial contribution to their respective disciplines; (2) exemplary teaching activities and well-recognized clinical expertise. Appointments are made for renewable five-year terms.

**Clinical Professor.** This rank is reserved for those few persons who have achieved national or international recognition for their exceptional scholarship and sustained contribution to academic life documented in both of the following ways: (1) publication or substantial contribution to their respective disciplines; (2) exemplary teaching activities and well-recognized clinical expertise. Appointments are made for renewable five-year terms.

## J.   Research Ranks

For research ranks in the School of Medicine, refer to Section XV.

## K.  Other Instructional Ranks

Appointments to these ranks are recommended by the chair and approved by the Dean. They do not require the approval of committees within the department or the School of Medicine.

### 1.  Lecturer

Appointments at this rank are normally on a one-year basis. To hold the rank of lecturer, a person must make contributions to the academic program through approved educational activities.

### 2.  Instructor

This rank is available:

- for individuals who have recently completed professional training and who wish to embark on a full-time academic career. The appointment is made for a maximum of three one-year renewable terms;

- for trainees in clinical fellowship programs who are qualified by prior training to provide independent clinical services and serve as teachers in fields of medicine. For such individuals the term of appointment is a one-year secondary appointment that may be renewed for the length of the fellowship. The years served as a secondary appointment instructor are not included in the total number of years available as a primary appointment instructor; and

- with prior approval by the Dean and the Provost, for certain categories of non-physician providers who are qualified to provide independent clinical services and serve as teachers in fields of medicine. For such individuals, the appointment is made for one-year renewable terms with no limit on the number of terms.

## L.  Training Ranks

The following ranks are not faculty appointments. Like postdoctoral fellows and associates, postgraduate fellows, and postgraduate associates (see Section XV), they may or may not be employees of the University.

### 1.  Hospital Resident

Postgraduate physicians who, as residents, are employees of the Yale-New Haven Hospital or other affiliated hospitals, may, upon recommendation by the chair and approval by the Dean, receive the title of hospital resident in the School of Medicine, coterminous with their hospital residency appointment. Hospital residents are entitled to access to certain School services such as the School of Medicine library. However, compensation and benefits are provided by the hospital of primary employment; ospital residents are not eligible to enroll in any of the University's health care plans.

### 2.  Clinical Fellow

Individuals with clinical responsibilities who have completed residency training or other appropriate training and are enrolled in a fellowship training program in a School of Medicine department are granted this rank, upon recommendation of the Chair and approval by the Dean. The maximum time an individual may spend in a clinical fellowship is four years. Clinical fellows engage in University-based activities, both clinical and scholarly. They may minister to patients as part of their training to the extent permitted by legal and quality standards. Clinical fellows are not faculty members. Their University status is comparable to that of postdoctoral associate if they are paid by the University or postdoctoral fellow if they are paid by a training grant or external fellowship (see Section XV.C.1).

Clinical fellows may receive limited additional compensation for teaching or other University service, but these activities may not interfere with their primary role as fellows in training.

### M.  Coterminous Appointments

A faculty appointment in any rank or track may be coterminous with an appointment at an affiliate institution, e.g., Yale-New Haven Hospital, the Veterans Affairs Connecticut Healthcare System, Connecticut Mental Health Center, or the John B. Pierce Laboratory. Coterminous appointments are designated such at the time of appointment, reappointment, or promotion and upon approval of the Dean.

A coterminous appointment normally ends automatically upon termination of the other institutional appointment, without any notice, grievance rights, or similar provisions otherwise afforded by the *Faculty Handbook*. However, at the time of appointment, the Dean, at the request of the Chair of the candidate's department, may offer a period of notice beyond the termination date of the other institution's appointment not to exceed two years for those at the ranks of professor or associate professor without term, or one year for a faculty member at any other rank.

An appointment coterminous with a Pierce Laboratory appointment will carry all of the rights and responsibilities of a department appointment, with the exception of voting privileges. Voting privileges may be granted to them by the professors and tenured associate professors in the non-voluntary ranks of the department of primary and, where applicable, secondary appointment. At least one faculty member with a primary appointment in the department of the proposed appointment and with experience pertinent to the proposed appointment will be a member, with vote, of each Pierce Laboratory search committee.

## N.  Leave Policy

Full-time professors and associate professors in the School of Medicine, are eligible to apply for Sabbatical Leaves of Absence and Triennial Leaves of Absence under those policies and conditions described in Section XVII. Senior Faculty Fellowships are not available at the School of Medicine. Eligibility for a Triennial Leave of Absence in the School of Medicine begins after two and one-half years of full-time activity at the rank of associate professor or professor. Thereafter, the faculty member will become eligible for a Triennial Leave after each additional two and one-half years of full-time faculty activity at Yale. Faculty members shall first become eligible for a Sabbatical Leave of Absence after having been employed at Yale at the rank of associate professor or professor for two and one-half years. Thereafter, they shall be eligible after having taught in those ranks at Yale for six full years from the end of their previous leave of absence.

In the School of Medicine, a Triennial Leave of Absence is up to four months in length during which time a faculty member receives full pay. A Sabbatical Leave of Absence may be up to six months at full salary or up to one year at half salary.  Clinical Track faculty leaves are granted for professional or clinical skill development that will advance Yale Medicine and/or the Yale clinical mission.  The leaves are subject to the same restrictions for sabbatical and triennial leaves for the other faculty tracks.  Additionally, leaves in the Clinical Track may be of variable length because of the particular requirements of maintaining a clinical practice, but cannot exceed the traditional sabbatical maximum of six months at full salary or twelve months at half salary in any seven-year period.

A leave of absence without salary may be granted to any member of the faculty, on the recommendation of the Chair and Dean, with the restrictions and provisions described in Section XVII.C.

## O.  Joint Appointments

Depending on the needs of the School of Medicine and its departments, joint appointments may be made in accordance with the procedures outlined in Section III.H. For fully joint appointments, the approval of the Office of the Dean is required before the vote by the relevant School of Medicine department(s).

# XIII.  School of Music and Institute of Sacred Music

## A.  Description

The School of Music is a graduate professional school whose goal is to educate musicians for professional careers through broad and intensive studies in performance and composition. Its curriculum, faculty, and other resources serve to develop both excellence in a special field and intellectual growth beyond the area of specialization. The School of Music offers professional instruction in composition, conducting, voice, keyboard, wind and string instruments, and related work in musicianship, music history, and music theory.

Through the affiliated Institute of Sacred Music, interdisciplinary study in liturgy, worship, music, and related arts is also available. The faculty of the Institute is appointed jointly with either the School of Music or the Divinity School. Additional collaborations exist with the Department of Music and with Yale College.

## B.  Governing Committees

The School of Music is governed by the following committees:

### 1.  The Executive Committee

The Executive Committee is appointed by the President and is chaired, alternately for one-year terms, by the Dean of the School of Music and the Chair of the Department of Music of the Faculty of Arts and Sciences. Members are appointed to the committee by the President upon recommendation from the Dean and Chair. Membership includes the Chair of the Department of Music, the Dean of the School of Music, a faculty member of the Department of Music, a faculty member of the School of Music, the Director of the Institute of Sacred Music, and one member-at-large. This committee considers major policy questions concerning all areas of music at Yale and coordinates the activities of the Institute, the Department, and the School. The committee meets monthly or more often if issues warrant.

### 2.  The Faculty Steering Committee

The Faculty Steering Committee consists of the coordinators of the performance programs of the School of Music. This committee advises the Dean on matters of policy and on promotion in the junior ranks and also serves as the Curriculum Committee.

### 3.  The Governing Board

The Governing Board is charged with making recommendations for appointment to senior ranks of members of the faculty promoted from within or recruited from outside. The membership consists of the Dean, tenured faculty, and professors in the practice.

## 4. Other Committees

Other governing committees include the Performance Committee, the Doctor of Musical Arts Degree Committee, the Academic Affairs Committee, the Master of Musical Arts Committee, the Admissions Committee, and the Dean's Student Advisory Committee. These committees are appointed by the Dean and meet as frequently as their individual charges dictate.

## C. Faculty Ranks and Appointments

Members of the faculty in the School of Music generally pursue active professional careers in addition to their teaching responsibilities at Yale. Appointments are made on the basis of distinction as an artist and success as a teacher.

## 1. Faculty Ranks

Faculty positions in the School of Music are at the non-ladder ranks of lecturer, instructor, assistant professor adjunct, associate professor adjunct, professor adjunct, professor in the practice, and appropriate designations for visiting appointments.

Professors in the practice will be distinguished practitioners who demonstrate eminence in the field, sustained accomplishment, and sustained activity in their area of practice. They will hold national or international reputations for their innovative and transformational contributions to their practice, through creative work, professional leadership, practice-centered publications, or other demonstrations of significant accomplishment. Exceptional contributions as a practitioner are the basis of evaluation. This appointment is not intended for those whose field of practice is primarily that of teaching or pedagogy. Terms will be up to five years, with the possibility of reappointment in accordance with applicable policies and procedures. Initial appointment or promotion to this rank will require review by the Provost's Standing Advisory and Appointments Committee (SAAC), approval of the Provost, and approval of the Corporation.

Conductor in residence is an adjunct rank and designates faculty devoting substantial time to the direction of Yale's performing ensembles, principally the Philharmonia Orchestra of Yale.

## 2. Appointment and Promotion Procedures

Initial appointments for all non-tenured faculty members are normally from one to three years and in no case exceed five years. Appointments recommended by the Governing Board are forwarded to the Provost. Recommendations for appointment at the level of associate professor adjunct and above will be made by the Provost with the advice of the SAAC. The Provost will forward approved recommendations to the Corporation. Recommendations for appointment are

made after a thorough search and are reviewed at levels below associate professor adjunct by the Faculty Steering Committee, which also reviews recommendations for promotion in the ranks of lecturer, instructor, and assistant professor adjunct. Recommendations for promotion to the ranks of associate professor adjunct and above are reviewed by the Governing Board.

### D.   Joint Appointments with the Department of Music

Depending on the instructional needs and resources of the School of Music and the Department of Music in the Faculty of Arts and Sciences, occasional joint appointments may be made, generally in the areas of conducting, composition, history, and theory. Recommendations for such appointments are made jointly by the Dean of the School of Music and the Chair of the Department of Music in accordance with the procedure outlined in Section III.H.

### E.   Off-campus Professional Engagements

The full-time faculty in the School of Music are encouraged to continue their professional pursuits as performing artists, composers, scholars, and teachers. In addition to their teaching, members of the faculty are also obligated to participate in auditions and interviews for admission to the School, degree recitals, juries, student advisory meetings, and MMA and DMA auditions and examinations. To ensure that all responsibilities to the students and programs of the School are met and that a reasonable balance of teaching and professional activity is maintained, faculty must receive approval for travel leave each semester. The normal allowance is three weeks per semester, and all lessons and classes must be satisfactorily assigned or rescheduled.

This requirement is not intended to restrict unduly the freedom of faculty to engage in professional activities, and permission will normally be granted automatically. Official notification of absence is necessary to enable the School to respond to inquiries that arise while faculty members are away, and it is important in the orderly administration of the School. Also, off-campus professional activities may be combined with University business, and prior approval by the Dean will have an important bearing on questions of liability in the event of death or injury while traveling.

### F.   Leave Policy

For information on leaves, consult the Dean of the School of Music.

### G.   Termination Policy

Individuals holding term appointments of three or more years receive written notification at least one year before the end of the current term of appointment. Under normal circumstances, individuals holding terms of appointment of fewer than three years are given three months' notice.

# XIV.  School of Nursing

## A.  Description

The School of Nursing offers master's and doctoral degree preparation for a variety of leadership roles in nursing specialties. The programs emphasize the relationships among nursing theory, practice, policy, and research. Graduates of the master's program are prepared to function as nurse practitioners and nurse midwives. The Doctor of Nursing Practice (DNP) program builds on traditional master's programs by providing education in evidence-based practice, quality improvement, and systems leadership. The Ph.D. program in nursing prepares nurse scientists to develop the scientific base of nursing.

The Yale School of Nursing subscribes to the tripartite mission of teaching, clinical practice, and scholarship. All faculty members contribute to excellence in teaching. The Clinical Track is designed to recognize clinical scholars who choose to place their primary emphasis on clinical practice and scholarship. Traditional Track faculty place their primary emphasis on research and scholarship. Traditional Track faculty also seek or have attained tenure.

## B.  Governance

### 1.  The Board of Permanent Officers

Faculty at the rank of professor who are appointed without limit of term, together with the President and Provost, *ex officiis*, and the Dean of the School of Nursing, constitute the School's Board of Permanent Officers (BPO). This is the governing board of the School, and it is entrusted with matters of policy and governance, including review and recommendations of appointments and promotions to tenure. The permanent officers may invite other faculty to attend meetings and to vote on matters before the Board, except recommendations for appointments of permanent officers. By long standing policy, the BPO has offered to all faculty who hold the rank of associate professor with tenure the opportunity to participate in Board activities, including voting in all matters before the Board except regarding promotion and appointment to professor with tenure. The Dean serves as chair of the BPO.  In all meetings, action is taken by majority vote of those present and eligible to vote.

### 2.  The Executive Committee

The Executive Committee is entrusted with matters of educational policy and serves in an advisory capacity to the Board for matters of curriculum and programmatic changes in the School of Nursing. The Committee is chaired by the Dean, or the Dean's designee, and it consists of the deputy, associate and assistant deans, *ex officiis;* dean-appointed representatives of the Board of Permanent Officers and Clinical Track professors; four elected members of the faculty who

hold rotating terms on the Committee; and three students of the School who act as non-voting Committee members.

**3.    The Appointments and Promotions Committee**

The Appointments and Promotions Committee is chaired by a tenured faculty member appointed by the Dean and reviews and recommends all initial appointments, reappointments and promotions to clinical, research, and traditional tracks, except appointments and promotions to tenure (the BPO holds responsibility for all tenure decisions). This includes appointments, reappointments, and promotions to the ranks of assistant professor, associate professor, clinical track professor, associate research scientist, research scientist and senior research scientist. The Committee consists of all faculty on permanent appointment, all clinical track professors, two associate professors on term who are elected by the faculty and two assistant professors also elected by the faculty. As a faculty member on permanent appointment, the Dean participates in and is eligible to vote on all appointment, reappointment, and promotion decisions.  Only committee members at or above the rank for which a candidate is under consideration may vote view reference letters, participate in discussions and vote on a given appointment.  Faculty on term appointments may not vote on reappointments to ranks equivalent to or above their own. In all meetings, action is taken by majority vote of those present and eligible to vote.

**C.    Faculty Composition and Responsibilities**

The School of Nursing seeks for its faculty individuals who can take on responsibility in teaching, practice, research, and scholarship. These expectations apply to all full-time faculty regardless of the division of their primary responsibilities among teaching, scholarship, clinical and administrative responsibilities, and notwithstanding whether or not they are nurses. The close relationship among nursing practice, teaching, and scholarship may mean that a single activity satisfies requirements for more than one aspect of faculty commitment.  Continued productivity in teaching and scholarly work is essential for continued reappointment and promotion.

Faculty members are clinical experts as well as scholars in their fields of study. Faculty members are expected to be knowledgeable about the contemporary practice, research, and policy issues within their areas of expertise.  Many faculty members hold joint appointments within a health care facility or organization and engage in the regular practice of their identified specialty. In addition to serving patient needs, many faculty members engage in the practice of nursing for the purpose of developing knowledge, demonstrating excellence in

practice, establishing innovations to improve patient care and population health, and developing model environments for student education.

## D.  Faculty Ranks

Ladder faculty appointments in the School of Nursing are made in the Traditional Track or the Clinical Track. The track of all ladder positions are designated prior to the beginning of an individual appointment. Faculty in any track at the rank of associate professor may request a one-time only transfer of an appointment to another track, subject to the following restrictions: transfer requests must be submitted by the end of the second year of the first term of the initial appointment at the rank of associate professor, no transfer of track will be permitted within two years of the expiration of the appointment, and such requests must be reviewed and approved by the Appointments and Promotions Committee.

### Faculty Not Assigned to Track Appointments

### 1.  Assistant Professor

Qualifications for appointment or promotion to this rank are a combination of actual and potential productivity as a teacher, scholar and clinician. Candidates for this rank must be doctorally prepared - postdoctoral training is desired.  Evidence of scholarship is demonstrated through publications and presentations.

### Faculty Assigned to Traditional-Track Appointments

### 2.  Associate Professor on Term

This is normally the rank of promotion from assistant professor or the rank of initial appointment for a person who has achieved excellence in teaching, clinical, and research activities, but who has not yet fully demonstrated the distinction necessary for appointment to the rank of professor. Associate professors on term must have recognition as independent investigators and demonstrated excellence as teachers.  Their record of achievement must hold promise strong enough to suggest qualification for tenure within five years. Distinction may be demonstrated in publications and completed research. Candidates for this rank must hold a research doctorate.

### Appointments to Tenure

Candidates for appointment or promotion to a tenure position must hold a research doctorate

and would normally hold the rank of professor or associate professor and achieved high distinction in scholarship, independence as a peer-reviewed, externally-funded scientist, excellence in teaching, and recognition as a leader. Tenure is a forward-looking decision. Therefore candidates for tenure are evaluated not only for their accomplishments, but also for their commitment to the continuing development of new knowledge in nursing science and to the education of the next generation of nurse-scholars, educators, and clinicians. Contributions made to the intellectual life of the School of Nursing and to the health of local, national, or international communities are important aspects of the tenure decision.

Pedagogical and clinical expertise and accomplishments are also considered, within the context of the candidate's training and scholarly work. Exceptionally effective teaching, an outstanding contribution to the community's health, or an outstanding contribution to the profession, while given weight in the tenure decision, do not substitute for contributions to knowledge through publications in the professional literature and productivity as a scientist.

### 3.    Associate Professor with Tenure

Candidates for this rank will be expected to have published or to have had accepted for publication a substantial work or body of scholarship that represents independent research undertaken since, and extending well beyond the scope of, the dissertation. Associate professors with tenure must be reviewed for promotion to professor within five years of their appointment to tenure. At any time after seven years have passed from the date of appointment or promotion to associate professor with tenure, the Provost, in consultation with the Dean, may recommend that individual directly to the Corporation for promotion to professor. Candidates for this rank must hold a research doctorate.

### 4.    Professor

Candidates for professor are expected to stand in competition with the foremost scholars and practitioners in their professional fields throughout the academic world as demonstrated by major scholarly achievements and by teaching.  There should be ample evidence that they will continue to make significant contributions as scholars and to serve as able and influential teachers and contributors to the Yale academic community. Candidates for this rank must hold a research doctorate.

### Faculty Assigned to Clinical-Track Appointments

The Clinical Track is designed to recognize those faculty who place their emphasis on clinical scholarship and practice. Faculty whose endeavors are derived from or affect the clinical practice setting and shape health care and outcomes are eligible for consideration for appointment to the Clinical Track.

**5.   Associate Professor**

After an appointment of at least three years as assistant professor, and after at least five years of post-specialization clinical experience (degree and national certification in area of specialty attained, when appropriate), full-time faculty members who have demonstrated exemplary teaching skills, high-level patient care or administration thereof, and clinical scholarship are eligible for consideration for associate professor in the Clinical Track. Candidates for this rank must hold a doctoral degree.

**6.   Professor**

Individuals who have held full-time faculty appointments at the rank of associate professor at Yale, or the rank of associate professor or professor at a comparable institution, are eligible for consideration for appointment as professor in the Clinical Track. Candidates for professor in the Clinical Track are expected to stand in competition with the foremost clinical and advanced practice scholars in similar professional fields. They will have achieved the highest recognition of distinction as demonstrated by publication record, completed clinical scholarship, clinical excellence, and professional and academic awards.  Candidates fot this rank must hold a doctoral degree.

**7.   Research Track Appointments**

Research appointments are available to persons holding the Ph.D. degree or having equivalent training. Faculty in the Research Track who take on teaching assignments will be appointed as lecturer annually by the Dean. The research track ranks are fully described in Section XV.B.

**Other Non-Ladder Appointments**

The following appointments are non-tenure, renewable, and based on the needs of the school. They are not among the ladder ranks, and appointments to these positions are not counted in the calculation of the maximum time that a faculty member may serve in any ladder rank or ranks.

**8.   Lecturer**

Appointment to the rank of lecturer is appropriate only for persons whose responsibilities include regular teaching, who demonstrate clinical excellence, and who hold a masters or doctoral degree. Appointments may be part- or full-time for up to one year and are renewable. Appointments are made in accordance with the criteria and procedures described in Section IV.I, with the exception that the length of lecturer appointments at the School of Nursing may be for less than one semester.

### 9.  Visiting Faculty

The School of Nursing appoints visiting faculty as designated in Section XVI.

### 10.  Professor in the Practice

Professors in the practice will be distinguished practitioners who demonstrate eminence in the field, sustained accomplishment, and sustained activity in their area of practice. They will hold national or international reputations for their innovative and transformational contributions to their practice, through creative work, professional leadership, practice-centered publications, or other demonstrations of significant accomplishment. Exceptional contributions as a practitioner are the basis of evaluation. This appointment is not intended for those whose field of practice is primarily teaching or pedagogy. Terms will be up to five years, with the possibility of reappointment in accordance with applicable policies and procedures. Initial appointment or promotion to this rank will require review by the Provost's Standing Advisory and Appointments Committee (SAAC), approval of the Provost, and approval of the Corporation.

### E.  Terms of Appointment

The cumulative total of all term appointments for faculty in the Traditional Track may not exceed ten years at which point the person must have achieved tenure. The School of Nursing follows University policy regarding part-time appointments (see Section III.I), with the exception that part-time appointments at the School of Nursing may be less than 50% time.

### 1.  Faculty Not Assigned to Track Appointments

**Assistant Professor**. The initial term in rank for an assistant professor is normally not less than three years and may not exceed five years. This rank is renewable for one additional term. No person may serve in the role of assistant professor in the School for more than seven years, except for the extensions provided in Section III.F. The seven-year maximum also includes paid and unpaid leaves which are granted for professional purposes.

### 2.  Traditional Track Appointments

**Associate Professor**. Initial appointment to the rank of associate professor is normally for a period of three years and may be up to a period of five years. There may be only one reappointment, and no person may serve in the rank of associate professor on term in the School for more than seven years, except for the extensions provided in Section III.F.

3. **Clinical Track Appointments**

   **a.  Associate Professor**. Appointments may be made for terms not to exceed five years and may be renewed with no limit on the number of terms. Persons at these ranks are considered full-time faculty.

   **b.  Professor**. The initial appointment and any subsequent reappointments may be made for terms not to exceed five years and may be renewed with no limit on the number of terms.

## F.  Procedures for Appointments and Promotions

Appointments and promotions follow in general the procedures outlined in Section III.K.

Recommendations for appointments and reappointments to all ranks except lecturer and visiting appointments are made by the Dean to the Provost. Recommended appointments are reviewed by the Provost and, if approved, forwarded to the Corporation for final  action.

Recommendations for appointments to the ranks of associate professor on term (traditional track), associate professor with tenure,, professor in the practice, and professor with tenure are transmitted by the Dean to the Provost for review by the Provost's Standing Advisory and Appointments Committee (SAAC). A recommendation regarding the  appointment  is  reviewed by  the  Provost  and,  if  approved,  forwarded  to  the Corporation for final action.

## G.  Coterminous Appointments

A faculty appointment in any rank or track may be coterminous with an appointment at another affiliated institution, e.g., Yale-New Haven Hospital, the Veterans Affairs Connecticut Healthcare System, or the Connecticut Mental Health Center. Coterminous appointments are so designated at the time of appointment, reappointment, or promotion.

A coterminous appointment normally ends automatically upon termination of the other institutional appointment, without any notice, grievance rights, or similar provisions otherwise described in the *Faculty Handbook*.

## H.  Courtesy Faculty

Courtesy faculty are generally individuals in the community or from other Yale departments who actively participate in the School of Nursing's educational or scholarly activities. They are not normally remunerated for their participation. Eligibility for appointment, reappointment, and promotion in these voluntary ranks requires active participation in programs at the School of Nursing or at affiliated institutions. The School of Nursing uses the criteria for appointment

to academic rank as guidelines for determining the rank of courtesy faculty. These criteria may include guidelines for the nature of required participation, such as the relative importance of teaching and precepting students, scholarship, and participation in the School's administrative and other activities. Appointments and determination of the rank and length of the appointment are the responsibility of the Dean.

**1.   Clinical Instructor**

Individuals who have completed clinical training and wish to be members of the courtesy faculty will be eligible for this rank. Appointments are made for up to two years in length and are renewable.

**2.   Assistant Clinical Professor**

This rank is for individuals who have achieved recognition at a high level of scholarship and made contributions to academic life documented in at least one of the following ways: (1) publication or substantial contribution to their respective disciplines; or (2) exemplary teaching activities and well-recognized clinical expertise. Appointments are made for up to three years in length and are renewable.

**3.   Associate Clinical Professor**

This rank is for individuals who have achieved recognition for their outstanding scholarship and sustained contribution to academic life documented in at least one of the following ways: (1) publication or substantial contribution to their respective disciplines; or (2) exemplary teaching activities and well-recognized clinical expertise. Appointments are made for up to five years in length and are renewable.

**4.   Clinical Professor**

This rank is reserved for individuals who have achieved national recognition for their exceptional scholarship and sustained contribution to academic life documented in the following ways: (1) publication or substantial contribution to their respective disciplines; or (2) exemplary teaching activities and well-recognized clinical expertise. Appointments are made for up to five years in length and are renewable.

**I.   Leave Policy**

The leave policy in the School of Nursing is generally consistent with that of the University (see Section XVII), with the exception listed below.

**Triennial Leave.** In addition to associate professors and professors, in the School of Nursing, assistant professors are eligible for the Triennial Leave of Absence. Faculty who hold coterminous appointments are relieved of their academic and administrative responsibilities only.

# XV.  Research Appointments: University-wide

## A.   General Policy

Research appointments are available to persons holding the Ph.D. or M.D. degree or having equivalent training. There are three categories of faculty research ranks and two non-faculty categories, namely postdoctoral appointees and visiting fellows. These are described below. All research appointees are expected to be in residence or at Yale on a regular basis during the period of their appointments. Exceptions require the approval of the Office of the Provost or the appropriate Dean.

Teaching is not required of any research appointee, but part-time teaching is permitted. Persons who are asked to undertake such teaching should also be given a teaching appointment as a lecturer or adjunct professor at the appropriate rank. In such circumstances an appropriate portion of the salary may be paid from a teaching budget; however, teaching efforts must be conducted in alignment with effort committed to and compensated by other University activities, and compensation for teaching must be administered in compliance with University and sponsors' effort reporting policies. In no case may any effort devoted to teaching be paid from an externally sponsored project unless teaching is a specific requirement of he project.

## B.   Description of Research Faculty Ranks

Persons holding the ranks of associate research scientist/scholar, research scientist/scholar, or senior research scientist/scholar are considered to be research faculty. In most cases they are employees of the University, and if employed at least half-time, receive fringe benefits and are eligible for membership in the Yale University Retirement Account Plan. In the School of Medicine, however, some research faculty may instead be employees of the Veterans Affairs Connecticut Healthcare System, the Yale-New Haven Hospital, the Howard Hughes Medical Institute, or the John B. Pierce Laboratory, and fringe benefits may vary according to the source of salary. Research faculty members who are so employed should consult with the Dean of the School of Medicine concerning these matters.

In each of the research faculty ranks, appointments and compensation for faculty are conditioned upon the availability of salary support from specified sources, including external research sponsors. In some circumstances, when external funding is unavailable or has been reduced or interrupted, a department may, at its discretion, provide internal funding support on a temporary basis. Reductions in salary support will result in commensurate reductions in effort and compensation or, in the case of the absence of salary support, in termination of the appointment and compensation. In any case,

termination prior to the end of an appointment for lack of salary support requires 90 days' notice.

The reappointment of persons holding research faculty appointments is not automatic. Schools and departments are expected to make a careful evaluation of each candidate's work and promise, as well as of the programmatic needs of the school or department, before deciding whether or not to recommend reappointment or promotion. Notice of non-reappointment for persons holding full-time appointments will normally be given in writing according to the schedule indicated under each research faculty rank description below, although failure to provide such notice does not create any right to extension or reappointment.

In general, research faculty who are full-time employees of the University are eligible for most of the benefits accorded to the ladder faculty, including the Scholarship Plan for Sons and Daughters of the Faculty and Staff, the Mortgage Program, Child-Rearing Leave, and Caregivers Leave, but excluding the teaching relief policy for faculty with teaching responsibilities and the associated extension of appointment described in Section XVII.D. However, full-time research faculty are eligible for the Parental Leave for Research Faculty described in Section XVII.D.5. Research faculty have access to the same procedures as do the teaching faculty for reviewing a decision not to reappoint or promote, unless the decision is related to the absence of salary support.

Full-time research faculty with the rank of research scientist/scholar or senior research scientist/scholar may apply for sponsored projects as principal investigators provided that the faculty member's department or school has committed the necessary space and other support, including salary support when necessary, for grant writing activities. Full-time research faculty with the rank of associate research scientist/scholar generally do not serve as principal investigators and may apply for sponsored projects as principal investigators only with the prior approval of the department chair and the relevant Dean. Part-time research faculty similarly must have permission from the relevant Dean in order to be principal investigators on sponsored projects.

Individual department faculties may invite research scientists and senior research scientists to participate in faculty meetings. They may not vote on ladder faculty appointments, but they may, if the department wishes, vote on research faculty appointments up to and including the rank they hold, though they may not vote on reappointment to ranks equivalent to their own.

## 1.   Associate Research Scientist/Scholar

This appointment is given to persons who are engaged in scholarly or scientific research in association with a faculty member or as a member of a research group. Such persons will normally have at

least two years of research experience following a Ph.D. (or equivalent), will have demonstrated professional ability in fields related to the work or program of the department or area concerned, and will be expected to contribute to it as a colleague. The initial term of appointment in this rank is normally one year and is renewable. There is no limit on the number of terms to which an associate research scientist may be reappointed. However, reappointment will depend on the continued need for the position, the availability of resources for the position, and the performance of the individual. With prior approval of the relevant Dean or cognizant provost, an appointment or reappointment may be for a term of up to three years, conditional upon the availability of salary support. In the Faculty of Arts and Sciences, nominations for this rank are submitted by department chairs to the Office of the FAS Dean. In the professional schools, appointments to this rank must be approved by the Dean of the school in which the appointment is to be made or the Dean's designee, in accordance with school policies. Non-reappointment for reasons other than the absence of salary support normally requires 90 days notice.

An associate research scientist/scholar must receive a professional development review at intervals of no longer than three years. While the primary goal of such a review is to advise on the professional development of the individual, the possibility of promotion should be considered at this time.

## 2. Research Scientist/Scholar

This appointment is given to persons who are engaged in scholarly or scientific research as advanced scholars or as senior members of a research group. The term of appointment in this rank may be up to three years, conditional upon the availability of salary support, and is renewable in successive terms of up to three years, again conditional upon the availability of salary support. Nominations for the rank of research scientist/scholar are submitted for approval by the department chair to the appropriate appointments committee. In the Faculty of Arts and Sciences, such appointments are reviewed by the office of the FAS Dean; and in the School of Medicine, by the Term Appointments and Promotions Committee. Procedures in the other professional schools are described in the relevant portions of **Sections V through XIV**. For research scientists who have served at least three years in that rank, non-reappointment for reasons other than the absence of salary support normally requires six months' notice.

A research scientist/scholar must receive a professional development review at intervals of no longer than five years. While the primary goal of such a review is to advise on the professional development of the individual, the possibility of promotion should be considered at this time.

3.    **Senior Research Scientist/Scholar**

This appointment is appropriate for persons of high professional attainment, outstanding ability, and critical importance to a major research program. The term of appointment in this rank may be up to five years, conditional upon the availability of salary support, and is renewable in successive terms of up to five years, again conditional upon the availability of salary support. Nominations for this rank are submitted for approval by the department chair and sent to the appropriate appointments committee. In the Faculty of Arts and Sciences these appointments are reviewed by the Faculty of Arts and Sciences Steering Committee; in the School of Medicine, by the Term Appointments and Promotions Committee. Procedures in the other professional schools are described in the relevant portions of **Sections V through XIV**. For senior research scientists who have served at least five years at that rank, non-reappointment for reasons other than the absence of salary support requires one year's notice.

4. **Research Professor**

Emeritus faculty members who plan to commit sponsor-paid effort as a principal investigator on an externally-funded award may be eligible for this distinguished title. The term of appointment in this rank may be three to five years (as necessary to be coterminous with awards) and is renewable in successive terms of three to five years (as necessary to be coterminous with awards). The initial appointment is conditioned upon a plan to submit proposal applications to external sponsors during the term. There is no limit to the number of terms a faculty member may serve at this rank, but there is no entitlement to reappointment. Reappointment is based on a number of factors including the availability of University resources and the research productivity and performance of the individual.

In the Faculty of Arts and Sciences, this appointment is approved by the Faculty of Arts and Sciences Steering Committee. In the School of Medicine, this appointment is approved by the Dean, or the Dean's designee. Procedures in the other professional schools are described in the relevant portions of **Sections V through XIV**. In all cases, faculty must apply for principal investigator status on an application basis and in accordance with Yale University Policy 1310 Principal Investigator Eligibility Requirements on Sponsored Projects.

C.    **Postdoctoral and Other Non-faculty Research Ranks**

1.    **Postdoctoral Appointees**

Postdoctoral appointments afford recent Ph.D. (and equivalent advanced degree) recipients a period in which to extend their education and professional training. Postdoctoral appointees may be appointed by or affiliated with a school, department, an academic unit authorized to

make non- ladder academic appointments (such as the MacMillan Center and the Institution for Social and Policy Studies), or --on an ad hoc basis with the approval of the Provost-- other academic units or research and collections units. All postdoctoral appointees must have financial support at a level that meets University standards. There are two categories of appointees: postdoctoral fellows and postdoctoral associates. The difference in classification arises from the requirements of the funding source. Appointees funded from Yale-administered research grants, contracts, or other University sources in order to provide services related to the supported research are postdoctoral associates; they are employees of the University even though they are considered trainees.

Postdoctoral fellows are also trainees, but they are not Yale employees. They may be funded either from training grants to the University or from funding directly awarded to the trainee from an outside source. The postdoctoral fellow classification is used if the funding source requires that the candidate not be an employee of the University. In nearly all other circumstances, appointees are classified as postdoctoral associates. The cumulative time an individual may spend in the two ranks should generally not exceed four years. Extensions to a fifth or sixth year may be granted in exceptional cases. In such cases, the relevant Dean or representative of the Provost's office would grant the extension. The total number of years of postdoctoral appointment may not exceed six.

The terms of appointment and procedures for postdoctoral appointees are set forth in University Policies for Postdoctoral Appointments available on the Office for Postdoctoral Affairs website. Each new postdoctoral appointment is to be made in writing by a letter from the supervising faculty member describing the details of the appointment. Approval must be obtained from the department chair and from the Dean or Provost or their designees. The supervising faculty member is expected to be a mentor to the postdoctoral appointee. They must provide training, supervision, and clear and timely annual written evaluations of, or progress reports concerning, the postdoctoral appointee's activities. Mentors have the responsibility to provide an educational postdoctoral experience that also seeks to advance the career of the postdoctoral appointee. The postdoctoral appointee is responsible for: (i) fulfillment of specific research and training objectives; (ii) conformity with ethical research standards of the University; (iii) compliance with all relevant federal, state and municipal regulations that relate to human subjects research, the care and use of laboratory animals, and the use of hazardous materials; (iv) compliance with all relevant University policies; and (v) appropriate recording and documentation of research results.

If the appointee will be engaged in other specific activities, such as teaching, these expectations should be stated in the letter of appointment or in a subsequent written communication.

The policies that govern eligibility of postdoctoral appointees to teach are determined primarily by the funding agency that supports the postdoctoral appointee. These agencies include the federal government and other outside agencies as well as Yale departments and programs. Specific policies concerning allowable teaching and other non-research related activities, outside employment, tax implications of stipends, and compensation in addition to the stipend are outlined in detail in University Policies for Postdoctoral Appointments available on the Office for Postdoctoral Affairs website.

A Grievance Procedure for Postdoctoral Appointees is available for individuals who believe they have been treated in a manner inconsistent with University policies, or that they have been discriminated against or have been inappropriately disciplined for misconduct. This procedure can be found in University Policies for Postdoctoral Appointments in the Office for Postdoctoral Affairs. Complaints of academic or scientific misconduct must be brought under the "Policies and Procedures for Dealing with Allegations of Academic Misconduct at Yale University." Benefits for postdoctoral appointees are described in Section XVIII.D.3.

## 2.   Postgraduate Fellows and Associates

Postgraduate appointments may be made under certain circumstances to invite individuals who have completed a terminal degree other than a doctorate to come to Yale primarily for advanced training. Their relationship to Yale is comparable to that of postdoctoral appointees. All postgraduate appointees must have a designated faculty supervisor and clearly defined training objectives. If the postgraduate appointee is to be compensated by the University, the appointment will be as a postgraduate associate. All are short-term appointments, with a maximum term of one year, with a possibility of a one-year extension under special circumstances. Appointments of postgraduate fellows and associates are processed through the Office for Postdoctoral Affairs.

## 3.   Visiting Fellow

The appointment of visiting fellow is given to individuals who hold the Ph.D., who are established scholars with equivalent training, or who are accomplished individuals such as government officials journalists, and writers, whose associations with the University and whose regular and significan presence at Yale for a limited period of time will be of mutual benefit. This appointment will only be given to individuals who need such formal affiliation to carry out their research or other planned activities at Yale. This appointment incorporates a former and very similar non-faculty appointment called research affiliate. Appointment at this rank requires review by the Office for Postdoctoral Affairs and approval of the relevant Dean or Provotial representative. Visiting fellows may normally be appointed for one semester or up

to one year, with the possibility of renewal for an additional year. Any further appointment requires approval by a member of the Office of the Provost. Visiting fellows are not members of the faculty, and no teaching or work for the University is required or permitted. Visiting fellows are, however, eligible for certain library borrowing privileges, and the department may apply for a Yale e-mail account when it is necessary for the planned activities of the fellow. Appointees are not considered employees of Yale and do not receive Yale salary or fringe benefits. They must show evidence of sufficien financial support and adequate medical insurance for the period of time they hold the appointment.

## 4. Laboratory Associate

The appointment of Laboratory Associate is given to individuals who hold the Ph.D. or have equivalent training, who are engaged in scholarly or scientific research in association with a faculty member or member of a research group, and whose work requires that they be present on campus and have access to Yale laboratory facilities. This appointment will only be given to individuals who need formal affiliation to carry out such collaborative activities while at Yale. Appointees will normally have at least two years of research experience following the Ph.D. (or equivalent) and will have demonstrated a high professional ability in fields related to the work or program in the area concerned. Appointment as Laboratory Associate requires review by the Office for Postdoctoral Affairs and approval of the relevant Dean. All applicable research compliance and safety training as stipulated by the University must be completed before an appointee enters the lab. Laboratory Associates are normally appointed for the actual duration of the on-campus collaborative activity, up to a maximum of one year. Any further appointment requires the approval of a member of the Office of the Provost. The appointee is not paid from Yale-administered funds, is not considered an employee of Yale, and does not receive fringe benefits.

Candidates for this assignment must provide evidence of sufficient financial support and adequate medical insurance, which must be maintained for the full term of the appointment.

# XVI.  Visiting Appointments: University-wide

## A.  Visiting Teaching Faculty

Faculty from other academic institutions are often invited to Yale to teach for a semester or an academic year, and on rare occasions for more than one year. Visiting faculty members on salaried appointments for one semester or longer are eligible for health benefits and contributions toward retirement (see Section XVIII.D.2). Persons who hold academic teaching appointments in an established college or university and who are appointed to a visiting teaching position at Yale will be given a title at Yale which is the same or equivalent to the title they hold at their home  institutions. Except in the School of Architecture, visiting faculty who do not concurrently hold regular professional rank at another institution will  be  appointed  as lecturers.

The  University  seldom  makes  appointments  of  visiting  faculty  who  during  their  Yale appointments  hold  full-time  teaching  appointments  at  other  institutions.  Where  a special situation requires the appointment of a part-time visitor, including for a period of less than one term, approval of the Yale Provost and the dean or provost of the visitor's institution is required before the appointment may be offered.

## B.  Visiting Research Faculty

This  category  is  reserved  for  persons  affiliated  with  other  institutions  whose  in-residence participation  for  limited  periods  in  sponsored  research  administered  by  Yale  will  be  of mutual benefit. Such persons will normally have at least two years of research experience following  the  Ph.D.,  M.D.  or  equivalent  degree.  The  appointee's  salary  is  normally  paid from  Yale-administered  grant  or  contract  funds.  The  salary  of  a  visiting  research  faculty member will not exceed the salary offered by that faculty member's home institution. The appointment title will be comparable to that held at the  individual's  home  institution,  with the  prefix  "visiting."  Visiting  research  faculty  must  comply  with  all  University  research  and training requirements.

Visiting research scientist/scholar appointments must be approved by the appropriate Dean.

## C.  Visiting Fellow

This title is given to established scholars and other distinguished individuals – for example, faculty on leave from other institutions, government officials, journalists, and writers – whose association with the University and whose residence in the community for a limited period will be of mutual benefit. No teaching or work for the University is required, and visiting fellows are neither members of the faculty nor Yale employees. Refer to Section XV.C.3 for a full description of visiting fellow.

# XVII.  Leaves of Absence and Teaching Relief: University-wide

Yale's commitment to support the research interests and professional development of its faculty is reflected in the opportunities for leave that are described below. All research leaves with salary paid from University funds and most leaves without salary paid from University funds are granted by and under the authority of the Corporation for purposes of research or to allow faculty to benefit from professional opportunities that necessitate a short time away from their normal duties.

In some cases, the University continues to pay the faculty member's full or partial salary or fringe benefits from Yale funds (including General Appropriations, endowments, or sponsored projects) during the period of leave. In other cases, the full or partial salary may be covered by an outside fellowship or another institution, as, for example, when the faculty member holds a visiting appointment elsewhere. Any leave that is fully or partially funded from University funds or from externally sponsored funds awarded to the University is referred to in this section as a paid leave. An unpaid leave is any leave during which the faculty member's salary is fully funded by an outside source—such as a fellowship paid directly to the faculty member or a visiting position at another university—or during which the faculty member otherwise receives no salary from University funds.

Faculty members who are eligible for leave with salary are nevertheless encouraged to help finance their leaves from sources outside the University. Faculty should consult both the Office of Sponsored Projects and Corporate and Foundation Relations in the Development Office for help in identifying agencies or foundations appropriate to the purpose of the leave.

Some leaves without salary are granted for personal reasons – such as medical disability or child rearing – or for public service not directly related to academic development. All policy questions concerning leaves in the Faculty of Arts and Sciences should be referred to the Office of the FAS Dean. Questions concerning leaves in a professional school, several of which have their own policies, should be referred to the Dean of that school.

## A.  General Conditions Governing All Leaves

**1.** Leave is a privilege, not a right. Eligibility for a leave according to the policies spelled out below does not in itself constitute entitlement to that leave. No leave will be granted without the approval of the Dean of the FAS and the applicable department or program chair (in the Faculty of Arts and Sciences) or Dean (in the professional schools), in consultation with the Office of the Provost. A leave generally will be granted only if the department or program chair and Dean, are assured that the leave will not have adverse effects on the department's, program's or school's

teaching, research program, or clinical or administrative responsibilities. A significant exception to this condition exists in that Morse Fellowships, Junior Faculty Fellowships, and Associate Professor Leaves – where the benefit to the faculty member is paramount – will not be disallowed or delayed by reason of adverse effect on the department, program, or school. A faculty member may be denied a leave if, during the period since the initial appointment or the prior leave, they have not adequately met their responsibilities to teaching, research, clinical work, and administrative service. Faculty members are expected to remain on campus and to teach during all semesters when not on an approved leave; scheduling teaching overloads during one semester to create a *de facto* leave during another semester is not allowed without prior approval of the Provost. University leave policies incorporate the rights provided to employees under both federal and state Family Medical Leave Acts.

**2.** A faculty member requesting a leave must submit a formal application in accordance with the regulations and deadlines established by their particular school. All applications for a research leave should include a full description of the faculty member's plans for that leave.

**3.** Faculty members who are granted leave will be relieved of all teaching and administrative duties, except that ordinarily they will be required to continue supervising dissertations.

**4.** The period of a full-year leave is defined as the academic year during which faculty members are otherwise expected to meet their institutional responsibilities. In the case of a semester's leave, the period of leave is one-half of the academic year. Leave periods in the Schools of Medicine and Nursing are exceptions to this rule. The normal requirement that a full-year leave be taken within a single academic year may be altered occasionally to permit such a leave to be taken during successive terms in the same calendar year.

**5.** The maximum period of a leave is one academic year, whether the leave is taken within a single academic year or divided between two successive academic years. One full year of teaching in residence must precede any leave, paid or unpaid. The normal expectation is that a faculty member who has had a leave of any kind will return to Yale for a full year of teaching. This expectation does not apply to a tenured faculty member who retires at the end of a scheduled leave or a non-tenured faculty member who has been granted permission to take a leave for which they is eligible in the final year of appointment.

**6.** In special circumstances and with specific approval by the Corporation, a second consecutive leave may be granted, typically in connection with a leave for public or military service such that the total period of absence exceeds one academic year (see Section XVII.C). The total period of consecutive leaves is extended beyond two academic years only in the most

exceptional circumstances, such as when required by law or for a public service leave deemed to be in the national interest.

**7.** No member of a University faculty may be on leave, whether paid or unpaid, more than four semesters in a seven-year period unless required by law. Absence from the University in excess of this limit is inconsistent with the teaching and University service expectations of a full-time member of the faculty. Exceptions to this policy will be considered when a faculty member has had one or more semesters of leave for reasons such as child rearing, caregiving, or public service, including leaves for military service. Teaching relief for child rearing or for a short-term medical disability is not considered a leave.

**8.** The calculation of the terms of appointment, maximum time in a particular rank, and maximum time in the combined non-tenure ladder ranks includes all leaves, with or without Yale salary, except Child-Rearing Leaves, Caregivers Leaves of at least six weeks, and leaves granted for public service. For these leaves and when a member of the faculty experiences a short-term medical disability of at least six weeks or has been granted teaching relief for child rearing, extensions in the terms of appointment and time in rank will typically also be granted. See Section XVII.D for policies regarding these leaves and teaching relief for child rearing. See Section III.F for policies governing maximum time in non-tenure ladder ranks and Section XXI.E for policies governing short-term medical disability.

**9.** With the agreement of the Provost, faculty members may change from one leave option to another provided that the criteria for the type of leave which is to be taken are met, and that the change is effective for the entire period (a semester or an academic year) for which the leave is taken.

**10.** Leaves of absence with reduced Yale salary or without Yale salary affect certain fringe benefits Members of the faculty who are on leave with less than full salary paid by Yale should check with the Benefits Office for further information.

**11.** Members of the faculty who are not eligible for a paid leave and who are awarded an outside fellowship may apply for an unpaid leave, but they will normally not be eligible to receive supplemental salary from the University. See Section XVII.C for policies governing unpaid leaves.

**B.   Leaves with Salary From University Funds**

**1.   General**

**a.   Eligibility.** On recommendation of the department chair and the FAS Dean in the Faculty of

Arts and Sciences and of the Dean in the professional schools, full-time faculty may be awarded a leave of absence with salary according to the policies described below. Eligibility for paid leaves varies from school to school. Faculty members should consult the Dean for information about policies governing eligibility for paid leave in their particular school. The normal expectation is that a full year of teaching in residence must follow any leave. Faculty members who intend to resign from the University at the end of a leave are not eligible for paid leave during that year, even if they meet other eligibility requirements. However, faculty members who retire or whose terms of appointment expire at the end of an academic year are eligible for paid leave during that year if they meet the other eligibility requirements.

**b.   Salary and Benefits**  The amount of salary and benefits received by a faculty member on a paid leave depends upon the type of leave. When a faculty member who is eligible for a paid leave is successful in obtaining partial or full outside support, the University will continue all benefits to which the faculty member is normally entitled. When the University contributes any part of salary or benefits, the leave is considered a paid leave.

**c.   Employment during Leave.** Faculty members who are granted paid leave under any of the provisions of this section are not permitted to teach or to engage in any remunerative employment during the period of the leave, except as provided under Section XVII.B.3 for Sabbatical Leave of Absence and as permitted for full-time faculty not on leave under policies on outside employment (see Section XX.E).

**2.   Triennial Leaves of Absence**

**a.   Eligibility**. Eligibility for a Triennial Leave of Absence begins after five semesters of teaching at Yale at the rank of associate professor (both term and without term) or professor, provided that five semesters of full-time teaching in residence have elapsed since the faculty member's previous paid leave. For a variation of this policy in the School of Nursing, see Section XIV.I. Thereafter, the faculty member must complete an additional five semesters of full-time teaching at Yale subsequent to the prior Triennial Leave before they become eligible for another. In the School of Medicine, two and one-half years of full-time faculty activity is considered the equivalent of five semesters of full-time teaching at Yale. Eligibility for a Triennial Leave of Absence in the School of Medicine begins after two and one-half years of full-time faculty activity at the rank of associate professor or professor. Thereafter, the faculty member must complete an additional two and one-half years of full-time activity at Yale subsequent to the prior Triennial Leave before they become eligible for another. Generally, accrued full-time teaching or activity in excess of five semesters or (in the School of Medicine) two and one-half years may not be carried forward beyond one Triennial Leave

of Absence in order to meet the eligibility threshold for another, except with permission of the Provost based on major administrative service.

**b.   Length and Salary.** A Triennial Leave of Absence is a one-semester leave during which a faculty member receives full salary. Except for leaves granted for child care, caregiving, or public service, a Triennial Leave may not be combined with any other form of leave, paid or unpaid, to make up a leave of absence for a full academic year. In the School of Medicine, a Triennial Leave may last up to four months, during which time a faculty member receives full salary.

**c.   Special Triennial Leave.** With the approval of the Dean and the Provost, a faculty member who is eligible for a Triennial Leave of Absence and who succeeds in winning outside fellowship support for a period extending beyond one semester may be granted instead a Special Triennial Leave of a full year. Yale's contribution to such Special Triennial Leaves will not exceed one-half of the academic year salary at the time of the leave, with the remainder up to full salary to come from the source originating outside the University. Yale's contribution to salary will be paid over the full leave period, and the full year will count as paid leave. University contributions to benefits will continue, with contributions to retirement accounts based upon the amount of salary paid by Yale.

**3.   Sabbatical Leaves of Absence**

**a.   Eligibility.** Faculty members shall first become eligible for a Sabbatical Leave of Absence after having taught at Yale or elsewhere at the rank of associate professor or professor for four years without a paid leave of absence. Thereafter they shall be eligible after having taught in those ranks at Yale for six years without a paid leave of absence. In the School of Medicine, faculty members shall first become eligible for a Sabbatical Leave of Absence after having taught at Yale at the rank of associate professor or professor for two years. Thereafter they shall be eligible after having taught in those ranks at Yale for six full years from the end of their previous leave of absence.

**b.   Length and Salary.** A Sabbatical Leave may be for either one semester at full salary or a full year at half salary. In the latter case, an exception will be considered to the general rule that employment may not be undertaken by a faculty member while on leave, and the faculty member may be permitted to supplement their Yale salary, up to full approved salary, from sources originating outside the University. A one-semester Sabbatical Leave of Absence at full salary may be combined with a one-semester leave of absence without salary to make up a full year's leave. In the School of Medicine, a Sabbatical Leave of Absence may be up to one semester at full salary or up to a full year at half salary. Although it may start or end in mid-year, faculty members do not become eligible for a subsequent Sabbatical Leave of Absence

Case 3:21-cv-00389-SALM Document 32-62 Filed 09/17/21 Page 143 of 194

until they have taught at Yale for six full years from the end of the academic year in which their previous Sabbatical Leave was taken.

**4.   Senior Faculty Fellowships**

**a.   Eligibility.** Faculty members in all schools except Medicine (see Section XII.N) shall first become eligible for a Senior Faculty Fellowship after having taught at Yale or elsewhere at the rank of associate professor or professor for six years without a paid leave of absence. Thereafter they shall be eligible after having taught in those ranks at Yale for six years without a paid leave of absence.

**b.   Length and Salary.** A faculty member awarded a Senior Faculty Fellowship is granted a full year's leave. The University will fund this leave at a level equal to the amount halfway between the base pay for the rank held and the individual's approved base salary. Faculty on Senior Faculty Fellowships may accept salary funding from sources originating outside of the University, provided that the purpose of that funding is consistent with the purpose of the leave. Faculty may also continue to receive project support from external sponsors during a Senior Faculty Fellowship. Salary may be charged to the sponsored project during the leave; however, the effort devoted must, at a minimum, be commensurate with the salary charged. Under no circumstances may a faculty member on a Senior Faculty Fellowship aggregate more than their approved base salary. Faculty members may not undertake outside employment while on this leave.

**5.   Special Leaves and Fellowships for Teaching Faculty in the Faculty of Arts and Sciences**

Please see Section IV.L for the policies and leaves that apply to and are available only to FAS faculty. These include paid leaves under FASTAP 2007 and FASTAP 2016 for non-tenured ladder faculty and paid Professional Development Leave for full-time non-ladder instructional faculty.

**C.   Leaves without Salary from University Funds**

**1.   General**

Faculty who are on appointments of three years or more and who have taught at Yale for at least one year are eligible for a one-semester or full year leave of absence without salary. Such a leave is granted on recommendation of the department chair and the FAS Dean in the Faculty of Sciences or of the Dean in one of the professional schools, and with the approval of the Provost.

Semesters spent on leave without salary do not count as years of teaching at Yale in determining eligibility for subsequent paid leaves. Faculty on leave of absence without salary cannot receive salary support from University-administered funds.

## 2. Public Service and Military Service

With the approval of the Provost, leaves may be granted to faculty for military service or to serve the public interest at a local, state, national, or international level. Such leaves are granted for either one semester or one year. Upon petition, recommendation by the Provost, and a special vote by the Corporation, a Public Service Leave or a Military Service Leave may be extended for up to a total of two years. Only in the most exceptional circumstances, such as when required by law, e.g. for military service, or for public service deemed to be in the national interest, can such a leave be extended beyond two academic years.

## 3. Benefits during a Leave

See Section XVIII.D for a more complete description of the fringe benefit plans that follow.

**a. Health, Dental, and Group Life Insurance.** Faculty on an unpaid leave of absence are responsible for their share, if any, of health, dental, and group life insurance costs. Yale will pay its share for the period of the leave. Faculty members who wish to maintain health, dental, and group life insurance coverage should contact the Benefits Office to arrange for prior payment of the individual's contribution.

**b. Disability Insurance.** For faculty members on unpaid leaves of absence, the University will continue to provide, at no cost to the individual, insurance as partial protection against loss of income and retirement benefits resulting from long-term disability.

**c. Retirement Annuities.** Both faculty and University contributions to retirement accounts are suspended during an unpaid leave of absence.

**d. Scholarship Plan for Sons and Daughters of the Faculty and Staff**. During an unpaid leave, a faculty member's children are not eligible to receive scholarship awards under the University's Scholarship Plan for Sons and Daughters. An unpaid leave does not count as a disruption of continuous University employment, but time spent on unpaid leave with outside employment does not count toward the six years of continuous full-time service that are required for eligibility in the Scholarship Plan.

**e. Payroll Deductions to Third Parties.** Faculty on unpaid leave should make arrangements with the appropriate office to maintain or discontinue, as desired, payments normally made by payroll deductions to third parties, such as the Yale Credit Union, the Yale Parking Service, and banks participating in the University Mortgage Program.

f.   **Tuition Benefit.** Faculty on unpaid leave and their spouses will continue to be eligible for tuition benefits on the same terms as those for faculty not on leave.

**D. Child-Rearing Leaves, Caregivers Leaves, and Parental Leave Policies (effective July 1, 2018)**

Child-rearing policies in the Schools of Medicine and Public Health are described on the School of Medicine's Office for Faculty Affairs website. The policies below apply in the rest of the University's Schools.

**1.   Federal and State of Connecticut Family and Medical Leaves**

As delineated by federal and State of Connecticut laws concerning family and medical leaves (federal and state family and medical leave acts are both commonly referred to as FMLA), a member of the faculty may take a leave of absence due to the faculty member's own serious health condition or to care for a seriously ill spouse, parent (natural, foster, adoptive, stepparent, or legal guardian), parent of the faculty member's spouse, or child (natural, adopted, foster, stepchild, or legal ward) who is under 18 years of age or, if older, is unable to provide self-care because of serious illness, for up to sixteen weeks in year one and twelve weeks in year two in any two-year period. Except in cases of emergency, two weeks' notice is required, and all requests must be accompanied by written documentation from a physician or other licensed health care provider verifying the need for a leave and the probable duration. Serious illness is considered to be a disabling physical or mental condition that requires in-patient care in a hospital or licensed nursing facility or continuing outpatient care requiring treatment by a licensed health care provider.

Leaves granted under Yale polices and FMLA may be paid or unpaid depending on the type of leave. Leaves taken for short-term medical disability, child rearing, and caregiving count as use of time granted under federal and State of Connecticut FMLA law. During a period in which Yale grants an unpaid leave under Federal and State of Connecticut FMLA, the University will continue to pay its share of health and any noncontributory insurance premiums for the caregiver on leave. A faculty member who has authorized payroll deductions for benefits must make arrangements with the Benefits Office to make those payments in order to continue coverage.

**2.   Child-Rearing Leaves**

A member of the faculty who becomes a parent of a newborn child or newly-adopted child under the age of six will be granted upon request an unpaid Child-Rearing Leave for up to one semester occurring within the first year after the birth or adoption for the purpose of the child's care. This leave may be taken in addition to the semester of Teaching Relief for Child Rearing.

General policies regarding the effect of unpaid leaves upon salary and benefits (see Section XVII.C.3) apply to these leaves, but policies regarding the effect of unpaid leaves upon eligibility for other leaves do not apply. For example, a semester of Child-Rearing Leave does not count as one of the terms of full-time teaching required between paid leaves. See Section III.F for policies regarding the effect of Child-Rearing Leaves on terms of appointment and time in rank. Time taken for a Child-Rearing Leave is granted under Yale policies and federal and state laws governing family and medical leaves as described above in Section XVII.D.1.

**3.    Caregivers Leaves**

A member of the faculty may take an unpaid leave of absence to care for a seriously ill spouse, parent (natural, foster, adoptive, stepparent, or legal guardian), parent of the faculty member's spouse, or child (natural, adopted, foster, stepchild, or legal ward) who is under 18 years of age or, if older, is unable to provide self-care because of serious illness for up to sixteen weeks in year one and twelve weeks in year two in any two-year period. Time taken for a Caregivers Leave is granted under Yale policies and federal and state laws governing family and medical leaves as described above in Section XVII.D.1.

**4.    Teaching Relief for Child Rearing for Ladder Faculty**

A full-time member of the ladder faculty who becomes a parent of a newborn child or newly-adopted under the age of six will be relieved of teaching duties, without loss of salary or benefits, for the whole of an academic semester occurring within the first year after the birth or adoption, for the purpose of providing substantial and sustained care for the child at least half-time during normal working hours. Any other administrative and departmental responsibilities should be consistent with the purpose of the teaching relief. A parent who gives birth is eligible for short-term medical disability as authorized by a physician and, during, this period, the parent is relieved of all responsibilities at Yale. The period of short-term disability is normally concurrent with the semester of Teaching Relief for Child Rearing.

If both parents are full-time members of the Yale faculty with multi-year appointments, each faculty member is eligible for the full benefits applicable to each of their respective appointments. Fully-paid teaching relief is available only once for each birth event or adoption. Teaching relief for child rearing is not considered a leave of absence. It does not count as a semester of teaching toward eligibility for triennial leave of absence or other paid leave. It does not count as a semester of leave when considering the above policy in Section XVII.A.7 that "no member of a University faculty may be on leave, whether paid or unpaid, more than four semesters in a seven-year period." It does count as use of time under FMLA; for more

information see above in Section XVII.D.1. See Section III.F for policies regarding the effect of the teaching relief on terms of appointment and time in rank and see Section XXI.E for policies regarding short-term disability.

**5.   Teaching Relief for Child Rearing for Non-Ladder Instructional Faculty**

A full-time member of the non-ladder teaching faculty who holds a multi-year appointment that extends through the semester in question and who becomes a parent of a newborn child or newly-adopted child under the age of six will be relieved of teaching duties, without loss of salary or benefits, for up to eight weeks that include the birth or adoption, for the purpose of providing substantial and sustained care for the child at least half-time during normal working hours. Eligibility for this relief ends eight weeks after the birth or adoption. A parent who gives birth is eligible for short-term medical disability as authorized by a physician, concurrent with this period of teaching relief, and is relieved of all responsibilities at Yale during the period of disability. Fully-paid teaching relief is available only once for each birth event or adoption.

If both parents are full-time members of the Yale faculty with multi-year appointments, each faculty member is eligible for the full benefits applicable to each of their respective appointments. Teaching relief for child rearing is not considered a leave of absence and does not count as use of time available under FMLA; for more information see above in Section XVII.D.1.

**6.   Parental Leave for Research Faculty**

A benefits-eligible member of the research faculty who holds a multi-year appointment or who has held a continuous appointment at their rank for more than one year and who becomes a parent of a newborn child or newly-adopted child under the age of six will be granted, upon request, a Parental Leave for Research Faculty of up to eight weeks, for the purpose of providing substantial and sustained care for the child at least half-time during normal working hours. A parent who gives birth is eligible for short-term medical disability as authorized by a physician, and during this period, the parent is relieved of all responsibilities at Yale. The period of short-term disability is normally concurrent with the period of Parental Leave. Compensation will reflect the effort percentage of the appointment prior to beginning the leave. An option will also be available for an additional eight weeks of part-time status with pay commensurate with the percentage of work effort. Time taken for Parental Leave counts as use of time under FMLA; see above in Section XVII.D.1. The research faculty member's current source of funding will be used to support this leave, if allowable under the policies of the funding agency(s).

The Parental Leave for Research Faculty may commence at any time from two weeks before the expected time of delivery or adoption until the end of the first year after birth or adoption. If both parents are full-time members of the Yale faculty with multi-year appointments, each parent is eligible for the full benefits applicable to each of their respective appointments. Paid parental leave is available only once for each birth event or adoption.

During the Parental Leave for Research Faculty, the faculty member will continue to receive their usual pay and fringe benefits. Upon return from leave, the faculty member is entitled to reinstatement to the position held prior to going on leave, or to one substantially similar, with no loss of seniority benefits or other privileges of employment.

## 7.   Timing and Arrangements

In the case of Child-Rearing Leaves, Caregivers Leaves, or Teaching Relief For Child Rearing, Parental Leave for Research Faculty, or for short-term medical disability, the faculty member should discuss as early as possible with the chair of the department or the Dean of the School or of the FAS their expectations regarding the timeframe of potential absence from teaching and administrative responsibilities. The faculty member and the chair or Dean should discuss a schedule for the year that will facilitate the carrying out of as many non-teaching responsibilities as are appropriate to the period of relief, leave, and/or disability, so as to minimize the impact of the faculty member's absence. See Section III.F for policies regarding extension of appointment.

# XVIII.  Faculty Compensation, Benefits and Services

Faculty members receive salaries as compensation for their contributions to the University in the form of teaching, research, and University service. Salaries are set on an annual basis, but increases are not automatic. The annual salaries of members of the faculty are normally adjusted for the ensuing academic year each July 1. Salary adjustments reflect a variety of factors, including consideration of the level of activity and quality of individual performance in teaching and research; contributions to the University community; competitive salaries in particular fields budgetary constraints; and, depending upon the school or department, relevant artistic, clinical, or other activities.

In certain professional schools compensation may be limited by the amount of external research funding that directly supports a given faculty member's salary. In the School of Medicine the amount of salary that a clinical faculty member may earn above the established base may be influenced by the clinical income generated by the individual or by the department.

## A.  Salaries

## 1.  Payment

Teaching faculty appointments at Yale are normally for the nine-month academic year. An exception to this is the School of Medicine, where appointments are generally for twelve months. Research faculty appointments are normally made on a twelve-month basis. New appointments normally take effect as of July 1 or January 1. In the Schools of Drama and Nursing initial appointments may be made at any time during the calendar year. In addition to the academic year salary, faculty members appointed on a nine-month basis may receive additional months of summer compensation from Yale-administered sources (see Section XVIII.B).

In all schools except the School of Drama, when faculty members on nine-month appointments resign or when their appointments terminate, the effective date of resignation or termination, except as specially authorized by the Provost, must be either December 31 or June 30. Their appointments may not be extended into the second semester or into July and August. Faculty members whose appointments terminate June 30 may request their final paycheck in May. In the Schools of Medicine and Nursing, resignations may be accepted at any time during the calendar year.

Salaries in most faculty ranks are paid monthly over a twelve-month period. The first salary payment is made at the end of the first month in which the appointment becomes effective. For

faculty members and other persons on nine-month appointments, salary payments received during July and August are considered advance payments for services rendered during the academic year. Persons on nine-month appointments are therefore required to return any compensation received for July and August should they not assume the responsibilities of their appointment at the beginning of the academic year or fulfill their duties for the semester or term of appointment. Persons who do not serve for the full nine months of their appointment are required to return a prorated amount of their July and August compensation.

Faculty on nine-month appointments who conduct scholarly or research activities during the academic year that are supported by external funding sources may elect to participate in an alternative compensation schedule wherein academic year salaries will be paid over the nine academic months. This program permits faculty who charge a portion of their academic year salaries to sponsored projects to establish from those salary savings a special research account which may be used (a) to provide for up to three months of summer salary, (b) as bridge funding, (c) to support new initiatives, or (d) for research-related expenses not normally allowable as direct costs on sponsored projects. This program is described in further detail on the website of the Office of Research Administration.

Faculty members on multi-year appointments who teach only one semester receive six monthly checks (July through December for the first semester; January through June for the second). These practices and obligations apply as well to leaves with salary.

Visiting and other faculty members holding one-year appointments are normally appointed from September through May and paid monthly on a nine-month basis. The first salary payment is made at the end of September. One-semester appointees are paid in four installments (September through December) for the fall semester or in five installments (January through May) for the spring semester. When circumstances warrant, and with permission of the Provost or the Dean in a professional school, faculty holding one-year appointments may be appointed and paid from July through June, and those holding one-term appointments may be appointed and paid from July through December or from January through June.

## 2.  Salary Advances

Salary advances may be requested to meet unusual short-term financial needs, for example when the extraordinary expenses of a research trip out of the country justify a departure from the normal schedule of salary payments. Salary advances may be approved for new foreign employees who are not allowed to take more than a minimum amount of currency out of their home countries. Salary advances may not exceed one month's net pay and must be repaid within two months. Advances

may also be approved for faculty members who have completed their term of employment at Yale and who would normally be paid at the end of the month.

Advances will not be approved to cover routine expenditures for which the individual should plan or find other ways to finance, such as tax payments, vacations, or the purchase of goods or services.

**3.    Federal and State Income Withholding Tax**

The University withholds from monthly salary checks an amount in accordance with current federal and state income tax withholding procedures. Withholding elections may be made in Workday.  For assistance with completing or updating tax withholding elections in Workday please contact Employee Services at 203-432-5552 or view more information at the Employee Services website.

**4.    Social Security**

The required social security tax is deducted from monthly salary checks. A new member of the faculty may already have paid, in part or in full, the tax for the current year before coming to Yale. Government regulations require, however, that the University withhold the tax as though there had been no previous employment. Amounts in excess of the individual's required tax may be claimed on the income tax return.

**B.    Summer Compensation from University-administered Funds**

Faculty on nine-month academic year appointments may be employed during any of the three summer months, either at Yale, at another academic institution, or by any other employer. There are no restrictions on the amount of compensation earned from any non-Yale employer.

Faculty members who hold academic-year (nine-month) appointments may, under the conditions listed below, receive additional salary from University-administered funds for work on projects during the summer; that is, between Commencement and registration for classes in the fall semester. Faculty on nine-month appointments may receive such additional salary whether they are compensated over nine or twelve months. The program permitting compensation over nine rather than twelve months is described in further detail on the website of the Office of Research Administration. Most such projects are sponsored by, and funded from, sources external to the University, often agencies of the federal government. Salary paid for work conducted during the summer months is subject to the normal withholding taxes and retirement contributions, subject to federal and state maximums. University policy imposes certain conditions on the receipt of summer compensation from Yale-administered funds.

**1.** The maximum monthly salary is one-ninth of the academic year salary, and the maximum amount of time for which full-time salary may normally be earned for work performed in the summer is two and a half months.

**2.** As is the case during the academic year, faculty members may not accept other employment during any month in the summer in which they receive full-time salary from Yale-administered funds.

**3.** The appropriate data showing the source and amount of funds and the period of work must be submitted as for any other appointment.

**4.** Faculty may receive honoraria, rather than salary, during the summer for programs administered by Yale only if all of the following conditions are met:

    **a.** For the month in which it is earned, this is the only payment to be received by the faculty member from Yale-administered funds and the payment is minimal, i.e., under $1,000.

    **b.** Such payments are made as supplementary payments through the Yale payroll system.

Under all other circumstances compensation for participation in a summer program (including grants or contracts) administered by Yale may not be paid as an honorarium, but must be shown on budgets as a percent of effort (or person-months, depending on sponsor) and paid through the payroll system as summer compensation. In such cases, the compensation received during a summer month cannot exceed the academic year monthly rate.

## C.  Other Compensation from University-administered Funds

Faculty employed full-time by the University normally may not receive additional income from the University for work performed during a period of full-time employment, typically the nine-month academic year. This includes income from salary, honoraria, or other kinds of compensation. Requests for exceptions to this policy are rarely given and must be made in advance and in writing to the Provost, or Provost's designee, with a full statement of the reasons why the University's interests would justify an exception. This policy derives from the assumption that the salary paid to an individual represents full compensation for the individual's total obligation to the University, including formal and scheduled commitments such as classes, formal but unscheduled commitments such as pursuit of personal research and supervision of thesis research, and informal participation in other University activities. The total compensation that can be expected by a faculty member for performance of all obligations during the academic year is therefore the

annual salary and benefits. Faculty members appointed on nine-month terms may earn additional summer compensation as described above provided that the work is actually performed during the summer. Faculty may not receive additional compensation during the summer for work performed during the academic year.

There are certain activities that, with prior approval from the Provost, or Provost's designee, will normally qualify for an exception to the policy prohibiting extra compensation during the academic year.

1. Teaching in specified and approved non-degree educational programs at Yale that meet a high threshold of institutional importance, including school-specific executive education programs, national or international leadership training programs, and distance educational programs, whether sponsored by the University or by a specific school.

2. Delivering papers at conferences and symposia that take place at Yale, whether funded by Yale or outside sources, when the symposium features predominately outside speakers. The proposed remuneration must be commensurate with that offered to participants from outside Yale.

3. Certain recurring and well-defined categories of additional compensation that have been established by the Office of the Provost (e.g., interim assignments, on-call pay).

Payments for any of these activities require prior approval from the Provost, or Provost's designee, and would take place through the regular payroll system, where they would be subject to normal rules of withholding and reporting.

Participation in these activities must not conflict with normal teaching responsibilities. They are subject to Yale's policies of effort reporting and conflict of interest and commitment, which limit the total of such effort, including both outside consulting and any supplemental compensated effort inside of Yale, to the permitted amount (currently one day per week) during the academic year.

## D.  Fringe Benefits

The benefits described in this section are those currently offered and may be changed from time to time by the University. The terms of each benefit are governed by its respective plan documents. This *Handbook* provides only a general description of the benefits. Detailed information may be obtained from the Benefits Office.

Members of the faculty who are eligible for benefits are urged to participate in them. Members of the faculty are automatically enrolled in the Yale University Retirement Account Plan (YURAP).

Application should be made at the time of appointment. Any required premium payment is made through the payroll system.

It is the responsibility of the individual to initiate application for most of these benefits, even when participation is automatic. Many require choices among alternatives or levels of participation. Yale has no obligation to assume responsibility for benefits lost through failure to apply for participation or to make a retroactive contribution to a benefit for a period prior to the time of application by an eligible faculty member.

### 1. Benefits Available to Most Members of the Faculty

The following benefits are available to all faculty employees appointed for two or more consecutive semesters (except those on visiting appointments) who are working at least half-time or who are on phased retirement.

**a. Medical Plans.** Faculty employed at least half-time for one semester or longer may enroll in one of the University's health insurance programs during the first 30 days of employment. Faculty may also enroll, add or delete dependents, or cancel coverage during the annual open enrollment period each fall, with coverage changes effective January 1 of the following year. Enrollment changes are also permitted because of a qualifying life event status change. For detailed information on these plans, including monthly premiums, consult the Benefits Office.

The Yale Health Plan (YHP) is a comprehensive, physician-led HMO health plan that operates a medical center on the Yale campus. YHP provides coverage for primary, specialty, and emergency care, as well as for a range of ancillary services. Upon referral, members have access to an extensive network of clinicians and services at other area facilities. Coverage is free for eligible faculty. Faculty members whose appointments are for less than one semester may use the Yale Health Plan on a fee-for-service basis.

Other health benefit choices are also available on a subsidized basis. Enrollment is required for participation in one of these plans. Information about health insurance coverage and costs and detailed descriptions of these plans are available at the Benefits Office.

**b. Dental Plan.** Faculty employed half-time or more and their spouses are eligible to purchase dental insurance from the University. Consult the Benefits Office for information.

**c.   Contributory Group Life Insurance.** The University currently offers group term life insurance in multiples of up to five times base salary, not to exceed $1,500,000. Members of the faculty must apply for coverage within sixty days after the beginning of their appointment, or within sixty days after taking up duties and responsibilities, whichever is later; otherwise a health statement and, in most cases, a physical examination will be required.

Faculty who terminate or retire may continue their coverage by purchasing a policy directly from the carrier with proof of insurability within 31 days. The insurance also provides for additional payments ("double indemnity") in the event of accidental death.

**d.   Disability Insurance.** The University provides insurance as partial protection against loss of income and retirement benefits resulting from long-term disability. Faculty employed half-time or more are automatically enrolled in the Basic Plan at no cost to the employee. Above specified salary levels, faculty may purchase Supplemental Disability Coverage for added protection against income loss.

Under the Basic Plan benefits begin on the first of the month following 180 days of at least partial disability resulting in lost earned income of 20% or more. Benefits normally continue during the participant's lifetime to age 65. Employees are entitled to receive 60% of their base monthly salary to a maximum of $7,500 per month minus any other University-sponsored payments received, such as worker's compensation or social security. For those faculty who participate in Supplemental Disability Coverage, that maximum is increased to $20,000 per month minus other University-sponsored payments received.

For participants in the Yale University Retirement Account Plan, employee and employer contributions to the Account Plan will be continued during a period of disability coverage at standard participation levels, as they may be adjusted from time to time.

**e.   Long-Term Care Plan.** A long-term care plan is currently offered to faculty and their immediate family members. Details are available from the Benefits Office.

**f.   Death Benefit** If a faculty member who holds an appointment of half-time or more dies while an active employee, their salary is paid up to and including the date of death. In addition, the employee's named beneficiary is paid an amount equivalent to one month's salary.

**g.   Yale University Retirement Account Plan (YURAP).** Retirement benefits for faculty are provided through a 403(b) Defined Contribution Plan. In a 403(b) Defined Contribution Plan both employer and participant know how much will be contributed to the Plan, but cannot know

precisely the retirement benefit. Such benefit will be affected by the amount of accumulation at the point of retirement, the age of the participant at that time, and the payout option elected, among other factors. The most important basis for the payout will be the accumulation, and the most important factor in the accumulation will be the investment return on assets over the accumulation period.

**Eligibility to participate in the plan.** An eligible employee is an individual who has a faculty or senior research appointment of at least half-time or greater. Upon hire, all faculty as defined by the Plan will be automatically enrolled in YURAP. Under YURAP's automatic enrollment feature, Yale will automatically reduce monthly salary by 5% and deposit that amount as a pre-tax employee contribution to YURAP. Yale will make a core contribution equal to 5% of salary and a University match equal to 5% of salary to the individual's YURAP account. Contributions and Yale's match will be invested with TIAA-CREF, and the individual may specify the investment funds into which they want contributions and Yale's match invested.

Unless directed otherwise, the individual's contributions and Yale's match will default to TIAA-CREF and will be invested in the age-based TIAA-CREF Lifecycle Fund that corresponds to the individual's estimated date of retirement. While enrollment in YURAP will be automatic, individuals may opt out of the University match component of the Plan at any time. Both the faculty member and employer contributions to the plan are immediately vested, meaning that the total accumulation belongs to the participant even if the employee terminates employment. The 403(b) plan consists of the University core, employee contributions, and University match.

**Yale Contributions to YURAP.** The University provides a University core contribution in addition to a University match.

i.    For the first amount of base salary corresponding to the Social Security Wage Base that a faculty member earns in a fiscal year (from July 1 through June 30), the University core will consist of a plan contribution equal to 5% of earnings plus a dollar-for-dollar match for up to the first 5% that the individual contributes to the Plan.

ii.   Once the faculty member earns over the Social Security Wage Base amount in a fiscal year, the University core contribution will increase to 7.5% of earnings, while the participant continues to receive a dollar-for-dollar match on contributions up to 5%.

**h.    Yale University Tax-deferred 403(b) Savings Plan**

Faculty who are below the benefit level and postdoctoral associates may choose to save for retirement by contributing a portion of their pay on a pre-tax basis. There is not a University match.

There are several options available when deciding on the amount to contribute, including:

1.   Electing a specific percentage

2.   Checking off the maximum box, which will allow the IRS maximum contribution. Consult the Benefits Office for additional details.

**i.    Completing University Retirement Plan Contributions.** Because the purpose of contributions to an individual's retirement plan is to provide for a comfortable retirement, continuation after that objective is achieved is not part of the retirement plan.

University contributions therefore cease after an individual can be expected to achieve a certain level of retirement income. This expected level is fixed as the time when the annuity that can be purchased with a participant's retirement account plus social security benefits, using a monitoring model described below, exceeds a targeted income replacement ratio that rises with service to a maximum of 70%.

The retirement plan bases the cessation of contributions on typical investment assumptions rather than on the success of an individual's particular investment strategy. Based on this investment experience, a calculation is made of the income replacement ratio that the "hypothetical individual" would achieve at Normal Retirement Age. The University ceases contributions when the participant's assumed account, plus social security benefits for those 65 or older, exceed the targeted income replacement ratio. In order to provide heightened assurance that the retirement objective has actually been met when University contributions end, they stop only after the formula has called for ending contributions in two successive years.

As an additional protective feature, if market conditions worsen so that, after contributions have been stopped, the participant's assumed account value plus any social security benefits is expected to be less than the targeted replacement ratio, then contributions will be restarted on the following July 1, assuming continued employment. For purposes of this calculation, the individual's account value will be adjusted for each year after the end of University contributions to reflect the receipt of retirement account yield.

**j.    Flexible Benefits  Plan.** This program permits individuals to save money by reducing taxable compensation and receiving instead certain non-taxable benefits offered by the University. A University-paid $25,000 basic life insurance benefit is available and automatic for eligible faculty members. In addition, faculty members pay the premium for Yale's health and dental insurance by a salary "reduction." These arrangements are irrevocable during the year elected, unless the

employee experiences a change in family status. An annual election, similarly irrevocable during each calendar year, provides the opportunity to pay for unreimbursed ("out-of-pocket") costs of medical, dental, or dependent care with pre-tax dollars in accordance with current IRS rules. Consult the Benefits Office for further information.

**k.   Yale Mortgage Program.** A mortgage program is made available to Yale employees by several local banks. In some cases, interest rates on first-mortgage loans for the purchaser of a permanent residence are slightly below the prevailing market. To be eligible, faculty members must meet the credit requirements of the bank.

Information concerning terms and conditions of the Mortgage Program may be obtained from the Benefits Office.

**l.   The Yale Homebuyer Program**. The Yale Homebuyer Program offers a significant financial subsidy to any Yale employee working half-time or more who buys a home in designated New Haven neighborhoods.

**m.   Scholarship Plan for Sons and Daughters of the Faculty and Staff**. Partial scholarship grants for sons and daughters of eligible faculty and staff members may be awarded under the following conditions:

i.   The student must be enrolled on a full-time basis in an accredited community college, four-year college, or university and must be a candidate for a bachelor's or an associate's degree.

ii.   At the time of matriculation for the covered term, a parent of the scholarship applicant must have been a full-time employee during the entire six years preceding the date of application; or the four years preceding the date of application and a total of forty-eight months, whether or not continuous, prior to the preceding four years for a total of eight years; or the parent must have been a retired, deceased, or totally disabled employee who, at the time of retirement, death, or disability, had been continuously employed full-time for the preceding six years.

iii.   The amount of the scholarship is equal to one-half of the school's tuition and general fees (except fees for room and board), up to a maximum amount that is determined annually by the Corporation.

iv. The student will not be eligible for a scholarship grant for any semester that begins after the student's twenty-fifth birthday.

For a full statement of the plan, consult the Benefits Office.

**n.    Auditing University Courses.** Full-time or emeritus faculty members and their spouses are eligible to audit courses in the Graduate School and Yale College during the academic year. Faculty members require only the instructor's permission to audit a course. Spouses must have the permission of both the instructor and a designated member of the Yale College Dean's Office for undergraduate courses or the appropriate associate dean of the Graduate School for graduate courses. For regulations governing the auditing of courses in the professional schools, consult the registrars of those schools directly.

**o.    Tuition Benefits** Faculty members whose appointments are at least half-time and their spouses may receive a tuition reduction when they enroll, through the regular admissions procedures, in courses offered through the Yale College non-degree Special Students Program, the Yale Summer Session, or the Graduate School's Division of Special Registration.

## 2.   Benefits  Available to Faculty on Salaried Visiting Appointments

Persons holding salaried visiting appointments for one semester or longer are automatically enrolled in the Yale University Retirement Account Plan and are eligible to participate in any of the health insurance programs (see Section XVIII.D.1).

## 3.   Benefits  for Postdoctoral Appointees

As employees of the University, postdoctoral associates are entitled to fully or partially subsidized membership in one of the available health plans offered by Yale, Long-term Disability and Group Life Insurance, retirement programs, and dental coverage for themselves, and their families, subject to specific plan provisions. For a full statement of applicable benefits consult the Benefits Office.

Postdoctoral fellows are eligible to enroll in health and dental plans, and this membership may be subsidized in whole or in part, to the extent that funds for this purpose are included in the fellowship or are supplemented by the mentor or the department.

Postdoctoral appointees are entitled to stated University holidays. In the event that an appointee's funding source specifies vacation or holiday provisions, the terms of the funding source shall apply.

Postdoctoral appointees may be granted up to eight weeks of paid Parental Leave. In addition, unpaid leave may be granted for up to sixteen calendar weeks in year one and up to twelve weeks in year two of any two-year period under the following circumstances: serious illness of the appointee; birth or adoption of a child; care of a seriously ill child, spouse, or parent. Requests for these and other exceptional leave arrangements should be forwarded by the appointee's advisor to the appropriate Dean in the case of the professional schools or to the Provost in the case of departments in the Faculty of Arts and Sciences. In the event that an appointee's funding source specifies leave provisions that differ from those stated above, the terms of the funding source shall govern, and where necessary the leave proposal shall also be sent to the funding agency.

Postdoctoral appointees and their spouses are eligible to audit courses and to receive tuition reductions when enrolling in a number of specific Yale programs. These benefits  are outlined in detail in the University's Policies for Postdoctoral Appointments.

### E.  Services for International Faculty and Research Staff

The University provides assistance to departments that wish to hire or host scholars from abroad. The Office of International Students and Scholars (OISS) is the University's representative and primary contact for all immigration matters to the Department of Homeland Security's U.S. Citizenship and Immigration Services (DHS/USCIS), as well as to any other government agencies involved in bringing foreign nationals to Yale University (e.g., Departments of State and Labor). The OISS Director or Associate Director or their designee must sign any immigration document issued by, or on behalf of, the University. Any application that is submitted to one of these agencies and that bears an unauthorized signature will be returned.

**Use of Outside Counsel**. Unless previously authorized by OISS and the Office of General Counsel, outside counsel may not represent the University, or sign any documents on behalf of the University, in any application that pertains to an immigration benefit for a University employee. Applications submitted to the United States Citizenship and Immigration Services or the Department of Labor that do not bear an authorized OISS signature will not be processed.

The Office of International Students and Scholars must be consulted before making a commitment to hire an individual who is neither a U.S. citizen nor a U.S. permanent resident. The Office will work with the hiring department and the individual to make certain that Yale's employment of the individual is compliant with both institutional policies and the relevant federal laws and regulations

prior to the individual commencing employment. OISS staff members are available to discuss the details of a particular case, to make recommendations, and then to follow through with the preparation and submission of the immigration application. In most instances, particularly where the individual's situation is fairly straightforward, OISS can handle the application expeditiously and without charge to the individual except for government filing fees.

A person accepting an offer of employment with the University must have an approved appointment before the process can begin as well as valid immigration status prior to beginning employment. The scholar must maintain valid immigration status with continual authorization for employment throughout the duration of the appointment at the University. Appointing departments are responsible for informing the foreign national of this requirement, and all offer letters to foreign nationals should include a phrase such as "offer is contingent upon obtaining and retaining valid immigration status." Appointing departments are also responsible for making sure they are in compliance with all I-9 requirements.

If a hiring unit brings a candidate to campus for an interview, that candidate may wish to meet with a member of the Office of International Students and Scholars to explore whether the candidate's present status is satisfactory for employment at Yale and, if not, what options exist to cover the proposed period of employment. The following considerations help determine the non-immigrant status for which the individual should apply:

1. Nature and duration of the initial appointment.

2. Amount of time available before the candidate is to take up the position and the time needed to process the applications.

3. Candidate's immigration history.

4. Long-terms plans of the University and the candidate. Is the nature of the employment likely to change? Does the candidate wish to remain in the United States indefinitely.

5. Possibilities of employment for the candidate's spouse.

6. Compensation and tax implications.

7. International travel plans.

The following visa classifications are typically used for faculty and staff:

**J-1 Exchange Visitor Professor or Researcher.** Available to visiting scholars, postdoctoral appointees, visiting and temporary faculty and research staff. The J-1 status cannot be used for a ladder faculty position. The source of salary support can be from sources external to Yale. The J-1 is limited to five years.

**H-1B Temporary Worker.** The individual must be a Yale employee holding an academic appointment in teaching or research. The H-1B is limited to six years.

**O-1 Person of Exceptional Ability.** The individual must be a Yale employee and a person of demonstrated national and international prominence. The initial period of stay is up to three years with one-year extensions thereafter. There is no maximum cumulative duration.

**U.S. Permanent Resident (immigrant status, i.e. "green card").** Positions eligible for Yale's sponsorship for U.S. permanent resident status include teaching and research faculty appointments, including lecturers and lectors with multiple-year appointments. Yale does not sponsor postdoctoral fellows or associates for U.S. permanent resident status.

**Special Procedures for Faculty Positions**. To assure consideration for United States permanent resident status, a new faculty member must contact the Office of International Students and Scholars during the first six months of their first appointment. It is possible to use the original faculty search as the basis of an application for United States permanent resident status, but only if the search included a print advertisement and the application is filed within 18 months of the position being offered.

**Short-Term Visitors**. There are restrictions concerning payment of persons in other non-immigrant statuses of which a department must be aware before extending an invitation to give a lecture or participate in a conference. An international visitor in a "tourist" classification, i.e. B-1, B-2, WB, or WT, may be reimbursed and paid an honorarium if the academic activity lasted no longer than nine days *and* if the visitor has not accepted payment of expenses or honorarium from more than five U.S. institutions or organizations in the previous six months. If either of these conditions is not met, the individual in tourist for pleasure status (B-2 or WT) may *not* receive either honorarium or reimbursement. However, if the individual holds tourist for business status (B-1 and WB), the visitor may be reimbursed for expenses, but may not be paid an honorarium. For visitors holding non-immigrant visa statuses other than tourist, reimbursement may usually be paid, but in most instances an honorarium cannot be provided. Please refer to Yale Policy 3415 for information about persons in other non-immigrant visa categories. Refer to the Yale Tax Compliance & Planning Office for a comprehensive guide and planning tool with respect to payments to international visitors.

**General Procedures and Information.** The Office of International Students and Scholars seeks to protect the privacy of foreign nationals in accordance with general University guidelines on the disclosure of information. Data on immigration status will be provided only as required by federal regulation.

OISS maintains up-to-date information about the regulations and procedures involved in hiring and hosting international scholars. Upon arrival at Yale, international scholars must visit OISS where they will receive a packet of important information about their immigration status responsibilities, as well as information about Yale and New Haven and the programs and resources offered by OISS.

**International Tax Office**. The Internal Revenue Service (IRS) requires that the University apply specific federal tax withholding and reporting rules to payments made to international students and scholars. For U.S. tax purposes, individuals are classified in one of the following categories: U.S. citizens, permanent resident aliens (i.e. green card holders), resident aliens, or nonresident aliens.

The International Tax Office provides guidance concerning federal tax withholding and reporting of payments made to individuals who are neither U.S. citizens nor U.S. permanent residents. This service is offered by the Yale Tax Department for the benefit of international students, scholars and visitors of Yale University.

The International Tax Office meets with the international student, scholar or visitor on a one-on-one basis to determine the individual's residency status for tax purposes and to determine the proper federal income tax and FICA withholding. The International Tax Office reviews and processes applicable tax treaty exemption forms.

International students and scholars receiving any type of payment from the University are advised to schedule an appointment with the Tax Office.

## F.  The Office  of International Affairs

The Office of International Affairs supports the international activities of the schools, departments, offices, centers, and organizations at Yale; promotes Yale and its faculty to international audiences; and works to increase the visibility of Yale's international activities around the globe. The Office  staff can provide country-specific contacts and information, materials about the University in many languages, and logistical assistance in developing new projects and resolving problems.

The University supports international collaborations and recognizes that they sometimes involve formal agreements that have legal standing or obligate the University in other ways. In order to assist in creating such relationships, the Office of International Affairs provides advice and guidelines for this process.  Faculty who wish to explore having a formal

relationship with a non- U.S. university, research institution, or other entity, are therefore asked to consult with the Office of International Affairs.

The University strongly encourages all members of the University community who are contemplating travel abroad for educational or other purposes to plan well in advance and to take precautions to ensure a safe trip. A range of resources for international trips are available at the Yale website for international travel. In addition to Web-based information that is provided by the United States State Department and various other governments, the University encourages members of the Yale community to consult UHC Global Travel Assistance (formerly "FrontierMEDEX"), a private travel emergency assistance provider engaged by Yale to support students, faculty, and staff who are traveling internationally.

## G. Resources and Accommodations for Faculty Who Have Disabilities

The Accommodation Program is designed to facilitate individual accommodations for current and prospective Yale faculty and staff who have disabilities. A faculty member in need of such an accommodation should contact the Director of the Office for Equal Opportunity Programs as early as possible. Accommodations may include, for example, authorization to use the special services van, preferential parking locations, adaptive computer hardware and software, and physical modifications in buildings

## H. Business and Administrative Support

Each school and department at Yale is supported by a business manager or other lead department administrator who is responsible for ensuring that faculty, students, and staff receive high quality financial, administrative, and related support. In providing this support the school or department business office staff assists faculty with understanding University policies and procedures, so faculty members can maximize the time and attention they spend on teaching and research, while also fulfilling their administrative responsibilities

Faculty are encouraged to engage the school or department business office staff for assistance with the wide range of administrative matters that can arise during the conduct of teaching and research. The staff may be able to provide such assistance directly or by referring the faculty member to the appropriate University office.

**I.   Yale Travel Services**

The Yale Travel Management office provides a list of preferred vendors, discounts available, and the Yale policy and procedures for travel can be found on its website. Yale travelers are encouraged to use a Yale University purchasing card (P-card) to pay for travel expenses. Information on how to obtain a P-card is available through the department's business manager.

**J.   Parking**

The University Parking and Transit Service administers parking for faculty and staff and allocates parking permits for which monthly fees are charged. Copies of the regulations and applications for parking-lot permits may be obtained from the Parking Service.

Members of the faculty who park in Yale-owned lots automatically pay for parking with pre-tax dollars through regular payroll deductions. Those who commute to work by mass transit or park in non-Yale lots may participate in the Yale pre-tax mass transit or parking benefit.

**K.   Identification Cards**

Identification cards are required for all employees. Members of the faculty must visit in person one of the University's I.D. centers. These centers are located at 246 Church Street for the central and science campus and at 333 Cedar Street, IE-41, Sterling Hall of Medicine, for the medical campus.

**L.   Identification Cards for Spouses**

Yale identification cards are available to spouses of faculty appointed for one semester or more and who are employed at least half-time. The spouse must visit in person the central or medical I.D. center and must provide proof of marriage. The privileges the Yale I.D. card permits include the borrowing of books from the University libraries, access to the Yale Shuttle bus and employee membership rates at the Payne Whitney Gymnasium and the Yale Golf Course. For additional information, contact the appropriate I.D. center.

**M.   Letters of Introduction**

Letters of introduction for faculty members who plan to travel abroad are provided by the Office of the Secretary.

## N.  Yale NetIDs

A Yale NetID and password are required to gain access to the campus network and most University information technology services and online resources. The lead administrator in the applicable department or program is responsible for coordinating the assignment of NetIDs to new faculty and staff. The most important NetID maintenance task is choosing and maintaining a strong password that must be changed once per year. For more information, see Guide 1610 GD.01, Selecting Good Passwords.

## O.  Technology and Computing Support for Faculty

Information Technology Services (ITS) promotes and develops the use of technology to support teaching, learning, and research throughout the University. A summary of ITS services for faculty can be found at the ITS webpage on teaching.

# XIX.  Retirement

On July 1, 1993, compulsory retirement of tenured faculty was eliminated. Because department and school planning is enhanced by knowing the approximate retirement dates of tenured faculty, the University has created several programs to encourage members of the faculty to plan for retirement and to inform chairs of their plans.

## A.  Full Retirement

Retired members of the faculty who continue to be professionally active contribute a great deal to the University community.  In order to support the continued professional activity of retired faculty and to accommodate this activity to the primary requirements of students and non-retired faculty, the following policies and procedures have been developed.

For information about emeriti titles for retired faculty, please see Section XXI.

## 1.  Office  and Research Space

While available office space must first accommodate those who have not retired, every attempt will be made to provide office space to retired members of the faculty. Although research space is even more limited, it can also be assigned to retired ladder faculty if circumstances permit and need is demonstrated, for example by an active and well-funded research program. Assignment will be made by the Provost or appropriate Dean on the recommendation of the department chair. The amount of research space provided will, in most instances, be substantially less than the amount occupied before retirement. Assignments of office and laboratory space to retired faculty will be reviewed annually to determine whether renewal is possible in the context of competing needs.

## 2.  Privileges for Retired Faculty

Retired faculty will retain a number of faculty privileges. They include the following:

**Library.** Stack and borrowing privileges are the same as for non-retired faculty. For further information, contact the Privileges Office  at Sterling Memorial Library.

**Parking.** In general, parking spaces will be assigned to retired faculty with the same priority as those faculty held before retirement but at the lowest rate category. For further information, contact the Parking Office.

**Computers.** Retired faculty are entitled to keep for their own use computers provided for them by the University.

2.   **Privileges for Retired Faculty (continued)**

**Fellowships in the Residential Colleges.** "Emeritus Fellow" status is determined by the heads and fellowships of the colleges. For further information, contact the Council of the Heads of College.

**Dining Halls.** All Emeritus Fellows are provided free lunches Monday through Friday in any Residential College dining hall or the Hall of Graduate Studies. Anyone connected with the University, including all retired faculty and their guests, may eat in any University dining hall and pay cash.

**Payne Whitney Gymnasium.** Rates and privileges are the same for retired faculty as for non-retired faculty. For further information, contact the Payne Whitney Gymnasium.

**Yale Charge Accounts.** Emeritus Fellows of Residential Colleges may have the same charging privileges as non-retired faculty.

3.   **Health Insurance**

Retired members of the faculty are eligible for University-sponsored and subsidized health insurance. The University's contribution to the cost of retiree health insurance premiums is based upon length of service at Yale and reaches its maximum at thirty years of service. To obtain information on cost and coverage, prospective retirees are encouraged to consult the Benefits Office.

4.   **Teaching**

Retired faculty members may teach on a part-time, per-course, year-to-year basis under certain conditions. For the professional schools, consult the appropriate Dean. For Emeritus faculty in the Faculty of Arts and Sciences, the following conditions prevail:

**a.**   Like one-year replacement faculty, Emeritus faculty are hired when a department or school has demonstrated that the teaching is necessary due to leaves or vacancies that cannot be covered by non-retired faculty.

**b.**   A Dean's or the Provost's capacity to make the appointments will depend upon the availability of funds to meet one-year teaching needs.

5.    **Supervision of Dissertations**

Faculty members are expected to anticipate their retirement by arranging their supervision of graduate dissertations so that all dissertations will be completed by the time of retirement or shortly thereafter. Emeritus faculty may, without being appointed as lecturers, serve as readers of dissertations, but they may not serve as directors of dissertations.

6.    **Research Sponsorship and Appointments**

Several important considerations determine whether the University will sponsor, totally or in part, retired faculty members' applications for grants or contracts, and whether it will authorize research appointments for retired faculty members on the grants or contracts of non-retired faculty members. In making its decision the University must take into account the contribution of the proposed research to the University community, its demand upon physical facilities, and its direct and indirect effects upon other research and training programs of the department and the University. The same considerations govern decisions to authorize retired members of the faculty to work with postdoctoral appointees and, if so, in what numbers. Non-retired faculty members may apply for research support that extends beyond retirement, and Emeritus faculty may apply for research support, provided that the Provost or the appropriate professional school Dean is willing to commit the necessary space and facilities for the period of the grant. In the case of faculty in the Faculty of Arts and Sciences and in the School of Medicine, this will be done only on the recommendation of the department chair.

If the department or school faculty so votes, and if the appointment is approved by the Corporation, the Emeritus faculty member may be given the additional title of senior research scientist/scholar, to be held during the period of grant or contract support. In the case of Emeritus faculty in the Schools of Medicine and Nursing, the department's recommendation should be forwarded to the Dean for approval. The same procedures will apply in the case of Emeritus faculty who seek appointment as senior research scientists/scholars on the grants or contracts of non-retired members of the faculty.

An Emeritus faculty member who is appointed as senior research scientist/scholar under the above conditions may be paid salary from the grant or contract for any fraction of their time, up to 100%. The salary will be set by the Provost or Dean, except that in no case may it exceed any cap imposed by the granting or contracting agency.

During the period that an Emeritus faculty member is being paid from a grant, they will be entitled to all fringe benefits normally accorded to senior research scientists/scholars, as long as these benefits are entirely chargeable to the grant. Fringe benefits are accorded only to employees who are paid for half time or more.

## B. Phased Retirement Plan

With the exception of faculty at the School of Medicine and the School of Public Health who may participate in retirement programs specific to those schools, all tenured faculty members with at least ten years of tenured service at Yale may enter the Phased Retirement Plan as early as the next January 1 or July 1 following their 65th birthday, but no later than the next July 1 following their 70th birthday. Eligible faculty may elect to participate in this plan between their 65th and 70th birthdays. A faculty member may elect Phased Retirement for a fixed period of one, two, or three years preceding full retirement. They works half-time through the entire such period, and is compensated at 100% salary during the first year, 75% salary during the second year (if any), and 50% salary during the third year (if any) in the Plan. An eligible faculty member may take a one-semester Triennial Leave of Absence while in the Phased Retirement Plan. While on such a leave, the faculty member will receive the percentage of salary designated to that specific year of the Plan.

For additional details about the Phased Retirement Plan, please consult the Benefits Office.

# XX.  University Policies Concerning Teaching and Research

## A.  Instructional and Institutional Responsibilities

Members of the teaching or research faculty are expected to meet their professional and institutional commitments at Yale on a regular basis throughout the academic year. For full-time teaching faculty this includes being on campus most days of the work week, except for holidays and recess time, in order to be available to advise students, serve on departmental and University committees, attend regular and special departmental meetings and seminars, interview prospective candidates for positions, and meet other normal obligations of a member of the faculty. All teaching faculty must remain on campus during reading and examination periods. If unable to meet a class because of illness or other emergency, faculty members should promptly notify their department or school officials. For faculty in professional schools whose responsibilities include off-campus professional activities or require different schedules, different expectations apply. For further detail, consult the Dean.

A primary mission of the University is to disseminate knowledge. As underscored by the Report of the Committee on Freedom of Expression, "to fulfill this function a free interchange of ideas is necessary not only within [the University's] walls but with the world as well."[29] Accordingly, all classes at Yale University are to be on-the-record, and all materials presented in these classes may be shared with the larger University community and the public (subject to applicable copyright laws). No class in the University may be considered confidential or off-the-record. Exceptions to this rule may be made for protected health or attorney-client information that is used in clinical educational settings. Exceptions may also be made for occasional presentations by visiting lecturers who are willing to present educationally valuable information to students, but only on condition that the information provided not be circulated beyond the classroom; under such circumstances, any other information that may be presented in class, including any information that is presented by the instructor of record and/or that may provide the basis for the evaluation of student performance, must be considered non-confidential and must be available for dissemination and open discussion. Any other request for an exception regarding the use of confidential content or materials in the instructional setting must be presented to the Provost or Provost's designee (normally a Dean) for review and must be approved by the Provost/designee before such content or materials are presented to or used by students. Nothing in this paragraph should be construed so as to undermine or erode Yale's

---

29  "Report of the Committee on Freedom of Expression at Yale" (Yale University, January 1975), available at:
https://yalecollege.yale.edu/deans-office/reports/report-committee-freedom-expression-yale

policy prohibiting the conduct of classified research. Further, nothing in this paragraph implies that students or others are permitted to record and distribute material from a class to the Internet or other media without the explicit prior permission of the instructor.

The department chair or, in a professional school, the Dean, is charged with assigning faculty members' classroom responsibilities that will provide students comprehensive and effective formal instruction. Varying instructional techniques and classroom demands mean that such assignments may differ among departments and schools. The obligations of a member of the teaching faculty go well beyond classroom and other teaching duties. They include time spent on research, student advising, and various kinds of department and University service on committees and in administrative roles. While the proportion of these components varies from individual to individual and from time to time, faculty may not substitute time spent on sponsored research for their regular teaching duties without special permission from the Provost.

Members of the faculty are often called upon to write letters of recommendation for students or to offer their professional judgments on the qualifications of candidates for positions at Yale or elsewhere. It is understood that such judgments, expressed orally or in writing, will be consistent with the nondiscrimination policy of the University (see Section III.A).

## B. Safety Issues

Members of the faculty share responsibility for maintaining the safety of the community and its individual members. Yale has its own police force, fire safety officials, and health and counseling services, as well as specialists in environmental safety and emergency preparedness. Further information and contact details can be found on the Yale Public Safety website.

These safety professionals rely on members of the Yale community to help identify potential threats of harm or violence and to allow support services to connect with people who may be at risk or who may be putting others at risk. Instructors are often the first to notice a student who is troubled. On occasion, the behavior of a student might appear to pose a risk of harm either to the student himself or herself or to others. It is important to communicate such observations and concerns to those who can best assess the information and manage the situation.

Any disturbing behaviors should be reported to the student's Dean and, in the case of Yale College students, to the appropriate residential college Dean or to the Dean of Student Affairs. If a threat of violence seems imminent, contact the Yale Police directly at 911 or 203-432-4400. A report of concern will not necessarily lead to disciplinary action. Indeed, in most cases, counseling or

some other risk reduction strategy is the most likely next step.

## C.  Research and Scholarship

Excellence in research and scholarship is expected of persons holding faculty appointments. It is University policy to encourage and assist research and scholarship that are essential to the training of students, to the advancement of knowledge, and to the intellectual growth of the faculty. To this end, the University will help faculty to secure appropriate research support from outside sources. Applications for external funding for research, teaching, or other activities (including subaward applications to other entities) must be submitted through Yale. Exceptions allowing submission of applications through another institution or organization require prior written approval of the Provost or, for faculty in the School of Medicine, the Dean. Clinical activities, which occur primarily in the Schools of Medicine and Nursing, are also covered by the policies and procedures below.

### 1.  Policies and Guidelines

**a.**   All members of the faculty are expected to conduct their scholarly research and publish the results of that research consistent with the highest standards of ethical conduct, truth, and accuracy. Any instance of suspected academic misconduct should be reported to the Dean of the relevant school or of the FAS. In accordance with federal regulations, the University has established policies and procedures for responding to allegations of academic or research misconduct. The policies and procedures describe the University process for conducting resulting inquiries and investigations. Faculty and students are required to cooperate fully in any inquiry or investigation of such allegations, e.g., by providing requested documents and information.

**b.**   The University does not conduct or permit its faculty to conduct secret or classified research. This policy arises from concern about the impact of such restrictions on two of the University's essential purposes: to impart knowledge and to enlarge humanity's store of knowledge. Both are clearly inhibited when open publication, free discussion, or access to research are limited.

**c.**   For the same reasons, the University requires that investigators be able to publish the results of their research without prior approval of a sponsor. Agreements may, however, permit sponsors a brief period to review proposed publications and presentations to identify 1) proprietary information that may require patent or copyright protection, or 2) information confidential to the sponsor that must be removed. In general, sponsors are granted review periods of 30 to 45 days prior to submission for publication, but review and delay periods should total no more than 90 days.

**d.**   The University requires that all documents related to federally sponsored projects, including primary research data, be available to federal auditors for the period specified by federal regulation – in most cases, a period of three years from the filing of the final required technical or financial report. Yale expects faculty members to retain all research data, whether resulting from federal sponsorship or not, in their laboratories or other bona fide research locations, and to provide access to the data when requested to do so by authorized institutional officials. Requests from sponsors or others for access to research data should be forwarded to the Office of Sponsored Projects. Subpoenas, summonses, or similar legal documents pertaining to research should be brought to the attention of the Office of the Vice President and General Counsel as soon as possible, and in any event, before a response is made.

**e.**   Yale believes that federal support of research should be allocated on the basis of excellence as determined by merit review. Consequently, the University does not seek funds through earmarking, nor does it permit its faculty to do so. If faculty have identified promising areas of research that are not adequately supported by federal funding agencies, the University is prepared to work with faculty to develop competitive, merit-based programs in such fields of research.

**f.**   In order to ensure that research is conducted by those who have the requisite training and skill, as well as the appropriate relationship to Yale, the University will normally sponsor proposals only when the principal investigator or project director is employed full-time by the University and holds an appointment as assistant professor, associate professor, professor, research scientist/scholar, or senior research scientist/scholar. Exceptions require the approval of the Provost or, where appropriate, the Dean of the relevant professional school or of the FAS. In some cases, the Provost or Dean may delegate approval to the department chair.

**g.**   It is University policy to take title to all patents and certain copyrighted materials that result from the research activities of faculty, staff and students at Yale. See Section XX.D for University policies on patents, copyrights, and licensing.

**h.**   In accordance with federal law, University policy, and the University's federalwide assurance of compliance, filed with the U.S. Department of Health and Human Services, every Yale investigator conducting research involving human participants, whether or not funded by a federal sponsor, must submit a proposed research plan to the appropriate Yale institutional review board (IRB) for review. In addition, investigators who participate in research involving human participants must complete training in human subjects research and must comply with IRB policies and procedures. Research may not begin until the IRB has fully approved the research plan and all related consent documents, and until the required training has been completed. Further information and a full statement of applicable University policies and procedures are

available on the Human Research Protection Program website.

**i.** The study of live vertebrate animals is an integral part of Yale University's research and teaching missions and is a privilege regulated by legal, state, and federal agencies. Faculty members contemplating using live vertebrate animals in research, teaching, or testing should refer to the Yale University Institutional Animal Care and Use Committee (IACUC) website and contact the IACUC office. Work with live vertebrate animals may not begin until all required training and approvals are obtained.

**j.** The University has developed guidelines and procedures for handling radioactive materials, hazardous chemicals, potentially hazardous biological materials, and controlled substances, as well as for other aspects of research relating to occupational and environmental safety. These policies are generally administered by Environmental Health and Safety (EHS). Any investigator planning to use such materials must consult with EHS for guidance on required training, required protocol review, proper handling, state and federal safety regulations, proper procedures in the event of spillage, etc., prior to initiating a study or bringing such materials into a laboratory. In most instances, a laboratory must be inspected and approved by EHS before hazardous substances are brought to that location at the University. Protocols calling for the use of certain substances must receive prior review by the relevant Safety Committee.

## 2. University Offices Supporting Research and Scholarly Activity

The process of obtaining and managing external support for research and scholarly activity is multifaceted. The University has many offices that support faculty in this endeavor. It is necessary for faculty to involve the appropriate offices when conversations with potential and actual sponsors take place and to continue discussions with the relevant University offices in planning proposals, preparing research agreements, and developing corporate and foundation relationships.

The Office of Research Administration integrates and effectively operates a number of offices related to the research enterprise.

The Office of Sponsored Projects (OSP) provides a diverse array of knowledge and services and should be consulted early in the planning stage of any funding proposal. This office assists faculty in locating funding sources, interprets sponsor guidelines, and ensures proposals for research, education, and training programs are submitted in accordance with sponsor requirements, Yale policies, and federal, state, and local laws. Further, OSP is charged with negotiating the terms and conditions of all domestic and foreign sponsored grants, cooperative agreements, research contracts, material transfer agreements, and clinical trials, and issues all subawards.

As the office authorized to accept awards on behalf of the University, OSP authorizes the establishment of University financial accounts to manage receipt and disbursement of funds supporting research.

In addition, OSP is responsible for the institutional financial aspects of externally-provided funding. This office manages billing and drawdown of sponsored funds, prepares financial reports and invoices, and monitors expenditures to assure compliance with sponsor terms and conditions. The OSP is also responsible for the University's effort reporting compliance program and oversees certain financial audits.

Corporate and Foundation Relations within the Office of Development builds and optimizes institutional relationships between the private sector and the University. It represents Yale to corporations and foundations when seeking support for faculty and institutional needs. Working closely with faculty and administrators, Corporate and Foundation Relations maintains relationships with a broad range of corporation and foundation donors and advises faculty on donor interests, proposal development, submission strategies, and stewardship. These relationships are realized in the form of gifts, grants, and other arrangements, which may be directed to research, student support, capital needs, and programmatic funding. In order to ensure that faculty are well served and that institutional policies and procedures are met, Corporate and Foundation Relations works closely with the Office of the Provost, the Office of Sponsored Projects and the Office of Cooperative Research. Faculty seeking support from corporations and foundations should inform Corporate and Foundation Relations of their activities in order to obtain advice and help and, as appropriate, authorization to proceed.

The Office of Cooperative Research (OCR) is charged with commercializing technology resulting from Yale research so that it may benefit the public. OCR will evaluate the commercial potential of inventions, biological materials, and Yale-owned copyrightable materials. If the potential market is deemed sufficient, OCR will arrange for the preparation of appropriate patent applications or other legal protection. Further, OCR will seek commercial partners and negotiate appropriate agreements to develop and commercialize marketable inventions and biological or copyrightable materials. Faculty inventors and creators are expected to assist the OCR as necessary in preparing patent applications and identifying and working with potential licensees. See Section XX.D for University policies on patents, copyrights, and licensing.

### 3.  Seeking and Maintaining External Research Support

**a.**  All faculty who expect to be engaged in sponsored research must complete certain online

training modules in order to comply with federal and other regulations and University policy. A key module is called Sponsored Research Administration for Yale Faculty, which can be accessed through the Office of Research Administration. Other training modules and forms (e.g. Animal Care and Use, Laboratory Safety, Human Subjects Protections, and Conflict of Interest/Commitment) can be accessed through the Training and Certification website. This website offers an assessment tool that allows individual faculty to learn what training they are required to take and provides the courses and forms that accompany these requirements.

**b.**   All applications and proposals seeking public or private support for research, teaching, or other programmatic activities must be reviewed and approved by the University before submission in the University's name to a potential sponsor through the Office of Sponsored Projects. That office will consult with the appropriate development office when the sponsor is a corporation or foundation and with the Office of Cooperative Research when a patent or license is involved. In particular, proposal budgets must be reviewed before submission to or negotiation with a sponsor. Corporate and foundation proposals other than those associated with established programs funded year-to-year should be discussed in advance with Corporate and Foundation Relations.

**c.**   Early contact with the relevant offices is strongly encouraged in connection with all applications for support, and adequate time should be allowed for administrative review and negotiation with the sponsor, particularly when a sponsor proposes terms that contravene University policy. Faculty members should be aware that proposals may have to be withdrawn if adequate time is not allowed for administrative review, or if the sponsor is unwilling to agree on terms consistent with the University requirements.

**d.**   All applications and proposals must state the full cost of the project and proposed sources of support. Any agreement requiring University cost-sharing must be approved by the Provost or by the Dean in a professional school or the FAS in advance of submission.

**e.**   All proposal budgets, including those submitted to corporate and foundation sponsors, must include the appropriate Facilities and Administrative costs (also known as indirect costs). Requests for adjustments in those costs should be addressed to the Office of Sponsored Projects, which in some cases may approve the request, or in others may forward it for consideration to the Dean of a professional school or of the FAS or to the Provost.

**f.**   Proposals will be approved for submission to sponsors only if it is clear that appropriate space, equipment, and personnel will be available to carry out the proposed activity and if the proposed activity complies with all applicable regulations and policies regarding the conduct of research.

**g.** Proposals that may involve the relationship between Yale and New Haven or other surrounding communities present special issues. Any grant proposal with significant impact on local institutions, firms, or individuals (as participants or as collaborators) should be brought to the attention of the Vice President and Director of New Haven and State Affairs and Campus Development, who has overall responsibility for relations between Yale and the surrounding community.

**h.** Post-award proposals to change the duration, award amount, or conditions of support require the same approvals within the University as an original proposal or award.

## D. Patents, Copyrights, and Licenses

The University encourages faculty members to consider ways in which the results of their research may best be disseminated and made available for the public good. To facilitate the patenting and licensing of inventions developed under University auspices, Yale established the Office of Cooperative Research (OCR). The primary goals of this office are to facilitate the dissemination of research results through commercial development and to generate revenue that will both reward inventors for their creativity and support research and other educational programs at the University.

Under the Yale University Patent Policy the University owns any patentable invention made by a faculty member using Yale facilities or otherwise under the auspices of the University. Biological materials created by faculty, like other forms of property at Yale, are generally owned by the University. Under the Yale University Copyright Policy, the University generally will not assert ownership of traditional copyrightable materials created by a faculty member unless the works are created: (1) pursuant to certain assigned tasks, (2) under funding agreements that provide for Yale ownership, or (3) under circumstances involving significant commitments of Yale resources, as determined by the Provost. The University shares any net royalties received through licensing of faculty inventions and Yale-owned copyrights in accordance with the plan set forth in the Patent Policy, and generally follows the same formula for Yale-owned copyrighted materials. The University's share of net royalty income is used primarily in support of research and education.

In conjunction with any application for external funding support, a faculty member must have completed the Training and Certification module confirming their acceptance of the University Patent and Copyright Policies, and committing to execute all appropriate forms required to document ownership by the University (through OCR) of any inventions conceived by them at the University and any copyrightable material to which the University takes title under the Copyright Policy. When disclosing a particular invention or certain copyrighted materials, a faculty member also must execute an assignment to the University of their interest in such

inventions and in those certain copyrights. Such assignments are necessary to document, report, or commercialize those inventions and copyrights and in order to share with faculty royalty revenues received by the University from commercial licensees.

For further information on the Office of Cooperative Research, see Section XX.C. For definitive statements of the Yale Patent and Copyright Policies, please refer to their complete texts, available at the **Office of Cooperative Research**.

### E.   Outside Interests and Employment

The University encourages its faculty to participate in sponsored research, consulting, and other activities that may benefit not only the individual faculty member, but also the University and society. Although activities directed outside the University are often compatible with teaching, scholarship, and research at Yale, they may in some cases conflict with these on-campus responsibilities or with the University's institutional goals. Outside interests and commitments may divert essential faculty creativity and energy away from Yale and may appear to compromise the integrity of Yale teaching, research, clinical care, or scholarship. Therefore, Yale reaffirms its unqualified  commitment to the following key principles:

**a.**   The overriding professional obligation of all full-time members of the University community is to Yale and to its mission of creating, disseminating, and preserving knowledge.

**b.**   No outside activity or financial interest of any member of the University community will be permitted to compromise the integrity of teaching, research, clinical care, and scholarship at Yale, to detract from the fulfillment of that member's fundamental obligations to Yale, or to compromise the welfare of Yale students.

Note also that faculty members should refrain from using University facilities more than occasionally and incidentally in performing any of the outside activities described in this subsection.

### 1.   Conflict  of Interest and Conflict  of Commitment

Yale is committed to ensuring that the research, consultation, and other activities of faculty and non-faculty employees are conducted properly and consistently with the principles of openness, trust, and free inquiry that are fundamental to the autonomy and well-being of a university and with the responsible management of the University's business. Toward that end and consistent with federal regulations, Yale has formulated a policy and procedures to identify and address potential, actual, and apparent conflicts of commitment and conflicts of interest. The text of the policy and procedures can be viewed on the Conflict of Interest Office website. The fundamental premise of this policy is that each member of the Yale community has an

obligation to act in the best interests of the University, and must not allow outside activities or outside financial interests to interfere with that obligation.  For example, conflicts of interest may exist with respect to University financial decisions in which the individual is involved. These might include investments,loans, purchases or sales of goods or services (See General Purchasing Policy https://your.yale.edu/policies-procedures/policies/3201-general-purchasing which describes restrictions and additional disclosure requirements) and financial accounting decisions.

A conflict of commitment occurs when the commitment to external activities of a faculty or staff member adversely affects their capacity to meet University responsibilities. This form of conflict is easily defined and recognized since it involves a perceptible reduction of the individual's time and energy devoted to University activities. Obligations to the University are not discharged solely by teaching classes; individuals must be available to their students outside the classroom, participate on committees and in other University activities, supervise graduate students and postdoctoral trainees, and make constant progress in research programs. Any relationship with an outside organization that requires frequent or prolonged absence from Yale represents a conflict of commitment that must be avoided.

A conflict of interest exists when an individual has an external economic or other personal interest that affects or provides an incentive to affect the individual's conduct of their University activities. Conflicts of interest can arise naturally from an individual's engagement with the world outside the University, and the mere existence of a conflict of interest does not necessarily imply wrongdoing on anyone's part. When conflicts of interest do arise, however, they must be recognized, disclosed, and either managed, reduced, or eliminated. Even when no conflict actually exists, the appearance of conflict of interest may be present. Such apparent conflicts can do as much damage as actual ones by undermining the credibility of research, clinical care, scholarship, or University financial decisions, and they also must be avoided.

The University Policy on Conflict of Interest requires that all faculty members employed more than half-time at the University, all faculty members who hold administrative positions, and all faculty members responsible for the design, conduct, or reporting of research at the University, even if employed half-time or less, submit an annual External Interest Disclosure Form. All such faculty must update the form whenever a material change has occurred and, whenever possible, disclose expected changes or newly anticipated financial or outside interests before they occur. Faculty new to Yale should complete the form as soon as possible after their arrival. The Provost's Conflict of Interest Committee (the Committee) is charged with reviewing disclosure forms and making recommendations to the Provost with respect to any actions required to manage, reduce, or eliminate conflicts.

An investigator may not apply for a grant or contract until they have completed and submitted an up-to-date disclosure. Likewise, a grant or contract award cannot be established until the required disclosures have been made and reviewed, and a determination reached either that no conflict of interest exists or that an identified conflict has been appropriately managed, reduced, or eliminated. In addition to the annual disclosure that is submitted to the Committee, investigators conducting research involving human participants may be subject to supplemental disclosure requirements as outlined in the policies of the relevant Institutional Review Board. For further information, contact the Conflict of Interest Office.

## 2.  Outside Academic Employment

Of all the activities in which faculty might engage outside the University, teaching presents issues that require special attention because it competes most directly with the core educational mission of the University. In judging the appropriateness of such activities outside of Yale, faculty members should consider the time commitment involved, as well as the potential impact of these activities on the fulfillment of Yale's institutional goals. In addition to those instances of outside teaching that are discussed below, ladder faculty may not accept a concurrent ladder faculty appointment at another academic institution, even while on unpaid leave from Yale or the other institution (see Section III.E).

**a.**   Outside teaching activities that relate closely to the University's educational mission require both prior approval by the relevant provost (or the Provost's designee) and disclosure to the Committee. These include:

**i.**   Participation in distance learning ventures with other institutions or with commercial firms whether or not for compensation, throughout the calendar year; or

**ii.**   Teaching or co-teaching courses during the academic year at another academic institution. (Note that it is unusual for the Provost to approve such activities. If permission is granted, a faculty member might receive a reduced schedule at Yale for such teaching by arrangement with the other institution, but they typically would not be permitted to receive extra compensation.)

**b.**   Outside teaching activities that do not require disclosure or prior approval by the cognizant provost include:

**i.**   Delivering individual lectures at other academic institutions, at conferences, or at public gatherings (with or without remuneration);

**ii.**   Teaching summer courses at Yale or elsewhere by faculty not receiving other summer compensation for the period in question; and

**iii.** Posting non-interactive educational materials on a website.

The above rules apply to faculty who hold more than half-time appointments at the University, all faculty members who hold administrative positions, and all faculty members responsible for the design, conduct, or reporting of research at the University. Faculty who are half-time or less are expected to discuss with the chair, relevent dean, or a provost their teaching activities outside of Yale when they are appointed and whenever a material change has occurred. Note that the ownership of teaching materials, whether used on or off-campus, is governed by the Yale University Copyright Policy.

**3. Outside Research Activities**

The primary professional responsibilities and obligations of a Yale faculty member, including teaching, research and service, are to the institution and its students. Faculty members may have consulting relationships with outside entities consistent with the principles in this *Handbook*. Faculty members may not participate as principal investigators, co-investigators or key personnel in projects supported by grant or contract funds awarded to another entity that is directly related to their Yale research. Exceptions are made rarely and only with the prior approval of the Provost.

Note also that in order to comply with their primary obligations to the University, faculty members must refrain from:

a) Devoting any measurable effort (paid or unpaid) to projects supported by grant or contract funds awarded to another entity directly related to or in conflict with their Yale research. However participation in a sponsored project awarded to another entity is permitted for example, when in the role of 'Other Significant Contributor' or similar role with no formal effort commitment or expected remuneration; and

b) Using University facilities more than occasionally and incidentally in performing any of the outside activities described in this subsection.

**4. Non-academic Employment**

When considering an offer of ancillary non-academic employment, such as consulting to a business concern or to a government agency, all faculty members should be guided and governed by the primary obligation of furthering the University's essential purposes.

Activities clearly of institutional benefit (e.g., occasional site visits or evaluations at the request of a government or special accrediting agency, advice to foundations, work for professional associations, academic lectures at other institutions, or certain community services) are an important component of faculty responsibility. Other extramural activities that are consistent with the individual's overriding obligation to the University, including consulting and other gainful employment, are acceptable and encouraged. Such activity must be consistent with the principles outlined above and

may not require on the average more than one day per seven-day week in any academic semester or in any summer month during which faculty members are receiving compensation for full-time employment at the University. These activities must be disclosed annually to the Committee. However, it is the responsibility of the chair, relevant dean, or Provost to take appropriate action to identify and address conflicts of commitment.

Persons on phased retirement may accept any outside employment that does not create a conflict of interest or interfere with their obligations to the University.

### 5.   Faculty Management of an Outside Entity

Because of the potential for conflict of interest or commitment, in many circumstances it would not be appropriate for a faculty member to participate in the day-to-day management of an outside entity, whether for-profit or non-profit. However, in certain circumstances, the University may allow faculty management of outside entities under conditions that are intended to minimize the likelihood of a conflict of interest or commitment. The following process must therefore be observed:

**a.**   If a faculty member has, or plans to assume, managerial responsibilities of an outside entity, that individual is required to disclose the proposed involvement to the Provost and relevant Dean, who will review the proposal to ensure that such activities do not interfere with the faculty member's obligations to the University. See Section XX.E.5 for policies regarding faculty service on boards of directors.

If the Provost or Dean determines that a faculty member's involvement with an entity entails, or is likely to entail, a conflict of commitment, then the Provost or Dean will consult with the faculty member in order to seek ways to eliminate or manage the conflict.

A faculty member may request a reduced appointment or a leave without pay for up to one year, consistent with the policies in this *Handbook*, to devote the time to the non-academic commitment. Such requests will be acted on by the Provost after an assessment of institutional needs.

At the end of any approved leave or period of reduced responsibility, the faculty member may request a return to full-time status. If the faculty member wishes to continue to devote substantial time to the outside entity, the individual will normally be expected to resign from the University. Subsequent reappointment to full-time status requires application and approval through the University's ordinary faculty appointment procedures. The faculty member may also request conversion to part-time adjunct status, but subsequent reappointment would similarly involve the usual University appointment procedures.

**b.**   After the Provost or relevant dean has reviewed the proposed involvement and resolved any conflict of commitment, the faculty member discloses the proposed activity to the COI Committee for review.

If the COI Committee determines that a faculty member's disclosed involvement with an outside entity entails, or is likely to entail, a conflict of interest, the Committee will consult with the faculty member and if necessary, the Provost or relevant dean, in order to seek ways to eliminate or manage the conflict.

**c.**   When an outside entity has been established to commercialize the results of a faculty member's professional endeavors, the proposal must also be reviewed and approved by the **Office of Cooperative Research**. Additional conflict management techniques may be implemented as described in the Conflict of Interest Principles Applicable to Faculty Relationships with Startup Companies codified in Appendix C of the University Policy on Conflict of Interest.

## 6.   Faculty Service on Boards of Directors

Faculty service on the board of directors (BOD) of a for-profit or non-profit entity creates fiduciary responsibilities to the outside entity that may conflict with the individual's obligations to the University. These fiduciary responsibilities may constrain the faculty member's ability to engage in certain University activities, including research. When considering service on the BOD of an outside entity, faculty members should be guided and governed by the principles outlined in this Handbook. In all cases, BOD activities must be disclosed to the COI Committee in accordance with the University Policy on Conflict of Interest. Further, in the following situations, faculty members must request approval from the relevant provost or designee prior to accepting a position on the BOD of any outside entity:

a)   The faculty member holds an administrative position at the University (e.g., dean, department chair, director of a center); or

b)   The outside entity is a start-up company which is based on intellectual property developed by the faculty member.

Board activities, when aggregated with all other non-academic employment, may not require on the average more than one day per seven-day week in any academic semester or in any summer month in which the individual is receiving compensation for full-time employment at the University.

Faculty members who serve on the board of any outside entity should recuse themselves from all University decisions that involve the entity. Further, faculty members should recuse themselves from all decisions on behalf of the entity that involve the University. Faculty members must comply with all requirements of the COI Committee for managing or eliminating any conflict or potential conflict involving the board service. In certain circumstances where the COI Committee or the Provost determines that a conflict cannot be managed effectively, the faculty member may be required to discontinue the board relationship with the outside entity.

### F.   University Equipment

Equipment purchased with internal Yale funds or Yale-administered outside grant funds is owned by Yale, except when a sponsor has expressly retained title.

**1.   Off-campus Use**. Faculty members planning to use University-owned equipment off campus or to take equipment with them on leaves of absence should complete a request for off-campus use of Yale University equipment. Consult Yale University Policy 1110, Personal and Off-Campus Use of University Property, for more detailed information. This policy applies to all types of equipment, including laboratory equipment, office equipment, and computing equipment. Note also that the faculty member is responsible for compliance with all regulations of Environmental Health and Safety (EHS) governing hazardous materials, insofar as they affect University equipment.

**2.   When Departing from Yale**. When a faculty member moves to another academic or nonprofit institution, transfer of equipment is treated as follows:

**a.**   Equipment purchased with University funds (provostial, school, or department) or purchased with outside grant funds may only be transferred in accordance with Yale University Policy 4209, Equipment, and if the sponsor's policy permits the transfer.

**b.**   The University is prohibited from transferring equipment purchased with federal funds to for- profit institutions. Any transfer of equipment purchased with internal Yale funds to a for- profit institution would require special permission from the Provost.

**3.   Decommissioning Equipment.** Environmental Health and Safety (EHS) maintains policies and procedures for decommissioning equipment, and should be consulted when equipment is no longer needed.

# XXI.  Other University Policies Affecting Faculty

## A.  Sexual Misconduct

Yale University is committed to maintaining and strengthening educational, working, and living environments founded on mutual respect in which students, faculty, and staff are connected by strong bonds of intellectual dependence and trust. Sexual misconduct is antithetical to the standards and ideals of our community. Therefore, Yale University prohibits all forms of sexual misconduct.

These policies apply to all members of the Yale community as well as to conduct by third parties (i.e., individuals who are not students, faculty, or staff, including but not limited to guests and consultants) directed toward University students, faculty, or staff members. Conduct that occurs in the process of application for admission to a program or selection for employment is covered by these policies. These policies also apply to conduct that occurs in Yale-related off-campus activities.

Many forms of sexual misconduct are prohibited by federal law, including Title IX of the education amendments of 1972, and by Connecticut statutes, and could result in criminal prosecution or civil liability.

Sexual misconduct incorporates a range of behaviors including sexual assault, sexual harassment, intimate partner violence, stalking, voyeurism, and any other conduct of a sexual nature that is nonconsensual or has the purpose or effect of threatening, intimidating, or coercing a person.  Violations of Yale's Policy on Teacher-Student Consensual Relations and its Policy on Relationships between Staff Members are also forms of sexual misconduct.  For more information on Yale's policies, definitions and resources, please see the Sexual Misconduct Response and Prevention website.

The University Title IX Coordinator has responsibility for ensuring compliance with Yale's policies regarding sexual misconduct. The University-Wide Committee on Sexual Misconduct (UWC) and the University and Deputy Title IX coordinators address allegations of sexual misconduct.

**Retaliation**. Yale University strictly forbids retaliation against individuals who report sexual misconduct, file complaints of sexual misconduct, cooperate in the investigation of sexual misconduct, or hear formal or informal complaints of sexual misconduct. This prohibition against retaliation protects complainants, respondents, witnesses, or other persons who have provided or may provide information to a Title IX coordinator or the University-Wide Committee on Sexual Misconduct (UWC).  If you believe you have experienced retaliation, you should consult with a Title IX coordinator or the UWC Secretary.

## B.   Teacher-Student Consensual Relations

The integrity of the teacher-student relationship is the foundation of the University's educational mission. This relationship vests considerable trust in the teacher, who, in turn, bears authority and accountability as a mentor, educator, and evaluator. The unequal institutional power inherent in this relationship heightens the vulnerability of the student and the potential for coercion. The pedagogical relationship between teacher and student must be protected from influences or activities that can interfere with learning and personal development.

Whenever a teacher is or in the future might reasonably become responsible for teaching, advising, or directly supervising a student, a sexual relationship between them is inappropriate and must be avoided. In addition to creating the potential for coercion, any such relationship jeopardizes the integrity of the educational process by creating a conflict of interest and may impair the learning environment for other students. Finally, such situations may expose the University and the teacher to liability for violation of laws against sexual harassment and sex discrimination.

Therefore, teachers (see below) must avoid sexual relationships with students over whom they have or might reasonably expect to have direct pedagogical or supervisory responsibilities, regardless of whether the relationship is consensual. Conversely, a teacher must not directly supervise any student with whom they have a sexual relationship.

Undergraduate students are particularly vulnerable to the unequal institutional power inherent in the teacher-student relationship and the potential for coercion, because of their age and relative lack of maturity. Therefore, no teacher shall have a sexual or amorous relationship with any undergraduate student, regardless of whether the teacher currently exercises or expects to have any pedagogical or supervisory responsibilities over that student.

Teachers or students with questions about this policy are encouraged to consult with the University's Title IX Coordinator, the Deputy Title IX Coordinator for their school or any other school, the Provost, or one of their designees.

A student or other member of the community may lodge a formal or informal complaint regarding an alleged violation of this policy with the University's Title IX Coordinator or with the University-Wide Committee on Sexual Misconduct.

Violations of the above policies by a teacher will normally lead to disciplinary action.

For purposes of this policy, "direct supervision" includes the following activities (on or off campus): course teaching, examining, grading, advising for a formal project such as a thesis or

research, supervising required research or other academic activities, serving in such a capacity as Director of Undergraduate or Graduate Studies, and recommending in an institutional capacity for admissions, employment, fellowships, or awards. "Teachers" includes, but is not limited to, all ladder and non-ladder faculty of the University. It also includes graduate and professional students and postdoctoral fellows and associates only when they are serving as part-time acting instructors, teaching fellows, or acting in a supervisory capacity or in similar institutional roles, with respect to the students they are currently teaching or supervising. "Students" refers to those enrolled in any and all educational and training programs of the University.

Additionally, this policy applies to members of the Yale community who are not teachers as define above, but have authority over or mentoring relationships with students, including athletic coaches, supervisors of student employees, advisors and directors of student organizations, Residential College Fellows, as well as others who advise, mentor, or evaluate students.

## C.  Accommodations for Students with Disabilities

The Resource Office on Disabilities facilitates individual accommodations for Yale undergraduate, graduate, and professional school students who have disabilities and who register with and have appropriate documentation on file in the Resource Office. Faculty members are notified in writing when students in their classes have disabilities and need accommodations for class work and exams. Examples of accommodations include extension of time on tests, a distraction-free testing location, use of a laptop computer to take an exam, and materials in alternate formats such as large print, Braille, or taped texts. The Resource Office staff welcome conversations with faculty members to ensure proper coordination of special arrangements for the student while maintaining the integrity of course requirements.

## D.  Employment of Members of the Same Family and Related Matters

Since appointments are based on individual merit, there is no presumption against employing two members of the same family in one academic department or school. It is expected, however, that one member of a family will not be present during discussion of, nor participate in decisions affecting, the appointment, promotion, salary, or other terms of employment of another member of that family. For the same reason, persons sharing an intimate relationship similarly must avoid being present during, or participating in, such decisions affecting the terms of employment of each other. In cases of doubt or conflict of interest, employment judgments should be determined by other qualified professional persons. In the case of academic appointments, these persons would act under the supervision of the Provost and the appropriate Dean. In the case of non-academic appointments, they would act with the aid of the Human Resources Department.

**E.  Short-term and Long-term Medical Disability (effective July 1, 2018)**

Full-time members of the teaching faculty who are unable to meet their teaching responsibilities or to perform other duties as a result of a planned or emergency short-term medical disability – including a period of incapacity related to the bearing of a child – will be relieved of those duties, without loss of salary or benefits, during the period of incapacity. Documentation of the nature and duration of the disability is required in order to determine the appropriate accommodation and arrangements. If the duration of the incapacity overlaps by more than three weeks with the faculty member's scheduled instruction, the Dean will determine appropriate arrangements, such as compressing the schedule, arranging replacement and/or co-instruction, or cancelling classes. Outside the period of incapacity, the faculty member will be expected to meet as many department and University responsibilities other than teaching, including research, committee membership, administrative duties, and student advising, as are compatible with the medical situation. Should the medical incapacity prevent the faculty member from meeting the full responsibilities for a period that extends beyond six months, the Office of the Provost should be consulted and the University's long-term disability policy may apply. Alternatively, a leave of absence without salary might be approved. A period of leave with relief from all responsibilities due to short-term medical disability counts as time granted under FLMA; for more information see Section XVII.D.1. For information regarding extensions of appointments related to a short-term medical disability, see Section III.F.

**F.  Standards of Business Conduct**

The Standards of Business Conduct, which have been endorsed by the Yale Corporation, articulate the ethical and legal principles that have long governed business dealings by Yale faculty and staff, both among themselves and with the outside world. The Standards reflect values to which the University subscribes, and they inform the University policies that address related issues. The specific matters discussed in the Standards are the following:

- Ethical conduct

- Respect for others

- Conflicts of interest

- Compliance with applicable laws and regulations

- Compliance with applicable University policies and procedures

- Compliance with contractual, grant, and other private obligations

- Individual responsibility and accountability

- Stewardship of property and funds

- Appropriate treatment of confidential informatio

- Recording, allocating, and charging costs and effort

- Internal controls

- Gifts, gratuities, and "kickbacks"

- Antitrust

- Obligation to report suspected material violations

- Consequences of violation

## G. Appropriate Use of Technology Resources

The use of Yale's information technology resources is subject to Yale's Information Technology Appropriate Use Policy.

## H. Military Service

The following policies apply to faculty with tenure, faculty on term appointments, research faculty, and postdoctoral appointees who are drafted, enlist in the armed forces of the United States for five  years or less, or are members of a reserve unit and are called to active duty for five years or less.

## 1. Faculty with Tenure

Tenured faculty members may rejoin the faculty after military service, upon application to do so within ninety days after release, honorable discharge, or retirement from such service, as though they had been on leave of absence without salary for the period of military service.

## 2. Faculty on Term Appointments

Faculty members on term appointments may, under federal law, return to their former position, or

to a position of like seniority, status and pay, upon application to do so within ninety days after release, honorable discharge, or retirement from military service, for the number of semesters remaining in their original term of appointment at the time they entered military service. Any academic semester during which the faculty member is required to miss at least six weeks of that semester due to military service is not counted in the term of appointment or in determining the maximum time in a particular rank or in the combined non-tenure ranks.

### 3.    Research Faculty and Postdoctoral Appointees

Research faculty and postdoctoral appointees may, under federal law, return to their former position, or to a position of like seniority, status and pay, upon application to do so within ninety days after release, honorable discharge, or retirement from military service, for the number of months of active employment remaining in their term of appointment at the time they entered military service. For postdoctoral fellows supported from non-Yale funds, concurrence of the supporting organization is necessary.

### 4.    Benefits

Fringe benefits available to tenured and non-tenured faculty members, research faculty, and postdoctoral associates who enter military service are the same as those available to persons in these categories who are on leave of absence without salary. See Section XVIII.C for a description of these benefits. Since the maximum length of an unpaid leave is limited to one year for faculty members whose terms of appointment are for three years or longer, and to three months for all other faculty members and postdoctoral associates, the University's contribution to the cost of health, dental, disability, and group life insurance has similar limits. Furthermore, eligibility for partial tuition grants under the University's Scholarship Plan for Sons and Daughters of the Faculty and Staff is limited to one year while the faculty or staff member is in military service.

### I.    Jury Duty

Faculty members occasionally may be called to report for jury duty. Faculty members scheduled for jury duty should notify their department chair and Dean in advance of the court appearance date. Faculty members on jury duty will be paid their regular salaries.

## J.  Use of University Facilities

University organizations that schedule events in University facilities should be certain that such events are consistent with the purposes of the University. Non-Yale groups wishing to use University facilities must receive written authorization from the Office of the Secretary or other appropriate University official. Generally, only nonprofit, tax-exempt organizations are eligible, and proof of liability insurance coverage will be required. Use of University facilities for research purposes by non-Yale organizations requires a special agreement negotiated by the Office of Special Projects.

## K.  Use of University E-mail Addresses, Websites, and Stationery

Yale e-mail addresses and websites, and all stationery printed with Yale identification, should be used only for Yale-related correspondence. They may not be used by any member of the academic community for soliciting funds or assistance for a cause not connected with the University, and they should not be used for expressing private opinions that are not directly related to the user's Yale responsibilities. For further detail, see Section 1607.1 of the Information Technology Appropriate Use Policy and Section 504.1 of the Personnel Policies and Practices Manual.

From time to time, the family or estate of a deceased faculty member requests access to the faculty member's Yale office files or e-mail account. Because these records may contain legally protected information about students, other Yale employees, or patients, the University cannot honor these requests. In some circumstances, the University may agree to provide to a deceased faculty member's family or estate their correspondence with a limited number of parties or records regarding specific subjects.

The University has adopted a standard format and style for official University stationery. All departments are encouraged to use this format and style. The best grade of Yale stationery is printed on paper made especially for Yale and bears the University arms as a watermark. This paper is used exclusively for the letterhead style approved by the Secretary of the University.

## L.   University Federal Relations

The Division of the Vice President and General Counsel coordinates the University's federal relations efforts and monitors federal legislative and administrative policies and actions. Faculty members who are interested in information on Congressional or federal administrative activities affecting the University are encouraged to contact the Associate Vice President for Federal and State Relations in the Office of Federal Relations. Faculty members who plan to testify before Congress should consult with the Associate Vice President for assistance and for information on communications made by the University on related federal matters.

## M.   Faculty Involvement in Community Activities

The Office of New Haven and State Affairs is responsible for Yale's community relations and appreciates notification of a faculty member's research, teaching, publications, or civic activities in the New Haven community that might bear on New Haven's municipal or social concerns as well as on the University's institutional interests. The Office of New Haven and State Affairs can assist faculty members who seek to engage the municipal or state governments on research or policy matters and should be informed when a faculty member appears before or submits testimony to city or state legislative bodies.

## N.   University Tribunal

The University Tribunal may be convoked by the President as an appropriate forum for addressing the most serious allegations of misconduct by a student or a member of the faculty. Copies of the procedures are available in the Office of the Secretary and the Office of the Provost.

## O.   Indemnification for Legal Expenses

The University will pay, under certain conditions, the legal fees and financial judgments incurred by its faculty members who are made parties to litigation because of actions they have taken in good faith and within the scope of their employment at Yale. Indemnification is governed by Connecticut statute, and questions on the subject may be directed to the Office of the Vice President and General Counsel.

## P.   Workplace Violence Prevention Policy

Yale University has a long-standing commitment to provide a campus that is safe and secure for faculty, staff, students, and visitors. Behavior that is threatening, harassing, intimidating or in any way dangerous or violent is strictly prohibited and will result in serious action by the University. For further details, please view the Yale University Campus and Workplace Violence Prevention Policy.

**Q.  Emeriti Titles**

**Emeriti titles** are granted by vote of the Corporation to members of the teaching faculty in certain ranks when they retire or resign from Yale, provided that they meet specified criteria for age and length of service. The ranks eligible for Emeriti status are: tenured faculty in all schools; professors in the practice in all schools; professors in the investigator, clinician-scholar, and clinician-educator ranks in the School of Medicine; professors in the clinical track in the School of Nursing; clinical professors in the Schools of Law; and full-time adjunct professors in the Schools of Art, Drama, and Music. To be eligible, a faculty member must have reached age 55, held full-time appointments in the eligible rank(s) for at least ten years, and the combination of age plus eligible years in rank must equal at least 75. Nominations for Emeriti status shall be submitted by a faculty member's Dean to the Office of the Provost by the final semester of the individual's non-retired status. Emeriti titles do not confer any academic appointment. They designate honorific status to which Yale attaches certain non-monetary administrative privileges, and the title may be withdrawn by the Corporation upon recommendation of the President or Provost.

# EXHIBIT F

# Yale SCHOOL OF MEDICINE

**NANCY J. BROWN, MD**
*Jean and David W. Wallace Dean of Medicine*
*C.N.H. Long Professor of Internal Medicine*

PO Box 208055
New Haven CT 06520-8055
T 203 785-4672
F 203 785-7437
nancy.j.brown@yale.edu

*courier*
Sterling Hall of Medicine (SHM)
Room C-203
333 Cedar Street
New Haven CT 06510

August 21, 2020

**<u>By Email</u>**

Bandy X. Lee, M.D., M.Div
bandy.lee@yale.edu

   Re:  Response to Letter Appealing Non-Reappointment

Dear Dr. Lee:

I am writing in response to the letter you sent me on August 14, 2020, asking to appeal your non-reappointment as a voluntary faculty member in the Division of Law and Psychiatry within the Department of Psychiatry at Yale School of Medicine.

Section III.L.3 of the Faculty Handbook describes the procedures through which faculty members may appeal non-reappointment decisions. Because the section excludes "voluntary faculty in the Schools of Medicine and Nursing" from its coverage (pg. 20, n. 11), these review procedures are unavailable to you.

I wish you all the best in your future endeavors.

Sincerely,

Nancy J. Brown, M.D.



JA-000259

# EXHIBIT G

# Yale OFFICE OF THE PROVOST

PO Box 208333
New Haven CT 06520-8333
T 203 432-4444
F 203 432-0161
provost.yale.edu

*courier*
2 Whitney Avenue, Suite 400
New Haven CT 06510

September 8, 2020

Bandy X. Lee, M.D., M.Div.
Via E-mail: bandy.lee@yale.edu

Dear Dr. Lee:

I am writing in response to your letter of August 25, 2020, seeking to appeal your non-reappointment as a voluntary faculty member in the Department of Psychiatry. As Dean Brown explained to you in her August 21, 2020 letter, the Faculty Handbook explicitly excludes voluntary medical school faculty members from Yale's appeal procedures. While I cannot accept your appeal, I have asked Dr. Krystal to write to you and explain the reasons that the Department declined to reappoint you, which I hope will address your concern that the decision was not adequately discussed with you.

Sincerely,

Scott Strobel
Provost and Henry Ford II Professor of Molecular Biophysics and Biochemistry
and Professor of Chemistry

# EXHIBIT H

**From:** D'Agostino, Victoria <victoria.dagostino@yale.edu>
**Sent:** Wednesday, January 22, 2020 3:26 PM
**To:** D'Agostino, Victoria
**Subject:** FW: Reappointment

**From:** Freedman, David
**Sent:** Friday, July 28, 2017 3:39 PM
**To:** Lee, Bandy <bandy.lee@yale.edu>
**Cc:** Ball, Samuel <samuel.ball@yale.edu>
**Subject:** Reappointment

Dr. Brandy Lee
123 York Street, #20E
New Haven, CT 06511

We are pleased to confirm your reappointment as Assistant Clinical Professor for the term of July 1, 2017 – June 30, 2020 in the Department of Psychiatry at Yale University.

Thank you for your continued contributions to the department.

Regards,
David Z. Freedman

Yale School of Medicine
Department of Psychiatry
Faculty Affairs Coordinator
300 George Street, Suite 901, Room 10
New Haven, CT 06520
Voice: (203) 785-7485
Fax:     (203) 785-7357
david.freedman@yale.edu

https://medicine.yale.edu/

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **BANDY LEE,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO.** |
| | : | **3:21-cv-00389 (SALM)** |
| **v.** | : | |
| | : | |
| **YALE UNIVERSITY,** | : | |
| **Defendant.** | : | |
| | : | **SEPTEMBER 19, 2022** |

## EMERGENCY MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION, NUNC PRO TUNC

Plaintiff, Bandy Lee, through her undersigned counsel, moves the Court for permission to file a motion for reconsideration, *nunc pro tunc*, with respect to the Court's Ruling granting Defendant's motion to dismiss, dated August 30, 2022 (Doc. No. 42). Plaintiff realizes that the seven-day deadline established by Local Rule 7(c) for filing a motion for reconsideration has already passed. Plaintiff also appreciates that Local Rule 7 and related caselaw advise that motions for reconsideration should generally be confined to certain criteria. Nevertheless, in light of the fact that new counsel has appeared for Plaintiff, Plaintiff appeals to the Court's discretion for permission to file a motion for reconsideration limited to the following issues that Plaintiff maintains are worthy of further consideration by the Court:

(1) The Court's Ruling misunderstood Plaintiff's contract claim as one that required a disregard for whether Defendant found Plaintiff was not qualified. At one point, the Court stated that it construed Plaintiff's claim as based on a contract "that Yale would not decline to reappoint plaintiff, regardless of whether it found that plaintiff was no longer qualified for the position, based at least in part on her public statements."

(Doc. 42, p. 20)(emphasis added). At other points, the Court repeated that same framing in concluding that Plaintiff's contract claim failed to state a claim. (*See* Doc. 42, pp. 28, 29.) On page 29, the Court construed Plaintiff's contract claim as effectively requesting that the Court "hold that a private university . . . undertakes a contractual commitment to guarantee reappointment to that faculty member, regardless of whether the university finds that the faculty member is no longer qualified for the position." (Doc. 42, p. 29)(emphasis in original). By construing Plaintiff's contract claim as one that disregarded whether Yale found that Plaintiff was no longer qualified for her position, the Court's Ruling construed and framed Plaintiff's breach of contract claim in a manner that did not conform to Plaintiff's actual claim as plead in the complaint. Plaintiff never defined her contract claim in that fashion, and now expressly clarifies for the Court that her contract claim does not require a disregard for whether Defendant found that she was no longer qualified for the position. Plaintiff's contract claim, as plead in the complaint, relies upon statements and representations by Yale, including in the Faculty Handbook, regarding free expression as a right and privilege at Yale. Before filing a notice of appeal, Plaintiff requests an opportunity to address this further through a motion for reconsideration. *See Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 59 (2d Cir. 1987)(reversing summary judgment on First Amendment retaliation claim, in part, because the District Court's decision misunderstood the plaintiff's claim).

(2) The Court's Ruling misunderstood Plaintiff's contract claim as one based on a contractual commitment for guaranteed reappointment. The Court also concluded

JA-000265

that Plaintiff's contract claim failed because Plaintiff's allegations "d[id] not support

a finding that Yale intended to guarantee plaintiff continued employment." (Doc. 42,

p. 24.) On the following pages, the Court also stated that Plaintiff's claim failed

because the Court found that the Faculty Handbook and policies identified by

Plaintiff did not demonstrate a "contractual commitment to <u>guarantee plaintiff</u>

<u>continued reappointment</u>." (Doc. 42, p. 25)(emphasis added)(*See also* Doc. 42, p.

27)("not sufficient to manifest the intent to form a contract for <u>guaranteed</u>

<u>reappointment</u>.")(emphasis added); (Doc. 42, p. 29)(construing Plaintiff's claim as a

request for the Court to hold that private university undertook contractual

commitment to guarantee reappointment). To clarify, Plaintiff's contract claim is not

based on a claim that Defendant guaranteed her continued reappointment. Rather,

Plaintiff's contract claim alleges that Defendant undertook a contractual commitment

that took the form of a limitation on Yale's ability to end Plaintiff's appointment for a

particular reason, i.e., Plaintiff's exercise of academic freedom and free expression,

and then violated that commitment. The Connecticut Supreme Court modeled how

an implied contract claim could be based on an agreement that an employer would not

terminate employment for a particular reason in *Coelho v. Posi-Seal Int'l, Inc.*, 208

Conn. 106, 113-14 (1988). The issue of how long Defendant would have continued

to reappointment Plaintiff, in the absence of Defendant's violation of its contractual

commitment, is a question of fact regarding the extent of Plaintiff's damages that

must be decided on a full record – not a reason to dismiss for failure to state a claim.

*See, e.g., Weinstein v. Univ. of Conn.*, No. DOCKET HHD-CV-11-6027112-S, 2022

Conn. Super. LEXIS 1421, at *69-72 (Super. Ct. June 30, 2022)(in awarding damages

for a period of years on an unlawful termination claim, trial court determined based on the trial record how long university would have continued reappointing plaintiff professor on an annual basis, even though plaintiff's appointments were annual appointments without guarantee of renewal).

(3) <u>Court Erred in Finding Facts Against Plaintiff.</u>  Plaintiff also respectfully submits that the Court erred in finding facts against Plaintiff.  For instance, in considering Plaintiff's contract claim, the Court apparently accepted as true that Defendant actually found that Plaintiff was no longer qualified for her position, and cited to Dr. Krystal's letter on that issue.  (Doc. 42, pp. 28, 29.)  However, just because Yale, or Dr. Krystal, made certain statements to Plaintiff, or included certain statements in a letter, does not conclusively demonstrate that Defendant actually believed, or determined in good faith, that Plaintiff's public statements rendered her not qualified.  It is certainly plausible that the rationale identified in Dr. Krystal's letter is a pretext.  In fact, Plaintiff's allegations in the complaint, which the Court must accept as true at this juncture, lend support for an argument that subsequent statements by Yale claiming that Plaintiff's public statements rendered her not qualified were pretextual.  (*See, e.g.,* Doc. No. 27, ¶¶ 38-41.)  Plaintiff also respectfully submits that, to the extent that the Court was entitled to consider certain documents outside the complaint that Yale submitted, such as the letter from Dr. Krystal, the Court was only entitled to consider them for the limited purpose of what the documents stated – not for the truth.  Since Yale offered its own correspondence as evidence, the documents are hearsay when Yale attempts to rely upon them and should not have been accepted for the truth

4

of the matter.  Accordingly, at this stage of the case, the Court could not find that Yale actually believed that Plaintiff was not qualified for her position.

(4) <u>In Deciding Plaintiff's 31-51q Claim, the Court Should Consider the Definition of "Employee" in Conn. Gen. Stat. § 31-51m.</u>  In deciding that Plaintiff was not an "employee" under Conn. Gen. Stat. § 31-51q, the Court applied the remuneration test that the Connecticut Supreme Court adopted for claims under CFEPA.  (Doc. 42, pp. 38-41.)  However, for several reasons, Plaintiff respectfully submits that the Court should look to the definition of employee in Conn. Gen. Stat. § 31-51m for guidance on the meaning of "employee" in § 31-51q, not the remuneration test adopted for CFEPA:  (a) § 31-51m and § 31-51q are in the same chapter, of the same title, of the Connecticut General Statutes, while CFEPA is in a different title altogether, § 46a-51 *et seq.*; (b) § 31-51q, which the legislature enacted shortly after it passed § 31-51m, follows a similar structure as § 31-51m that includes a prohibition against discipline or discharge of an employee for engaging in protected conduct, and Connecticut courts have interpreted "discipline" in both statutes to have the same meaning, *see, e.g., Weinstein v. Univ. of Conn.*, No. DOCKET HHD-CV-11-6027112-S, 2022 Conn. Super. LEXIS 1421, at *4 (Super. Ct. June 30, 2022); (c) § 31-51q and § 31-51m are both intended to protect citizens and employees who engage in protected speech or disclosures; even though they define the protected speech and disclosures differently, they are designed to protect people from retaliation at work because they engage in conduct as citizens.  In contrast, CFEPA, like the federal employment discrimination statutes to which the Connecticut Supreme Court looked for guidance in answering the question under CFEPA, is limited to prohibiting discriminatory

*employment practices*; the anti-retaliation provision of CFEPA is similarly limited to prohibiting retaliation against employees who oppose discriminatory *employment practices*.  Therefore, the narrower standard for "employee" that controls CFEPA is not necessarily the best guide for a statute like § 31-51q that is not limited to protecting speech relating to discriminatory employment practices.  Since § 31-51m defines an employee as "any person engaged in service to an employer in a business of his employer," Conn. Gen. Stat. § 31-51m(a)(3), and is devoid of any requirement for "remuneration," Plaintiff submits that further consideration of that definition is warranted.

If the Court is willing to exercise its discretion to allow Plaintiff and her new counsel to file a motion for reconsideration relating to these issues, notwithstanding that the deadline in Local Rule 7(c) has already passed, Plaintiff agrees to file her motion for reconsideration within five days of the Court's ruling (or sooner if the Court directs).  If the Court is only willing to hear further argument with respect to some, but not all, of the issues raised herein, then Plaintiff will of course limit her motion to only those issues on which the Court may grant Plaintiff permission.  In accordance with the goals of Fed. R. Civ. P. 1, Plaintiff is bringing these issues to the Court's attention now, promptly after the appearance of new counsel, so that the Court has an opportunity to consider these issues before the parties commence the appellate process.

Since Plaintiff's deadline to file a notice of appeal is approaching soon,[1] Plaintiff also requests that the Court adjudicate this motion on an expedited basis as an "emergency" motion under Local Rule 7(a)(6).

PLAINTIFF,
BANDY LEE

By: ___/s/Todd Steigman_____
Todd Steigman (ct26875)
Jacques J. Parenteau (ct09771)
Madsen, Prestley & Parenteau, LLC
402 Asylum Street
Hartford, CT 06103
Tel: (860) 246-2466
Fax: (860) 246-1794
tsteigman@mppjustice.com
jparenteau@mppjustice.com

## CERTIFICATION OF SERVICE

I hereby certify that on September 19, 2022 a copy of the foregoing was filed electronically. Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Todd Steigman_____

---

[1] Plaintiff's current deadline to file a notice of appeal is September 29, 2022. After conferring with Defendant's counsel as required by Local Rule 7(b), Plaintiff expects to file a motion for a thirty-day extension of time to file a notice of appeal so that the Court has an opportunity to consider this motion.

7

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **BANDY LEE,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO.** |
| | : | **3:21-cv-00389 (SALM)** |
| **v.** | : | |
| | : | |
| **YALE UNIVERSITY,** | : | |
| **Defendant.** | : | |
| | : | **OCTOBER 6, 2022** |

### NOTICE OF APPEAL

Notice is hereby given that BANDY LEE, Plaintiff in the above-named case, hereby

appeals to the United States Court of Appeals for the Second Circuit from each and every part of

the final judgment (Doc. No. 43) entered in this action on the 30th day of August 2022, including

the Court's Ruling granting Defendant's Motion to Dismiss, dated August 30, 2022 (Doc No.

42), and the Court's Order, dated October 6, 2022 (Doc. No. 58).

**PLAINTIFF,**
**BANDY LEE**

BY: /s/ Todd Steigman
Todd Steigman (ct26875)
Madsen, Prestley & Parenteau, LLC
402 Asylum Street
Hartford, CT 06103
Tel: (860) 246-2466
Fax: (860) 246-1794
Email: TSteigman@mppjustice.com
HER ATTORNEY

**CERTIFICATION**

I hereby certify that on October 6, 2022 a copy of the foregoing was filed electronically. Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Todd Steigman*