# 22-2634

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

BANDY LEE, MD, MDiv,

*Plaintiff-Appellant,*

v.

YALE UNIVERSITY,

*Defendant-Appellee.*

On Appeal from the United States District Court
For the District of Connecticut
Case No. 3:21-cv-00389
The Honorable Sarah A.L. Merriam, U.S. Magistrate Judge

## BRIEF OF DEFENDANT–APPELLEE

Anjali S. Dalal
WIGGIN AND DANA LLP
437 Madison Avenue
35th Floor
New York, NY 10022
(212) 551-2846
adalal@wiggin.com

Jonathan M. Freiman
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
New Haven, CT 06510
(203) 498-4400
jfreiman@wiggin.com

*Attorneys for Defendant–Appellee Yale University*

## CORPORATE DISCLOSURE STATEMENT

Defendant Yale University is not a stock corporation and no publicly held company owns any shares of it.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ..................................................................... iv

STATEMENT OF ISSUES ......................................................................1

INTRODUCTION ..............................................................................2

STATEMENT OF THE CASE....................................................................4

    A. Plaintiff Served as an Unpaid Volunteer Member of the Yale School of Medicine Faculty Whose Term Appointments Were Subject Exclusively to the Judgment of the University ..........................................................4

    B. Plaintiff's Public Statements and Psychiatric Diagnoses of Unexamined Public Figures ...........................................................................8

    C. Yale's Response to Plaintiff's Public Psychiatric Diagnoses of Public Figures She Had Never Examined .................................................13

    D. Plaintiff Sues Yale .......................................................................18

    E. Yale's Motion to Dismiss the Amended Complaint and the District Court Decision ..............................................................................18

    F. Plaintiff's New Lawyers File a Motion for Leave to File a Late Motion for Reconsideration, Which the Court Denies........................................22

SUMMARY OF THE ARGUMENT ....................................................24

STANDARD OF REVIEW .................................................................25

ARGUMENT .................................................................................26

I.    THE DISTRICT COURT CORRECTLY FOUND THAT PLAINTIFF DID NOT PLAUSIBLY ALLEGE THAT YALE BREACHED ITS CONTRACT WITH HER. ...............................................................26

    A. Plaintiff's Three-Year Term as Voluntary Faculty Had No Guarantee of Renewal and Was At Yale's Discretion. ......................................27

B.  The District Court Correctly Construed Plaintiff's Allegations. ................... 40

II.   THE DISTRICT COURT PROPERLY DISMISSED THE GOOD FAITH
      AND FAIR DEALING CLAIM. ................................................... 43

III.  THE DISTRICT COURT PROPERLY DISMISSED THE SECTION
      31-51Q CLAIM. ............................................................... 45

A.  Plaintiff Was Not an Employee Under Section 31-51q. ................................ 46

   1.      The District Court Properly Defined "Employee." .............................. 46

   2.      The District Court Properly Applied the Remuneration Test. .............. 52

B.  Plaintiff Has Not Alleged "Discipline or Discharge" Within the Meaning
    of Section 31-51q. ............................................................ 55

C.  Section 31-51q Does Not and Cannot Limit a University's First
    Amendment Rights. ........................................................... 56

CONCLUSION ..................................................................... 58

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009) ..............................................................25

*ATSI Commc'ns, Inc.* v. *Shaar Fund Ltd.*,
493 F.3d 87 (2d Cir. 2007) ..................................................25

*Avedisian v. Quinnipiac Univ.*,
387 F. App'x 59 (2d Cir. 2010) ............................................55

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007) ........................................................25, 43

*Booking v. Gen. Star Mgmt. Co.*,
254 F.3d 414 (2d Cir. 2001) ........................................26, 47, 48

*Byrne v. Yale Univ., Inc.*,
450 F. Supp. 3d 105 (D. Conn. 2020) ........................34, 38, 39

*Chambers v. Time Warner*,
282 F.3d 147 (2d Cir. 2002) ..................................................9

*CHRO v. Echo Hose Ambulance*,
322 Conn. 154 (2016) ..........................48, 49, 50, 52, 53, 54

*Coelho v. Posi-Seal Int'l, Inc.*,
208 Conn. 106 (1988) ..........................................................34

*Cotto v. United Techs. Corp.*,
251 Conn. 1 (1999) ..............................................................52

*Coulter* v. *Morgan Stanley & Co.*,
753 F.3d 361 (2d Cir. 2014) ..................................................25

*Craine v. Trinity College*,
259 Conn. 625 (2002) ..................2, 27, 33, 34, 36, 37, 38, 57

*Daley v. Wesleyan Univ.*,
63 Conn. App. 119 (2001) ....................................................36

*Est. of Brooks v. Comm'r of Revenue Servs.*,
325 Conn. 705 (2017) ........................................................................58

*Faigel v. Fairfield University*,
75 Conn. App. 37 (2003) ..............................................................36, 37

*Finn v. Barney*,
471 F. App'x 30 (2d Cir. 2012) ....................................................8, 10

*Gaudio v. Griffin Health Servs. Corp.*,
249 Conn. 523 (1999) .......................................................................34

*Geysen v. Securitas Sec. Servs. USA, Inc.*,
322 Conn. 385 (2016) .......................................................................44

*Goel v. Bunge, Ltd.*,
820 F.3d 554 (2d Cir. 2016) .......................................................19, 25

*Grutter v. Bollinger*,
539 U.S. 306 (2003) .....................................................................35, 56

*Gupta v. New Britain General Hospital*,
239 Conn. 574 (1996) ...............................................................36, 37, 39

*Hartwig v. Albertus Magnus Coll.*,
93 F. Supp. 2d 200 (D. Conn. 2000), OB32, 38 ...............................39

*Hope Acad. v. Friel*,
2004 WL 1888909 (Conn. Super. Ct. July 22, 2004) .......................37

*Hughes v. Twenty-First Century Fox, Inc.*,
304 F. Supp. 3d 429 (S.D.N.Y. 2018) .............................................54

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) ...........................................................................56

*Kloth-Zanard v. Amridge Univ.*,
2012 WL 2397161 (D. Conn. June 25, 2012) ..................................37

*Landry v. Spitz*,
102 Conn. App. 34 (2007) .................................................................44

v

*Lieberman v. Gant*,
630 F.2d 60 (2d Cir. 1980) ................................................................35

*Madej v. Yale Univ.*,
2020 WL 1614230 (D. Conn. Mar. 31, 2020) ....................................37

*McNeil v. Yale Univ.*,
436 F. Supp. 3d 489 (D. Conn. 2020), *aff'd in part, vacated in part
sub nom. McNeil v. Yale Chapter of Alpha Delta Phi Int'l, Inc.*,
2021 WL 5286647 (2d Cir. Nov. 15, 2021) ........................................37

*Meade v. Yale Univ.*,
2006 WL 2730320 (Conn. Super. Sept. 7, 2006) ...............................39

*Menaker v. Hofstra Univ.*,
935 F.3d 20 (2d Cir. 2019) ...................................................................9

*Miami Herald Publishing Co. v. Tornillo*,
418 U.S. 241 (1974) .............................................................................56

*Michel v. Yale Univ.*,
547 F. Supp. 3d 179 (D. Conn. 2021) .................................................44

*Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California*,
475 U.S. 1 (1986) .................................................................................56

*Pietras v. Bd. of Fire Comm'rs of the Farmingville Fire Dist.*,
180 F.3d 468 (2d Cir. 1999) ................................................................54

*Ramirez v. Health Net of the Northeast, Inc.*,
285 Conn. 1 (2008) ..............................................................................44

*Redgrave v. Boston Symphony Orchestra, Inc.*,
855 F.2d 888 (1st Cir. 1988) ...............................................................56

*Regents of Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978) .............................................................................35

*Richards v. Direct Energy Servs., LLC*,
915 F.3d 88 (2d Cir. 2019) ..................................................................45

*State v. Williams*,
205 Conn. 456 (1987) ..........................................................................58

vi

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957) ........................................................................35

*Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P.*,
252 Conn. 479 (2000) ....................................................................34

*Trusz v. UBS Realty Investors LLC*,
319 Conn. 175 (2015) ....................................................................52

*Varley v. First Student, Inc.*,
158 Conn. App. 482 (2015) ......................................................47, 48

*York v. Ass'n of Bar of City of New York*,
286 F.3d 122 (2d Cir. 2002) ...............................................22, 53, 54

*Young v. City of Bridgeport*,
135 Conn. App. 699 (2012) ............................................................51

**Statutes**

Massachusetts Civil Rights Act ..............................................................57

C.G.S. § 31–40c(a)(2) ...........................................................................48

C.G.S. § 31-51m ..................................... 46, 47, 48, 49, 50, 51, 55

C.G.S. § 31-51n.................................................................................49, 50

C.G.S. § 31-51o ......................................................................................49

C.G.S. § 31-51p......................................................................................49

C.G.S. § 31-51r(a) ..................................................................................50

C.G.S. § 31-51t to 31-51aa ....................................................................50

C.G.S. § 46a-60(b)(1) .............................................................................50

C.G.S. § 46a-60(b)(4) .............................................................................51

## Other Authorities

Andrew Feinberg, *Trump's mental state*, THE INDEPENDENT (Dec. 4, 2019), https://www.independent.co.uk/news/world/americas/us-politics/trump-mental-state-impeachment-psychiatrist-petition-congress-a9232386.html ...............................12, 13

Bandy Lee, *Opinion*, RAW STORY (Nov. 24, 2019), https://www.rawstory.com/2019/11/trumps-53-minute-fox-rant-is-another-dangerous-sign-of-his-worsening-mental-state-yale-psychiatrist/.....................................11

Bandy Lee, *The Dangerous Case of Donald Trump: 27 Psychiatrists and Mental Health Experts Assess a President* 12 (2017) .................................10

Bandy Lee, TWITTER (Jan. 16, 2020, 9:15 AM), https://twitter.com/bandyxlee1/status/1217812518992842755?lang=en ...........14

Charlie Nash, *Psychiatrist Who Evaluated Trump's Mental State on CNN and MSNBC Argues President is Worse Than Hitler*, MEDIAITE (Nov. 2, 2020), https://web.archive.org/web/20201103014135/https://www.mediaite.com/politics/psychiatrist-who-evaluated-trumps-mental-state-on-cnn-and-msnbc-argues-president-is-worse-than-hitler/.......................................8

Chauncey Devega, *Psychiatrist Bandy Lee,* SALON (May 25, 2017, 5:00 AM), https://www.salon.com/2017/05/25/psychiatrist-bandy-lee-we-have-an-obligation-to-speak-about-donald-trumps-mental-health-issues-our-survival-as-a-species-may-be-at-stake/.................................10

D. Conn. L. Civ. R. 7(c)........................................................................22

Federal Rule of Civil Procedure 12(b)(6) ...............................................25

Tana Ganeva, *Yale psychiatrist*, RAW STORY (July 17, 2019) https://www.rawstory.com/2019/07/yale-psychiatrist-trump-using-racism-as-a-coping-mechanism-as-his-mental-state-rapidly-deteriorates/.........................................................................................11

*The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry*, AMERICAN PSYCHIATRIC ASSOCIATION, 9 (2013), https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/Ethics/principles-medical-ethics.pdf. ..........................................................................9

*Woodward Report on Freedom of Expression*, YALE UNIVERSITY, (Dec. 23, 1974, https://web.archive.org/web/20221103232243/https://dhr.yale.edu/policies-definitions/woodward-report-freedom-expression ...............................................................6, 7, 28, 30, 31, 32

# STATEMENT OF ISSUES

1. Did the District Court properly dismiss the breach of contract claim where Plaintiff's voluntary term faculty appointment had ended, the contract stated she had no right to reappointment, and she did not plausibly allege that Yale agreed to ignore her words when deciding whether to reappoint her?

2. Did the District Court properly dismiss the breach of the covenant of good faith and fair dealing claim where Plaintiff did not plausibly allege an underlying contractual provision on which her claim is based?

3. Did the District Court properly dismiss Plaintiff's claim under C.G.S. § 31-51q because she was a volunteer, not an "employee," or alternatively because she did not suffer "discipline or discharge" or the statute would be unconstitutional as applied to university decisions regarding faculty selection?

## INTRODUCTION

Plaintiff's three-year term as an unpaid volunteer professor in the Yale Psychiatry Department ended. Her faculty colleagues in the Department chose not to offer her a new term as an unpaid volunteer professor, allegedly after considering her public statements regarding psychiatric diagnoses. She had no contractual right to receive another contract. To the contrary, The Yale University Faculty Handbook ("Faculty Handbook"), which Plaintiff invokes as the basis for her contract claims, makes plain that voluntary faculty in the Yale School of Medicine (which includes the Psychiatry Department) "do not have a right to reappointment," and that reappointment decisions "are subject to the exercise of professional and scholarly judgment by competent University authorities."

A university's determination on who is fit to teach its students lies at the very core of educational decision-making. As the Connecticut Supreme Court has recognized, a "university's prerogative to determine for itself on academic grounds who may teach is [not only] an important part of our long tradition of academic freedom," but also constitutionally "rooted in the first amendment," and the academic prerogative "prevents courts from substituting their judgment for the judgment of the school." *Craine v. Trinity College*, 259 Conn. 625, 646 (2002). Plaintiff's opening appellate brief ("OB") repeatedly asks this Court to ignore that fundamental principle. It serves as a soapbox, a platform for broad grievances and

2

assertions that, despite their rhetoric, fail to satisfy the pleading requirements for the claims she has made. No matter how many times she wraps herself in the mantle of "academic freedom" or names political figures, Plaintiff cannot explain away the fundamental failures of her pleading.

In the District Court, she could not even identify the specific contractual promise that Yale allegedly broke. She zigzagged among theories: she had been promised eternal appointment to the voluntary faculty ranks, or she had been promised that her public psychiatric diagnoses would never be considered evidence of her competence to teach Yale students, or she had been promised that the University would not hold her to the ethical standards of the American Psychiatric Association. Now, on appeal, she has settled on a theory: Yale promised not to consider her "exercise of free expression and academic freedom"—by which she means the things she said and wrote—when it decided whether to offer her another term. OB26. But that imaginary promise to a voluntary Medical School faculty member does not appear anywhere. In fact, it would contravene the express words of the contract, which indisputably state that voluntary faculty in the Medical School do "not have a right to reappointment," and that decisions concerning their reappointment "are subject to the exercise of professional and scholarly judgment by competent University authorities." JA93.

Plaintiff also fails to explain how she has alleged a violation of C.G.S. § 31-51q. That statute protects "employees" from "discipline or discharge." C.G.S. § 31-51q(b). But she was a volunteer, not an employee, and the incidental benefits she allegedly received as a voluntary faculty member did not turn her into an employee. Nor did she experience "discipline or discharge"; her contract expired and was simply not renewed. Finally, any application of the statute to impinge a university's right to select who will teach its students would be unconstitutional as applied.

The District Court correctly saw past the theatrics that Plaintiff used to frame her case. This is not a morality play. It is a civil action in federal court, brought by a plaintiff who did not—and could not—state a claim.

## STATEMENT OF THE CASE[1]

### A. Plaintiff Served as an Unpaid Volunteer Member of the Yale School of Medicine Faculty Whose Term Appointments Were Subject Exclusively to the Judgment of the University

Plaintiff Dr. Bandy Lee served as a volunteer faculty member in the Department of Psychiatry (the "Department") at the Yale School of Medicine, JA40, from 2003 to 2020, when her term appointment was not renewed. JA29, 32; *see also* JA263 (letter confirming Plaintiff's "reappointment as Assistant Clinical Professor

---

[1] This statement is based on the factual allegations of the Amended Complaint (the "Complaint")—taken as true only on a motion to dismiss—and documents that the District Court considered incorporated or integral to the Complaint. "SA__" refers to the Special Appendix. Throughout this brief, unless otherwise indicated, emphasis is added and internal citations, quotation marks and ellipses are omitted.

for the term of July 1, 2017-June 30, 2020 in the Department of Psychiatry at Yale University.").[2]

The Faculty Handbook on which Plaintiff relies provides that appointments to the Assistant Clinical Professor position "are made for renewable terms of up to three years." JA178. And as Plaintiff recognizes, "[f]aculty members on term appointments *do not have a right to reappointment or promotion*, and decisions on reappointment, like initial decisions on appointment, are subject to the exercise of professional and scholarly judgment by competent University authorities." JA93.[3]

The Faculty Handbook notes that "[v]oluntary faculty typically do not receive compensation or benefits from the School." JA178. Plaintiff alleges that her position as a volunteer Yale faculty member allowed her to leverage the position to earn "opportunities" from other third parties who paid her, but she does not allege that Yale remunerated her for her volunteer work on the faculty. JA41. Instead, she alleges that her volunteer work entitled her to incidental benefits like library access,

---

[2] The District Court found this letter "integral to the Amended Complaint" and appropriately considered on a motion to dismiss. SA6-7. Plaintiff never challenged its authenticity, and her appellate brief does not challenge its consideration.

[3] The Faculty Handbook contains extensive procedural protections for tenured or tenure-track faculty members who believe they were terminated, non-renewed, or disciplined by the University in an arbitrary or insufficiently supported manner. *See* JA93-102. Plaintiff invoked one of those mechanisms and argued it below, but chose to abandon that argument on appeal after being directed to the handbook text, which states that voluntary term faculty in the Medical School lack the right to invoke these mechanisms.

5

use of computer programs and software, office space, and campus transportation, JA31.

In addition to its specific provisions regarding the appointment and renewal of unpaid voluntary faculty like Plaintiff, the Faculty Handbook underscores the value of academic freedom. It states that:

> The primary function of a university is to discover and disseminate knowledge by means of research and teaching. To fulfill this function a free interchange of ideas is necessary not only within its walls but with the world beyond as well. It follows that a university must do everything possible to ensure within it the fullest degree of intellectual freedom. The history of intellectual growth and discovery clearly demonstrates the need for unfettered freedom, the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable. To curtail free expression strikes twice at intellectual freedom, for whoever deprives another of the right to state unpopular views necessarily also deprives others of the right to listen to those views.

JA79. That paragraph comes from the Woodward Report, written in 1974 by a committee of faculty, staff and students that was convened "to examine the condition of free expression, peaceful dissent, mutual respect and tolerance at Yale, to draft *recommendations* for any measures it may deem necessary for the maintenance of those principles, and to *report* to the faculties of the University early next term." *See Woodward Report on Freedom of Expression*, YALE UNIVERSITY, ("Chairman's Letter to the Fellows of the Yale Corporation") (Dec. 23, 1974) ("Woodward Report") at Section 1, https://web.archive.org/web/20221103232243/https:

//dhr.yale.edu/policies-definitions/woodward-report-freedom-expression.[4]    The

Woodward Report recommended that the University implement some of its broad

principles through the Faculty Handbook. *See id.* at Section III ("We *urge* that all

University catalogues, as well as the faculty and staff handbooks, include explicit

statements on freedom of expression and the right to dissent.").

The Faculty Handbook ultimately incorporated the Woodward Report's

concerns over academic freedom through certain specific terms, providing that

faculty, staff, and students may not attempt to block the speech of others in the Yale

community. Section II of the Faculty Handbook, entitled, "Academic Freedom and

Faculty Standards of Conduct," provides:

> Members of this University have freely associated themselves with
> Yale and in doing so have affirmed their commitment to a philosophy
> of mutual tolerance and respect. Physical restriction, coercion, or
> intimidation of any member of the community is contrary to the basic
> principles of the University. It is also a violation of these principles and
> of the University's rules of conduct for any member of the faculty, staff,
> or student body to prevent the orderly conduct of a University function
> or activity, such as a lecture, meeting, interview, ceremony, or other
> public event. It is similarly a violation of these principles to block the
> legitimate activity of any person on the Yale campus or in any Yale
> building or facility.

---

[4] As noted below, *see* pp. 30-31, the Woodward Report excerpts in the Faculty
Handbook are part of the record on appeal, but the full Woodward Report is not, and
need not be considered here. But because Plaintiff's unpreserved argument relies
heavily on the full Woodward Report, Yale provides this overview for the Court's
convenience, without waiving the argument that the full report is outside the record.

JA79. The specific terms of this paragraph—focusing on the threat to academic freedom posed by physical restriction, coercion, or intimidation of members of the Yale community, and by efforts to block or disrupt Yale events—directly follow and operationalize the principles expressed in the preceding excerpt from the Woodward Report.

### B. Plaintiff's Public Statements and Psychiatric Diagnoses of Unexamined Public Figures

Plaintiff shared her political opinions with the press,[5] as do other Yale professors, both volunteer and paid. Unlike other Yale professors, volunteer or paid, she began using her credentials as a licensed psychiatrist to make public statements using psychiatric diagnostic terminology that purported to describe the mental health of public figures she had never personally examined. Most of her public statements focused on then-President Trump. She began speaking of what she called his

---

[5] *See, e.g.,* Charlie Nash, *Psychiatrist Who Evaluated Trump's Mental State on CNN and MSNBC Argues President is Worse Than Hitler*, MEDIAITE (Nov. 2, 2020), https://web.archive.org/web/20201103014135/https://www.mediaite.com/politics/psychiatrist-who-evaluated-trumps-mental-state-on-cnn-and-msnbc-argues-president-is-worse-than-hitler/ ("At least Hitler improved the daily life of his followers, had discipline, and required more of himself to gain the respect of his followers. Even with the same pathology, there are varying degrees of competence.'"). Plaintiff did not challenge the authenticity of this statement before the District Court or address it in her opening appellate brief. This Court can take judicial notice of Plaintiff's public commentary even if not all are referenced in her complaint. *See Finn v. Barney*, 471 F. App'x 30, 32 (2d Cir. 2012).

"psychosis," which over time she came to describe as a psychosis "shared" by his followers. JA36.

The first major step in her public diagnoses of public figures came in 2017, when Plaintiff organized a conference at Yale, which led to the publication of a book, *The Dangerous Case of Donald Trump: 27 Psychiatrists and Mental Health Experts Assess a President*. In that book, Plaintiff expressed her frustration with the Goldwater Rule, a rule of professional ethics promulgated by the American Psychiatric Association ("APA") which states that:

> On occasion psychiatrists are asked for an opinion about an individual who is in the light of public attention or who has disclosed information about himself/herself through public media. In such circumstances, a psychiatrist may share with the public his or her expertise about psychiatric issues in general. However, it is unethical for a psychiatrist to offer a professional opinion unless he or she has conducted an examination and has been granted proper authorization for such a statement.

*See The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry*, AMERICAN PSYCHIATRIC ASSOCIATION, 9 (2013), https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/Ethics/principles-medical-ethics.pdf.[6] Plaintiff, who is not a member of the APA, *see* JA34, attacked the

---

[6] The Amended Complaint incorporates the Goldwater Rule by reference, JA34, and Plaintiff relies on it in her opening brief. OB15. It can thus be considered here. *Menaker v. Hofstra Univ.*, 935 F.3d 20, 28 (2d Cir. 2019); *Chambers v. Time Warner*, 282 F.3d 147, 152 (2d Cir. 2002).

Goldwater Rule. Bandy Lee, *The Dangerous Case of Donald Trump: 27 Psychiatrists and Mental Health Experts Assess a President* 12 (2017).

Having chosen to criticize and flout the Goldwater Rule, Plaintiff regularly made public statements about the mental health of public figures whom she had never examined. Later in 2017, when she was interviewed by *Salon*, Plaintiff stated as a psychiatrist that the then-president had "a grave mental disability" and "mental impairment." Chauncey Devega, *Psychiatrist Bandy Lee*, Salon (May 25, 2017, 5:00 AM), https://www.salon.com/2017/05/25/psychiatrist-bandy-lee-we-have-an-obligation-to-speak-about-donald-trumps-mental-health-issues-our-survival-as-a-species-may-be-at-stake/. She described what she called the President's "and his followers' pathology," stating that "[w]hen you see a person falling into [mental] illness, the deeper the illness grows, the less aware they will be of their illness. The more insistent they will be on destructive ways.... At a later point, doctors and hospitals will be the thing that they will avoid at all costs. That is why sometimes physicians have to hospitalize against the person's will or put them on a stretcher." *Id.*[7]

By 2019, Plaintiff was regularly reported as making public statements about the mental health of public figures whom she had not examined. In July 2019, she

---

[7] This and the other publications reporting Plaintiff's comments were cited in the District Court; Plaintiff did not challenge their authenticity or object to their consideration. *See generally Finn*, 471 F. App'x at 32.

was quoted as saying that the "president is deteriorating rapidly." Tana Ganeva, *Yale psychiatrist*, RAW STORY (July 17, 2019) https://www.rawstory.com/2019/07/yale-psychiatrist-trump-using-racism-as-a-coping-mechanism-as-his-mental-state-rapidly-deteriorates/. He had a "lack of mental capacity," she said. *Id.* She called his verbal attacks on others "a maladaptive means of coping with stress." *Id.* Finally, she noted that while "[m]ost mental disorders cause suffering on the afflicted person and violence against the self...there is a small subset that inflicts suffering on and violence against others.  It should be no secret which category the president's impairments fall." *Id*.

In November 2019, she wrote that the "president's cognitive functioning alone, in terms of his ability to process information and thoughts, has deteriorated to the point where he has difficulty stringing together a single coherent sentence. His word-finding difficulties, repetitions, and loose connections are only superficial indicators of a more serious, deeper process. He has additionally shown multiple neurological signs, including slurred speech, movement abnormalities, and confabulations (filling in gaps of memory with fabricated stories).... These are not actions that are explainable as rational or political strategy, as much as a typical manifestation of the mental impairments we have been observing for a long time." Bandy Lee, *Opinion*, RAW STORY (Nov. 24, 2019),  https://www.rawstory.com/

2019/11/trumps-53-minute-fox-rant-is-another-dangerous-sign-of-his-worsening-mental-state-yale-psychiatrist/.

In December 2019, in an interview with *The Independent,* Plaintiff concluded that the President was experiencing "delusions." Andrew Feinberg, *Trump's mental state*, THE INDEPENDENT (Dec. 4, 2019), https://www.independent.co.uk/news/world/americas/us-politics/trump-mental-state-impeachment-psychiatrist-petition-congress-a9232386.html. The President's tweets did not represent calculated political moves, she said. *Id.* Rather, they revealed mental illness: "they fit the pattern of delusions rather than just plain lies." *Id.*

And Plaintiff unequivocally stated that she was diagnosing the President in her expert capacity as a medical professional and licensed psychiatrist. She acknowledged that though some observers "might dismiss the warning she and her colleagues are delivering as just a product of differences of political opinion." *Id.* But she rejected that notion. She urged the public to take her diagnoses seriously because her psychiatric training allowed her to recognize what ordinary political observers could not: that the President was exhibiting "definitive signs of severe pathology of someone who requires an advanced level of care" and who "meets every criterion of lacking a rational decision-making capacity." *Id.* Plaintiff emphasized that it was her psychiatric training that allowed her to "distinguish between what is healthy and what is abnormal," between what is "pathology" and

what is not. *Id.* She claimed to have recognized "a pattern of disease," not just "another political ideology or another political style." *Id.* While an "everyday person who is unfamiliar with pathology" might think that the President was operating politically rather than pathologically, her psychiatric training allowed her to determine that the President was delusional, diseased, pathological, "lacking a rational decision-making capacity," and requiring "an advanced level of care." *Id.* Plaintiff concluded that the President's delusions risked drawing members of the public into a "shared psychosis at the national level." *Id.*

On January 2, 2020, Alan Dershowitz was reported as saying that he had a "perfect sex life." JA35. Plaintiff noted that then-President Trump frequently used the word "perfect" to describe himself, and from that similarity in word usage, she leaped to a psychiatric diagnosis: "given the severity and spread of 'shared psychosis' among just about all of Trump's followers," Plaintiff wrote, Dershowitz had likely "wholly taken on Trump's symptoms by contagion." JA36.

### C. Yale's Response to Plaintiff's Public Psychiatric Diagnoses of Public Figures She Had Never Examined

On January 13, 2020, Dr. John Krystal, Chair of the Psychiatry Department, emailed Plaintiff, asking to meet with her and with Dr. Howard Zonana—who headed the Law and Psychiatry Division of the Department—to review Plaintiff's public statements. JA52. Krystal wrote:

13

It seems to me that you have been increasingly reckless and irresponsible in your public statements. I have tried very hard to find a path that would enable you to continue your teaching role. However, you are putting me in a position where I have to ask, "Is this the sort of person that I can trust to teach medical students, residents, and forensic psychiatry fellows?" I have consulted Howard Zonana on this question and he is equally concerned that you are not showing good medical judgement in your public statements. *It is our shared opinion that if your behavior does not change, we will have no alternative but to terminate your teaching role at Yale University. As you have no other duties at Yale, termination of your teaching role would also terminate your faculty appointment*.

JA52.

Three days later, Plaintiff elaborated on her "shared psychosis" theory, tweeting that "[p]sychosis is particularly contagious," writing about "shared psychosis with Donald Trump's followers," and speaking of diagnostic definitions in the latest Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") and its predecessor, DSM-4. Bandy X Lee, TWITTER (Jan. 16, 2020, 9:15 AM), https://twitter.com/bandyxlee1/status/1217812518992842755?lang=en.

On January 17, 2020, Plaintiff met with Krystal, Zonana, and two other Department faculty members to discuss whether her statements reflected her ability to teach psychiatry trainees. *See* JA38; JA55. As Krystal's January 13th letter had noted, Plaintiff had no formal teaching activities sanctioned by the Department at that time, with her only teaching outside the Department, where she supervised two undergraduates and a medical student. JA55.

On May 17, 2020, Krystal wrote to Plaintiff, informing her that because she no longer had a formal teaching role in the Department, her voluntary faculty term appointment would end as scheduled on June 30, 2020, and would not be renewed. *See* JA44; JA60. Plaintiff appealed her non-reappointment to the Dean of the Medical School, who replied by noting that the Faculty Handbook section she had invoked specifically excludes "voluntary faculty in the Schools of Medicine and Nursing" like Plaintiff from seeking further review of non-reappointment decisions. JA42; JA94; JA259.

Plaintiff then sought review by the Provost, who denied her request. JA42-43; *see also* JA261. By then, Plaintiff had received a second letter from Krystal, dated September 4, 2020, further explaining the Department's non-renewal of her appointment. JA43-44; JA55-58. It stated:

> In recent years, you mainly provided case evaluations and acted as a consultant to law students in the clinical program. At the beginning of this year, that role came to an end, partly due to a concern that your psychiatric opinions were open to challenge in court. In addition, your attendance at key didactic seminars within the Department, such as Friday case conferences, dwindled in 2019. By the beginning of this year, you had no formal Departmentally-sanctioned teaching activities. Your only teaching role was outside the Department, as supervisor to two undergraduates and a medical student doing projects on prison violence.
>
> Given these circumstances, the review committee needed to consider whether the Department could offer you a continuing teaching role, and we met with you to help us make that decision. The key question in our minds was whether you had the clinical judgment and professionalism to teach trainees key aspects of their profession. Your diagnostic

impressions of President Trump and several other public figures and your recommendations for treating President Trump played a role in our discussion. This was not because of the political content of your speech. As you know, the Department and the University publicly defended your academic freedom and your right to express your opinions as a citizen. As detailed below, the Committee's concern was what your diagnoses and treatment recommendations said about your clinical abilities and professionalism.

JA55-56.

Krystal recounted several of Plaintiff's diagnostic opinions of the President, not "as a layperson offering a political judgment," but rather in her "professional capacity as a psychiatrist." JA56. He stated that "the committee decided it was appropriate to consider how these statements reflected your ability to teach trainees." JA56. The letter recounted that at the January 17 meeting, Plaintiff failed to address questions about whether her diagnosis and treatment recommendations of public figures "should have included a disclaimer regarding limited evidence" and "whether they adequately reflected the process of differential diagnosis," among other things. JA56. When asked to explain the basis for her diagnosis of public figures including Dershowitz, "none of the evidence [Plaintiff] offered met the DSM-5 criteria for shared delusional disorder." JA56. Krystal noted that Plaintiff "explored no other explanations that might have accounted for the data that led you to your diagnosis." JA56-57.

Krystal stated that after the meeting, the review committee had considered Plaintiff's responses when assessing her "capacity to teach trainees the core

16

competencies required by" the Accreditation Council for Graduate Medical Education ("ACGME"). JA57. He reported that the review committee had determined that Plaintiff lacked the capacity to teach psychiatry trainees three of six ACGME core competencies: medical knowledge, interpersonal and communication skills, and professionalism. JA57.

> Krystal stated:

> Our discussion of your diagnosis of shared psychosis or, as you preferred, shared delusional disorder convinced the committee that you do not adequately understand or choose not to follow current methods for diagnosing psychotic disorders, which are common in the psychiatric practice that our trainees will enter.

> ... In our lengthy discussion with you, you were unable to explain to four trained colleagues the basis of a very serious diagnosis. In addition, you have made many conflicting, confusing, and sometimes inaccurate public statements about psychiatric diagnosis and the profession's duty to warn.

> Finally, the ACGME requires trainees "to demonstrate a commitment to carrying out professional responsibilities, adherence to ethical principles, and sensitivity to a diverse patient population." Although the committee does not doubt that you are acting on the basis of your personal moral code, your repeated violations of the APA's Goldwater Rule and your inappropriate transfer of the duty to warn from the treatment setting to national politics raised significant doubts about your understanding of crucial ethical and legal principles in psychiatry.

JA57.

Krystal explained that after the review committee concluded that the Department should not seek a new teaching role for Plaintiff, its conclusion "was

17

shared with the Executive Committee of the Department of Psychiatry and discussed at length," and that the Executive Committee unanimously endorsed the review committee's conclusion. JA57. Krystal then explained to Plaintiff that "[i]n the absence of a formal teaching role," her voluntary appointment was not reinstated. JA57.

### D. Plaintiff Sues Yale

On March 21, 2021, Plaintiff sued Yale, alleging four causes of action: breach of contract, breach of the implied covenant of good faith and fair dealing, wrongful termination in violation of C.G.S. §31-51q, and negligent misrepresentation. JA7-27. Plaintiff filed an amended complaint on August 21, 2021 alleging the same four causes of action. JA28-50.

### E. Yale's Motion to Dismiss the Amended Complaint and the District Court Decision

On September 17, 2021, Yale filed a motion to dismiss the Amended Complaint, attaching eight exhibits it contended were incorporated by reference or integral to the complaint. *See* JA4. The District Court found six to be documents properly considered on a motion to dismiss: a communication from Krystal to Plaintiff requesting they speak about her public diagnoses of public figures; a letter from Krystal to Plaintiff stating that her "faculty appointment in our Department and School of Medicine will end as of June 30, 2020"; a letter from the Dean of the Yale School of Medicine dismissing Plaintiff's appeal of her non-reappointment; a second

18

letter from Krystal to Plaintiff explaining why Yale did not offer her a new appointment; the 2019 Faculty Handbook; and the communication confirming Plaintiff's term appointment from July 1, 2017 to June 30, 2020. SA5-7. The District Court found the last one "integral to the complaint and, accordingly, a fair object of consideration on a motion to dismiss...where the complaint relies heavily upon its terms and effect," SA6 (citing *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)), and found the others incorporated by reference, SA5.[8]

The District Court dismissed all four claims. SA45.

On the breach of contract claim, the Court accepted Plaintiff's assertion that her "breach of contract claim is not 'based on any singular document'" and "construe[d] the Amended Complaint to assert that the parties formed an implied contract that Yale would not decline to reappoint plaintiff, regardless of whether it found that plaintiff was no longer qualified for the position, based at least in part on her public statements." SA20. Considering Plaintiff's allegations and the documents incorporated by reference, the District Court held that "they do not support a finding that Yale intended to enter into an implied contract with the terms alleged by plaintiff." SA22. Specifically, the District Court noted that Plaintiff "fails to acknowledge, in arguing that she expected her appointment to be effectively

---

[8] Plaintiff did not argue in her opening brief that the district court erred in considering any of the six documents.

automatically renewed, that the Faculty Handbook expressly provides: 'The reappointment of persons holding term appointments is not automatic at Yale.' As noted elsewhere, plaintiff expressly relies on the Faculty Handbook where she believes it supports her claims, but disregards this express statement of the Faculty Handbook that undermines her claims." SA23.

As to the "vague assertion that some unspecified provision in the Faculty Handbook creates a right to 'academic freedom,'" the Court found the allegation "plainly insufficient to show that defendant undertook a contractual commitment to guarantee plaintiff continued reappointment." SA25. Similarly, the Court held that "generalized statements" by Yale supporting free speech and academic freedom "are not sufficient to manifest the intent to form a contract for guaranteed reappointment." SA27. Given its conclusion that Plaintiff had not adequately alleged the existence of an implied contract "that Yale would not decline to reappoint plaintiff, regardless of whether it found that plaintiff was no longer qualified for the position, based at least in part on her public statements," SA28, the District Court found it unnecessary to address the rights of academic institutions to select their faculty. SA30. Nonetheless, the Court noted that when a plaintiff attacks an academic institution's discretion to exercise its "professional judgment on academic matters," the plaintiff must "allege facts showing that the University's decision had no discernible rational basis." SA30-31.

20

The District Court dismissed the Plaintiff's claim of breach of the implied covenant of good faith and fair dealing because "[d]ismissal of the breach of contract claim requires dismissal of the implied covenant claim that relies upon it." SA33.

The Court then addressed Plaintiff's claim that Yale violated C.G.S. § 31-51q, when it chose not to give her a new appointment. That statute protects "employees" from discharge or discipline because of their exercise of "rights guaranteed by the first amendment to the United States Constitution or section 3, 4, or 14 of article first of the Connecticut Constitution." C.G.S. § 31-51q . Because the statute protects employees, not volunteers, the District Court analyzed whether Plaintiff was an employee. It noted that Plaintiff "concedes that she did not receive traditional compensation" and that she had instead contended "her relationship with Defendant yielded substantial tangible and intangible benefits for both parties," which she argued made her an "employee" under § 31-51q. SA39. The District Court ruled that "access to the university's libraries, subscription-based research materials, office space, [and] the university's facilities" does not qualify as the sort of remuneration necessary to establish an employer-employee relationship under the statute. SA39-40 (brackets in original). The District Court explained that "[u]nlike a salary, vacation, sick pay, or benefits such as health insurance, disability insurance, life insurance, death benefits, and retirement pension, all of which primarily benefit the employee independently of the employer, the benefits put forward by [plaintiff]...,

21

were merely incidental to the administration of the [defendant's] programs for the benefit of [Yale] at large." SA40 (brackets in original) (*citing York v. Ass'n of Bar of City of New York*, 286 F.3d 122, 126 (2d Cir. 2002). Having failed to allege facts to support her claim that she and Yale had entered into an employee-employer relationship as required under § 31-51q, the District Court dismissed Plaintiff's claim. SA41.[9]

Finally, the District Court dismissed Plaintiff's negligent misrepresentation claims because "Plaintiff has failed to allege any false statements of fact, and has failed to point to any specific representations [that] contained false information" and "even if plaintiff had adequately asserted a misrepresentation of fact, she has not alleged facts which, if taken as true, would demonstrate that Yale knew, or should have known, [its] statements were untrue at the time they were made."[10] SA43-44 (brackets in original).

### F. Plaintiff's New Lawyers File a Motion for Leave to File a Late Motion for Reconsideration, Which the Court Denies

On September 19, 2022, twenty days after the District Court's decision on Yale's motion to dismiss—and thirteen days *after* the deadline for a motion for reconsideration, D. Conn. L. Civ. R. 7(c)—Plaintiff filed an emergency motion for

---

[9] The District Court thus did not address Yale's other arguments regarding § 31-51q. SA35.

[10] Plaintiff does not appeal the dismissal of this claim.

leave to file a late motion for reconsideration. JA264-270. Plaintiff had hired new counsel, and their late brief said they wanted to file a reconsideration motion because the District Court had "misunderstood" Plaintiff's contract claim. JA264. Their motion for leave to file the late reconsideration motion purported to "clarif[y]" her contract claim. JA265.

On October 6, 2022, the District Court rejected the motion to file a late motion for reconsideration, noting that "[a] motion for reconsideration is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." SA47-48. It explained that although "plaintiff's new counsel might have made different arguments about the sufficiency of the claims in the Amended Complaint," that "does not warrant reconsideration." SA48.

The District Court emphasized that although Plaintiff's new counsel "may be dissatisfied with its predecessor's arguments to the Court," the new counsel is nonetheless "bound by those arguments." SA48. Furthermore, the Court concluded that even if it were timely, the motion would be futile because, "[t]he substance of plaintiff's proposed, untimely motion would not alter the Court's conclusion that the Amended Complaint, on its face, failed to state a cognizable claim." SA48.

## SUMMARY OF THE ARGUMENT

Plaintiff's contract with Yale stated that she had no right of reappointment and that Yale would make decisions whether to reappoint her on the basis of its professional and scholarly judgment. While Yale embraces and protects academic freedom, it does not promise voluntary faculty in the Medical School that it will ignore their written and spoken words. Any such promise would be nonsensical, as such a faculty member's published work and commentary on subjects in their field may be relevant to an appraisal of their fitness to teach medical students. The District Court properly found that Plaintiff's vague invocations of academic freedom did not state a claim for breach of her contract with Yale.

The District Court also properly found that Plaintiff did not state a claim for breach of the covenant of good faith and fair dealing. Under Connecticut law, such claims derive from particular contractual promises that were allegedly breached; they amplify breach of contract claims by emphasizing *how* they were breached, *i.e.*, in bad faith, or what Connecticut courts have called "moral obliquity." But as noted above, Plaintiff did not state a claim even for a breach of contract, so her amplified claim of a bad-faith breach likewise fails.

Plaintiff also did not state a claim for violation of C.G.S. § 31-51q, which protects "employees" from "discipline or discharge" meted out by employers unhappy with their employees' constitutionally-protected speech. As the District

24

Court correctly found, Plaintiff was not an employee, but a volunteer. Moreover, Plaintiff was not disciplined or discharged: her term appointment ended and she was not offered another one. And in any event, the state statute cannot be applied to violate what both the U.S. Supreme Court and the Connecticut Supreme Court have described as a university's constitutional right "to make its own judgments as to education," among them the educational judgment about who is best suited to teach.

## STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it fails to plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). In conducting this inquiry, a court may consider "statements or documents incorporated into the complaint by reference," as well as "documents possessed by or known to the plaintiff and upon which it relied in bringing the suit," *ATSI Commc'ns, Inc.* v. *Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), and those "integral" to the complaint. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

This Court reviews the District Court's grant of a motion to dismiss *de novo* and may affirm on any basis supported by the record. *Coulter* v. *Morgan Stanley & Co.*, 753 F.3d 361, 366 (2d Cir. 2014).

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY FOUND THAT PLAINTIFF DID NOT PLAUSIBLY ALLEGE THAT YALE BREACHED ITS CONTRACT WITH HER.

Plaintiff argues on appeal that she had a contract with Yale that contained "an essential understanding" that "Yale would not consider or rely upon Plaintiff's exercise of freedom of expression and academic freedom when deciding whether to terminate or renew Plaintiff's faculty appointment." OB28.[11] But the Faculty Handbook on which she relies does not state or suggest any such "essential understanding" for her voluntary Assistant Clinical Professor position. Instead, it plainly states that appointments to that position "are made for renewable terms of up to three years," JA178, and as Plaintiff herself recognizes, "[f]aculty members on term appointments do not have a right to reappointment or promotion, and decisions on reappointment, like initial decisions on appointment, are subject to the exercise of professional and scholarly judgment by competent University authorities." JA41. Though she asserts that she was "terminated," her own complaint relies on documents that show she had a three-year term, which expired; she was not renewed. JA263. Even in an ordinary employment context, her claim that she had a right to

---

[11] She previously also alleged that Yale breached certain "procedures" related to "academic misconduct" and non-reappointment to a term faculty position, JA41, but abandoned that argument in her opening brief, waiving it. *See Booking v. Gen. Star Mgmt. Co.,* 254 F.3d 414, 418 (2d Cir. 2001).

reappointment would plainly fail where her contract plainly states that she did "*not have a right to reappointment.*" *See* JA93. In the academic context, where Connecticut law provides additional protection to a university's exercise of professional and scholarly judgment in selecting teachers, her claim falls far short of the mark. In the end, her contract claim rests on the assertion that despite the clear language of the Faculty Handbook, Yale promised—not in the Faculty Handbook but in a 50-year-old committee report—not to consider what voluntary faculty said or wrote when deciding whether to offer them new term teaching positions. Universities consistently assess what non-tenured faculty have said and written when deciding whether to hire, promote, or renew them; their scholarship and teaching is built on words, *i.e.*, academic speech. Connecticut law wisely leaves those decisions to universities, rather than outsourcing them to courts.

### A. Plaintiff's Three-Year Term as Voluntary Faculty Had No Guarantee of Renewal and Was At Yale's Discretion.

Plaintiff admits that the Faculty Handbook contains "the essential employment understandings between members of the faculty and the University," JA40; OB29 (*citing Craine*, 259 Conn. at 655); OB34.

As noted above, the Faculty Handbook states that volunteer Assistant Clinical Professor positions like hers "are made for renewable terms of up to three years," JA178; *see also* JA263 (letter confirming Plaintiff's "reappointment as Assistant Clinical Professor for the term of July 1, 2017-June 30, 2020 in the Department of

27

Psychiatry at Yale University[]"), and that "[f]aculty members on term appointments do not have a right to reappointment or promotion, and decisions on reappointment, like initial decisions on appointment, are subject to the exercise of professional and scholarly judgment by competent University authorities." JA93.

Plaintiff aims to evade these clear and specific contractual provisions by turning to a paragraph in the Faculty Handbook that broadly extols the benefits of academic freedom. That paragraph, drawn from a faculty/student committee that issued a report in 1974, states in its entirety that:

> The primary function of a university is to discover and disseminate knowledge by means of research and teaching. To fulfill this function a free interchange of ideas is necessary not only within its walls but with the world beyond as well. It follows that a university must do everything possible to ensure within it the fullest degree of intellectual freedom. The history of intellectual growth and discovery clearly demonstrates the need for unfettered freedom, the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable. To curtail free expression strikes twice at intellectual freedom, for whoever deprives another of the right to state unpopular views necessarily also deprives others of the right to listen to those views.

JA79. Plaintiff argues that this paragraph, the full Woodward Report from which it is excerpted, and later statements supportive of the value of academic freedom, mean that she had a contract with Yale that prevented Yale from considering what she said or wrote when evaluating whether to reappoint her.

Academic freedom does not mean that Plaintiff's words—whether written in academic publications, spoken to reporters, or delivered to students in classrooms— are immune from scrutiny by a university considering whether to re-appoint her. To

the contrary, as Plaintiff notes, the Faculty Handbook states unequivocally that for term positions like hers, "decisions on reappointment...are subject to the exercise of professional and scholarly judgment by competent University authorities." JA93. That professional and scholarly judgment *requires* assessing the written and spoken words of faculty members.

The Faculty Handbook provision on academic freedom provides that faculty, staff, and students may not attempt to block the speech of others in the Yale community. It does not address decisions to reappoint a voluntary faculty member in the Medical School to a new term. Section II of the Faculty Handbook, entitled, "Academic Freedom and Faculty Standards of Conduct," provides:

> Members of this University have freely associated themselves with Yale and in doing so have affirmed their commitment to a philosophy of mutual tolerance and respect. Physical restriction, coercion, or intimidation of any member of the community is contrary to the basic principles of the University. It is also a violation of these principles and of the University's rules of conduct for any member of the faculty, staff, or student body to prevent the orderly conduct of a University function or activity, such as a lecture, meeting, interview, ceremony, or other public event. It is similarly a violation of these principles to block the legitimate activity of any person on the Yale campus or in any Yale building or facility.

JA79. This paragraph follows, and operationalizes, the broad terms of the previous paragraph quoted above. Plaintiff does not allege that she could not express her views due to physical restriction, coercion, or intimidation, or that her work on the Yale campus was blocked.

Because the paragraph of the Woodward Report contained in the Faculty Handbook does not help Plaintiff's contract claims, and because she cannot claim that the terms of the Faculty Handbook's Academic Freedom or the reappointment provisions were violated, she asserts that the entirety of the Woodward Report is incorporated into the Faculty Handbook, and that her contract includes the entire report as well as later university statements supporting the report. *See* OB34-37. She did not make that claim in the District Court and did not ask the District Court to take judicial notice of the entirety of the report or the many statements with which she peppers her opening appellate brief (but which were not cited below). This Court need not wade through this unpreserved theory and newly cited websites.

But it would make no difference to this case if it did. The Woodward Report, written in 1974, contains the "findings and deliberations of a committee appointed" by the then-president of Yale "to examine the condition of free expression, peaceful dissent, mutual respect and tolerance at Yale, to draft *recommendations* for any measures it may deem necessary for the maintenance of those principles, and to *report* to the faculties of the University early next term." *See* Woodward Report at Section 1. The Woodward Report is a statement of principles; clearly not every word of a committee report, even one whose principles the University strongly embraces, can be understood as a set of *contractual* promises. In fact, the Report recommends that the University implement some of its principles *through the Faculty Handbook*.

30

*See id.* at Section 2(III) ("Of Ways and Means") ("We urge that all University catalogues, as well as the faculty and staff handbooks, include explicit statements on freedom of expression and the right to dissent."). Much of the committee report presented a lengthy "review" of a tumultuous time at Yale, *see id.* at Section 2(II) ("Of Trial and Errors"), but it concludes with a section in which it "propose[s]" several recommendations, *see id.* at Section 2(III) ("Of Ways and Means"). The University's embrace of the Woodward Report's principles does not render the entirety of the report a *contractual promise* to voluntary term faculty. The question begged by Plaintiff's invocation of the Woodward Report is whether the entirety of that report constitutes contract terms specifically promising voluntary term faculty that they will be reappointed without any consideration of their written or spoken words. The answer is obviously no.[12]

Plaintiff nevertheless asserts that the excerpted paragraph in the Faculty Handbook makes the entire report part of her contract with the University, and that the report constitutes "a formal policy and practice of providing for academic freedom for all its faculty," JA41. From there, she argues that if "freedom of expression and academic freedom mean anything for the faculty members such as

---

[12] The Faculty Handbook cites the core paragraph of the Woodward Report excerpted above but does not state that the entire report forms part of the essential employment understandings between voluntary Medical School faculty and the University. *See* JA79-81.

31

Plaintiff covered by the Handbook," then "those obligations *must* mean that Yale agreed to not consider or rely upon a faculty member's exercise of free expression and academic freedom when determining whether to terminate or renew a faculty member's appointment." OB37 (emphasis in original).  But her assertion of what the Faculty Handbook "*must* mean", OB37, is not consistent with what it *actually says*. As Plaintiff admits, it says unequivocally that "[f]aculty members on term appointments do not have a right to reappointment or promotion, and decisions on reappointment, like initial decisions on appointment, are subject to the exercise of professional and scholarly judgment by competent University authorities." JA41. Plaintiff points to nothing in the Faculty Handbook stating that "professional and scholarly judgment" requires ignoring the public writings and speech of voluntary faculty. *See* JA41.

Contrary to Plaintiff's claims, the Woodward Report does not somehow, and without saying so, preclude Yale from selecting its faculty. It does not mean, for example, that Yale would have to offer a term appointment to a voluntary faculty member in the astronomy department who asserted that the sun revolves around the earth and taught his students that. It does not mean that a disgruntled lecturer or professor can always claim that her "academic freedom" has been denied when an appointment or renewal or promotion committee assessing her scholarship and teaching finds that it does not meet Yale's standards. It should be self-evident that a

university does not squelch academic freedom when it determines that a faculty member's scholarship on Immanuel Kant is not sufficiently novel or profound, or that a paleontologist's research is insufficiently supported or important. Those are decisions best left to universities. *See Craine*, 259 Conn. at 625.

Because she cannot identify anywhere that Yale promises that it will ignore a faculty member's written and spoken words when its competent committees and academic leaders evaluate that faculty member, Plaintiff retreats to general principles from which she manufactures unwritten and highly specific promises. For example, the Faculty Handbook states that the "free interchange of ideas is necessary not only within [Yale's] walls but with the world beyond as well," and that "a university must do everything possible to ensure within it the fullest degree of intellectual freedom." JA79; *see* OB34. That's true, and as Plaintiff acknowledges, those principles "advance [Yale's] mission." OB34 (brackets in original). But they are not promises modifying the Faculty Handbook's express rules regarding voluntary term faculty appointments. [13]

---

[13] Plaintiff argues that because the Woodward Report uses words like "necessary," "must," and "need," the report must somehow alter Plaintiff's contract with Yale, preventing Yale from deciding to not reappoint her. OB34-35. She does not explain how the plain language of the Faculty Handbook governing reappointment decisions for voluntary term faculty is changed by the language of the report. Instead, she points to the fact that words like "shall" and "must" in faculty handbooks have been found to create obligations in other cases. OB35. That does not help her. The obligatory language in those other cases was connected to concrete promises related

"[W]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." *Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P.,* 252 Conn. 479, 495 (2000). Here, the plain language of the contract indisputably states that "[f]aculty members on term appointments do not have a right to reappointment or promotion, and decisions on reappointment, like initial decisions on appointment, are subject to the exercise of professional and scholarly judgment by competent University authorities." JA93. Plaintiff's assertions about what broad statements regarding academic freedom "must mean" do not somehow make the clear contract language unclear.[14] Under

---

to the plaintiffs' employment, not to broad statements in an unrelated committee report. *See Craine*, 259 Conn. at 656 (faculty handbook required that reappointment committee "*shall* indicate as clearly as possible those areas to which a candidate *needs* to address ... ." and that a decision not to grant tenure "*must* be based on failure to meet the standards"); *Byrne v. Yale Univ., Inc*., 450 F. Supp. 3d 105, 124 (D. Conn. 2020) (faculty handbook provision stated individual with conflict of interest "*must* absent himself or herself" from tenure decision, but process was allegedly not followed).

[14] Perhaps aware of the *Tallmadge Brothers* rule, Plaintiff focuses on cases where a plaintiff alleged a specific but unwritten promise. *See* OB31-33. In *Coelho v. Posi-Seal Int'l, Inc*., 208 Conn. 106, 112 (1988), for example, a plaintiff alleged that defendant made specific oral promises about the support he would receive from defendant if he took a job. Plaintiff alleges no such promises. Her repeated reliance on *Gaudio v. Griffin Health Servs. Corp.,* 249 Conn. 523 (1999) is puzzling. There, the plaintiff claimed to have been promised ongoing employment, and the personnel manual did not contain "express contract language that definitively stated that employees are at-will," which was the defendant's position. *Gaudio*, 249 Conn. at 533. Here, by contrast, the Faculty Handbook states that voluntary term faculty have no right to reappointment and that reappointment decisions are "subject to the

ordinary principles of Connecticut contract law, then, the District Court properly dismissed Plaintiff's contract claim because the plain words of the contract do not contain any promise that voluntary term faculty will be automatically reappointed, or that they will be reappointed without competent University authorities exercising their professional and scholarly judgment to assess the faculty member's written and spoken words.

While the District Court properly dismissed Plaintiff's contract claim under ordinary principles of Connecticut law, Plaintiff's claim also fails under the more rigorous doctrine applied to contract claims attacking an educational institution's selection of its faculty. This doctrine of Connecticut law derives its first principles from federal law, which recognizes a university's First Amendment right "to make its own judgments as to education," *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003), a right that necessarily includes the right "to determine for itself on academic grounds" not only "what may be taught [and] how it shall be taught," *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978), but also "*who* may teach." *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980) (*quoting Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., joined by Harlan, J.,

---

exercise of professional and scholarly judgment by competent University authorities." JA93.

concurring in the result)). In Connecticut, the doctrine developed into an aspect of

state contract law. As the Connecticut Supreme Court has held:

> A university's prerogative to determine for itself on academic grounds
> who may teach is an important part of our long tradition of academic
> freedom.... This academic freedom is rooted in the first amendment ....
> First amendment protection of academic freedom prevents courts from
> substituting their judgment for the judgment of the school.

*Craine,* 259 Conn. at 646. This deference to academic decisions means that plaintiffs

challenging academic decisions—like the decision not to offer a new term to a

voluntary faculty member whose term has expired—must allege "a specific

contractual promise" that does *not* involve the exercise of academic discretion. *See*

*Gupta v. New Britain General Hospital*, 239 Conn. 574, 593 (1996); *see also Daley*

*v. Wesleyan Univ.*, 63 Conn. App. 119, 133 (2001) ("an inquiry into whether an

evaluation of a faculty member's 'teaching,' 'scholarship' or 'colleagueship' was

accurate,...concerns a requirement representative of an academic relationship

because conducting such evaluations is a specialty that is strongly associated with

institutions of higher learning, *and* such an evaluation has little to do with the normal

attributes of an employee relationship," and such academic decisions are "afforded

considerable discretion."). This heightened requirement of a specific contractual

promise creates an "exacting standard." *Faigel v. Fairfield University*, 75 Conn.

App. 37, 38 (2003). Plaintiffs bringing breach of contract claims in this context must

make "precise" claims that are "based on specific contractual terms or provisions,"

*Kloth-Zanard v. Amridge Univ*., 2012 WL 2397161, at *4 (D. Conn. June 25, 2012), not claims grounded on "[g]eneral or vague promises," *Hope Acad. v. Friel*, 2004 WL 1888909, at *2 (Conn. Super. Ct. July 22, 2004). Courts have found a promise insufficiently specific when a university promised to give a foreign student "many credits" for her study abroad, *Faigel*, 75 Conn. App. at 42, when a university promised to "eradicate sexual misconduct," *McNeil v. Yale Univ*., 436 F. Supp. 3d 489, 532 (D. Conn. 2020), *aff'd in part, vacated in part sub nom. McNeil v. Yale Chapter of Alpha Delta Phi Int'l, Inc*., 2021 WL 5286647 (2d Cir. Nov. 15, 2021), or when a school expelled a foreign student despite a "steadfast commitment to [its] international students" and statements that international students are "welcome and respected on [its] campus," *Madej v. Yale Univ*., No. 3:20-CV-133 (JCH), 2020 WL 1614230, at *11 (D. Conn. Mar. 31, 2020).

Plaintiff's claims in this context can succeed only if the alleged promise is sufficiently specific and stated in objectively measurable language. In *Gupta*, for example, the Court noted that a promise that an institution would stay "properly accredited" could survive. *Gupta*, 239 Conn. at 593. Indeed, the cases Plaintiff cites in support of her breach of contract claim all involve breaches of very specific promises to the faculty member. For example, in *Craine v. Trinity College*, see OB29, the faculty handbook promised tenure-track professors that, if reappointed, the relevant committee "shall indicate as clearly as possible those areas to which a

[tenure] candidate needs to address special attention" and that "a negative [tenure] decision must be based on failure to meet the standards of improvement derived from expectations for rank and specified *in the last letter of reappointment*." 25 Conn. at 631, 656. The professor there pleaded (and later proved) that the college had not fulfilled either promise. The promises there were concrete, allowing a factfinder to review "the last letter of reappointment" and the tenure decision, and comparing them to determine whether the college had done what it promised: to state clearly in the reappointment letter what the professor needed to do, and to base its tenure decision on the clear expectations set out in the reappointment letter. *Id.* at 632, 656-59. Here, by contrast, Yale made no such promises: to the contrary, it stated that there was *no* right to reappointment, and that all reappointment decisions are committed to the professional and scholarly judgment of the competent officials.

Plaintiff also cites trial court cases involving university professors where a concrete promise was found to have been alleged. In *Byrne v. Yale Univ., Inc*., for example, *see* OB30, 33, 35, a professor alleged the breach of a contract based on a Faculty Handbook provision specifically providing that other professors with "a personal or professional conflict of interest concerning an individual on whom a vote is taken must absent himself or herself from all discussions and all votes taken on that individual." 450 F. Supp. 3d at 124. The court found that promise to avoid conflicts of interest constitute "a procedural concern," not educational decision-

making, and because "conflict of interest" was not defined, the claim was allowed to proceed. *Id.* at 123-24.[15]

Plaintiff's reliance on *Hartwig v. Albertus Magnus Coll.*, 93 F. Supp. 2d 200 (D. Conn. 2000), OB32, 38, is particularly inapt. There, the plaintiff claimed "*and the College does not deny*, that as part of the employment agreement between them, the College agreed not to discriminate against Hartwig on the basis of his sexual orientation. Hartwig claims that the College's actions breached that agreement." *Id.* at 215. Here, by contrast, Yale rejects Plaintiff's assertion of a promise not to consider voluntary term faculty members' written or spoken words when deciding whether to reappoint them. The *Hartwig* decision also involved a claim by that plaintiff that the faculty handbook there "contained language concerning the academic freedom for teachers" that prevented Hartwig's dismissal. *Id.* at 203. But the trial court opinion in *Hartwig* does not quote relevant language on academic freedom from the Albertus Magnus faculty handbook, discuss any argument by the defendant that that handbook lacked a specific and enforceable promise, or explain how the unquoted language of the handbook could support a contractual claim in the

---

[15] Plaintiff also cites *Meade v. Yale Univ.*, 2006 WL 2730320, at *1 (Conn. Super. Sept. 7, 2006), but that case involved an accountant, not the *Gupta* doctrine or educational decision-making. Moreover, the plaintiff had alleged a concrete contractual promise: that she had been fired because she had criticized her supervisor, but that her supervisor's supervisor had "directly promised her on several occasions that she would not" be fired in such circumstances. *Id.* at *3.

educational context. *Hartwig*'s cursory treatment of the issue provides no persuasive support for Plaintiff's arguments.

### B. The District Court Correctly Construed Plaintiff's Allegations.

Plaintiff argues that the District Court "misconstrued" her contract claim, OB38–40, and that it improperly treated documents incorporated by reference into her complaint as true, OB41–44, despite thier being hearsay, OB44–46. The arguments are incorrect.

Plaintiff has framed her contract claim differently at different times, reflecting the fact that she cannot point to any contractual promise Yale made that would give her the right to reappointment. It has never been clear, given the plain language of the Faculty Handbook, why Plaintiff thinks that Yale's decision not to reappoint her to another term violated a contractual promise to "[r]ights of academic freedom and freedom of expression[,] expressly preserved in the Faculty Handbook, and elsewhere on Yale's website." JA40. Her theory has oscillated between a belief that she had some sort of right to permanent employment and the belief that she had a contractual right to have everything she said or wrote ignored when Yale evaluated her suitability for reappointment. On appeal, she gives her theory a new formulation, saying that Yale contractually promised not "to end [sic] Plaintiff's appointment for a particular reason, i.e., Plaintiff's exercise of academic freedom and free expression." OB40.

She takes issue with one way that the District Court formulated her position: the Court noted that Plaintiff's breach of contract claim required finding that Yale contractually promised to "reappoint plaintiff, regardless of whether it found that plaintiff was no longer qualified for the position, based at least in part on her public statements." SA20. As explained above, that is indeed the consequence of her claim, which asserts that despite the plain language of the Faculty Handbook, Yale either had to reappoint her or could not consider what she had said or written when deciding whether to reappoint her. But however framed, the District Court clearly understood Plaintiff's argument, finding that her "vague assertion that some unspecified provision in the Faculty Handbook creates a right to 'academic freedom' is plainly insufficient to show that defendant undertook a contractual commitment to guarantee plaintiff continued reappointment." SA25. The Court held that "generalized statements [by Yale] of principles [of free speech and academic freedom] are not sufficient to manifest the intent to form a contract for guaranteed reappointment." SA27.

Plaintiff similarly mischaracterizes the District Court's decision when she claims that the Court made factual determinations when granting the motion to dismiss. OB41. It did not; it simply reviewed the express language in the Faculty Handbook governing voluntary faculty term appointments and recognized that there was no right of renewal and that the decision to reappoint was squarely within the

academic discretion of the University. *See, supra*, Section I(A). Because there was no relevant contractual promise that Plaintiff would be reappointed, the question of whether Plaintiff adequately alleged a breach of a promise of reappointment was irrelevant. The District Court thus explained that it "need not -- and does not --decide whether Yale's failure to reappoint plaintiff would breach" an agreement to reappoint Plaintiff where it found that she was no longer qualified for the position, based at least in part on public statements she made, if such an agreement had "existed." SA30. The District Court was explicit about this, noting that "an academic institution is afforded considerable discretion when, through its employees, it exercises its professional judgment on academic matters," but that it did not need to "reach whether Yale's reappointment decision in <u>this</u> case was an academic decision entitled to deference, because the Court finds no contract existed. Nor does it reach whether Yale had a discernible rational basis for its decision." SA30–31.

Plaintiff's repeated arguments about "pretext," OB18–23, 43–44, are thus beside the point. If there was no contractual promise to reappoint Plaintiff, then the reason given by Yale for not reappointing Plaintiff is irrelevant. Pretext is relevant only if there is a contractual promise allowing termination for certain reasons, and

the employee claims that the permissible reason offered by the employer is not the true and impermissible reason.[16]

Relatedly, Plaintiff argues that the District Court violated hearsay rules when considering the documents incorporated by reference into her complaint. *See* OB44-46. She asserts again that the letters to Plaintiff explaining the reasons for her non-renewal should not be presumed to have relayed the truth. OB45-46. She does not cite any part of the opinion saying that the District Court presumed the truth of the letters, but regardless, the District Court's conclusion that there was no contractual provision supporting Plaintiff's claim makes the truth of the letters irrelevant. That would be relevant only to an argument over whether a contractual provision—if it existed—was breached.

Because there is no ambiguity, and no relevant factual dispute, the construction of the contract here was purely a question of law and susceptible to disposition on a motion to dismiss. Plaintiff did not clear the threshold hurdle of stating "a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

## II.     THE DISTRICT COURT PROPERLY DISMISSED THE GOOD FAITH AND FAIR DEALING CLAIM.

The District Court properly found that "[d]ismissal of the breach of contract claim requires dismissal of the implied covenant claim that relies upon it." SA32.

---

[16] Pretext is also relevant in statutory discrimination claims like Title VII but Plaintiff did not bring such claims.

Under Connecticut law, the implied covenant of good faith and fair dealing is "an implied duty" that "presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Geysen v. Securitas Sec. Servs. USA, Inc*., 322 Conn. 385, 399 (2016). Where, as here, there is no alleged breach of a specific contract term, a breach of the implied covenant of good faith and fair dealing related to the missing term must necessarily fail.

Even where there *is* a specific contract term, a claim for breach of the implied covenant of good faith and fair dealing can survive only if the plaintiff has pleaded facts supporting an assertion that "the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Ramirez v. Health Net of the Northeast, Inc*., 285 Conn. 1, 16-17 n.18 (2008). That is a high bar. It requires "actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some contractual obligation." *Landry v. Spitz*, 102 Conn. App. 34, 42-43 (2007). "Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. [I]t contemplates a state of mind affirmatively operating with furtive design or ill will." *Michel v. Yale Univ*., 547 F. Supp. 3d 179, 191 (D. Conn. 2021) (brackets in original). "Because this is a high bar, the covenant will be breached only

in a narrow range of cases." *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 97 (2d Cir. 2019) (applying Connecticut law).

The Amended Complaint offers no plausible factual averments of bad faith. Instead, it (and the documents incorporated into it by reference) reveals growing concerns within the Department about Plaintiff's use of psychiatric diagnostic terms in describing public figures. While Plaintiff criticizes the Goldwater Rule, she recognizes that it is an ethical rule endorsed by the American Psychiatric Association. JA34. And although Plaintiff disagrees with those who support the ethical rule, promulgated by the largest professional organization of psychiatrists and trainee psychiatrists in the United States, she does not (and could not) contend that those who support the ethical rule act in bad faith. She simply thinks they are mistaken in supporting the rule. JA34.

Plaintiff does not identify any factual allegations of bad faith, instead conclusorily asserting that Yale acted in bad faith by denying Plaintiff what she describes as academic freedom. OB48-49.

## III. THE DISTRICT COURT PROPERLY DISMISSED THE SECTION 31-51Q CLAIM.

Section 31-51q protects employees against "discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the [Connecticut] Constitution." C.G.S. § 31-51q(b). Before the District Court,

Defendant argued that this count fails to state a claim for three independent reasons: Plaintiff has not alleged facts showing that she was a Yale employee (as opposed to volunteer); she has not alleged facts showing that she was disciplined or discharged; and the state statute cannot be applied in a way that violates Yale's federal constitutional rights. The District Court dismissed Plaintiff's § 31-51q claim solely on the first ground—failure to allege facts that would indicate that Plaintiff was an employee of Yale University for the purposes of § 31-51q. SA41. That was correct, though the other two arguments provide alternative grounds to affirm.

## A. Plaintiff Was Not an Employee Under Section 31-51q.

### 1. The District Court Properly Defined "Employee."

Plaintiff argues that the District Court should not have analyzed her status as an "employee" under § 31-51q by looking to how Connecticut courts have construed "employee" under the "remuneration" test used to determine employee status under the Connecticut Fair Employment Practices Act ("CFEPA") and other areas of Connecticut law. Instead, she says, her status as an "employee" under § 31-51q should be determined under the definition of "employee" provided under § 31-51m. OB49-56. Her argument fails for several independent reasons.

First, Plaintiff waived the argument. In the District Court, she argued she satisfied the remuneration test; she never cited § 31-51m, let alone contended that it

controlled the definition of "employee" in § 31-51q. This Court should not consider the argument for the first time on appeal. *See Booking,* 254 F.3d at 418.

Second, Plaintiff never explains why she thinks the definition of "employee" in § 31-51m includes an unpaid volunteer. The statutory text does not say it does. She offers no legislative history supporting that interpretation. She provides no case citations holding that (and Yale has found none).

To the contrary, the Connecticut courts have foreclosed that interpretation of either § 31-51q *or* § 31-51m. In *Varley v. First Student, Inc*., the Connecticut Appellate Court noted that § 31-51q does not define "employer," and so looked to determine its "ordinary meaning." 158 Conn. App. 482, 497-98 (2015). *Varley*— which Plaintiff never mentions in her opening brief—noted that both legal and general dictionary definitions of "employer" turn on whether an owner or boss *pays* a worker. *Id*. at 498-99 (noting that Black's Law Dictionary defines "employer" as a "person who controls and directs a worker under an express or implied contract of hire *and who pays the worker's salary or wages*," that Webster's Third New International Dictionary defines "employer" as an owner "that employs persons *for wages or salaries*," that Random House Webster's Unabridged Dictionary defines "employer" as someone "that employs one or more people, esp. *for wages or salaries*", and that the American Heritage Dictionary defines "employer" as someone "that employs persons *for wages or salary*."). *Varley* concluded that under

Connecticut law, an "employer" is typically defined as "one who employs the services of others; one for whom employees work and who pays their wages or salaries." *Id*. at 498. Moreover, *Varley* considered the very statute Plaintiff presses here, § 31-51m, but did *not* find that it required a different definition of employer. To the contrary, *Varley* concluded that the definition of employer as someone who pays "wages or salaries" — "is *consistent* with that set forth in several related statutes in title 31, chapter 557, part II of the General Statutes, all of which pertain to regulations concerning the protection of employees, and which specifically define 'employer' as 'a person engaged in business who has employees....' *Id.* at 499 (*citing* **§ 31–51m**, plus §§ 31–40c(a)(2); 31–40j(2); 31–40q(a)(2); 31–40t(a)(2); 31–51r(a)(1); and 31–51tt (a)(2)). Because *Varley* held that, under § 31-51q, an employer means someone who pays wages or salaries to employees, an employee necessarily means someone who works for those wages or salaries—not a volunteer.

That definition is consistent with the definition of employee under other Connecticut anti-discrimination laws. In *CHRO v. Echo Hose Ambulance*, 322 Conn. 154, 159 (2016), the Connecticut Supreme Court addressed whether the phrase "any person employed by an employer" in CFEPA included unpaid volunteers. The Court noted that "[t]wo tests—the right to control test and the remuneration test—have emerged from the federal courts to determine whether an individual is an employee in the context of the substantively identical definition of that term under Title VII."

48

*Id*. at 160. While the right to control test gauged whether a hired party was an employee or independent contractor, the Connecticut Supreme Court found that the "remuneration test" was better suited for "circumstances in which, in contrast to the employee versus independent contractor situation, it was not clear that the putative employee had been 'hired' in the first instance." *Id*. at 161. Applying the remuneration test, the Court found the plaintiff did not fall within the statutory definition of employee because she was an unpaid volunteer, not remunerated. *Id*. at 166.

Third, Plaintiff ignores the text and structure of the cited statutes and their neighboring provisions. The text of § 31-51m(a)—a state whistleblower statute—defines the terms for that section, specifically limiting the definitions "as used in *this section*." That section addresses the protection of employees who disclose their employer's illegal activities or unethical practices or reports a suspected incident of child abuse or neglect. *Id.* at § 31-51m(b)-(c). But the very next section, § 31-51n, has *another* set of definitions—including definitions for employer and employee—that apply only to § 31-51n and § 31-51o, which addresses health insurance for employees affected by relocation or closing of certain establishments. And the next two sections, § 31-51p (addressing membership in health care centers as part of benefits plans) and § 31-51q (the statute Plaintiff invokes here) offer no definitions of their terms—including the terms "employer" and "employee." The following

49

section, § 31-51r(a), offers yet *another* set of definitions, including for "employer" and "employee," again limiting those definitions to "*this* section" (which prohibits employment promissory notes). And § 31-51t, which regulates employer drug testing, provides definitions—including for "employer" and "employee"—not just for one section, but for "the purposes of sections 31-51t to 31-51aa, inclusive." In other words, the Legislature defines "employer" and "employee" differently in different neighboring sections, carefully limiting certain definitions (like the one found in § 31-51m) to just the particular section, making others (like § 31-51n and § 31-51t) applicable to two or more sections, and leaving others—like § 31-51q— without any statutory definitions, to be read by their common law definitions, as in *Varley* and *Echo Hose*.

Fourth, numerical proximity in the statutory code does not beget conceptual closeness. Both § 31-51m and § 31-51q address adverse employment actions against employees, including discipline and discharge—but so does CFEPA. CFEPA addresses prohibited discriminatory employment practices, including actions by an employer "*to refuse to hire* or employ or to bar *or to discharge* from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of" certain protected characteristics, *Id.* at § 46a-60(b)(1), and actions by an employer "*to discharge*, *expel* or otherwise discriminate against any person because such person has opposed any

50

discriminatory employment practice or because such person has filed a complaint or testified or assisted in" certain proceedings regarding that discrimination, *Id.* at § 46a-60(b)(4). And while § 31-51m and § 31-51q deal with speech, so does CFEPA, which protects employees who have "opposed" a discriminatory employment practice or "filed a complaint" or "testified" or "assisted" in proceedings—all forms of speech. *Id.* at § 46a-60(b)(4).

Finally, much of Plaintiff's argument rests on a fundamental misunderstanding. She conflates the "right to control" test (which distinguishes employees from independent contractors) and the remuneration test (which asks whether someone has been hired at all, in either capacity). Plaintiff's allegation that Yale could exercise some control over Plaintiff (e.g., which classes she taught) might be relevant to whether she is an independent contractor, but it is not relevant to whether she is an employee. Entities "control" volunteers without transforming them into employees: when volunteers walk into a community soup kitchen to help, they are told where to go and what to do, but that does not make them employees.

To be sure, a statute offering protection to employees does not necessarily protect independent contractors. For that reason, courts must sometimes decide whether a plaintiff is a protected employee or an unprotected independent contractor. In *Young v. City of Bridgeport*, 135 Conn. App. 699, 710 (2012) (*cited* at OB53), the Connecticut Appellate Court analyzed that question under both § 31-51q and § 31-

51

51m, concluding that the plaintiff was an independent contractor, not an employee, and so lacked standing to invoke either statute. But the question here is whether a volunteer can be an employee—not whether Plaintiff is an independent contractor. The answer, for all the reasons given above, is no. [17]

In sum, her argument that this Court should ignore the remuneration test and construct an entirely new test to define "employer" under § 31-51q is waived, wrong as a matter of statutory interpretation, and inconsistent with the only Connecticut appellate authority interpreting the meaning of employment under § 31-51q, which Plaintiff simply ignores.

### 2. The District Court Properly Applied the Remuneration Test.

Plaintiff recognizes that the remuneration test requires a volunteer to "show remuneration as a threshold matter." *Echo Hose Ambulance*, 322 Conn. at 161 (cited at OB56). Only if a plaintiff establishes remuneration does a court need to determine whether the plaintiff is an employee or an independent contractor. *Id.* at 161-62. Here, Plaintiff never clears the threshold. And she admits that *Echo Hose* defines remuneration as "either direct compensation, such as a salary or wages, or indirect

---

[17] Plaintiff observes that two Connecticut Supreme Court decisions construe § 31-51q broadly. OB53-54. But both involve the scope of protected speech, not who counts as an employee under the statute: *Cotto v. United Techs. Corp.*, 251 Conn. 1, 16 (1999), found the statute prohibits an employer from disciplining an employee for engaging in constitutionally-protected speech both inside and outside the workplace; *Trusz v. UBS Realty Investors LLC*, 319 Conn. 175, 206 (2015), concluded that the statute protects public employee speech involving official duties.

benefits that are not merely incidental to the activity performed." OB56. But because she never pleaded anything more than incidental benefits, the District Court properly found that she failed the remuneration test.

Unable to point to allegations of anything other than incidental benefits, Plaintiff pivots to discussion of the right-to-control test, *see* OB56-58, but that is irrelevant unless she has first passed the threshold remuneration test.

And instead of showing why she thinks the District Court erred, Plaintiff asserts conclusorily that she received "benefits, privileges, and opportunities, that were worth tens of thousands of dollars per year," OB58, something the Amended Complaint does not allege. What the Amended Complaint did allege was a laundry list of incidental benefits that were available to voluntary term faculty, like access to a campus office, campus gyms and libraries and related data and articles, software and IT help, and campus shuttle buses, as well as malpractice coverage for the tasks she undertook at Yale. JA31. These are "indirect benefits," "merely incidental to the activity performed" at Yale, not the required remuneration, which would require either "direct compensation, such as a salary or wages," or meaningful financial benefits like a pension or disability insurance. *See Echo Hose Ambulance*, 322 Conn. at 161-62.

This Court regularly applies a similar remuneration test to assess federal employment-discrimination claims advanced by unpaid volunteers. *See, e.g.*, *York*, ,

286 F.3d at 126 (reiterating that "where no financial benefit is obtained by the purported employee from the employer, no plausible employment relationship of any sort can be said to exist because although compensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition ... it is an essential condition to the existence of an employer-employee relationship."). Under that test, like the *Echo Hose* remuneration test, an unpaid volunteer alleging benefits like workspace, clerical support, publicity, reimbursement for out-of-pocket expenses, limited tax deductions, and networking opportunities does not establish remuneration. *Id.* at 126; *cf. Pietras v. Bd. of Fire Comm'rs of the Farmingville Fire Dist.*, 180 F.3d 468, 471 (2d Cir. 1999) (unpaid plaintiff satisfies remuneration test despite lack of salary or wages where plaintiff received, among other things, "(1) a retirement pension, (2) life insurance, (3) death benefits, (4) disability insurance").

Plaintiff also points to ways she leveraged her Yale volunteer title to earn money from other parties, OB58, but work for others, and payment from them, does not mean she received remuneration *from Yale*. *Cf. Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 443-44 (S.D.N.Y. 2018) (alleged benefits of publicity associated with appearance on television network as commentator, boosting of career prospects, reimbursement for transportation, hair, and makeup insufficient to establish employee status of unpaid plaintiff under Title VII on motion to dismiss).

**B. Plaintiff Has Not Alleged "Discipline or Discharge" Within the Meaning of Section 31-51q.**

This Court can also affirm the dismissal of Plaintiff's § 31-51q claim on the alternative ground that the non-renewal of her expired appointment does not constitute "discharge," and that the Department's decision not to find a new teaching role for a voluntary faculty member not then teaching does not constitute "discipline." The statutory text provides a cause of action only for employees subjected "to discipline or discharge." C.G.S. § 31-51q(b).

The "discipline or discharge" prerequisite is much narrower than some other Connecticut employment statutes (and many federal anti-discrimination laws). For example, Connecticut's whistleblower statute makes it unlawful for an employer to "discharge, discipline *or otherwise penalize* any employee because the employee...reports...a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance or regulation to a public body .... " C.G.S. § 31-51m(b).

In this context, the "discipline or discharge" prerequisite sets clear limits. As this Court has noted, all "Connecticut courts that have considered whether the denial of tenure or the failure to renew a nontenured faculty member's employment contract constitutes 'discipline or discharge' within the meaning of § 31–51q have uniformly answered that question in the negative." *Avedisian v. Quinnipiac Univ.*, 387 F. App'x 59, 60 (2d Cir. 2010) (citing cases).

55

### C. Section 31-51q Does Not and Cannot Limit a University's First Amendment Rights.

This Court can also affirm the dismissal of Plaintiff's § 31-51q claim on the alternative ground that the application of the statute to a university's decision on who may teach its students would infringe the university's federal First Amendment rights. As noted above, universities have a right of "educational autonomy" that is "grounded in the First Amendment." *Grutter*, 539 U.S. at 329. § 31-51q cannot be applied in a manner that infringes that right of educational autonomy. If § 31-51q penalized Yale for exercising its own First Amendment rights, then the Connecticut statute would be unconstitutional as applied. States may not compel organizations to associate with or promote the speech of those with whom they disagree. *See, e.g., Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 581 (1995) (city government may not compel private parade organization to include group whose speech it disagrees with); *Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California*, 475 U.S. 1, 20 (1986) (state commission may not compel private company to include the "speech of a third party with which [it] disagrees") (plurality op.). That is no less true when a state acts through a statute. *See, e.g., Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (invalidating state statute forcing newspapers to print candidates' replies to editorials as an impermissible burden on "editorial control and judgment"); *cf. Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888, 904, 08 (1st Cir. 1988) (noting that "the plaintiff's

statutory 'free speech' right against the defendant is to be measured against the defendant's constitutional right against the state" and declining to interpret Massachusetts Civil Rights Act [MCRA] to limit a private organization's decision to cancel an outspoken performer's contract because there was "no reason to think that the Massachusetts Legislature enacted the MCRA in an attempt to have its courts, at the insistence of private plaintiffs, oversee the editorial judgments of newspapers, the speech-related activities of private universities, or the aesthetic judgments of artists").

The Connecticut Supreme Court has acknowledged those principles in the particular context of universities selecting their teachers. Decades after § 31-51q was enacted, the state supreme court recognized that our "long tradition of academic freedom" is "rooted in the first amendment," and that this first amendment freedom includes a "university's prerogative to determine for itself on academic grounds who may teach.... " *Craine*, 259 Conn. at 646. Even if § 31-51q could curtail the speech and association rights of other private employers, it should not be read to limit a university's First Amendment prerogative to choose its teachers.

The Court could avoid the serious constitutional questions that § 31-51q presents in this context by deciding that an unpaid faculty member is not an "employee," or that an unpaid faculty member who fails to receive a teaching assignment or a new contract when her existing contract expires has not been

"discipline[d]" or "discharge[d]." This would be in keeping with the Court's duty under Connecticut law "to construe [Connecticut] statutes, whenever possible, to avoid constitutional infirmities" and to "search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." *Est. of Brooks v. Comm'r of Revenue Servs*., 325 Conn. 705, 728 (2017); *see also State v. Williams*, 205 Conn. 456, 473 (1987) ("this court has the power to construe state statutes narrowly to comport with the constitutional right of free speech" and "[t]o avoid the risk of constitutional infirmity"). Whether this Court avoids constitutional problems through statutory construction or finds the statute unconstitutional as applied to a university's choices about who will teach, Plaintiff's § 31-51q claim must be dismissed.

## CONCLUSION

This Court should affirm the District Court's judgment.

Dated: January 31, 2023     Respectfully submitted,

             */s/ Jonathan M. Freiman*
             Jonathan M. Freiman
             One Century Tower
             265 Church Street
             New Haven, CT 06510
             (203) 498-4400
             jfreiman@wiggin.com

             Anjali S. Dalal, Esq.
             WIGGIN AND DANA LLP
             437 Madison Avenue
             35th Floor
             New York, NY 10022
             (212) 551-2846
             adalal@wiggin.com

# CERTIFICATE OF COMPLIANCE

### Federal Rules of Appellate Procedure Form 6.
### Certificate of Compliance With Rule 32(a)

### Certificate of Compliance With Type-Volume Limitation,
### Typeface Requirements and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ☒  This brief contains 13,960 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), **or**

    ☐  This brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because:

    ☒  This brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14 point Times New Roman type style, **or**

    ☐  This brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: January 31, 2023

By: /s/ *Jonathan M. Freiman*
Jonathan M. Freiman