# 22-2634

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

BANDY LEE,

*Plaintiff-Appellant,*

v.

YALE UNIVERSITY,

*Defendant-Appellee.*

On Appeal from the United States District Court
For the District of Connecticut
Case No. 3:21-cv-00389
The Honorable Sarah A.L Merriam, U.S.C.J.

PLAINTIFF-APPELLANT'S REPLY BRIEF

Todd Steigman
Madsen, Prestley & Parenteau, LLC
402 Asylum Street
Hartford CT 06103
Tel.: (860) 246-2466
tsteigman@mppjustice.com
*Counsel for Plaintiff-Appellant*

Dated: February 14, 2023

TABLE OF CONTENTS

ARGUMENT ...................................................................................................1

   A. The Court Should Disregard Yale's Arguments that Deviate from
      Rule 12(b)(6) …………………………………………. ……………..1

   B. Plaintiff Can Prevail Even Without Guaranteed Right to
      Reappointment …………………………………………………………8

   C. Commitment for Yale to Base Decision on Scholarly and Professional
      Judgment Actually Supports Plaintiff's Claim …………………………9

   D. Enforcing Contractual Obligations that Yale Undertook Is Not a
      Violation of Yale's Rights …………………………………………..15

   E. Plaintiff's Claim under Section 31-51q Should be Allowed to
      Proceed …………………………………………………………………20

      1. Plaintiff Sufficiently Alleged Employee Status ……………………20

      2. Plaintiff Sufficiently Alleged Discipline or Discharge ……………..22

      3. Plaintiff's Section 31-51q Claim Will Not Violate Yale's First
         Amendment Rights …………………………………………………..27

CONCLUSION ...........................................................................................29

CERTIFICATE OF COMPLIANCE …………………………………………30

CERTIFICATE OF SERVICE …………………………………………………...30

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Avedisian v. Quinnipiac University,* 387 Fed. Appx. 59 (2d Cir. 2010) … 22,26

*Bombalicki v. Pastore*, No. 378772, 2000 Conn. Super. LEXIS 1259 (Super. Ct. May 10, 2000) …………………………………………………. 23

*Bracey v. Bd. of Educ.,* 368 F.3d 108 (2d Cir. 2004) …………………… 26

*Brown v. Office of the State Comptroller*, 456 F.Supp. 3d 370 (D. Conn. 2020) ………………………………………………………………………. 24,25

*Browne v. Connecticut Department of Corrections*, No. NNH-CV17-6067843, 2017 Conn. Super. LEXIS 4605 (Super. Ct. Sep. 27, 2017) …. 23,24,25

*Byrne v. Yale Univ.,* 450 F.Supp. 3d 105 (D. Conn. 2020) ……………… 15,27

*Cotto v. United Techs. Corp.,* 251 Conn. 1 (1999) ……………………… 23,26

*Craine v. Trinity College*, 259 Conn. 625 (2002) ……………………….. *passim*

*Curry v. Allan S. Goodman, Inc.,* 286 Conn. 390 (2008) ……………….. 26

*D'Onofrio v. Westport/Weston Health Dist.,* No. 3:21-cv-1052 (JAM), 2022 U.S. Dist. LEXIS 98414 (D. Conn. June 2, 2022) ………………… 24

*Daley v. Wesleyan Univ.,* 63 Conn. App. 119 (2001) …………………… 17,19

*Doe v. Columbia Univ.,* 831 F.3d 46 (2d Cir. 2016)…………….……….. 1

*Faigel v. Fairfield Univ.,* 75 Conn. App. 37 (2003) …………………….. 17,19

*Global Network Comm's, Inc. v. City of New York, 458 F.3d 150* (2d Cir. 2006) …………………………………………………………………. 1

*Gupta v. New Britain General Hosp.,* 239 Conn. 574 (1996) …………… 17,18

*Hartwig v. Albertus Magnus College*, 93 F. Supp. 2d 200 (D. Conn. 2000) …………………………………………………….. 27

*Hope Academy v. Friel*, No. CV 03 0081183 S, 2004 Conn. Super. LEXIS 3181 Conn. Super. July 22, 2004 ……………………………… 17,18,19

*Jacobson v. Deutsche Bank, A.G.,* 206 F. Supp. 2d 590 (S.D.N.Y. 2002) . 6

*Kloth-Zanard v. Amridge Univ.,* No. 3:09-cv-606, 2012 U.S. Dist. LEXIS 87560 (D. Conn. June 25, 2012) ……………………………………… 17,19

*Lieberman v. Grant*, 630 F.2d 60 (2d Cir. 1980) ……………………….. 20

*Lynch v. City of N.Y.*, 952 F.3d 67 (2d Cir. 2020) ……………………… 1

*McConnell v. Howard Univ.,* 818 F.2d 58 (D.C. Cir. 1987) ……………. 16

*McNeil v. Yale Univ.,* 436 F. Supp. 3d 489 (D. Conn. 2020) ………….. 18

*Madej v. Yale Univ.,* No. 3:20-cv-133 (JCH), 2020 U.S. Dist. LEXIS 58651 (D. Conn. Mar. 31, 2020) ……………………………………... 18,19

*Mumma v. Pathway Vet All., LLC,* No. 3:20-cv-00926 (TOF), 2023 U.S. Dist. LEXIS 848 (D. Conn. Jan. 4, 2023) …………………………. 28

*Powell v. Syracuse Univ.,* 580 F.2d 1150 (2d Cir. 1978) ……………... 16,27

*Ramirez v. Health Net of the Northeast, Inc.*, 285 Conn. 1 (2008) ……… 12,15

*State v. CHRO*, 211 Conn. 464 (1989) ………………………………….. 26

*Trusz v. UBS Realty Investors,* 319 Conn. 175 (2015) …………………. 23,26

*Varley v. First Student, Inc.,* 158 Conn. App. 482 (2015) ……………… 20,21

*Vollemans v. Wallingford*, 103 Conn. App. 188 (Conn. App. 2007) …… 26

*Weinstein v. Univ. of Conn.*, HHD-CV-11-6027112-S,
2022 Conn. Super. LEXIS 1421 (Super. Ct. June 30, 2022) …………… 7,24

*Wroblewski v. Lexington Gardens, Inc.,* 188 Conn. 44 (1982) …………. 26

*Young v. City of Bridgeport*, 135 Conn. App. 699 (2012) ………………. 53

*Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217 (2d Cir. 2006) …………… 25

## Rules

Fed. R. Civ. P. 12(b)(6) ……..……………………………………. *passim*

## Statutes

Connecticut General Statutes §31-51q ………………………………. *passim*

Connecticut General Statutes §31-51m ………………………………… 21,24

## Other Authority

*The Principles of Medical Ethics with Annotations Especially Applicable
to Psychiatry*, American Psychiatric Association, 2, 3, 9 (2013) ……… 5

## **ARGUMENT**

A.     The Court Should Disregard Yale's Arguments that
          Deviate from Rule 12(b)(6)

In reviewing Yale's arguments and the decision below, this Court must

scrupulously apply the standards of Rule 12(b)(6):  accept all facts alleged by

Plaintiff as true, consider the facts in the light most favorable to Plaintiff, and draw

all reasonable inferences in her favor.  *Doe v. Columbia Univ.*, 831 F.3d 46, 48-49

(2d Cir. 2016).  The Court should neither consider the probability that Plaintiff will

succeed nor weigh the evidence.  *Lynch v. City of New York*, 952 F.3d 67, 75 (2d

Cir. 2020); *Global Network Comm's, Inc. v. City of New York*, 458 F.3d 150, 155

(2d Cir. 2006).

Yale's arguments reflect a consistent disregard for the controlling standards

of Rule 12(b)(6).  Yale does not accept Plaintiff's version of the facts and many of

its arguments are based on a narrative that conflicts with Plaintiff's claims.  For

instance, Yale does not credit Plaintiff's allegations that Defendant acted in bad

faith and relied on pretextual reasons even though those contentions are central to

Plaintiff's claims.  Instead, Yale argues from a presumption that Defendant simply

rendered an academic decision to which courts must defer and acted in accordance

with its asserted right to deny reappointment based on the exercise of a

professional and scholarly judgment.  Yale argues from that position even though

there are no facts in the current record which the Court can accept as true

1

demonstrating that when Yale decided to not continue Plaintiff's appointment it relied on academic grounds and exercised professional and scholarly judgment. Yale advances that argument even though it conflicts with Plaintiff's version of the facts and even though Plaintiff denies that Yale was exercising a professional and scholarly judgment. Where Yale advances arguments that fly in the face of Plaintiff's allegations that Yale acted arbitrarily and in bad faith and advanced pretextual reasons to mask its true reasons, this Court must reject them.

Yale also repeatedly advances factual contentions that are not alleged in Plaintiff's complaint, refers to documents that are not identified in or integral to the complaint, and frames issues and arguments in the light most favorable to Yale. The Court should not only disregard these contentions and documents and refuse to accept Yale's framing of issues in ways that are not the most favorable to Plaintiff, but the Court should also take notice that Yale deemed it necessary to rely on facts and documents outside of Plaintiff's complaint that are not properly considered under Rule 12(b)(6) and to frame issues in the light most favorable to itself. Yale's need to resort to these efforts is a significant indicator that this case should not have been dismissed based on the facts alleged in the operative complaint, and that a full record is necessary to adjudicate this matter.

For example, Yale repeatedly advances a false narrative based on incorrect factual assertions that Plaintiff rendered diagnoses of public figures. (Doc. 47, pp.

2

2, 3, 8, 9, 12, 13, 16, 17, 18.)  Yet, Plaintiff never alleges in the operative

complaint that she diagnosed any public figures.  To the contrary, Plaintiff

explicitly denies the characterization that her public comments constituted

diagnoses and alleges that pointing out danger and calling for evaluation is

different from diagnosis.  (JA-35, ¶ 27; JA-36, ¶ 32; JA-38, ¶ 36.)  While Krystal's

letter repeatedly employs some variation of the term diagnosis (JA-56-57), it is not

only improper to rely on the contents of that document for the truth, (Doc. 29, pp.

44-46), but on a full record, Plaintiff would have an opportunity to demonstrate

why Krystal's deliberate mischaracterizations constitute proof of bad faith and

pretext.  Diagnosis has a particular meaning in medicine and psychiatry, and

Plaintiff did not render any diagnoses of any public figures.  Similarly, Yale's

usage of the term "psychosis" is not consistent with Plaintiff's allegations in the

complaint.  (Doc. 47, p. 8.)  Plaintiff did use the term "shared psychosis," but that

is a psychosocial phenomenon, not a diagnosis, and it is distinct from "psychosis,"

which is the state of mind of an individual.

Yale's treatment of the *Goldwater Rule* also departs from Plaintiff's claim as

alleged and framed in Plaintiff's complaint.  Plaintiff disagrees with Yale's claims

that she "attacked" and "flouted" the *Goldwater Rule*, (Doc. 47, pp. 9-10), which is

not what Plaintiff alleges in her complaint.  Rather, Plaintiff alleges that she

disagreed with the APA's drastic reinterpretation of the *Goldwater Rule* in March

2017 which expanded the restriction from the rule's original intent and understanding to create a gag rule for its members, even when the psychiatrists refrained from offering formal diagnoses, and which disregarded psychiatrist's duties to promote public health and warn about dangers to public health. (JA-34-35, ¶¶ 22-27.)

Yale cites to the language of the *Goldwater Rule*, expressed in the APA's third annotation to Section 7 of the Principles of Medical Ethics, (Doc. 47, p. 9), but the language of the *Goldwater Rule* itself does nothing to demonstrate that Plaintiff's claims should be dismissed under Rule 12(b)(6). Yale seems intent on attacking Plaintiff and trying to demonstrate the truth and validity of justifications that it has offered to support its actions against Plaintiff, but this is an appeal governed by Rule 12(b)(6), not a motion for summary judgment or an appeal following a trial. In addition, on a full record, Plaintiff could offer additional evidence regarding how "professional opinion" in the *Goldwater Rule* itself was understood before 2017 to mean a diagnosis, which Plaintiff refrained from rendering. Plaintiff could also offer additional evidence regarding how the *Goldwater Rule* is subordinate to the Preamble which recognizes that "As a member of this profession, a physician must recognize responsibility to patients first and foremost, *as well as to society*," and the superior and overarching rule of Section 7 that "A physician shall recognize a responsibility to participate in

4

activities contributing to the improvement of the community and the betterment of public health," and that the APA's annotations, of which the *Goldwater Rule* is one, "are not designed as absolutes." *The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry*, American Psychiatric Association, 2, 3, 9 (2013), available at

https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/Ethics/principles-medical-ethics.pdf.

For several additional reasons, the Court should also not consider any of the third-party media articles upon which Yale relies.[1] (Doc. 47, pp. 7-12.) Those

---

[1] While the Court should not rely on any of the articles cited by Yale at this stage, it is plausible that Plaintiff could use some variation of the information reflected in at least one of the articles cited by Yale to buttress her claims in subsequent proceedings. For instance, Yale cited to an article in *Salon*, dated May 25, 2017, as evidence of some of Plaintiff's public statements and to support its claim that Plaintiff opined about the mental health of public figures. Yale takes issue with what the article claims that Plaintiff stated. (Doc. 47, p. 10.) However, Yale notified Plaintiff that it was renewing her appointment for another three-year term on July 28, 2017, *two months after* that article was published in *Salon*. (JA-263.) This type of information would bolster Plaintiff's claim that her right to make public statements on matters of public concern was one of the terms of her reappointment, that her continued exercise of her right to free expression during the term of her renewed appointment after July 2017 was not inconsistent with any of the terms of her contract with Yale, and that Yale's action to not renew Plaintiff's appointment because of her continued free expression violated Plaintiff's reasonable expectations. This type of information would also support Plaintiff's claim that Yale took actions against her in 2020, shortly after Mr. Dershowitz's complaint, based on pretextual justifications that Yale relied upon in bad faith -- not because Plaintiff had actually done something improper nor because Yale was simply engaged in a legitimate exercise of its scholarly or

media articles are not alleged in Plaintiff's complaint, nor are they incorporated by reference or integral to Plaintiff's complaint. Accordingly, it is improper to consider them under Rule 12(b)(6). Second, the news articles are hearsay when offered to demonstrate that Plaintiff made the statements alleged in the articles. *Jacobson v. Deutsche Bank, A.G.*, 206 F. Supp. 2d 590, 594 (S.D.N.Y. 2002). Third, since the facts alleged by Plaintiff in the complaint do not establish that Yale had knowledge of the articles to which Yale cites and that Yale actually relied on the articles as the motivation for its actions against Plaintiff, the articles are irrelevant based on the current record. To the extent that Yale relies on an article from November 2020, it is obviously irrelevant to Yale's decision to not renew Plaintiff's appointment earlier that year before June 2020. (Doc. 47, p. 8 fn. 5.)

This Court should also not accept Yale's effort to marginalize and detract from Plaintiff's status by claiming that Plaintiff was just a "volunteer." (Doc. 47, 2, 4, 5, 27, 51, 52, 54.) In 2017, Yale reappointed Plaintiff to another three-year term as an "Assistant Clinical Professor." (JA-263.) The word "volunteer" or "voluntary" does not exist anywhere in Plaintiff's letter of reappointment, or in the title that she held during her appointment. Plaintiff held appointments as a member of Yale's faculty for seventeen years, from 2003 until 2020, during which

---

professional judgment. As Plaintiff expressly alleges, Yale had been supportive of her public activities before Mr. Dershowitz's complaint. (JA-39, ¶¶ 39-40.)

time she taught courses to Yale students in the School of Medicine, Law School, and at Yale College.  (JA-30-33, ¶¶ 9-19.)  While Yale's Handbook lists Plaintiff's appointment under the category of voluntary ranks (JA-178), the designation of that category in the Handbook does not preclude Plaintiff from prevailing on any of her claims.  *See, e.g., Weinstein v. Univ. of Connecticut*, No. HHD-CV-11-6027112-S, 2022 Conn. Super. LEXIS 1421 *55-56 (Conn. Super. June 30, 2022)(dismissing defendant's argument that the plaintiff who held an appointment as an Assistant Professor in Residence (APIR) was just a "temporary" employee based on a characterization in the collective bargaining agreement (CBA) because the facts established that there was a custom and practice of renewing faculty in those positions, and observing "That an APIR is listed in the CBA as a temporary position has no bearing on this case except to the extent that it means that the position is not a tenure track position.")

It is absurd for Yale to analogize Plaintiff's status as a member of its faculty to that of a volunteer in a soup kitchen.  (Doc. 47, p. 51.)  Yale appointed, and reappointed, Plaintiff to positions in its faculty and hired her to teach, mentor, and support, its students, for seventeen years.  In exchange for the services that Plaintiff provided to Yale and its students, Yale provided Plaintiff with "benefits" and "related compensation."  (JA-31, ¶¶ 13-14.)  At various times, the "benefits" and "compensation" that Yale provided to Plaintiff took different forms.  Under

Rule 8 of the Federal Rules of Civil Procedure, Plaintiff was not required to identify every form of compensation and every benefit that she received in the complaint; nor does it require that Plaintiff plead evidence. However, on a full record, Plaintiff would be able to offer evidence that, at certain times during her career as a member of Yale's faculty before her reappointment in 2017, Plaintiff received "compensation" in the form of wages from Yale. On a full record, Plaintiff would be also able to offer evidence that the "benefits" that Plaintiff received from Yale at certain points in her career also included the opportunity to participate in the TIAA-CREF retirement plan that Yale offered to its employees, and that Plaintiff still maintained that retirement account that she participated in as a member of Yale's faculty when Yale ended her appointment in 2020. (JA-219)(referencing retirement plan with TIAA-CREF). Plaintiff could also offer evidence that if she had remained a member of Yale's faculty, she could have chosen to resume performing duties that would have allowed her to earn wages directly from Yale again. These are additional reasons why Plaintiff's status as an employee under § 31-51q should be resolved on a full record, not under Rule 12(b)(6).

B.  Plaintiff Can Prevail Even Without Guaranteed Right to Reappointment

Despite Yale's repeated invocation of the provision, (Doc. 47, pp. 2, 3, 5, 24, 26, 28, 29, 34, 35, 38), the statement in the Handbook that faculty on term

8

appointments "do not have a right to reappointment" (JA-93) does not defeat Plaintiff's claims. Plaintiff's claim is not based on an allegation that she had a guaranteed right to reappointment. (Doc. 29, pp. 39-40.) Since Plaintiff's claim is not based on, and does not require, a guaranteed right to reappointment, (Doc. 29, pp. 28-38), the language in the Handbook stating that no such right exists is not fatal to Plaintiff's claim. The Handbook clearly states that Plaintiff's appointment was renewable (JA-178); Yale also renewed Plaintiff's reappointment several times over the course of her 17-year tenure on the faculty and Plaintiff had a reasonable expectation of continued reappointment. Just as an at-will employee can pursue a wrongful discharge claim without the guarantee of continued employment, and tenure-track professors can pursue breach of contract claims without the guarantee of tenure, professors on renewable term appointments can pursue claims based on the denial of reappointment even though reappointment is not guaranteed. (Doc. 29, p. 40).

C. Commitment for Yale to Base Decision on Scholarly and Professional Judgment Actually Supports Plaintiff's Claim

Yale similarly relies on the statement in the Handbook that reappointment decisions "are subject to the exercise of professional and scholarly judgment by competent University authorities," (JA-93), as one of the foundations of its arguments. (Doc. 47, pp. 2, 3, 5, 24, 26, 28, 29, 34, 35, 38.) However, that provision actually supports Plaintiff's claims.

9

As an initial matter, that provision of the Handbook cannot be the basis for dismissing Plaintiff's claim at this juncture because there is currently no factual basis to find that Yale's decision regarding Plaintiff's reappointment actually constituted an "exercise of professional and scholarly judgment by competent University authorities." There is currently no factual basis to support such a finding because Plaintiff does not allege in her complaint that Yale's decision to not continue her appointment was based on Yale's exercise of professional and scholarly judgment. In fact, Plaintiff alleges and claims the opposite: that Yale violated the requirements of Section III.L.I. of the Handbook (JA-41, ¶ 46-47) and acted arbitrarily and in bad faith and offered pretextual justifications for its decision to not continue her faculty appointment. (Doc. 29, pp. 18-23, 26, 43-44, 48-49.) Since the Court must accept Plaintiff's allegations as true and draw all reasonable inferences in Plaintiff's favor, it cannot find that Yale's decision represented an exercise of professional and scholarly judgment. Accordingly, the factual predicate for Yale to be able to invoke this provision *against Plaintiff* - - one of the foundations for Yale's entire argument - - simply does not exist.

However, the language in Section III.L.1 of the Handbook upon which Yale relies so heavily actually supports Plaintiff's claim because it embodies a commitment by Yale that its decisions regarding reappointment will be based on the exercise of professional and scholarly judgment by competent University

10

authorities.  (JA-93.)  At one point in its brief, Yale appears to agree that Yale made such a commitment.  (Doc. 47, p. 24)("*Plaintiff's contract with Yale stated that she had no right to reappointment and that Yale would make decisions whether to reappoint her on the basis of its professional and scholarly judgment*.")(emphasis added). Since Yale made such a commitment in the Handbook, Plaintiff can enforce it against Yale as part of her claim.[2]  (Doc. 29, pp. 29-30, and cases cited therein.)  As alleged by Plaintiff, Yale's decision was not based on an exercise of scholarly and professional judgment and Yale's failure to adhere to this commitment in the Handbook is a reason why Plaintiff's claim should not have been dismissed under Rule 12(b)(6).

Yale's treatment of Section III.L.1 of the Handbook is also divorced from the limited and conditional language that is actually contained in that provision. Under Section III.L.1, "decisions on reappointment, like initial decisions on appointment, are subject to the exercise of professional and scholarly judgment by competent University authorities."  (JA-93.)  That language *does not* vest competent University authorities with unlimited and absolute discretion to make decisions based on any reason; rather, it permits them to make decisions on reappointment based on the exercise of professional and scholarly judgment.

---

[2] Plaintiff referred to Section III.L.I. and Yale's deviation from it in her operative complaint and in her Brief.  (JA-41, ¶¶ 46-47; Doc. 29, p. 23, 44, 49.)

*Compare Ramirez*, 285 Conn. at 14 (contract provision that permitted the defendant to terminate upon 90 days notice "for any reason" was plain and unambiguous because "broad and inclusive language, specifically the use of the word 'any,' gives the defendant expansive rights . . . ."). If Yale claimed on a full record that its decision was based on an academic or scholarly judgment, Plaintiff could still prevail by demonstrating the falsity of that claim, or alternatively, that Yale acted arbitrarily or in bad faith – which is precisely what Plaintiff claims. (Doc. 29, pp. 18-23, 26, 44, 48-49, *supra*, p. 3.)

Section III.L.1. of the Handbook is also not a basis to dismiss Plaintiff's claim under Rule 12(b)(6) because the District Court would be required to instruct the jury to interpret the contract in a manner which gives effect to every provision. "[I]n construing contracts, we give effect to all the language included therein, as 'the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous." *Ramirez v. Health Net of the Northeast, Inc.*, 285 Conn. 1, 14 (2008)(citations and quotation omitted).

This Court should reject Yale's interpretation of the Handbook because it would render a majority of what Yale included, and emphasized, as part of the "University Policy on Freedom of Expression" to be superfluous. The "University Policy on Freedom of Expression" begins with an entire paragraph that Yale chose

to indent and italicize for emphasis.[3]  (JA-79.)  As part of that paragraph, Yale

emphasized that, to fulfill the primary function of a University, "*a free interchange*

*of ideas is necessary not only within its walls but with the world beyond as well*,"

that "*a university must do everything possible to ensure within it the fullest degree*

*of intellectual freedom*," and highlighted "*the need for unfettered freedom, the*

*right to think the unthinkable, discuss the unmentionable, and challenge the*

*unchallengeable*."  (JA-79)(italics in original, underlines added).  Even though

Yale included that paragraph as part of the "University Policy on Freedom of

Expression, within the Handbook that makes clear that "[t]he policies included and

referred to in this *Handbook* form part of the essential employment understandings

between members of the faculty and the University," (JA-75), and further

emphasized the entire paragraph with italics, Yale argues that the paragraph has no

contractual significance or effect.  Under Yale's argument, the Handbook, and the

University Policy on Freedom of Expression, would have exactly the same

meaning if that italicized paragraph was removed entirely – the very definition of

surplusage.  Yale also ignores the language in Section II.B of the Handbook which

states that Yale faculty (including administrators with faculty appointments) "bears

---

[3] Yale also referred to, and included a link to, the full Woodward Report as part of
its Policy on Freedom of Expression in the Handbook.  (JA-79 & fn. 1.)

primary responsibility for preserving the conditions necessary to advance [Yale's] mission, including protection of the freedom of inquiry . . . ." (JA-79.)

Contrary to the extreme characterization suggested by Yale, Plaintiff is not claiming that everything she says or writes is immune from consideration by Yale. (Doc. 47, p. 28.) Plaintiff acknowledged that the protections afforded to free expression are not absolute, (Doc. 29, p. 37), but the limits of the protections afforded to free expression at Yale cannot be resolved against Plaintiff under Rule 12(b)(6) on the current record. Furthermore, the hypotheticals suggested by Yale have no factual application to the facts of this case. (Doc. 47, pp. 32-33.) Unlike a faculty member who taught students that the sun revolves around the earth, or a faculty member who is denied tenure because their scholarship is not sufficiently novel, profound, supported, or important, Plaintiff does not claim that Yale took any action against her because of anything that she taught in the classroom, or because her scholarship in refereed journals and academic publications did not satisfy Yale's standards.[4] Under Rule 12(b)(6), the Court cannot consider any hypothetical or scholarly motivation suggested by Yale because it must accept the

_____

[4] Even under Yale's version of events, the reasons that Yale identified for its decision against Plaintiff were devoid of any allegations that Plaintiff's previous teaching to students was deficient at any point during her 17 year tenure as a member of Yale's faculty; nor did Yale claim that it decided to not renew Plaintiff's appointment because her formal academic research was not sufficiently profound, novel, interesting, or supported.

truth of Plaintiff's allegations that Yale retaliated against her because of her free

expression and then acted arbitrarily and in bad faith to offer pretextual

justifications for its actions, without honestly rendering a professional or scholarly

judgment.

On a full record and after remand, the District Court will need to balance and

reconcile different portions of the Handbook that may be relevant so that each is

given effect.[5]  That determination will involve questions of fact that must be

decided by a jury.  *Byrne v. Yale Univ.*, 450 F. Supp. 3d 105, 124 (D. Conn. 2020).

In addition, when construing the Handbook, any ambiguities will need to be

resolved in favor of Plaintiff, and against Yale.  *Ramirez*, 285 Conn. at 14.

### D.   Enforcing Contractual Obligations that Yale Undertook Is Not a Violation of Yale's Rights

Contrary to Yale's claim (Doc. 47, p. 2), it is not a violation of Yale's rights

for a Court to force Yale to comply with contractual obligations that it has

undertaken.  While Yale cites to *Craine*, the Connecticut Supreme Court's decision

in that case does not support Yale's position.  In the context of analyzing the

plaintiff's discrimination claims, the Connecticut Supreme Court explained that

"[t]he principle of academic freedom protects institutions from infringement of

---

[5] Since Plaintiff's claim is not based on the language of the Handbook alone, Plaintiff will be able to offer additional documents and evidence in support of her contract claim.

their first amendment rights by preventing courts from substituting their own evaluations of obscure and abstract scholarship for an honest but negative evaluation by a school, but it does not insulate institutions from redress for legitimate claims." *Craine v. Trinity College*, 259 Conn. 625, 647 (2002). *See also Powell v. Syracuse Univ.*, 580 F.2d 1150, 1154 (2d Cir. 1978); *McConnell v. Howard Univ.*, 818 F.2d 58 (D.C. Cir. 1987)(cited in *Craine*, 259 Conn. at 655). In the context of the plaintiff's breach of contract claim, the Connecticut Supreme Court made clear that faculty members could pursue claims for breach of contract against a private college or university to challenge decisions regarding their faculty appointment, in that case a denial of tenure. *Craine*, 259 Conn. at 654-655. Even though the decision in *Craine* involved the question of who the college wanted teaching its students, which is how Yale framed the issue in this case (Doc. 47, p. 2), the Connecticut Supreme Court still enforced the contract against the college. "[A] university cannot claim the benefit of the contract it drafts but be spared the inquiries designed to hold the institution to its bargain. The principle of academic freedom does not preclude us from vindicating the contractual rights of a plaintiff who has been denied tenure in breach of an employment contract." *Craine*, 259 Conn. at 654-655 (citations and quotations omitted). *See also McConnell*, 818 F.2d at 69.

16

Yale's discussion of *Craine* also ignores one of the contract violations affirmed by the Connecticut Supreme Court in that case with obvious relevance here. (Doc. 47, p.p. 37-38.) The Connecticut Supreme Court agreed that the college also breached its contractual obligations to the plaintiff by not "consider[ing] the plaintiff's candidacy under the affirmative action policy" set forth in the faculty manual. *Craine*, 259 Conn. at 660. Likewise, in this case, Plaintiff claims that Yale breached its contractual obligations to Plaintiff by not considering the policy on freedom of expression when deciding whether to continue Plaintiff's appointment (and by not adhering to its commitment to base decisions regarding reappointment on professional and scholarly judgment).

For various other reasons, none of the cases that Yale cites regarding academic discretion and the requirement for specific contractual promises support the dismissal of Plaintiff's case under Rule 12(b)(6). (Doc. 47, pp. 36-37.) First, none of the decisions to which Yale cites for that proposition were decisions granting a motion to dismiss under Rule 12(b)(6) or its Connecticut equivalent in an employment case.[6] In *Gupta*, the facts developed through discovery and a

---

[6] *Gupta v. New Britain General Hosp.*, 239 Conn. 574 (1996)(appeal following decision on summary judgment in an education case brought by a surgical resident); *Daley v. Wesleyan Univ.*, 63 Conn. App. 119 (2001)(appeal following jury trial); *Faigel v. Fairfield Univ.*, 75 Conn. App. 37 (2003)(appeal following decision on summary judgment in a case brought by a student); *Kloth-Zanard v. Amridge Univ.*, No. 3:09-cv-606, 2012 U.S. Dist. LEXIS 87560 (D. Conn. June 25, 2012)(summary judgment decision in case brought by student); *Hope Academy v.*

motion for summary judgment supported a finding that the contract between the

surgical resident and the hospital had a primary purpose of providing educational

opportunities, not employment, *Gupta*, 239 Conn. at 581-85, and the Connecticut

Supreme Court held that the hospital's decision was based on a judgment that the

surgical resident "was not then, and would not likely become, a safe and

independent surgeon," which "has little to do with the normal attributes of an

employee relationship" but "implicates, instead, the academic core of the residency

agreement," *id.* at 586-87. The Court further explained that "[a] residency

committee's decision to dismiss a resident physician for poor performance in the

clinic mirrors a professor's decision to fail a medical school student for poor

performance in the classroom." *Id.* at 587. Based on its determination that the

claims brought by the plaintiff "implicated the educational component of the

residency agreement," the Court proceeded to establish standards for evaluating

breach of contract claims involving the delivery of educational services to students.

*See id.* at 590-597. Since Plaintiff is not a student and is not claiming that Yale

---

*Friel*, No. CV 03 0081183 S, 2004 Conn. Super. LEXIS 3181 Conn. Super. July 22, 2004 (decision following trial to the court in a case brought by school seeking unpaid tuition from student's family); *McNeil v. Yale Univ.*, 436 F. Supp. 3d 489 (D. Conn. 2020)(motion to dismiss in a case brought by a class of students against Yale, fraternities, and housing companies); *Madej v. Yale Univ.*, No. 3:20-cv-133 (JCH), 2020 U.S. Dist. LEXIS 58651 (D. Conn. Mar. 31, 2020)(decision denying preliminary injunction in a case brought by a student).

breached its contractual obligations to provide educational services to her, Yale's reliance on *Gupta* and its progeny is misplaced.[7]  *See Craine*, 259 Conn. at 663-64.

*Daley* involved an academic judgment because the plaintiff was challenging the university's decision to deny him tenure based on an assessment of his teaching, scholarship, and colleagueship.  *Daley*, 63 Conn. App. at 133.  Since the plaintiff was challenging those academic judgments on a decision to not award tenure, he was required to demonstrate that the decision was made arbitrarily, capriciously, or in bad faith.  *Id.* at 134.  While *Daley* was an employment case, it does not support the dismissal of Plaintiff's case under Rule 12(b)(6) for several reasons.

First, on the current record under Rule 12(b)(6), the Court cannot conclude that Yale's decision to not continue Plaintiff's appointment represented an academic judgment on which Yale is entitled to deference.  Second, following *Daley*, the Connecticut Supreme Court held in *Craine* in 2002 that a university's failure to consider a policy that is included in the faculty manual when rendering a decision can constitute a breach of contract, and the university is not entitled to any deference in connection with such a claim.  259 Conn. at 660.  Third, even if on a

---

[7] *Faigel*, 75 Conn. App. 37; *Kloth-Zanard*, 2012 U.S. Dist. LEXIS 87560; *Hope Academy*, 2004 Conn. Super. LEXIS 3181; *McNeil*, 436 F. Supp. 3d 489; and *Madej*, No. 3:20-cv-133 (JCH), 2020 U.S. Dist. LEXIS 58651; were all disputes between students and educational institutions in which courts applied *Gupta*.

full record a court subsequently determines that certain aspects of Yale's decision against Plaintiff constitute academic judgments, Plaintiff can still prevail by demonstrating that Yale acted arbitrarily or in bad faith – which is precisely what Plaintiff claims. Also, unlike *Daley*, this case involves renewal of a term appointment, not lifetime tenure, so different standards and interests are involved. *Lieberman v. Gant*, 630 F.2d 60, 64 (2d Cir. 1980).

      E.      <u>Plaintiff's Claim under Section 31-51q Should be Allowed to Proceed</u>

          1.     *Plaintiff Sufficiently Alleged Employee Status*

Plaintiff sufficiently alleged that she was an employee for purposes of § 31-51q and that claim should be adjudicated on a full record, not dismissed under Rule 12(b)(6). (Doc. 29, pp. 49-58; *supra* pp. 6-9.) Yale relies on *Varley v. First Student, Inc.*, 158 Conn. App. 482 (2015), (Doc. 47, p. 47), but that decision does not require dismissal here. First, *Varley* was decided on summary judgment based on a full record. *Id.* at 484. Second, the *Varley* court interpreted the meaning of "employer" under § 31-51q, not "employee;" there is no dispute here that Yale qualifies as an employer under § 31-51q. Third, the facts of *Varley* are inapposite. Unlike in *Varley*, Plaintiff is not claiming that a third party constitutes her employer merely because she provided services to that third party pursuant to a contract between her employer and that third party. Unlike the plaintiff in *Varley*, on a full record, Plaintiff would *not* stipulate that she "*never* received a paycheck,

tax forms, health insurance or other benefits from [Yale]," (*see supra* pp. 7-9), and Plaintiff here *does* allege "that she was [Yale's] employee under an express or implied contract of hire." *Id.* at 500 (emphasis added). Fourth, *Varley* supports Plaintiff's position that consideration of the definition of employee in § 31-51m is appropriate when considering the meaning of that term in § 31-51q. The *Varley* court's suggestion that the meaning of "employer" in § 31-51q should be interpreted consistently with the definition of "employer" in § 31-51m(a)(2), *id.* at 499, supports Plaintiff's argument that the meaning of "employee" in § 31-51q should likewise be consistent with the definition of "employee" in § 31-51m(a). As the *Varley* court explained, "It is a well-established canon of statutory construction that '[a]n identical term used in [statutory provisions] pertaining to the same subject matter should not be read to have differing meanings unless there is some indication from the legislature that it intended such a result.'" *Varley*, 158 Conn. App. at 499. Section 31-51q and § 31-51m involve "the same subject matter" because they both prohibit discharge or discipline against employees because they engage in protected activity as citizens. While Connecticut may have defined "employee" differently in other statutes, (Doc. 47, pp. 49-50), those statutes do not involve the "same subject matter" like § 31-51m and § 31-51q.

21

2.      *Plaintiff Sufficiently Alleged Discipline or Discharge*

This Court should reject Yale's claim that Plaintiff failed to allege discharge or discipline, (Doc. 47, p. 55), and this Court's decision in *Avedisian v. Quinnipiac University*, 387 Fed. Appx. 59 (2d Cir. 2010), does not require dismissal of Plaintiff's claim. (Doc. 47, p. 55.) Plaintiff has alleged discharge or discipline as it has been recently interpreted by Connecticut courts, and the meaning of discharge or discipline under § 31-51q should adhere to the standard for an adverse action under the federal First Amendment.

"The proper interpretation of § 31-51q is a state law question that we review de novo, guided by Connecticut case law. To the extent that case law is unsettled, '[o]ur role as a federal court sitting in diversity is not to adopt innovative theories that may distort established state law,' but instead to 'predict how the state's highest court would resolve' any identified uncertainty or ambiguity. 'In making this prediction, we give the fullest weight to pronouncements of the state's highest court, . . . while giving proper regard to relevant rulings of the state's lower courts.'" *Avedisian*, 387 F. App'x at 60 (citations omitted).

While no Connecticut appellate court has rendered a controlling definition for the meaning of discipline or discharge under § 31-51q, the Connecticut Supreme Court's decisions in § 31-51q cases suggest that Connecticut's highest court would favor an expansive interpretation of discipline and discharge. When it

22

has been faced with opportunities to decide questions about the scope of § 31-51q, the Connecticut Supreme Court has recognized greater protections for individuals and rejected narrower interpretations. *See, e.g., Cotto v. United Techs. Corp.*, 251 Conn. 1 (1999); *Trusz v. UBS Realty Investors*, 319 Conn. 175 (2015).

While this Court's prior decision in *Avedisian* may have reflected the body of law produced by Connecticut courts regarding the meaning of discipline under § 31-51q as of 2010, more recent Connecticut decisions have supported a broader definition. In 2017, current Connecticut Supreme Court Justice Ecker, while sitting as a Judge on the Superior Court, issued an important decision in *Browne v. Connecticut Department of Corrections*, No. NNHCV176067843, 2017 Conn. Super. LEXIS 4605 (Super. Ct. Sep. 27, 2017), in which he identified reasons that he was unlikely to follow the narrower standard of discipline articulated in *Bombalicki v. Pastore,* No. 378772, 2000 Conn. Super. LEXIS 1259 (Super. Ct. May 10, 2000), and why he favored a broader standard. *Browne*, 2017 Conn. Super. LEXIS 4605 *7-9 & fn.8. In *Browne*, now-Justice Ecker defined discipline as "any adverse material consequence imposed by an employer on an employee for the purpose of punishing or deterring behavior that the authority wishes to suppress," *Browne*, 2017 Conn. Super. LEXIS 4605, at *8, and suggested that the standard under § 31-51q should follow the standard for retaliatory adverse actions applied under the federal First Amendment, *Id. *8 fn. 8.

23

Since *Browne*, other Connecticut courts have similarly applied a broader interpretation to discharge or discipline. Two District Courts in Connecticut have followed now-Justice Ecker's decision in *Browne*. *See Brown v. Office of the State Comptroller,* 456 F. Supp. 3d 370, 412 (D. Conn. 2020)(following *Browne* and concluding jury could find discipline under § 31-51q for same reasons that it could find retaliatory adverse action under First Amendment); *D'Onofrio v. Westport/Weston Health Dist.*, No. 3:21-cv-1052 (JAM), 2022 U.S. Dist. LEXIS 98414, at *13 (D. Conn. June 2, 2022)("Discipline is an 'adverse material consequence imposed by an employer on an employee for the purpose of punishing or deterring behavior that the authority wishes to suppress.')(quoting *Browne*). Just last year, the Connecticut Superior Court held that a decision by a university to not renew the appointment of a non-tenured professor who had worked on a series of renewable 1-year appointments constituted discharge under Conn. Gen. Stat. § 31-51m. *Weinstein v. Univ. of Conn.*, No. DOCKET HHD-CV-11-6027112-S, 2022 Conn. Super. LEXIS 1421, at *4 (Super. Ct. June 30, 2022).

The commonly understood meaning of discipline instructs that "discipline" is intended to punish or deter a particular behavior, and to decrease the likelihood that the behavior will be repeated or continued. *Browne*, 2017 Conn. Super. LEXIS 4605, at *8 ("Discipline is any adverse material consequence imposed by an employer on an employee for the purpose of punishing or deterring behavior

that the authority wishes to suppress."). Under the First Amendment, retaliatory conduct is actionable if it is likely to dissuade a reasonable person from engaging in protected activity. *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006). The construct of that standard, i.e., dissuading persons from engaging in protected activity, is consistent with the commonly understood purpose of discipline.

Interpreting discipline under § 31-51q consistent with the federal First Amendment standard is also consistent with the purpose of § 31-51q, to protect employees' right to engage in constitutionally protected speech. For that purpose to be fulfilled, the scope of retaliatory actions which are prohibited under § 31-51q should include any action by an employer which are severe enough to dissuade an employee from engaging in protected speech. Any rule which falls short of that standard will necessarily permit employers to engage in some retaliatory actions that are sufficient to dissuade a reasonable employee from exercising her constitutional speech rights, and will therefore fail to achieve the purpose of the statute. *See Browne*, 2017 Conn. Super. LEXIS 4605 *8 n.8 (recognizing that the federal standard has "the advantage of a direct nexus to the vice (chilling effect) to be deterred"); *Brown*, 456 F. Supp. 3d at 412 (agreeing with this argument).

Following the federal First Amendment standard in § 31-51q cases would also be consistent with principles established by the Connecticut Supreme Court.

25

Connecticut courts, including the Connecticut Supreme Court, "consistently look to federal First Amendment law to determine whether section 31–51q gives rise to a cause of action in the cases before them." *Bracey v. Bd. of Educ.*, 368 F.3d 108, 116 (2d Cir. 2004). The Connecticut Constitution and § 31-51q confer greater rights to Connecticut employees than the First Amendment, *Trusz*, 319 Conn. 175, and § 31-51q is a remedial statute entitled to a broad and generous construction, *Cotto*, 251 Conn. at 8.  It would be inconsistent with the Connecticut Supreme Court's decision in *Trusz* for employees asserting retaliation claims under § 31-51q to receive less protection from retaliatory acts than the First Amendment affords. Connecticut courts have also made clear that, in the area of employment law, Connecticut's statutes should be at least as protective as federal law, *Wroblewski v. Lexington Gardens, Inc.*, 188 Conn. 44, 53 (1982); *Curry v. Allan S. Goodman, Inc.*, 286 Conn. 390, 407 (2008); if not more so, *State v. CHRO*, 211 Conn. 464, 476-77 (1989); *Vollemans v. Wallingford*, 103 Conn. App. 188 (Conn. App. 2007), *aff'd* 289 Conn. 57 (2008).

In addition, *Avedisian* does not require the dismissal of Plaintiff's § 31-51q claim because, unlike in *Avedisian*, Plaintiff did not quit after the university offered her another appointment.  *Avedisian*, 387 Fed. Appx. at 61-62.  Therefore, the standard for discharge that this Court applied in *Avedisian* would not defeat Plaintiff's claim.

26

3. *Plaintiff's Section 31-51q Claim Will Not Violate Yale's First Amendment Rights*

This Court should also reject Yale's alternative argument that applying § 31-51q to Yale would violate its First Amendment rights. (Doc. 47, pp. 56-58.) First, it is well-established that professors can bring state law claims against private universities challenging decisions regarding denial of tenure, or reappointment, without violating the universities' rights under the First Amendment. *See, e.g., Craine*, 259 Conn. at 647 & 654-55; *Hartwig v. Albertus Magnus College*, 93 F. Supp. 2d 200, 215-218 (D. Conn. 2000); *Byrne*, 450 F. Supp. 3d at 124. Just as academic freedom does not embrace the freedom to discriminate, *Powell*, 580 F.2d at 1154, neither does it provide license to retaliate against professors in violation of state laws such as § 31-51q, nor prohibit courts from enforcing contractual obligations that universities have undertaken.

Second, this argument by Yale is not ripe on the current record under Rule 12(b)(6). In order for Yale to assert a First Amendment defense based on the claim that it was exercising First Amendment rights by making a decision on academic grounds, there must be a factual basis for finding that Yale's decision was based on academic grounds, or that Yale's decision was based on a scholarly judgment. There is currently no factual basis to support such a finding, and such a claim is contrary to Plaintiff's version of the facts. If a factfinder determines that Yale was not exercising scholarly judgment or rendering a decision on academic grounds,

but rather that Yale offered pretextual justifications and acted arbitrarily and in bad faith to retaliate against Plaintiff because of her free expression, then there will be no factual basis to find any interference with Yale's legitimate First Amendment rights.  Similarly, if a court is simply enforcing contractual limitations on Yale's right to make faculty decisions that a factfinder concludes that Yale voluntarily undertook, then there is no violation of Yale's First Amendment rights.  On the current record, Yale's argument is nothing more than a request for an impermissible advisory opinion without a factual predicate.

Third, Yale's argument is without merit because § 31-51q includes a statutory balancing test to ensure that the rights of employers are not unduly infringed upon.  Conn. Stat. § 31-51q ("…provided that such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer ….")(SA-51). Section 31-51q also incorporates *Pickering* balancing that protects the legitimate interests of the employer.  *See Schumann v. Dianon Sys.*, 304 Conn. 585, 623-26 (2012); *Trusz*, 319 Conn. at 183-84, 193, 212-13.  Yale has the right to advance such defenses under the statute on a full record if there is a factual basis for doing so.  *See Mumma v. Pathway Vet All., LLC*, No. 3:20-cv-00926 (TOF), 2023 U.S. Dist. LEXIS 848, at *22-35 (D. Conn. Jan. 4, 2023)(analyzing defenses on motion for summary judgment).

## <u>CONCLUSION</u>

The Court should reverse the District Court's decision dismissing Plaintiff's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation in violation of Conn. Gen. Stat. § 31-51q, and it should vacate the judgment entered in favor of Defendant.

By: <u>/s/ *Todd Steigman*</u>
        Todd Steigman
        Madsen, Prestley & Parenteau, LLC
        402 Asylum Street
        Hartford, CT 06103
        (860) 246-2466 (phone)
        (860) 246-1794 (fax)
        tsteigman@mppjustice.com
        *Counsel for Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), undersigned counsel certifies that:

1.  This brief complies with the type-volume limitation of 2nd Circuit Local Rule 32.1(a)(4)(A) because it contains 6,981 words, excluding the table of contents, table of authorities, signature block, and certifications; and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

*/s/Todd Steigman*
Todd Steigman

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of February, 2023, a true and accurate copy of the foregoing was filed electronically with the Court of Appeals for the Second Circuit via the Court's CM/ECF System.  Notice of this filing was sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/Todd Steigman*
Todd Steigman
